UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


------------------------------
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE
FARM FIRE AND CASUALTY COMPANY,

     Plaintiff,

VS.

           No.  1:18-CV-23125-RNS
HEALTH AND WELLNESS SERVICES, INC.,
BEATRIZ MUSE, LAZARO MUSE, HUGO
GOLDSTRAJ, MANUEL Franco, MEDICAL
WELLNESS SERVICES, INC., NOEL SANTOS,
ANGEL CARRASCO, JORGE RAFAEL COLL,
PAIN RELIEF CLINIC OF HOMESTEAD, CORP.,
and JOSE GOMEZ-CORTES,

     Defendants.
------------------------------
JORGE RAFAEL COLL,

     Counter-Plaintiff,

VS.

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE AND CASUALTY COMPANY,

     Counter-Defendants,
-----------------------------/
         Miami, Florida
         August 13, 2019
         8:50 A.M.


- - - - - - -
VIDEOTAPED DEPOSITION

OF

HUGO GOLDSTRAJ, M.D.

VOLUME 2

PAGES 125 - 311
- - - - - - -

APPEARANCES:

   On behalf of the Plaintiff:

      HOLLAND & KNIGHT, LLP
      222 Lakeview Avenue, Suite 1000
      West Palm Beach, FL 33401
      (561) 833-2000
      BY:  DAVID SPECTOR, ESQUIRE,
      David.spector@hklaw.com
      BY:  CAITLIN SALADRIGAS, ESQUIRE,
      Caitlin.saladrigas@hklaw.com
      BY:  DAVID NEWMAN, ESQUIRE,
      David.newman@hklaw.com

   On behalf of the Defendants Medical Wellness
   Services, Inc., Beatriz Muse, Lazaro Muse & Noel
   Santos

      RICHARD J. DIAZ, P.A.,
      3127 Ponce De Leon Blvd.,
      Coral Gables, FL 33134
      (305) 444-7181
      BY PHONE:  RICHARD J. DIAZ, ESQUIRE,
      Rick@rjdpa.com

      ROBERTO E. PERTIERRA, P.A.,
      2655 Lejeune Road, Suite 1105,
      Coral Gables, FL  33134
      (305) 444-0011
      BY PHONE:  ROBERTO E. PERTIERRA, ESQUIRE,
      Robertopertierra@gmail.com

   On behalf of the Witness Hugo Goldstraj:

      MICHAEL D. NICOLEAU, P.A.
      11900 Biscayne Blvd., Suite 770,
      North Miami, FL  33181
      (305) 438-2737
      BY:  MICHAEL D. NICOLEAU, ESQUIRE
      Michael@nicoleaulaw.com

   On behalf of Defendant Jesus Lorites:

      KAREN B. PARKER, P.A.,
      2550 S. Bayshore Drive, Suite 102
      Coconut Grove, FL  33133
      (305) 343-8339
      BY PHONE:  KAREN B. PARKER, ESQUIRE
      Kparker@kbparkerlaw.com

I N D E X

WITNESS                                    PAGE
Direct examination by Ms. Saladrigas        6
Cross examination by Mr. Diaz              256

PLAINTIFF'S EXHIBITS
No. 1 -  Complaint                    9
No. 2 -  Curriculum Vitae            12
No. 3 -  List of Clinics             26
No. 4 -  Medical Director Agreement        43
No. 5 -  Health & Wellness Application     45
No. 6 -  Preparation of a Medical Record
         Chart                       66
No. 7 -  Protocol for Adequacy of
         Medical Records             67
No. 8 -  Licensure Requirements            67
No. 9 -  Physician's Plan of Treatment     68
No. 10 - Therapy Order for "BR"            73
No. 11 - Procedure for Treatment/Therapy    76
No. 12 - Initial Patient Evaluation        160
No. 13 - Medica Director Oversight Form    217
No. 14 - "BR" Therapy Note 4/16/12         218
No. 15 - Fraud Affidavit             229
No. 16 - "BR" Therapy Note 4/19/12          238
No. 17 - "BR" Therapy Note 4/26/12          239
No. 18 - "BR" Therapy Note 4/30/12          241
No. 19 - "BR" Therapy Note 5/9/12           242
No. 20 - Letter dated 6/3/13          247

            * * * * * * * *

Videotaped Deposition of HUGO GOLDSTRAJ, a

witness of lawful age, taken by the Plaintiff,

for the purpose of discovery and for use as

evidence in the above-entitled cause, pending in

the United States District Court, Southern

District of Florida, pursuant to notice

heretofore filed, before LAURA LENTOSKI, a Court

Reporter and Notary Public in and for the State

of Florida at Large, at 701 Brickell Avenue,

Suite 3300, Miami, Miami-Dade County, Florida, on

the 13th day of August, 2019, commencing at 8:50

A.M.

1          THE VIDEOGRAPHER:  We are now back on video

2      record, 12:44 P.M.

3   BY MS. SALADRIGAS:

4    Q.  Doctor, we're going to go back and talk a little

5   bit about Rainbow Pediatrics.

6          Tell me who else was involved in owning Rainbow

7   Pediatrics.

8    A.  It was my -- it was a partner of mine that was

9   owner.

10   Q.  Who was it?

11   A.  What was the name?  I don't remember right now

12   the name.  I going to give you the name as soon as I

13   remember it.

14          MR. PERTIERRA:  I can barely hear the

15      Doctor.  What was --

16          THE WITNESS:  I don't remember now the name

17      of the -- it was Robert -- Roberto or Robert.  I

18      don't remember the last name, no.  He was my

19      partner, yeah.

20   BY MS. SALADRIGAS:

21   Q.  Was it Robert Novo?

22   A.  Novo, yes.  Robert Novo, yeah.

23   Q.  How did you meet Mr. Novo?

24   A.  When we decided to buy together the first office,

25   a big, large office, then we -- we meet together.

1    They -- they present me, and we associate and bought

2    this office.

3      Q.  Is Mr. Novo a doctor?

4      A.  Yeah, sure.  He's a pediatrician, yeah.

5      Q.  He's a pediatrician?

6      A.  Yeah.

7      Q.  How did you meet him?

8      A.  In the -- in the office that we bought together.

9      Q.  But, I mean, did you know him already?

10     A.  No.

11     Q.  Then --

12     A.  He just present me and say that he wants to buy

13   this office with me.  And we bought the first office

14   there.

15     Q.  Who presented him to you?

16     A.  Dr. Finerman.

17     Q.  Can you spell that?

18     A.  Yes.  F-

19          MR. SPECTOR:  N-E-R-M-A-N, Finerman.

20     Q.  Dr. Finerman.  And --

21     A.  This office belongs to Dr. Finerman.  And we work

22   together in this office.

23     Q.  Were you and Mr. Novo working for Mr. Finer --

24   Dr. Finerman?

25     A.  No, not myself.  Dr. Novo was working for him.

1     Q.  Dr. Novo was working for him.  How did you -- how

2  did you meet Dr. Finerman?

3     A.  Well, Dr. Finerman was a famous pediatrician in

4  the area, and we met in several places.  And he

5  always -- he has a position for me that I didn't take.

6  He offered me this position some months before.

7        And I didn't work with him, but he contact me

8  when he want to sell his practice.  In that way, I went

9  there and they say that he wants Dr. Novo to be partner.

10  And I agree, because I liked Dr. Novo, was a very nice

11  man at that time, yeah.

12     Q.  But I thought you said that you hadn't met

13  Dr. Novo until they presented him as --

14     A.  No, they --

15     Q.  -- your partner?

16     A.  They present me -- Dr. Finerman present me

17  Dr. Novo.

18     Q.  Okay.

19     A.  And they -- Dr. Novo and me decide to be partners

20  and to buy the office.

21     Q.  Let me back up.

22        How many times did you meet Dr. Finerman before

23  he offered you his practice to sell?

24     A.  You know, three or four times.

25     Q.  And where did you meet him in those three or four

1    times?

2            MR. PERTIERRA:  Objection, form.

3            THE WITNESS:  In his house.  He -- I was

4        invited to his house.  I went to his practice.

5    BY MS. SALADRIGAS:

6      Q.  The first time you met him before he invited you

7    to his house?

8      A.  No.  No.  He invited me the first time to the

9    house.  It was the Super Bowl, and we see the Super Bowl

10   together.

11     Q.  The first time you met him, he invited you to his

12   house for Super Bowl?

13     A.  Yeah.

14     Q.  Really?

15     A.  Why not?

16     Q.  Okay.  So, you -- you meet him three or four

17   times and then he offers you his practice to sell.  How

18   long were the negotiations for you to purchase his

19   practice?

20     A.  Probably one month or something like that.

21     Q.  One month?

22     A.  Yeah.

23     Q.  So, when in that one month did you meet Dr. Novo?

24     A.  I -- I don't remember exactly.  I met him in

25   the -- in the office of Dr. Finerman a couple of times.

1   And we talk and we agree, and that we can buy this

2   practice, yeah.

3     Q.  Did Dr. Finerman have -- you said he was a famous

4   pediatrician?

5     A.  He was a very famous pediatrician.

6     Q.  Did he have multiple offices?

7     A.  He had several -- several offices, yes.

8     Q.  How many?

9     A.  He has this office in Hallandale, 3 Street, he

10  has one in  Miami Lakes, and he -- he has one in

11  Hollywood, other than that.

12    Q.  Was this to purchase all of them?

13    A.  Yes.

14    Q.  Okay.  So, let's fast forward a little bit.

15       You and Dr. Novo purchase Rainbow Pediatrics.

16  Was it called Rainbow Pediatrics --

17    A.  No.

18    Q.  -- at the time?

19    A.  No.  We -- we --

20    Q.  You changed the name?

21    A.  We changed the name.

22    Q.  Okay.  And when about was it that you guys

23  purchased --

24    A.  When?

25    Q.  Yeah.

1   A.  I don't remember exactly.

2   Q.  Roughly?

3   A.  1990, 1991.  No, something like that I don't

4 know.

5   Q.  Okay.

6   A.  I don't remember exactly.

7   Q.  Okay.  Were there any other owners, besides you

8 and Dr. Novo?

9   A.  Not at the beginning.

10   Q.  When were there other owners that came into the

11 pictures?

12   A.  When we tried to go public.

13   Q.  When was that?

14   A.  Probably one year later.

15   Q.  Can you tell me when it was that you were going

16 to go public?

17   A.  I don't know, maybe 2000, something like that.

18   Q.  What -- let's talk about the decision to go

19 public.

20   A.  Yeah.

21   Q.  Whose idea was that?

22   A.  We both have idea.  Finerman had an idea before

23 and this come to my mind, and Dr. Novo, we sought it

24 out.  In the way that we were acquire other practices,

25 we wanted to be -- to get the funds for that, and in

1  that way, we decide, at this moment, was not very

2  difficult to go public, not like now.  In that way, we

3  have an idea.  We contact people in New York.

4    Q.  Who did you contact?

5    A.  It was people that was a -- I don't remember the

6  names, but they were people that was in the stock

7  market.  In that way, we acquired shell and we did

8  investments over the shell.

9          MR. SPECTOR:  You did what?

10          THE WITNESS:  A shell.

11          MR. SPECTOR:  I got the shell, what did --

12      but I didn't --

13          THE WITNESS:  We did a reverse --

14          MR. SPECTOR:  Reverse what?

15          THE WITNESS:  A reverse merger.

16          MR. SPECTOR:  Merger.

17          THE VIDEOGRAPHER REPORTER:  Oh.

18          MR. SPECTOR:  Yeah, so that's why I wanted

19      to make sure you got it right.  You said you did

20      a reverse merger involving the shell --

21          THE WITNESS:  Yes.

22          MR. SPECTOR:  -- fair?

23          THE WITNESS:  The shell was Andover.

24  BY MS. SALADRIGAS:

25    Q.  When you say you talked to people in the stock

1   market, that were in New York, what type of business

2   were those people in?

3   A.  They were in the business of private funding.

4   Q.  Private funding.  Did you talk to any lawyers?

5   A.  Huh?

6   Q.  Did you talk to any lawyers?

7   A.  Yeah, of course, that they have to do the book.

8   Q.  Okay.  And, then, tell me about the reverse

9   merger.  When did that -- with the shell, when did that

10  happen?

11  A.  Around 2000, 2001.  I don't remember exactly the

12  times.  It was many years ago.  It was almost 20 years

13  ago.

14  Q.  Okay.  How did that -- how did it work out, the

15  reverse merger?

16  A.  Well, they want to buy the private placement.  In

17  the private placement, we rise a good amount of money

18  for the place, and that way worked fine, and we tried to

19  start trading, but we never start trading.

20  Q.  Okay.  What was the name of the shell?

21  A.  Andover.

22      MR. SPECTOR:  Andover what?

23      THE WITNESS:  Huh?

24  BY MS. SALADRIGAS:

25  Q.  Andover what?

1    A.  Well, it was Andover firm.  I don't know.

2   Andover was the name of the corporation, that was

3   public.  You know when you have -- you know what is a

4   shell?

5          MR. SPECTOR:  (Shakes yes.)

6          THE WITNESS:  Okay, very good.  The shell is

7       an empty company that is trading.  In that way,

8       you acquire this, and you put your company inside

9       the shell.  In that way, you become public.

10  BY MS. SALADRIGAS:

11   Q.  Okay.

12   A.  This was used to be -- I don't think it's Andover

13  anymore possible to do that.

14   Q.  Okay.  So, what happened the reverse merger with

15  the shell?

16   A.  Well, we did some acquisition, etcetera,

17  etcetera.  But, evidently, there was something that

18  happened in the stock market, people, that they didn't

19  like the way that we managed the things, and they did

20  a -- they cover the -- the problem is financing.

21          They -- the placement took 30 percent --

22  33 percent of the -- of the -- the other 33 percent was

23  mine.  And the other 33 percent was Novo.

24          The people that held the 33 percent investment,

25  they didn't like the way that we were -- or I was trying

1  to bring the corporation to.  In that way, they come

2  into my partner, to associate with them, and take me,

3  and still take over of my part.  And what they did is

4  this:  With the 66 percent, they take over my part.

5  When they took over my part, I lost my part.  The

6  problem was that I keep with the 33 percent, of the

7  shares.  But these people were so stupid that they

8  didn't do it very good business.  Six months later, the

9  corporation was finished and destroyed, and anything was

10  valued zero.

11    Q.  So, it was closed six months after you were

12  pushed out?

13    A.  Yes.

14    Q.  Okay.  And the people that owned the 33 percent,

15  that wasn't owned by you, and wasn't owned by Novo, who

16  were they again?

17    A.  Investors.

18    Q.  Investors, okay.

19    A.  But they were represented by some people of the

20  stock market.

21    Q.  Okay.

22    A.  The problem is they want to do write-off money,

23  and this was the intention, okay, and want to destroy

24  everything to write-off money.

25    Q.  Do you know what it was that they didn't like

1  about what you were doing and how you were running the

2  business?

3    A.  No, I don't have any idea.

4    Q.  Nobody told you?

5    A.  No.

6    Q.  Did you ever talk to Dr. Novo about why he

7  decided to associate with them?

8    A.  Yes, he was pushed to that, was, you know, like a

9  -- some way forced to do that.  And we talk later, he

10  was very repentant of what he did.  He lost everything,

11  too.  He has to start like zero, like I start.  And

12  that's it.

13        Well, it was a big project.  It was very good.

14  We have the resources to grow a lot, and they destroy

15  everything.  What can I tell you?

16    Q.  So, after you leave Rainbow Pediatrics, I want to

17  talk about that time period, really quickly.  Your prior

18  testimony -- scratch that.

19        Were you looking for other employment?

20    A.  Yes, because I -- you know, I have a house with a

21  mortgage, and I have things.  And I didn't have any

22  income because all my income came from the --

23    Q.  Uh-huh.

24    A.  -- from the Rainbow Pediatrics.  In that way, I

25  didn't have any income.  I put all money that I could

1   get, even the loans, etcetera, etcetera, in this

2   project.  In that way, it was very bad.

3         I start asking for a job.  I have a friend that

4   has a PIP clinic, and they offer me to work, not as a

5   medical director, just to see the cases.  And they pay

6   me for every case that I was seeing.  They was paying me

7   very badly.  They was paying me a hundred dollars, for

8   each patient.

9   Q.  Who was this?

10  A.  He's not working in PIP anymore, for a long, long

11  time.

12  Q.  That's okay.  What was his name?

13  A.  I prefer not to give his name because he's a

14  friend of mine.  He was a very good friend of mine.

15        MR. SPECTOR:  He has to give it.

16  BY MS. SALADRIGAS:

17  Q.  You've got to tell me.

18        MR. NICOLEAU:  You have to give the name.

19  BY MS. SALADRIGAS:

20  Q.  I'm sorry to be intrusive.

21  A.  One of them was Garber, Dr. Garber, but he was

22  not a doctor, in the United States.

23  Q.  What's Dr. Garber's first name?

24  A.  I think it's M. Garber.  It's Mario or something

25  like that.  Miguel.  Miguel.  It's Miguel.

HUGO GOLDSTRAJ, M.D. Volume 2                              August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                         141

1    Q.  Okay.  So, Dr. Miguel Garber suggests to you that

2    you treat some patients, at his PIP clinic?

3    A.  Yeah.

4    Q.  Was he the owner of that clinic?

5    A.  Yeah, he was the owner.

6    Q.  Okay.  But before we talk about doing that, did

7    you -- you -- you were -- you were a pediatrician,

8    right?

9    A.  Yeah, sure.

10   Q.  Did you apply to work at any facilities that were

11   doing pediatric care?

12   A.  No, I didn't apply to facilities with pediatric

13   care, and there was a reason that I was a senior

14   pediatrician.  I'm not a junior pediatrician.  They

15   don't take senior pediatricians.  They are afraid of --

16   that you're going to take over the place, or whatever.

17   They don't hire senior pediatricians.  They hire, like

18   the lawyers do, too, very young people, to start.

19   Q.  Did you apply anywhere or did --

20   A.  No.  No, I knew.  I knew pediatricians very well,

21   what pediatricians were in the market.  And I was sure

22   that nobody was going to hire me.

23   Q.  Not even in a hospital?

24   A.  And I'm a very well-known pediatrician.  You

25   know, I have hundreds, if not thousands, of patients.

1   And I was very well known everywhere.

2         In that way, they know if I go to work in

3   whatever place, I'm going to get my own place, very

4   soon.  In that way, they didn't offer me.  And I have to

5   get a salary because I couldn't even have money to put a

6   new practice.  I was looking for a new practice.  And

7   even though I ask to work for some hospitals, with a

8   salary guaranteed, they offered me, but they never

9   concreted any -- any offer, really.  In that way, I

10  start doing whatever I could.  When you start, you

11  continue doing it.

12    Q.  Okay.  So, you rule out the pediatric avenue.

13  Did you consider trying to work as a doctor anywhere

14  else, other than in the pediatric field?

15    A.  Yeah, it was not easy.

16    Q.  Did you apply anywhere else?

17    A.  Yeah, I apply at other places, but they -- you

18  know, when you're a pediatrician, you are a

19  pediatrician, you cannot see adults.  You're not

20  internal medicine and you're not a general practitioner.

21  In that way, if you don't work as a pediatrician, it's

22  very difficult to work in any other position.  In that

23  way, I choose the easy way, and I was very bad, after

24  the problems that we have with the Rainbow Pediatrics,

25  and probably I made a mistake not to change and go back

1   to Texas or go to other places.  I should leave, but I

2   didn't.

3       Q.  Why do you think that you that you made a

4   mistake?

5       A.  Because probably I need to move from Florida.

6   You know, after you fail in that way, you have to go and

7   start in a new place, again, and I didn't do it.  My

8   wife was very angry for that.  But it's true, I didn't

9   do it.

10      Q.  So, let's talk about Dr. Garber.

11      A.  Yeah.

12      Q.  Garber.  How did you know Dr. Garber?

13      A.  I know from -- he's from Argentina.

14      Q.  Okay.

15      A.  In the way, he belongs to the very same circle of

16  friends or whatever.

17      Q.  Okay.

18      A.  He was a very good cardiologist, in Argentina.

19      Q.  Okay.

20      A.  And he has a clinic for cardiology here, too.  He

21  put some resources in that clinic, special spinal CT

22  scan.  And he told me, in the way, I'm very good in

23  cardiology, to work with him, to produce some -- a

24  papers to publish and to go to the congress.

25          And, at the same time, he has in the same clinic,

1  some PIP patients, and tell me if I can take care of

2  them.  I say, well, yes, just -- I going to see his

3  patients.  I'm going to pay you a hundred dollars for

4  each one you see.  Okay, great.

5     Q.  Okay.

6          MR. SPECTOR:  Can you just spell his name

7       for me?

8          THE WITNESS:  Garber?

9          MR. SPECTOR:  Yeah.

10          THE WITNESS:  G-A-R-B-E-R.  He's in Spain,

11       now.  He's practicing in Spain.

12  BY MS. SALADRIGAS:

13     Q.  Let me ask you about the --

14     A.  Why not?  He can practice in Spain because

15  Argentinians can practice in Spain, but he doesn't have

16  the place to practice here.  From here, he went to

17  Spain, I think so.

18          MR. SPECTOR:  Ms. Saladrigas will ask you

19       questions.

20          MR. NICOLEAU:  Please, don't worry about

21       him, what his facial expressions are.

22          MR. SPECTOR:  I was just trying to look up

23       the name.

24  BY MS. SALADRIGAS:

25     Q.  Was Dr. Garber -- was he a licensed Florida

1   doctor?

2    A.  No.

3    Q.  No, okay.  So, tell me about the clinic.  I want

4   to make sure I understand.  I couldn't tell if you were

5   saying that Dr. Garber had a PIP clinic or a clinic that

6   was treating mostly patients with PIP insurance, or if

7   he had a --

8    A.  It was a mixed clinic.

9    Q.  It was mixed.  Okay.

10    A.  A lot of different patients.

11    Q.  Okay.  And do you know about when -- so, tell me

12   about -- tell me a little bit more about how it came up

13   that Dr. Garber offered you the opportunity to treat

14   patients, at his clinic?

15    A.  Well, he knew I was having some difficulties, and

16   he had the opportunity to give me some resources.  There

17   were not too many resources because I would see maybe

18   three or four patients, in a week, or something like

19   that.  And in that way was just some money to help me to

20   buy some things, but they really didn't do so many.

21    Q.  How long were you working for Dr. Garber or with

22   Dr. Garber?

23    A.  Probably, one year, something like that.

24    Q.  What was the name of that clinic?

25    A.  I don't remember.  Let me see if it was in one

1   medical literature.  Let me see the --

2           MR. NICOLEAU:  Exhibit 3?

3           MS. SALADRIGAS:  I think that's what he's

4   looking for.

5           THE WITNESS:  Exhibit 3, I think it was.

6           MS. SALADRIGAS:  Yeah.

7           THE WITNESS:  I don't know where I put it.

8           MS. SALADRIGAS:  We have quite a stack

9   there; don't we?

10          THE WITNESS:  I don't know.

11          MS. SALADRIGAS:  Here, I'll take a look.

12   It's all right.  I'll just flip through real

13   quick.  I have another copy.  You guys okay with

14   me marking a different version of the listed AHCA

15   clinics?  It's Exhibit 3.  I don't know where it

16   went.

17          MR. NICOLEAU:  I have a copy.

18          MR. SPECTOR:  Just take his.

19          MS. SALADRIGAS:  Okay.  Thank you.

20          THE WITNESS:  I don't think it's here.

21   Never mind.

22          MR. NICOLEAU:  Can I have that back, please?

23          Thank you.

24   BY MS. SALADRIGAS:

25   Q.  So, you worked for Dr. Garber, at his clinic, for

1   about a year?

2     A.  Yeah, something like that.

3     Q.  Tell me how you transitioned from working -- you

4   were treating patients there, right?

5     A.  Uh-huh.

6     Q.  How did you transition from treating patients

7   there -- and let's back up.  What kind of treatment were

8   you administering, at Dr. Garber's clinic?

9     A.  Well, I was ordering physical therapy.

10    Q.  You were ordering physical therapy; is that what

11  you said?

12    A.  Physical therapy and medication, whatever, yeah.

13    Q.  Was there a physical therapist on staff, at Dr.

14  Garber's office?

15    A.  Yeah.

16    Q.  What was the name of that physical therapist?

17    A.  I don't know.  I don't remember.

18    Q.  Were you prescribing the same modalities there

19  that you prescribed at Health and Wellness?

20    A.  Probably.

21    Q.  Do you remember?

22    A.  No, I don't remember exactly, but probably the

23  same, yeah.

24    Q.  Tell me how you transitioned from working with

25  Dr. Garber, to serving as a medical director and

1  treater, for other clinics, that were on Exhibit 3, that

2  we were talking about earlier.

3    A.  You know, I don't remember exactly how they

4  start, but it was a decision.  I think one of the people

5  that was working in Garber tell me that there was a

6  clinic that needed medical director, and I went there,

7  and I start there.  And, then, when you start in one,

8  they recommended others, and it's mouth to mouth thing.

9    Q.  Okay.  So, someone recommended or mentioned to

10  you that there was an opportunity?

11    A.  An opportunity, and I went there.  And they say

12  yes, and they start another place.

13    Q.  And do you remember what clinic that was?

14    A.  No, I don't remember, but one of the first ones.

15    Q.  Okay.  And why did you -- about how much money

16  were you making, when you were working for Dr. Garber,

17  monthly?

18    A.  I'll tell you, yes, $400 or $500 a week, or less.

19    Q.  Okay.  So, why did you decide to become a clinic

20  director or medical director?

21    A.  I needed money.

22    Q.  Okay.  Is that why you continued to take on more

23  clinics, as medical director?

24    A.  Absolutely, yes.

25    Q.  All right.  You mentioned that you and Dr. Garber

1   were -- you published some papers together?

2    A.  Yes, we have --

3    Q.  Are they on your CV?

4    A.  Yes.

5    Q.  Can you show me?

6        Here we go.  Let's try to find this document.

7   Hopefully, it's not gone.

8    A.  We get the full price, the full price of research

9   at the -- Spain.

10    Q.  All right.  Go ahead and show me which one.

11    A.  Here it is, "Non-Invasive Assessment of Coronary

12   Stents By Spiral CT Scan and Advance Reconstruction.

13   Miguel Garber and Hugo Goldstraj, in the European

14   Conference Management of Coronary Artery Disease, Nice,

15   France, 2002."

16        "And M. Garber and Hugo Goldstraj, M.D., Revision

17   of Arteriosclerotic Coronary Artery Block.  This

18   demonstrated with multi-P slice speedo-computic

19   tomography in patients with unstable angina pectoris.

20   European Society of Cardiology Admitting in Spain, 2004,

21   first prize to original research."

22    Q.  Thank you.

23    A.  Okay.

24    Q.  Okay.  All right.  Okay.  It's on Page 3, so you

25   know.  Very good.  Thank you, Doctor.

HUGO GOLDSTRAJ, M.D. Volume 2                                     August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                                    150

1    A.  You're welcome.

2    Q.  Did you know Dr. Garber, in Argentina?

3    A.  No.

4    Q.  You met him in the United States?

5    A.  Yes.

6    Q.  How did the two of you meet?

7    A.  Because we have friends in common.

8    Q.  Okay.  You were introduced by mutual friends?

9    A.  Yeah, sure.

10    Q.  Okay.  While we're talking about your

11   publications, have you ever been an expert in

12   litigation?

13         MR. NICOLEAU:  Okay.

14         THE WITNESS:  No, I never.

15   BY MS. SALADRIGAS:

16    Q.  Okay.  Have you ever tried to become an expert,

17   to serve in litigation?

18    A.  Well, I was an expert, as a pediatrician, in a

19   trial, in what was was abused children.

20    Q.  Can you say that one more time?  I didn't

21   understand you.

22    A.  I was as a pediatrician in a trial, in which was

23   child abuse.  I was an expert on that.

24    Q.  Where was the case?

25    A.  In Corpus Christi, Texas.

1    Q.  Okay.  Would that have been when you were in

2  Texas?

3    A.  Yeah, when I was in Texas; yeah, the fellowship.

4    Q.  Between 1985 and 1980?

5    A.  No, I was here, in Pediatric residency, in the

6  Hospital of Texas, Galveston Branch.

7    Q.  Okay.  So, between 1998 -- sorry.  1988 and 1990?

8    A.  Yeah.

9    Q.  Okay.  Let me just look at my notes, for a

10  second.

11      I want to talk to you about what was going on in

12  that time frame, after Rainbow Pediatrics.  Did you, at

13  that time, form any businesses?  Did you open any

14  companies?

15    A.  No, as far as I remember.  I -- I did

16  corporations, but never the corporations worked.  I

17  didn't do any business with the corporations.  I think I

18  opened some corporations because I want to do some

19  business, but I didn't do any business.

20    Q.  What kind of business did you want to do?

21    A.  I don't remember exactly, but they --

22        MR. SPECTOR:  Hey, Robert, put your phone on

23      mute.

24        THE WITNESS:  If you tell me the

25      corporations, maybe I can say, but I don't

HUGO GOLDSTRAJ, M.D. Volume 2                             August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                          152

1        remember which -- which ones.

2    BY MS. SALADRIGAS:

3      Q.  What about Medicine NuCare, LLC; does that sound

4    familiar to you?

5      A.  No.

6      Q.  What about Hoseah Medical Center, Inc.?

7      A.  Huh?

8      Q.  Hoseah, H-O-S-E A-H?  Hoseah?

9      A.  Did you say Michael Pediatrics?  No, I had

10   nothing to do with it --

11     Q.  That's okay.

12     A.  -- as far as I can remember.

13     Q.  That's okay.

14     A.  What else?

15     Q.  Solaris Corp.?

16     A.  No.

17     Q.  Kids Walk-In Center?

18     A.  No.

19     Q.  R&H Medical Services, Inc.?

20     A.  Which one?

21     Q.  R&H Medical Services, Inc.?

22     A.  I think I worked there, but I don't know if I was

23   part of the --

24     Q.  You think that you worked there?

25     A.  Yes, I worked there, I think.  R&H, I think --

HUGO GOLDSTRAJ, M.D. Volume 2                                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                              153

1  it's not there in the --

2    Q.  Not RPM or --

3           MR. NICOLEAU:  I don't see.

4           THE WITNESS:  No.  In that way, no.

5           MR. NICOLEAU:  It's not on Exhibit 3.

6  BY MS. SALADRIGAS:

7    Q.  Okay.  Did you have any other businesses, with

8  Robert Novo, besides Rainbow Pediatrics?

9    A.  No, no, no.  Robert Novo opened his own practice.

10   Q.  Okay.  What about Gold Cash, LLC?

11   A.  Yeah, this is mine.  I never -- they never work.

12   Q.  What is that business?

13   A.  Well, the idea was, you know, my father was in

14  chemistry, and he works with gold, and he teach me how

15  to purify gold.  In that way, my idea was to buy gold on

16  the internet, to purify gold, because I know how to do

17  it, in a laboratory.  For this, I found Gold Cash.  And

18  it didn't work because the people just send me the

19  garbage, in the mail.

20   Q.  The internet is great, right?

21       So, that business was -- how long did you operate

22  that?

23   A.  I didn't operate anything because I didn't get

24  anything.  I tell you just like I never get one gram of

25  gold.  In that way, I couldn't do it.

1    Q.  What about MG Rehab Center of Doral?

2    A.  No, I don't have nothing to do with that.  They

3  have my initials, but I knew that place, but it's not

4  me.  It's --

5    Q.  What did you mean they have your initials?

6    A.  Is it not HG or MG, or something like that?  They

7  have my initials.

8          MR. NICOLEAU:  Can you repeat what the name

9      of the company is?

10  BY MS. SALADRIGAS:

11   Q.  Sure.  Sure.  It's MG Rehab Center of Doral.

12   A.  Well --

13   Q.  Do you know a man named Jose M. Martinez?

14   A.  I don't know.  I don't remember.

15   Q.  Is your address 3900 Northwest 79th Avenue?

16   A.  Now?

17   Q.  Has it ever been that?

18   A.  Yes, it's my house.  3900 Northeast 79th Street.

19          MR. NICOLEAU:  What's the address, again?

20  BY MS. SALADRIGAS:

21   Q.  3900 Northwest 79th Avenue.

22   A.  No.

23   Q.  You don't recognize that address?

24   A.  No, no.  I was thinking that you mentioned my

25  house, now.

1    Q.  Okay.  Okay.  And you have no -- you have no

2    knowledge about what MG Rehab Center of Doral is?

3    A.  Well, at least, I don't remember.

4    Q.  Tell me everything you know about MG Rehab Center

5    of Doral.

6    A.  I don't remember that place.

7    Q.  Have you heard that name before?

8    A.  Yes.

9    Q.  Have you seen any documents with that name on it?

10   A.  Not as far as I know.

11   Q.  Who have you spoken to about MG Rehab Center of

12   Doral?

13          MR. NICOLEAU:  Objection, leading.

14          THE WITNESS:  I spoke with who?

15   BY MS. SALADRIGAS:

16   Q.  Did you speak with anyone about MG Rehab Center

17   of Doral?

18   A.  Not as far as I remember.  I don't remember this

19   place.

20   Q.  Okay.  What about Hugo D. Goldstraj, M.D., PA.?

21   A.  This is me.

22   Q.  Is that your current practice?

23   A.  No, I don't have any practice.  I don't have

24   license, how can I have a practice?

25   Q.  When was that practice operational?

1    A.  Well, it was operational -- I don't know, before

2    I have these problems.  I don't know.  It was a PA, then

3    it was that.  Probably, my first office, in -- that I

4    have in a -- in Countyline and 441.  This was my first

5    private office, and probably there I did my --

6    Q.  Before Rainbow Pediatrics?

7    A.  Before Rainbow, yeah.

8    Q.  All right.  Are there any other companies that

9    you have owned, that we haven't talked about?

10    A.  Not as far as I remember, no.

11    Q.  Okay.  Let's circle back to the medical director

12    piece.

13        You start working in 2004, this is after Dr.

14    Garber, at a number of different clinics, as the medical

15    director.  Had you heard about, at that time, fraud

16    happening at clinics where patients were primarily --

17    patients with PIP insurance were primarily being

18    treated?

19    A.  Well, I don't understand exactly your question.

20    If I heard?

21    Q.  Were you aware of fraud happening at clinics,

22    that were primarily treating PIP insured patients?

23    A.  It was in the newspapers.

24    Q.  So, you had heard of it?

25    A.  Yeah, sure.

1    Q.  What did you know?

2    A.  I know that some of these were places in which

3  they didn't do what they have to do.  They didn't treat

4  the patients.  Patients were not real.  I don't know.

5  Different things.  No, but most of these things I knew

6  through the newspapers.

7    Q.  Did you -- do you know when you were reading the

8  newspapers, about those issues?

9    A.  No.  There are many times they come in the

10  newspapers, these things.

11    Q.  Did you -- were you familiar with those issues

12  when you started to be a medical director, in 2004?

13    A.  I don't know if at the beginning I was aware of

14  that, but probably later, yes, I was aware there was

15  some.

16    Q.  Roughly, when did you become aware?

17    A.  I don't know, 2006, 2008.  I don't know.

18    Q.  Before you became the medical director, at Health

19  and Wellness?

20    A.  Yes, before.  Yeah.

21    Q.  Okay.  When you learned or became aware that

22  there were -- there was fraud in the PIP industry --

23    A.  Uh-huh.

24    Q.  -- did you -- what -- did you do any

25  investigating, at the clinics that you were working at,

 1  to make sure that it wasn't happening there?

 2   A.  No.

 3        MR. DIAZ:  Objection to form.

 4        MR. NICOLEAU:  Objection, yeah.

 5        THE WITNESS:  I didn't do any investigation.

 6  BY MS. SALADRIGAS:

 7   Q.  Do you think -- strike that.

 8        Between 2004 and 2007, that's when you became

 9  aware?

10   A.  Uh-huh.

11   Q.  Of fraud, in the PIP industry?

12   A.  Yeah.

13   Q.  Were you aware, at that time -- strike that.

14        At that time, did you believe that it was the

15  medical director's responsibility to detect fraud?

16   A.  Well --

17        MR. DIAZ:  Form.

18        THE WITNESS:  -- I didn't have these very

19     often.  I tell you the truth, I don't like to put

20     my nose in the business of -- and, literally, I

21     was -- okay.  I didn't do any --

22        (Discussion held off the record.)

23        THE WITNESS:  -- in the business of other

24     people, as an investigator, because I don't think

25     it's my duty.  Any way, I was aware they could be

1        that, but I see that the patients were patients

2        that complain.  Always, I trust what the patient

3        says to me.  And that is the main thing.  And I

4        was just making the physical examination and I

5        ordered the treatment.  And I didn't make any

6        investigation about that.

7    BY MS. SALADRIGAS:

8      Q.  Did you ask anybody anything?

9      A.  No.

10     Q.  At any of the clinics that you worked at?

11     A.  To ask what?

12     Q.  Anything about PIP fraud going on, at any of the

13   clinics that you worked at?

14     A.  To ask --

15          MR. DIAZ:  Object to form.

16          MS. PARKER:  Form.

17          THE WITNESS:  -- to whom, to the owner, to

18       the patient?

19   BY MS. SALADRIGAS:

20     Q.  To the owner, to the therapist?

21          MR. DIAZ:  Form.

22          MR. SPECTOR:  To anyone.

23          MR. DIAZ:  Form.

24          THE WITNESS:  No, I didn't ask anything

25       about that.  I was not suspicious of that.

1   BY MS. SALADRIGAS:

2   Q.  Okay.  Let's move to Health and Wellness.

3   A.  Okay.

4   Q.  You're the medical director of Health and

5   Wellness?

6   A.  I am.

7   Q.  Was it your understanding that it was your role,

8   as the medical director, to detect fraud, at Health and

9   Wellness?

10   A.  No.

11         MR. DIAZ:  Form.

12         MS. PARKER:  Form.

13         MR. NICOLEAU:  Form, yeah.

14   BY MS. SALADRIGAS:

15   Q.  Was it your role, at Health and Wellness, as the

16   medical director, to detect fraud?

17   A.  No.

18         MR. DIAZ:  Form.

19         MS. PARKER:  Form.

20   BY MS. SALADRIGAS:

21   Q.  Okay.  We're going to turn back to the treatment

22   at Health and Wellness.

23   A.  Uh-huh.

24         (Thereupon, Plaintiff's Exhibit No. 12 was

25      marked for identification.)

1   BY MS. SALADRIGAS:

2      Q.  I'm marking, as Exhibit 12, the initial patient

3   evaluation of a patient with initials "BR".

4          Doctor, do you recognize this document?

5   A.  No.

6   Q.  Have you ever seen this form before?

7   A.  The form, yes, but not this document.

8          MS. PARKER:  For those on the phone, can you

9      please identify the document?

10         MS. SALADRIGAS:  Sure, Karen, I just did.

11     It's an initial evaluation form, for a

12     Patient "BR".  It's a Health and Wellness initial

13     evaluation form.

14         MS. PARKER:  Thank you.

15         MS. SALADRIGAS:  No problem.

16         MR. NICOLEAU:  Is there a pending question?

17         MS. SALADRIGAS:  No.

18         THE WITNESS:  That's it?

19  BY MS. SALADRIGAS:

20     Q.  No, that's not it.  I haven't asked you yet.

21         All right, let me back up.

22         Will you agree that the treatment that's

23  performed at Health and Wellness was performed to help

24  improve the patient's condition?

25     A.  Yes.

1    Q.  Okay.

2          MS. PARKER:  Form.

3    BY MS. SALADRIGAS:

4    Q.  In the way that -- was the treatment performed at

5    Health and Wellness -- strike that.

6          The way that Health and Wellness aimed to improve

7    the patient's condition was through the therapy; is that

8    correct?

9    A.  Yes.

10         MS. PARKER:  Form.

11   BY MS. SALADRIGAS:

12   Q.  Okay.  While you were the medical director and

13   the treating physician, at Health and Wellness, patients

14   -- sorry, back up.

15         What -- were the patients, at Health and

16   Wellness, did they have varying ages?

17   A.  Yes.

18   Q.  What about different medical histories?  Did they

19   all have the same medical history?

20   A.  No, they have different complaints.

21   Q.  Okay.  In your experience, treating auto accident

22   patients, do patients generally present with pain in

23   their cervical, thoracic, and lumbar spine?

24   A.  Yes.

25         MS. PARKER:  Form.

1    BY MS. SALADRIGAS:

2      Q.  Would you expect that patients -- that over

3    90 percent of patients, who are involved in an

4    automobile accident, would present with cervical,

5    thoracic, and lumbar spine pain?

6              MR. NICOLEAU:  Form.

7              MS. PARKER:  Form.

8              THE WITNESS:  I don't know the statistics.

9        I don't know if 90 percent, or 80 percent, or

10       70 percent, but it's very frequent.  And there is

11       a reason for that.

12          The reason for the most common accident is a

13       rear-ender.  The rear-ender is the most common

14       accident.  And in the rear-ender, the

15       displacement of the cervical spine, the thoracic

16       spine, the lumbar spine is the rule.  In other

17       kinds of accidents, side accidents and front

18       accidents, also, is implied.  But in rear

19       accidents, it's the rule.  And most of the

20       accidents are rear accidents.

21    BY MS. SALADRIGAS:

22      Q.  How do you know that most of the accidents are

23    rear accidents?

24      A.  Because any studies you can look on the internet,

25    whatever, they are going to tell you that's the most

1   common accident is the rear accident.  As a matter of

2   fact, there's a rule, when you have a rear accident, the

3   one that struck the first is the guilty, and the one

4   that is in the front is innocent.  This is the rule.

5      Q.  Where does that rule come from?

6      A.  From the law; you're a lawyer.

7      Q.  I am a lawyer.

8      A.  Well, you don't know too much about accidents.

9   When it's a rear, the back is guilty, and the front is

10  innocent.  And this is the most common accident.

11     Q.  Okay.  What I'm trying to understand is how --

12  what supports your position that -- that patients would

13  have cervical, thoracic, and lumbar spine pain?

14          You're telling me that it's because most patients

15  are in rear-end accidents.

16     A.  Well, many patients are in rear accidents.  And

17  other type accidents, they can have these problems.  But

18  the spine is the one that most suffers, in an accident,

19  because of the shake.  The shaking of the accident

20  produces the displacement of the vertebra, in the

21  cervical spine, in the lumbar spine.

22          The thoracic spine usually disperse, a little

23  bit, because they have the rib cage, that holds the

24  vertebrae.  But the lumbar and the spine -- the cervical

25  spine, they can displace very easily.  For this is

1  described the wipelash, {sic}.  The wipelash, {sic}, in

2  which with the accident -- the accident, the cervical

3  spine goes back first, and then front, and again back.

4    Q.  Did you mean whiplash?

5    A.  Whiplash.

6    Q.  Is there any medical literature that supports

7  that opinion?

8    A.  Sure, there's a lot of medical literature that

9  supports that opinion.

10   Q.  Can you tell me what the leading article would be

11  or book?

12   A.  Oh, there's a lot of books.  You just look in the

13  internet, they're going to have 10 or 15 books about

14  whiplash injury.

15   Q.  Sure.  But can you tell me what's the leading

16  book on it?

17   A.  No, I cannot tell you because I don't remember

18  which is the leading one, but there's a lot of books.

19  And I read a lot of books about that.

20   Q.  Can you name a single book that you read about

21  it?

22   A.  No.

23   Q.  What about a single journal article?

24   A.  I don't remember the articles.  Okay?  But you

25  can find the articles in any literature.  It's -- a

 1  whiplash accident is one of the most common things that

 2  are in the medical literature.  Like you tell me where

 3  you study anatomy.  I don't know.  I read a lot of books

 4  on anatomy.  Whiplash injury is a very common, in

 5  medical literature, because it's one of the most common

 6  lesions that they have, a patient, when they have an

 7  accident.

 8    Q.  Do you have -- so, you're telling me there's tons

 9  of literature, and you've read lots of literature.

10    A.  Yeah.

11    Q.  Do you have any of these books at your house?

12    A.  Yes, probably.  Yeah.  Let me see.  I can -- we

13  don't have internet here.

14        MR. NICOLEAU:  Yeah.

15  BY MS. SALADRIGAS:

16    Q.  I want to clarify my question a little bit.

17  You're talking about whiplash.

18    A.  Uh-huh.

19    Q.  And if I understand your testimony correctly,

20  you've said that whiplash is very common; is that right?

21    A.  Yes.

22    Q.  Okay.  Does whiplash affect the cervical,

23  thoracic, and lumbar spine?

24    A.  No, usually the cervical spine; lumbar spine is

25  not called whiplash.

1    Q.  What's it called?

2    A.  It's called displacement of vertebra, of the

3    lumbar spine, pain in the lumbar spine, whatever.  No,

4    whiplash is a lesion of the cervical spine.

5    Q.  Okay.  What about the thoracic spine; does it

6    affect the thoracic spine?

7          MR. NICOLEAU:  Objection, vague.

8          THE WITNESS:  I don't understand your

9       question.

10   BY MS. SALADRIGAS:

11   Q.  If a patient has whiplash, does that mean that

12   their thoracic spine is implicated?

13   A.  No.

14   Q.  Okay.  In your experience, is it common for

15   patients to present with severe pain, across all three

16   regions of their spine?

17   A.  Yes.

18   Q.  Would you expect that over 90 percent of

19   patients, that were in automobile accident, would have

20   severe spine -- severe pain in their cervical -- excuse

21   me -- in their entire -- all three regions of their

22   spine, following the accident?

23   A.  I cannot say; this, I didn't do the studies, it's

24   90 percent, but it's very frequent.

25   Q.  Have you reviewed any medical literature that

1  supports the position that a patient would have -- that

2  the majority of patients would have severe spine pain,

3  in the cervical, thoracic, and lumbar, after an

4  accident?

5    A.  I don't know if I review any literature about

6  that.  But in my experience, most of the patients

7  complain of that.  They come and say, I have pain in my

8  neck, pain in my back, and pain in my -- you know, I

9  can't move it.

10         And when you do the physical examination, they

11  have a lot of pain, compression, movement of the

12  cervical spine, and the lumbar spine.  And when you

13  touch the spine, how they -- the thoracic spine, they

14  complain of pain.  In that way, most of the patients

15  that I see, they have these problems associated with

16  other problems, knee pain, elbow pain, shoulder pain.

17         You know, when you have the back, the patients,

18  most of the time, they have the arms on the wheels.  In

19  that way, when they have the impact, they do like that,

20  (indicating), and usually if they're right-sided, they

21  have shoulder problem.  And the other side is they have

22  usually the foot in the brake.  In that way, they force

23  this, and they have usually pain in the knee or in the

24  foot.

25         And another way, there are many things related

HUGO GOLDSTRAJ, M.D. Volume 2                                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                              169

1   specific with the accident, in the pain.  Usually, there

2   are multiple parts the patient has pain, after an

3   accident.  And it's interesting because the pain is not

4   immediate.  They usually take 24 to 48 hours to develop

5   the pain.

6     Q.  Would you expect the level of the patient's pain

7   to vary, depending upon how severe the accident was?

8     A.  No, it's not related.

9     Q.  You would expect a patient to present with severe

10  pain, in the cervical, thoracic, and lumbar, if they

11  were in a parking lot crash, at five miles an hour?

12    A.  Yes.

13         MR. NICOLEAU:  Objection, calls for

14      speculation.

15         THE WITNESS:  Yes, I do.

16  BY MS. SALADRIGAS:

17    Q.  Okay.

18    A.  I don't think they should -- of course, there is

19  some relation if it's a very bad accident, and pain, but

20  they can be small accidents that produce a lot of

21  damage.  It all depends in which is the age of the

22  patient, it's the musculature of the patient, the

23  position of the patient, and many other things.  In that

24  way, you can have a small accident, with a very bad

25  consequences, even with great consequences, because the

1  shaking of the head, they produce bleeding many times,

2  that is not detected many times, because they don't do

3  MRIs or CT scans of the brain, in a regular office --

4  offices.  They do it in the emergency room.  If you go

5  to the emergency room and you have -- in a motor vehicle

6  accident, you're going to get a CT scan of the head,

7  automatically.

8     Q.  So, you're saying that a patient could have

9  severe injury, including a brain bleed, from an accident

10  of five miles an hour?

11     A.  Yes.

12     Q.  And that patient should be referred for a CT

13  scan?

14     A.  Yes.  If they complain of headaches, and you find

15  neurological symptoms and neurological signs, in the

16  physical examination, yeah, sure.

17     Q.  All right.  Was there a general treatment plan,

18  at Health and Wellness?

19          MR. NICOLEAU:  Objection, vague.

20  BY MS. SALADRIGAS:

21     Q.  Were there cycles of treatment, at Health and

22  Wellness?

23          MR. NICOLEAU:  Objection, vague.

24          THE WITNESS:  I don't understand the

25          question very -- if it was a -- I don't

1         understand really.  Can you clarify the question?

2    BY MS. SALADRIGAS:

3      Q.  Sure.  At Health and Wellness, if a patient comes

4    in, who's had an auto accident --

5      A.  Yeah.

6      Q.  -- is that patient going to receive treatment

7    five times a week, for two weeks?

8              MR. NICOLEAU:  Objection, vague.

9              THE WITNESS:  Well, it all depends on the

10        patient.  It's not for every patient.  It depends

11        of the type of injuries, the pain, and the age.

12        Because if you have a five years old, or 10 years

13        old, in an accident, you tilted one way.  If you

14        have a 20 years old, it's other way.  If you have

15        70 years old, it's a different thing.  In that

16        way, all depends on other factors.  But most of

17        the time, you try to do as much as possible, as

18        soon as possible.  Okay.  In that way, you try to

19        treat patients, they have severe pain, as soon as

20        possible, to relieve the pain.

21             More, if you are not accustom to give a --

22        pills related with the -- with morphine.  Okay.

23        What is now a very big problem, in the United --

24        if you want to treat pain, we have to give you

25        very bad medicines.  You have to try to do it

1      with the physical therapy and just

2      over-the-counter medication, Ibuprofen.  And this

3      is what I was doing.  I tried to save for just

4      very few patients, major medication.  And just

5      over-the-counter medication and physical therapy.

6          And as soon as possible and as much as possible.

7   BY MS. SALADRIGAS:

8      Q.  Would that include -- so, let's say the patient

9   has severe pain on cervical, thoracic, and lumbar spine,

10   they've just been in an accident, would you prescribe

11   the patient traction?

12     A.  No, not at the very beginning.  Probably, I'm

13   going to wait two or three days, until they relax the

14   muscles.  The traction is not for just the beginning of

15   the treatment.  They have to wait a little bit for

16   traction.

17     Q.  What about neuromuscular re-education, would you

18   prescribe that right away?

19     A.  No.

20     Q.  What about therapeutic exercises?

21     A.  No.

22     Q.  Therapeutic activities?

23     A.  Well, depends what kinds of activities.  If it's

24   OT,  if it's movement with the fingers, or whatever,

25   yes.  But if it's major joints or muscles involved, no.

1    Q.  What about gait training?

2    A.  Gait training is for later.

3    Q.  Okay.  At Health and Wellness, were patients

4  usually scheduled for appointments?

5    A.  Yes, I think so.

6    Q.  Okay.  So, we're talking about when you were

7  treating patients there.  I think that you said that you

8  were there Tuesdays and Thursdays; is that right?

9    A.  Yes.

10   Q.  Okay.  So, when you came in, to Health and

11  Wellness, on a Tuesday --

12   A.  Uh-huh.

13   Q.  -- would you know who you were going to be

14  treating that day?

15   A.  I don't know if I going to see some patients that

16  day or if I going to be treating those patients.

17   Q.  No.  If there were going to be patients that you

18  were going to need to see that day.

19   A.  Yeah, sure, yes.

20   Q.  How would you know that?

21   A.  Because of the waiting area.  Usually, when I

22  come after, they have a lot of patients in the waiting

23  area, like six, seven, eight patients.

24   Q.  So, let me just interrupt --

25   A.  I was scared of them, how many patients were

1   there.

2     Q.  You were scared of how many patients were there?

3     A.  Yes.  I'm a lazy doctor.

4     Q.  So, let me just make sure I understand this.

5         You would walk in and you would see all the

6   patients you were going to have to treat, because they'd

7   be waiting in the waiting room?

8     A.  Yeah, most of them.  They would come after that,

9   but most of them are sitting in the waiting area, yeah.

10    Q.  Okay.  And, so, you would then go into, I think

11  you described, an examination room --

12    A.  Yes.

13    Q.  -- right?

14        And what would happen then?  Would someone bring

15  you a chart?

16    A.  They would bring me a chart.  The name on the

17  chart, of course, they have to fill up.  And they bring

18  the patient.  In that way, I start asking what happened

19  with them.  They tell me, well, if it was an accident or

20  whatever.  How was the accident?  How did the accident

21  happen?  What happened after the accident, etcetera,

22  etcetera.  Always I put how the accident happened.

23    Q.  Okay.  And let's say this is the patient's first

24  visit with you --

25    A.  Yes.

1    Q.  -- at Health and Wellness.  Do you complete a

2    form that looks like Exhibit 12?

3    A.  This one?  Yes.  Yeah, uh-huh.

4    Q.  So, this was the form that you would use?

5    Obviously, not this specific one, but --

6    A.  No, no, this is not mine.  It's not my

7    handwriting.  But, yes, this is the regular form that I

8    would use.

9    Q.  Okay.  Okay.  Would you expect the date of the

10   accident to be included on the form?

11   A.  I don't know.  I always ask when was the

12   accident.  Myself, I ask, when was the accident, was it

13   yesterday or was it before yesterday?  It was one week

14   ago, it was two weeks ago?  Yes, I always ask.

15   Q.  Why?

16   A.  Because there are different situations with this,

17   whether it's an immediate accident, it's one thing.  You

18   have it two weeks accident, it's another situation.

19   Q.  What's the significance?

20   A.  The significance is usually you don't have very

21   bad symptoms, wait two weeks to be treated.  Okay.  You

22   can have pain, you can have contractures, but usually

23   you don't have broken bones, or dislocations, or very

24   bad things, if it happened two weeks ago.

25        Always I ask if they went to the emergency room,

1    if they were seen in the emergency room or not.

2      Q.  And if the patient went to the emergency room,

3    then what do you do?

4      A.  Well, I would try to get the reports of the

5    emergency room.  But it was very unusual that they going

6    to send you these.

7      Q.  Why?

8      A.  Because hospital doesn't like to release records.

9    You have to go and sign, to release records.  If you

10   call and you ask for records, they're not going to give

11   you the records, even if you're a doctor.  The patient

12   has to go there and sign for them, etcetera, etcetera.

13   The patients, you know, don't like to go and do that.

14   Usually, you don't get the report of the emergency room.

15     Q.  Did most of the patients, at Health and Wellness,

16   that you treated, did they go to the emergency room?

17     A.  No.  Most of them, no.

18     Q.  In your experience, is it common that most of the

19   patients, who were involved in automobile accidents,

20   would not have gone to the emergency room?

21          MR. NICOLEAU:  Form.

22          THE WITNESS:  Probably, yeah.

23   BY MS. SALADRIGAS:

24     Q.  Why?

25     A.  Well, they didn't feel that they have to go.  I

1  don't know.  I can't ask -- I didn't ask why you didn't

2  go to the emergency room.  Most of them, I tell you, the

3  pain appears usually 48 hours after the accident.  And

4  when they say that -- when they appear the pain, they

5  already were at home, with their family.  And when they

6  are still having the pain and the pain persists, they

7  come to the clinic.

8     Q.  Is that true even if the patient was in a severe

9  accident?

10    A.  No, in a severe accident, they go to the

11  emergency room.  I don't even ask that because they

12  come, the ambulance, they took them, and they go to the

13  emergency room, yeah.  In a severe accident, which is

14  fractures of the arm, or whatever, loss of conscious.

15    Q.  In completing the section of this initial

16  evaluation, regarding the history of present illness,

17  what would you rely on?

18         MR. NICOLEAU:  Can you repeat the question?

19  BY MS. SALADRIGAS:

20    Q.  Sure.  So, the first page of the initial

21  evaluation, where it says "History of Present Illness,"

22  my question is:  What, Dr. Goldstraj, would you rely on,

23  to complete that section?

24    A.  Well, here, this describes the accident.  I told

25  you that always I put how was the accident happen.  And

1   the mechanism of the injury is related with that.  Okay.

2   But how the accident happens and what could be the

3   mechanism of the injuries.  It's important to consign

4   there if there was a loss of consciousness, if he was in

5   the hospital, you know.  Whether he went to the

6   emergency room or not.  And, then, you can sign the

7   complaints, what is the patient telling that is hurting

8   or not hurting, or if he's dizzy, or if he's with

9   nausea, or if he's with other complaints.  The most

10  common complaint, of course, is pain.  But there are

11  other complaints, like I told you, tinnitus sometimes,

12  loss of hearing, blurred vision, and other things that

13  can happen and are related with, most of the time, with

14  the neck injury.  Neck injury can produce any of those

15  things.

16    Q.  This would have been based on what the patient

17  told the doctor?

18    A.  Yeah, sure.

19    Q.  Let's turn --

20    A.  And, then, you have to go through the general

21  questions, like toxic habit, if he's smoking, or they do

22  drugs, or they do alcohol, addicted to coffee, if he

23  take any patient medication, if he have any kind of

24  allergies, if he had previous accidents.

25    Q.  Why is that important?

1    A.  Because, usually, when you have a previous

2   accident and it's close to this, it can be a worse

3   injury because this is injury over the injury.

4    Q.  Let's talk about the "Family History" section.

5        Is that enough room to take a comprehensive

6   family history from the patient?

7    A.  Well, you don't need a comprehensive family

8   history, in these cases.

9    Q.  Why not?

10    A.  Because it's not related with any kind of a

11   family history, the accident.  It's for an eventual

12   thing that happens.  The family history is just to see

13   genetics complaints.  It's very unusual that you have

14   any genetic thing that can influence the result of an

15   accident.

16        There are some of the genetic things that can be

17   related with the accident.  More, they are the -- the --

18   the complaints or the -- the things that are related

19   with the tissues, to the ligaments, etcetera, etcetera.

20   For example, the Ehlers-Danlos, the --

21        (Reporter clarification.)

22        THE WITNESS:  Ehlers -- Ehlers-Danlos,

23     you -- if you want me to write it down.

24    A.  Ehlers-Danlos disease, which is a laxative of the

25   ligaments, made that the injuries can be worse, because

1   there is an alteration of the ligaments, and the

2   articulations, and the joints, and the way they can be.

3   But this is a so-weird disease, like other diseases

4   related to that, generally, if you ask somebody in the

5   family that has this same thing.

6     Q.  Let me ask you a question.  I can't remember what

7   you told me.  I think I asked this of you already.  Did

8   you create this form?

9     A.  No.

10    Q.  Anybody consult with you, in creating this form?

11   Did anybody ask you about this form?

12    A.  No, it's a regular form that they use in any

13   other clinic.

14    Q.  Can you read the handwriting under "History of

15   Present Illness"?

16    A.  I don't know exactly what it says here.  It's a

17   -- this was probably of how the accident happened.  I'm

18   just rambling because I don't understand what this

19   reads.

20         MR. NICOLEAU:  You asked if he can read the

21      handwriting?

22         THE WITNESS:  Yeah, I can read the

23      handwriting, but not very clear.

24         MR. NICOLEAU:  Okay.

25   BY MS. SALADRIGAS:

1    Q.  All right.  Let's turn to the second page.

2    A.  Yeah.

3    Q.  You see where it says "Cervical Spine"?

4    A.  Where, here?

5    Q.  Uh-huh.  Right here, that section.

6    A.  This section?

7    Q.  Yeah.  Do you see that section?

8    A.  Yes.

9    Q.  Okay.

10   A.  Severe pain.  Severe tenderness.  Severe spasm.

11  That number is negative.

12   Q.  Let me ask you about the use of the word

13  "severe", to describe the patient's pain.  Is that the

14  standard of care?

15   A.  Well, if I tell you what they do, it even -- you

16  know, what she does or he does.

17   Q.  Well, we're talking about this form.

18   A.  Well, when you have a pain, 1 to 10, in that way,

19  you ask if you have to graduate your pain, it's 2, it's

20  4, it's 6, it's 8.  If they tell you that it's 8 or

21  more, it's severe.

22   Q.  What's that based on?

23   A.  It's based on the personal thing.  Pain is

24  something that is subjective, it's not objective.  You

25  cannot have objective evaluation of pain.  You have this

1  pain.  If you take 1 to 10, how much is this pain.

2   Q.  Uh-huh.

3   A.  This isn't usually 10.  This is part of the

4  medical interrogation.  They tell you, well, it's five,

5  it's six, it's eight, whatever.  If they tell you it's

6  five or six is moderate.  If they tell you it's seven,

7  eight, or nine, or 10, it's severe.  More if it's eight,

8  nine, or 10, but usually it's severe.  And this is a

9  subjective thing you cannot -- this is what the patient

10  says.  It's not what you observe.

11   Q.  Is describing the pain as minimal, moderate, and

12  severe, is that the standard of care?

13          MR. NICOLEAU:  Vague, objection.

14          THE WITNESS:  I don't know what you mean by

15       the standard of care.

16          MR. SPECTOR:  If you can just object to the

17       form, because no speaking objections.

18          MR. NICOLEAU:  Okay.

19          THE WITNESS:  It's words of expression, but

20       it's not the standard of care.  It's not care.

21       It's an evaluation.  It's not a standard of care.

22       It's an evaluation.  Evaluation of the pain.

23  BY MS. SALADRIGAS:

24   Q.  Right.  It's an evaluation of the patient's

25  subjective pain complaints?

1    A.  Yes.

2    Q.  Would you agree that the 1 to 10 pain scale is

3  the standard of care?

4    A.  Yes, it's standard of care.

5    Q.  Okay.  So, that would mean that using minimal,

6  moderate, and severe, to describe the patient's

7  subjective pain complaints, is not the standard of care?

8    A.  No, I don't say so.  I say one way to express

9  what is the pain.

10    Q.  What you're saying is that minimal, moderate, and

11  severe is one way of expressing the 1 to 10 pain scale?

12    A.  Yes.

13    Q.  Okay.  So, what's a 4 out of 10; is it minimal or

14  is it moderate?

15    A.  4?

16    Q.  A 4 out of 10 pain.

17    A.  4 is minimal to moderate.

18    Q.  But which one do you check, minimal or moderate?

19    A.  Both.

20    Q.  You check both?

21    A.  Yes, both.  I would say moderate because they say

22  four or minimal, depends on the patient.  You have to

23  see what the patient's expression is.  Okay.  You have

24  to evaluate the expression of the patient.  Because in

25  the way that this is subjective scale, the patient says,

1   well, how can I differentiate 4 from 5, or 5 from 6?

2   You know, this is a very subjective way of scaling your

3   pain.

4        Usually, they say they hurt me a lot.  And, well,

5   from 1 to 10, how much?  It's 10 or 11, they say.

6    Q.  Okay.

7    A.  They make you laugh.  But this is real true, what

8   I say is the real true.  What the patient says, oh, I

9   have a lot of pain.  Okay.  What can you put?

10   Q.  Let me ask you a question.

11       Would you expect that the specific levels where

12   the patient is feeling pain, in their spine, would be

13   indicated?

14   A.  I didn't understand the question.

15   Q.  Cervical spine, that's a region in the back,

16   correct?

17   A.  Yes.

18   Q.  Are there multiple levels, in that region?

19   A.  Multiple using a vertebrae?

20   Q.  Uh-huh.

21   A.  Yes.

22   Q.  Okay.  Is it the standard of care that pain would

23   be associated to a specific vertebrae or level, in the

24   spine?

25   A.  Hopefully not.

1    Q.  Why do you say that?

2    A.  Usually, the pain is all the cervical spine.  If

3  it's in a specific place, you have to be suspicious that

4  something very wrong happened.

5    Q.  Why do you say that?

6    A.  Because when it's hurting just one of the

7  vertebrae, it's because it's a fracture, or a

8  dislocation of the vertebrae, or something.  When they

9  say, oh, the pain is just here.  This is not the real

10  thing that happened.

11       The real happen, in a whiplash, is that all the

12  cervical spine hurts, and there is rectification of the

13  cervical spine.  The cervical spine has a curvature.

14    Q.  Uh-huh.

15    A.  And this curvature, when there's pain, it's

16  rectified, instead of curved.  It's straight because of

17  the contraction of the muscles.  And, usually, the pain

18  isn't all over the spine.  When it's specific, in one

19  place, and it's very tender in that place, it's very

20  suspicious of a very bad lesion.

21    Q.  Okay.  Let's flip to the last page.  Whose

22  signature is that?

23    A.  I don't know.  It's a messy signature.  It's

24  C-r-r-r-r-r-r.

25    Q.  Okay.  What was the patient prescribed?  How much

1  therapy was the patient prescribed?

2   A.  Cervical spine, sprain and strain.  Right -- what

3  is this?  Right and left knee?  Rib cage.  Pain in the

4  right rib cage, but it's not uncommon.  Okay.  Because

5  probably it was hit against one of the sides.

6      Right shoulder, I told you there was the brace of

7  the -- usually the steering wheel.  And right knee,

8  probably related with the foot in the brake.  Usually,

9  if it's a rear-end, it makes the things worse, because

10  when you have the impact from behind, you press the

11  brake, they produce resistance.  They lift, push, but --

12  okay.

13   Q.  What's the purpose of this initial exam?

14   A.  To know what happened to the patient, to do a

15  diagnosis.

16   Q.  Is the initial exam what is used to create the

17  plan of care, for the patient?

18   A.  Yes.

19   Q.  Would you agree that the plan of care needs to be

20  sufficiently -- excuse me.

21      Would you agree that the initial exam needs to be

22  sufficiently detailed, to allow for an accurate plan of

23  care?

24   A.  Yes, it have to be detailed, if it's possible.

25   Q.  We're going to go back to Exhibit 10, the massage

1  therapy order of Patient "BR".

2    A.  This is Patient "BR", too?

3    Q.  Uh-huh.

4        Do you want a copy?

5            MR. SPECTOR:  Oh, thanks.

6  BY MS. SALADRIGAS:

7    Q.  All right.  Let's talk about some of the

8  modalities that are listed on here.

9    A.  Uh-huh.

10   Q.  Based on your experience, as the treating

11 physician, when would this form be completed?

12   A.  At the end of the physical examination.

13   Q.  Okay.  Would it be based on the doctor's findings

14 during the physical examination?

15   A.  Yes.

16   Q.  What is the difference -- I'm looking in the

17 cervical, thoracic, and lumbar spine section, what is

18 the difference between EMS and TENZ?

19   A.  There's a lot of difference.  EMS is an

20 electrical musculoskeletal stimulation.  Electrical

21 musculoskeletal is to produce, to enhance the strength

22 of the muscles.

23   Q.  Okay.

24   A.  The TENZ is related with the nerves, and it

25 produce hipostasia (Spanish) or anesthesia, in the

1   nerves.

2           (Reporter clarification.)

3    A.  Hipostasia (Spanish) or anesthesia of the nerves.

4   It's to reduce pain.  The TENZ is for reduce pain.  The

5   EMS is for stimulation of the muscles.

6    Q.  Okay.

7    A.  They are completely different things.

8    Q.  Different machines?

9    A.  Different machines, yes.

10    Q.  Okay.  Did Health and Wellness have both of those

11   machines?

12    A.  Yes.

13    Q.  How is the EMS machine used?  Is it -- is there

14   just an on/off button, you turn it on, you use it,

15   that's it; or are there different currents?

16    A.  There are different currents, different types of

17   currents, different intensity of currents, different

18   place to application.

19    Q.  Okay.

20    A.  Yeah.  There are -- for example, the waves of the

21   current can be round waves, or it can be straight waves.

22   So, there are many other things that stimulate the

23   muscles.  It can be applied -- as I told you before, the

24   best thing to apply is to have an electromyography to

25   have the point in which to apply.  But the way they

1   don't do electromyography, they try to use places in

2   which they can see the contracture of the muscles

3   better.

4        Usually, here, she was very explicit and say EMS

5   have to be slight.  Why?  Because probably the patient

6   has a lot of pain and they want -- they didn't want a

7   lot of contractions.  They want just very slight

8   contractions, to the muscles, like to relax that.  And

9   they say, very specific, that -- also the ultrasound

10  want to be light.

11  Q.  I want to wait on ultrasound for just a second.

12  A.  Okay.

13  Q.  I want to keep talking about EMS.

14  A.  Okay.

15  Q.  You said there's different currents, right?

16  A.  Yes, different types of currents.

17  Q.  Different types of currents.  Okay.

18       How would a massage therapist, looking at this --

19  let's back up.

20       Is this what a massage therapist would look at --

21  A.  Yes.

22  Q.  -- to perform treatment, on a patient?

23  A.  Yes.

24  Q.  How would a massage therapist know, looking at

25  this, what currents to use?

1    A.  It's usually the same kind of current.  They put

2   the low voltage, because it's light, and they use

3   usually round waves, not straight waves.

4    Q.  But how would the licensed massage -- massage

5   therapist know to do that?

6    A.  Because this is probably what she's instructed to

7   do, by this doctor or me, sometimes.  They know that we

8   don't use a current that are like a very prolonged or

9   very straight up.  They are just soft currents, because

10  this patient doesn't need to develop muscle, doesn't

11  need to -- just to contract muscle to gain a little bit

12  of strength.  Because in the way that these patients

13  cannot move very much, they have a tendency to have

14  atrophy of the muscles.  And the way they stimulate a

15  little bit, the contractures.  It is not like it used to

16  -- to be in the -- in Russia, in which they made the

17  physical cauteries use the EMS to produce muscle.

18   Q.  Did you perform any training, at Health and

19  Wellness, to the massage therapists, that they should

20  only use the round curve you're describing?

21   A.  I probably say one time, or two times, that they

22  have to use that therapy and not to change, yeah.

23   Q.  Okay.  How does a physical -- excuse me.

24       How does a licensed massage therapist know how

25  long to perform the EMS, based on looking at this?

1    A.  Well, it was a standard.  I don't remember

2  exactly how long it was.  It was a standard that they do

3  almost every time, the very same thing.

4    Q.  Did you say it wasn't or it was?

5    A.  It was.  Was, yeah.

6    Q.  It was.  So, what was the standard?

7    A.  I don't know.  I don't remember exactly.

8    Q.  Was that -- I mean, how do you know that there

9  was a standard?

10    A.  Because there always was the very same day.  They

11  don't have this idea to change things.  They are very --

12  you know, doing the very same thing, with any device,

13  every time.

14       There was not any rules written.  There was not

15  anything specific.  But they do just to put the

16  stimulation for 10, 15 minutes, or whatever.

17    Q.  Would it be 10, 15 minutes on the cervical, 10

18  15 minutes on the thoracic, and then 10, 15 minutes on

19  the lumbar?

20    A.  Well, probably, yeah.

21    Q.  So, it would be 45 minutes of EMS?

22    A.  Probably, it's around 30 minutes to 45 minutes.

23    Q.  How --

24    A.  I didn't put too much attention how long it was.

25  I know that it was not a lot of time.  It doesn't mean

1  too much to be five more minutes, or less five minutes.

2  They have to be sometime like 10 minutes or 15 minutes

3  of treatment.  I don't think it's a very big difference

4  of that.

5      Q.  Did you train the massage therapists on how long

6  to use the EMS?

7      A.  Well, you asked me this question.  And I tell

8  you, no, I didn't train them directly.  I say, well,

9  just give 10 minutes or 15 minutes.  It's not a

10  training, it's just a recommendation, yeah.

11     Q.  And you did that?

12     A.  Yeah.

13     Q.  Did you write that down --

14     A.  No.

15     Q.  -- anywhere?

16     A.  No, I didn't make any rules, specific rules.

17     Q.  Okay.  Let's talk about massage and manual

18  therapy.  Can you tell me what the difference is?

19     A.  Well, manual therapy -- massage doesn't need to

20  be manual.  Okay?  Massage can be mechanical massage.

21  Manual therapy implies manual massage or tambien

22  (Spanish) manual mobilization of the --

23     Q.  When you say "tambien," you mean "also"?

24     A.  Also, yes, a mobilization of the joints.  Okay?

25  In that way, usually if you do manual therapy, what you

1    do is the massage and mobilization, passive mobilization

2    of the joints, in the lumbar spine and cervical spine.

3          Is that clear?

4      Q.  Kind of.  If I understood you correctly, manual

5    therapy could be massage, but massage could be something

6    other than manual therapy?

7      A.  Yes.

8      Q.  Okay.  And, again, how is -- first of all, that

9    seems like a lot of massage-type modalities, right?

10          We've got one that's actually massage and one

11    that could be massage, and they're getting both of them,

12    for a period of time that we don't know how long it is?

13          MR. NICOLEAU:  Form.

14          THE WITNESS:  Okay.  I -- I can explain very

15          easy.  Did you went to the mall sometimes?

16    BY MS. SALADRIGAS:

17      Q.  Okay.  I'm just going to tell you, you're not

18    here to ask me questions.

19      A.  You -- you put the -- the electric key massage on

20    your back?  Woo, woo, woo.  Well, this is massage, but

21    this is a mechanical massage.

22      Q.  Okay.

23      A.  In another place of the mall, you go and somebody

24    is doing like that, (indicating), on your back.  These

25    are different.  Okay?  They are different therapies and

1  specifically in this kind of things, one is just to

2  relax the muscles, and the other is to mobilize the

3  joints and to relax the muscles.  They are two different

4  things.  They are related, of course, but they are not

5  the same thing.

6     Q.  Okay.  Let's talk about the therapeutic

7  exercises.  It looks like the date of the initial

8  evaluation, which is Exhibit 12, is April 16, 2012.  And

9  this therapy order, which is Exhibit 10, is also

10  April 16, 2012; is that right?

11     A.  Yes.

12     Q.  And this patient, on their -- after their initial

13  exam, was prescribed with therapeutic exercises?

14     A.  Well, this is a mistake.

15     Q.  Okay.

16     A.  Therapeutic exercises, they shouldn't be in the

17  first or second week.  Okay.  I don't know if the idea

18  was just to mark it and not to do it, at the beginning,

19  because in the way it's not going to be new orders in

20  the next 15 days, or three weeks.  Maybe the intention

21  is that.  But, of course, it's not the prudent thing to

22  do therapeutic exercises, at the very beginning of the

23  treatment.

24     Q.  Why?

25     A.  Because, usually, they mobilize things that are

1   still very stiff and contracture.  You just leave it

2   until the pain is gone, and the contracture is gone, to

3   produce the exercises.

4      Q.  Would you describe the first two weeks as the

5   acute phase?

6      A.  Yes.

7      Q.  And --

8      A.  Acute and subacute phase, yeah.

9      Q.  Okay.  And, so, when the patient is receiving

10  treatment during the acute phase, what kind of modality

11  should they be getting at that time?

12     A.  Well, the EMS is okay.  Cold pack is okay.

13  Massage is okay.  Ultrasound is okay.  Always, if it's

14  less than 18 years -- more than 18 years old.  Usually,

15  we don't do ultrasound unless more than 18 years old.

16          Hydromassage is just another way of massage.  And

17  I tell you there are therapies that are -- maybe if you

18  want to classify doing that, but I would say that doing

19  them are complimentary.  Okay.  Contrast bath is another

20  way to say that we're going to do a hot/cold packs.

21  Contrast bath is with the -- giving hot with the wax,

22  and they -- which is one way of heat in the --

23          MR. SPECTOR:  Hot what?  Hot the walks?

24          THE WITNESS:  Wax.

25          MR. SPECTOR:  Rocks?

1        THE WITNESS:  Wax.

2        MR. NICOLEAU:  Hot wax?

3        THE WITNESS:  Yeah, hot wax.

4        MR. SPECTOR:  Oh, hot wax.

5    BY MS. SALADRIGAS:

6     Q.  That's the contrast bath?

7     A.  Yes.

8        MR. SPECTOR:  That's why I need to clarify

9      it.

10        THE WITNESS:  Manual therapy, I told you

11      just what it was.  Mechanical traction, of

12      course, no in acute phase.  It says very clear,

13      "No", there.

14        TENZ, I don't know why he didn't mark TENZ.

15      But I would prescribe TENZ, on this patient, if

16      he's in acute phase.  Therapeutic activities,

17      well, this is all depends what are the lesions

18      and where are the things.  I don't know.

19    BY MS. SALADRIGAS:

20     Q.  Okay.  So, during the acute phase, do you think

21    t's appropriate for a patient to treat for -- it looks

22    ike here the patient has been prescribed five times a

23    week, for two weeks.

24     A.  Uh-huh.

25     Q.  Do you think it would be appropriate, during the

1    acute phase, for the patient to receive all of that

2    therapy for --

3       A.  Well, I tell you, therapeutic exercises, no.  The

4    other things, yes.

5       Q.  Okay.  Let me finish my question because that's

6    not what I'm asking.

7          Do you think it's appropriate for a patient to

8    receive 10 visits, five times a week, for two weeks,

9    with all that therapy, without any communication from

10   the doctor about how the patient's progressing?

11             MS. PARKER:  Objection, form.

12             THE WITNESS:  Maybe.  I don't know.  Most of

13          the time, I'm not very concerned about the

14          progress of the patient because the patient is

15          progressing every day, in two weeks.  And the way

16          I think I'm going to be the progress in the next

17          visit, in the follow-up.  In that way, I probably

18          didn't have any, myself, and I don't know these

19          doctor -- any news about how the patient is

20          doing, only if they have big problems, or have

21          problems with the therapy, and he's not

22          responding at all, or something unusual happen.

23          But if it's the current evolution of a patient

24          that has this kind of therapy, probably you're

25          not going to know about it, until you have the

1      follow-up.

2    BY MS. SALADRIGAS:

3      Q.  And why is it that you wouldn't know about it?

4      A.  Why I wouldn't know?

5      Q.  Yeah.

6      A.  It's not necessary.

7      Q.  Why is it not necessary?

8      A.  Why you're going to know if it's a normal course

9    of traction and the results, why are you going to know

10   that?  You don't need to know.

11     Q.  Let me refer you back to Page 3, of Exhibit 12.

12   This patient was diagnosed with cervical spine strain?

13     A.  Sprain.

14     Q.  Sprain/strain?

15     A.  Yes.

16     Q.  And a thoracic spine sprain/strain?

17     A.  Yes.

18     Q.  And a lumbar spine sprain/strain; is that right?

19     A.  Yes.

20     Q.  Dr. Goldstraj, do soft -- are those -- would you

21   describe those as soft tissue injuries?

22          MR. NICOLEAU:  Form.

23          THE WITNESS:  They are at least soft tissue

24       injuries.

25   BY MS. SALADRIGAS:

1    Q.  Why do you say "at least"?

2    A.  Because we know that this pain, and it's in a

3  sprain and strain, in every one of these localizations,

4  but we don't know if it's not more lesions like that.

5    Q.  Why don't you know?

6    A.  Because we don't have an x-ray.

7    Q.  So, let me get this right.

8    A.  We cannot guess what this is behind the soft

9  tissue.  The hard tissue, which is the bones and the

10  ligaments, and everything else, you cannot see it from

11  outside.  You can see the results of the injury, in the

12  soft tissue, but you cannot see these in the hard

13  tissue.  Only if in the hard tissue is the lesions, so

14  big, and so important, that it's, obviously, seen as a

15  simple view.  For this the x-ray was invented, to see

16  what you cannot see.

17    Q.  Uh-huh.  But this patient, if we're just looking

18  at the sprain and strain, that's indicated, was

19  diagnosed with soft tissue injuries?

20    A.  Yes.

21    Q.  Okay.  Dr. Goldstraj, do soft tissue injuries

22  tend to resolve on their own?

23    A.  Not really.  The soft tissue injuries resolve

24  with the time, with a lot of scars.  Okay.  You don't

25  see the scars because the scars are behind the skin.

HUGO GOLDSTRAJ, M.D. Volume 2                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                200

1   When you have a soft tissue injury, they produce scars

2   in the muscles, in the ligaments, because the rupture of

3   the muscle, the rupture of the ligaments, when they heal

4   by itself, produce scars.  And this usually produce

5   chronic pain.

6        In that way, when do you physical therapy, you

7   have the tendency to not form scars, not just to heal

8   was a normal tissue.  But when you don't do this

9   treatment, they produce scars.

10        What means a soft tissue injury?  Means that

11   there's a rupture of muscle, it's bleeding in the

12   muscle, it's bleeding in the facia, it's bleeding in the

13   ligaments, it's distension, it's rupture.  And this is

14   how the same thing that heals your skin, when you're

15   cut, it's with a scar.  You need plastic surgery.  Okay.

16   Well, in the deep, you cannot do plastic surgery.  The

17   only thing we can do is physical therapy.

18   Q.  Okay.  I'm focusing on the diagnosis on Page 3,

19   of Exhibit 12.  Would that diagnosis have been made

20   before an x-ray was ordered?

21   A.  Yes.

22   Q.  I'm looking over here, just to be clear.

23   A.  Yeah, I don't know if even an x-ray was ordered.

24   I don't know.  I don't know.

25   Q.  To the extent an x-ray was ordered, would this

1  diagnosis have been completed before the x-ray was

2  ordered?

3     A.  Probably, yeah.

4     Q.  Why?

5     A.  I don't know.

6     Q.  If I understand your testimony correctly, you

7  just testified that there may be other injuries, other

8  than this strain and this sprain, that's indicated here,

9  right?

10    A.  I think they could be, not they are.  They could

11 be.

12    Q.  Okay.

13    A.  It could be other injuries.  I don't know.  I did

14 not see this patient.  But, yes, there could be other

15 injuries.

16    Q.  Okay.

17    A.  Many things you don't discover, in the first

18 visit.  Maybe you discover in the second visit.

19    Q.  Uh-huh.

20    A.  Many times they -- your evaluation is not so

21 good, like to discover lesions that you didn't describe.

22 You know, we doctors are human beings.  We can fail.  We

23 can sometimes not to find the things that we have to

24 find.  And this happens.  And I don't say often, but it

25 happens.

1        I don't know this patient, specifically, but they

2    describe soft tissue injury results, but they didn't say

3    that there's any other kind of injuries.  And I think

4    any doctor, in his mind, is going just to rule out other

5    injuries, if not really convinced that there's not any

6    other injuries, for many reasons.  First of all, because

7    they can be wrong.  And, second, because they can be

8    sued.

9       Q.  Okay.  Was it your practice to complete the

10   "Diagnosis" section, before ordering or receiving x-ray

11   results?

12      A.  Yes.

13      Q.  Would you update the diagnosis --

14      A.  In the --

15      Q.  -- based on the up -- the x-ray results?

16      A.  In the -- in the follow-up, yes.  Not in the same

17   initial visit.  I'm going to do it in the follow-up.

18   Usually, when the radiologist finds something, they are

19   going to call you by phone.  They say, you know, I find

20   a fracture, I find there's a -- the vertebra is out of

21   place, or I found other things.

22        In that way, you call the patient and you do a

23   follow-up, before the appointment, and whether it's a

24   bad injury.  If it's not a bad injury, and the

25   radiologist don't call you, and they come later and say

1   she has stratification -- rectification of the spinal,

2   or whatever, that it's not a -- means that you're going

3   to modify your treatment, or you're going to do other

4   things, you just wait for the follow-up.

5      Q.  Okay.  Let's go back to the therapy order form,

6   that's marked as Exhibit 10.

7      A.  Yeah.

8      Q.  Go down to the section that's titled "Shoulders

9   and Knees."

10     A.  Yes.

11     Q.  Why is there a section that is addressing those

12  two areas of the body, together?

13     A.  Because they're joints.

14     Q.  Okay.

15     A.  Most the common thing is they're joints.

16     Q.  Would you expect that those two joints would

17  receive the same treatment --

18     A.  Yeah, usually.

19     Q.  -- if they're both injured?

20     A.  Yeah, usually, yes.

21     Q.  Okay.

22     A.  More at the beginning.  Okay?

23     Q.  But would you agree, looking at this form, there

24  s no way if the patient had a shoulder injury and a

25  knee injury, that they could get ultrasound on the

1   shoulder and EMS on the knee?

2           MS. PARKER:  Form.

3           MR. DIAZ:  Form.

4           THE WITNESS:  I didn't understand what you

5       said.  They said they have ultrasound?

6   BY MS. SALADRIGAS:

7    Q.  I'm not referring to what's marked on the form,

8   currently.  I'm saying if the patient presented with

9   injuries, in those two different areas, could they

10  receive -- based on looking at this form, could you

11  prescribe one modality to one of those areas, like the

12  shoulder, and a different modalities to the other area,

13  like the knee?

14   A.  Yes, it could be.

15   Q.  You would just write it?

16   A.  Yes.

17   Q.  I mean, how --

18   A.  Yeah, you write it.

19   Q.  Okay.  You -- let's talk about therapeutic

20  exercises.  They're listed in that section.  And they're

21  also listed in the section regarding cervical, thoracic,

22  and lumbar spine.

23   A.  Uh-huh.

24   Q.  How does the massage therapist, looking at this

25  massage therapy order form, know what therapeutic

1  exercises to perform?

2    A.  Well, they probably their -- I saw it was on the

3  wall, different kind of a therapies, therapy exercises

4  to do with each one of the joints.  They are usually no

5  very complicated.  For the knee, usually it's just

6  extension and flexion, because the knee doesn't have any

7  other movement, just extension and flexion.  You try to

8  extend and flex the knee, in therapeutic exercises.

9       If it's early on, usually you don't use any other

10  kind of weight.  Probably, later, if it's necessary,

11  you're going to use some weight, in the extension and

12  flexion of the knee.  All depends on the pain and how

13  this is evolution.

14       In the -- with respect to the shoulder, it's also

15  a -- most of the cases, just extension and flexion of

16  the shoulder, and sometimes abduction and adduction.

17       I don't understand exactly the question is, what

18  they do, what they have to do?

19    Q.  How do they know --

20    A.  Usually the massage therapist is trained in this.

21  They know what kind of therapeutic exercises to do.

22    Q.  Would you agree that, looking at this document,

23  the specific therapeutic exercises are not stated there?

24    A.  No, it's not stated.

25    Q.  Okay.  So, how --

1    A.  Many times, it's not stated.

2    Q.  Okay.  How many therapeutic exercises are there

3  for the spine?

4    A.  Flexion, extension, lateral flexion --

5         MR. SPECTOR:  You've got to speak up,

6      Doctor.  She can't take it down.

7         THE WITNESS:  Oh.  Flexion, extension,

8      lateral flexion, left and right, rotation; very

9      different exercises.

10  BY MS. SALADRIGAS:

11    Q.  So, how does the massage therapist know, of those

12  six that you just described --

13    A.  Well, the -- I think -- I -- I think that they

14  have the education to do that.  They're not very

15  complicated things.

16    Q.  Okay.  What about therapeutic activities; how are

17  those different from therapeutic exercises?

18    A.  I don't have any idea.

19    Q.  I'm sorry?

20    A.  I don't have any idea what means therapeutic.  I

21  think it's OT, which means that they do small movements,

22  in the hands or in the feet.  I think this is what they

23  refer to.

24    Q.  Did --

25    A.  I don't have, really, very clear what is

1   therapeutic activities.  Any activity that's going to be

2   therapeutic.  It's so generalized a term, I don't know

3   really what they mean.

4      Q.  Okay.  Did you ever do anything to educate

5   yourself on what therapeutic activities are?

6      A.  I don't think there is no way to -- to educate,

7   in this situation.  Like what you want to educate, I

8   don't know, in something that is not specific.

9      Q.  What about doing a search on the internet?

10     A.  Huh?

11     Q.  What about doing a search on the internet,

12  regarding therapeutic activities?

13     A.  I don't know.  I didn't try.  You?  I don't know.

14     Q.  Does --

15     A.  Therapeutic activities, they are not going to

16  find anything specific on internet or anyplace.  It's

17  just something that's very not specific.

18     Q.  Okay.  But were therapeutic activities

19  prescribed, at Health and Wellness?

20     A.  I don't -- I think I didn't prescribe this.

21     Q.  Did anybody else?

22     A.  Maybe, I don't know.  I don't think this person

23  ordered that.

24     Q.  No, that's right.  This person didn't.  But is

25  there -- you describe this chart of therapeutic

HUGO GOLDSTRAJ, M.D. Volume 2                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                  208

1   exercises, hanging up at --

2   A.  Therapeutic exercises --

3   Q.  Exercises, right.

4   A.  -- but not activities.

5   Q.  I know.  I'm going to get there.

6        You described a chart of therapeutic exercises

7   hanging at Health and Wellness.  Was there a similar

8   chart of therapeutic activities hanging at Health and

9   Wellness?

10   A.  I don't remember that.  I don't think so.

11   Q.  Okay.  So, do you know how a massage therapist

12   would select what activities a patient should perform

13   when therapeutic activities are prescribed?

14   A.  I don't have any idea.

15   Q.  Okay.

16        MR. SPECTOR:  Let's take a break.

17        MS. SALADRIGAS:  Oh, sorry.

18        THE VIDEOGRAPHER:  Going off video record,

19        2:28 P.M.

20        (Thereupon, a short break was taken.)

21        THE VIDEOGRAPHER:  We're now back on video

22        record, 2:40 P.M.

23   BY MS. SALADRIGAS:

24   Q.  Dr. Goldstraj, before the break, we were looking

25   at the massage therapy order of Patient BR.  I want to

1   ask you a little bit more about it.

2        So, if you look at the section for shoulders and

3   knees, do you see to the right what appears to be

4   handwriting, the word "Hip"?

5   A.  Yes.  Right hip.

6   Q.  Okay.  Based on looking at this form, does it

7   appear that the shoulder and the hip are being

8   prescribed with all of the modalities that are in that

9   section?

10  A.  Lower leg.

11  Q.  Okay.  Can you tell me how a patient -- how a

12  massage therapist would perform paraffin on a patient's

13  hip?

14  A.  No, it's not going to produce paraffin on

15  patient's hip.

16  Q.  Why not?

17  A.  I don't think it's possible.  I don't know.  I

18  don't think you can put paraffin on the hip, but maybe.

19  don't know.

20  Q.  Why not?

21  A.  Because hip is a place in which it's quite

22  difficult, probably, to put paraffin.  I tell you, I

23  don't know.  Maybe they put it, I don't know.  I don't

24  think it's very important thing, in the therapy of the

25  hip, to put paraffin.  It's not going to do anything.

1    Q.  Would you prescribe paraffin to the hip?

2    A.  Personally, no, I don't think so.

3    Q.  Would you prescribe paraffin to the shoulder?

4    A.  I'm not very fond of paraffin, but maybe I'm

5  going to market.  I don't know.

6    Q.  Why are you not fond of paraffin?

7    A.  The thing is it's the same way of giving heat.

8  You can have many ways of giving heat to the place, you

9  know.

10   Q.  Is ultrasound a substitute for paraffin?

11   A.  Well, a difference between ultrasound and

12  paraffin, ultrasound is a deep hip.  They produce

13  increase of the heat deeply in the tissue.  Paraffin is

14  just surface.

15   Q.  So, would hot packs be a substitute?

16   A.  Maybe, yeah.

17   Q.  Okay.

18   A.  Probably.

19   Q.  Would you expect to see hot packs and paraffin

20  prescribed, at the same time?

21   A.  They could be.  I think it's not a very nice

22  practice, but they could be, yeah.

23   Q.  What do you mean when you say "very nice

24  practice"?

25   A.  Well, they're going to give two -- two things to

1  superpose.

2   Q.  They are "super" what?

3   A.  Yeah, they're superpose, they're both doing the

4  very same effect.  It doesn't mean that it's not going

5  to help, to do both of them, but I don't think it's

6  necessary, absolutely to do both of them.

7   Q.  Okay.  Let's talk about mechanical traction.

8      How was mechanical traction performed, at Health

9  and Wellness?

10   A.  Well, it depends which mechanical traction they

11  are doing.  If they are doing it to the neck, usually

12  they put a thing there, and they stretch the spine, in a

13  machine that has the way to stretch.

14   Q.  Is the patient standing when that --

15   A.  Standing.  Usually, standing -- they can be

16  lying, too, but they're usually standing, yeah.

17   Q.  Were patients that received cervical traction, at

18  Health and Wellness, was it administered while they were

19  standing?

20   A.  I think -- I don't remember exactly were standing

21  or were lying, but they can be both of them.  Standing

22  is easier to perform, standing than lying.

23   Q.  Are those two different machines, the standing

24  and the lying?

25   A.  Well, they're very similar.  The situation of the

1   machines are different.  The one is put on the side of

2   the wall, and the other is put in the side of the bed

3   treatment.

4     Q.  Did Health and Wellness have both?

5     A.  I don't remember.  I tell you the truth, I don't

6   remember.

7     Q.  Okay.  So, that's cervical traction.  What other

8   types of traction are there?

9     A.  Well, usually, the traction is in the cervical

10  spine.  They can be also in the lumbar spine, it's

11  another kind of device.  It's done with the patient

12  lying and it's a like harness, that goes around the

13  hips, and they track the lumbar spine.

14    Q.  Okay.  Did Health and Wellness have a machine to

15  perform lumbar traction?

16    A.  Probably, it does.  I don't remember.  To tell

17  you the truth, I don't remember.

18    Q.  Okay.  You mentioned earlier that traction should

19  not be performed in the acute phase of therapy?

20    A.  No, I don't think so.

21    Q.  Okay.  Even though it was ordered here?

22    A.  It was ordered here?

23    Q.  Right.  And we already talked about this is the

24  initial therapy order?

25    A.  Where it says traction can be --

1          MR. NICOLEAU:  What exhibit are you looking

2     at?

3          MS. SALADRIGAS:  I'm looking at Exhibit 10.

4          THE WITNESS:  It says, "No traction."

5  BY MS. SALADRIGAS:

6   Q.  Sorry.  I'm sorry.  My bad.  I was thinking about

7  therapeutic exercises.  Sorry.  Sorry.  Sorry.

8          If you saw mechanical traction, in the initial

9  phase of treatment, or the acute phase of treatment,

10  would that be appropriate?

11   A.  I don't think it's going to be appropriate.

12   Q.  Okay.  Are there any patients that should not

13  receive mechanical traction?

14   A.  Yes.

15   Q.  Tell me about those patients.

16   A.  Patients below 18 years old, 16 years old, they

17  shouldn't have traction.

18   Q.  Okay.  Any other types of patients that shouldn't

19  receive traction?

20   A.  Well, older patients, with a tendency to have

21  fractures with osteoporosis, things like that.

22   Q.  How old would you stop performing traction?

23   A.  After 40.

24   Q.  After 40?

25   A.  I'm just kidding.

1    Q.  Oh, okay.

2    A.  No, I cannot have an age.  You have to see the

3    patient.  You know, there are patients that have 70,

4    looks very good, they're very athletic; and there are

5    patients that are in their 50's and they have tendency

6    to be osteoporotic and don't do any kind of exercises.

7    That way, I cannot tell you an age, but older patients

8    have less tendency to do it -- to do traction.  Usually,

9    patients doesn't like traction.

10    Q.  Why not?

11    A.  Because it's something that is not very nice.

12    Q.  I don't understand what you mean.

13    A.  Just stretch the neck and stretch the body is

14    not --

15    Q.  Is it uncomfortable?

16    A.  Some kind of uncomfortable.  For this, where the

17    patient has pain, it's better not to do it, in acute

18    pain.

19    Q.  Do you prescribe traction for patients?

20    A.  Well, sometimes, when you see that there is a --

21    like a compromise of the nerve, because you think that

22    there is some kind of herniation, and the nerve is

23    compressed, it's better to do some traction, to release

24    the compression of the nerves, okay, that comes from the

25    side of the spine.

1    Q.  Uh-huh.

2    A.  And in that way, the traction is going to work

3   now.  Even, if it's uncomfortable for the patient, it's

4   going to release the -- the nerve is going to decrease

5   the inflammation of the nerve.  It's going to be a

6   positive thing.  But I never like it too much.

7    Q.  Is that the only time that you would prescribe

8   traction; you, personally?

9    A.  Probably.  Probably.  I didn't like too much

10   traction.  Maybe I order it automatically, sometimes,

11   but really I don't like it very much.

12    Q.  Okay.  And for those types of patients that have

13   that injury, that you were just describing, that you

14   think would benefit from traction, do those patients

15   generally have a more severe injury?

16         MR. NICOLEAU:  Form.

17         THE WITNESS:  Well, most of the injuries

18         that other patients have less severe injury than

19         other patients.  You cannot say it's more or

20         less.  They have an injury that produce some kind

21         of a clinical suspicion of compression of the

22         roots, of the nerves.

23   BY MS. SALADRIGAS:

24    Q.  Is that a patient that should be referred out to

25   a specialist?

1    A.  Well, not necessarily.

2    Q.  Why not?

3    A.  Because they're not going to change too much.  If

4  it's a fracture or it needs surgery because, for

5  example, you have a patient that has a chronic pain and

6  is not improving, with these treatments, you're going to

7  suggest other kind of treatments.  And these have to be

8  done by a specialist, for example, to burn the nerves,

9  or to put the intraspinal treatments, with the

10  anesthesia.

11    Q.  Like injections?

12    A.  Or other kinds of more aggressive treatments,

13  even surgery, okay, fixation of the spine, or fixation

14  of the column -- lumbar spine.  But, usually, we are not

15  talking of these cases that have just, you know,

16  physical therapy, in the clinic.  These are cases that

17  are more complicated patients, you have to refer these

18  patients, because they don't resolve with the treatment

19  that you're doing.  You do treatment and they have pain,

20  pain, pain, pain.  I cannot move.  You refer to a

21  surgeon, an orthopedic surgeon, usually, and they decide

22  what to do.

23    Q.  How often were patients, at Health and Wellness,

24  referred out to specialists, like you just described?

25    A.  Not usually.  It was not usual, but it was done.

1    Q.  Why not?

2    A.  Because there was not many patients that didn't

3  improve with the therapy, okay?  There was no major

4  lesions very often.  Usually, they were just soft tissue

5  jurors.  Okay?  And they don't need an orthopedic

6  surgeon, to make the evaluation.

7    Q.  Okay.  I'm going to mark Exhibit 11, to the

8  Amended Complaint, as Exhibit 13, to this depo.

9        (Thereupon, Plaintiff's Exhibit No. 13 was

10        marked for identification.)

11  BY MS. SALADRIGAS:

12    Q.  I'm just sticking the exhibit sticker over the

13  top of -- it was an exhibit to a deposition, and then

14  marked as an exhibit, in our lawsuit, and now being

15  marked as an exhibit to this deposition.

16        So, for purposes of clarity, I'm just putting the

17  sticker on top of that, just so that we're all clear on

18  what's going on there.  Let me just make sure this is

19  clean.

20        MR. NICOLEAU:  Thank you, so much.

21  BY MS. SALADRIGAS:

22    Q.  Uh-huh.  Take a moment and review that,

23  Dr. Goldstraj.

24        MR. NICOLEAU:  Can you repeat where this

25        came from?

1   BY MS. SALADRIGAS:

2       Q.  It's Exhibit 11, to the Amended Complaint, in

3   this lawsuit.

4       A.  Uh-huh.  I don't know what this is.

5       Q.  Do you recognize it?

6       A.  No.

7       Q.  Have you ever seen it before?

8       A.  No.  As far as I remember, no.

9       Q.  Do you recognize that handwriting?

10      A.  No.

11      Q.  Do you have any knowledge of whether this

12  document was used in the treatment of patients, at

13  Health and Wellness?

14      A.  No.

15      Q.  Do you have any knowledge of whether this

16  document was used in the completion of the daily therapy

17  notes, at Health and Wellness?

18      A.  No, not really.  I don't know this.

19      Q.  Okay.  I'm going to mark -- I cannot keep track

20  of these stickers.

21          (Thereupon, Plaintiff's Exhibit No. 14 was

22      marked for identification.)

23  BY MS. SALADRIGAS:

24      Q.  -- as Exhibit -- excuse me -- 14, the daily

25  therapy note for Patient BR, from April the 16th, 2012,

1  as Exhibit 14.  Take a look at that document.

2       Do you recognize that document?

3  A.  Yes, I saw this kind of document before.

4  Q.  What is it?

5  A.  It's massage therapy notes.

6  Q.  Did you create this form?

7  A.  No.

8  Q.  Did anybody consult with you about the creation

9  of this form?

10  A.  No.

11  Q.  Did you recommend that this form be used?

12  A.  No.

13  Q.  Have you seen this form at any other clinic,

14  other than Health and Wellness?

15  A.  Yes, something similar.  I don't know if it's

16  identical, but similar, yes.

17  Q.  Okay.  This is -- go ahead and compare this form

18  to Exhibit 12, the initial evaluation.

19  A.  Uh-huh.

20  Q.  Did this -- does this daily therapy note have the

21  same date as the initial evaluation?

22  A.  Yes.

23  Q.  What does that mean to you?

24  A.  It means that it was done on the same day.

25  Q.  Okay.  This would be the first therapy visit?

1    A.  You're saying to this patient?

2    Q.  Yes, for this patient.

3    A.  I don't know because the patient name is blank.

4    Q.  Is redacted?  Assuming this is the same patient.

5    A.  I can assume it's the same patient, but I don't

6    know if it's the same patient.

7    Q.  Whatever.  So, if this is the same patient, this

8    is the same date as the initial --

9    A.  Uh-huh.

10   Q.  -- exam?

11   A.  Yeah.

12   Q.  Look at the section under the word "Assessment",

13   on the top right-hand corner.

14       Do you see "Patient" --

15   A.  It says "IS."

16   Q.  You see that, where it says, "Patient condition

17   s"?

18   A.  "Worse."

19   Q.  "Worse."  How can that be?

20   A.  It could be.  Why not?

21   Q.  Worse compared to what?

22   A.  Worse to the beginning of the treatment.

23   Q.  But this is the beginning of the treatment.

24   A.  Yes, but it's probably two hours later or one

25   after later after they perform.  I think -- I guess.

1  You know, I didn't mark that, in a way.  Why they say

2  worse, probably because they start doing the treatment

3  and the patient has more pain.

4    Q.  Let's back up.  Who completed this?

5    A.  Huh?

6    Q.  Who completed this form?

7    A.  I don't know.  The name of the person, I don't

8  know.  There's a signature there, therapy signature.  I

9  don't know who was the therapy signature.

10   Q.  Would a massage therapist have completed this?

11   A.  Well, in the top of the page, it says, "Massage

12  therapy notes."  Obviously, it has to be massage therapy

13  person.

14   Q.  I just want to understand, was it the practice,

15  at Health and Wellness, that a massage therapist would

16  complete this form?

17   A.  Yes, it's -- the form says "Massage therapy

18  notes."

19   Q.  Were massage therapists trained on how to

20  complete this form?

21   A.  Well, I'm not very knowledge of what kind of

22  training massage therapy does, but probably, yes.  I

23  don't know.  This is something that is out of my range

24  of knowledge.

25   Q.  So, did you perform any training for the massage

1   therapists on how to complete this form?

2    A.  No.

3    Q.  Did you instruct anyone else to perform -- excuse

4   me.  Did you instruct anyone else to train the massage

5   therapists on how to complete this form?

6    A.  No.  And, specifically, this form has nothing to

7   do with anything that I do because it's not related with

8   me.  It's other doctor, it's other complaint, it's

9   nothing to do -- I didn't do anything of that.

10    Q.  You would review these forms, though, as the

11   medical director?

12    A.  Well, sometimes, yes.  I told you, I was not a

13   very good medical director.

14    Q.  Okay.  So, I want you to look at the "Note"

15   section of this form.

16        Can you read that handwriting?

17    A.  The handwriting here?

18    Q.  No, in the "Note" section, right here.

19    A.  "The patient initiated the first couple of

20   treatments plan, cycle of treatment plan.  The patient

21   initiated the first cycle of treatment plan."

22    Q.  Go ahead and read Number 1, on Exhibit 13.

23    A.  "The patient initiated the first cycle of

24   treatment plan.  The patient complains of equal pain on

25   the affected areas."

1   Q.  Just Number 1.

2   A.  "The patient initiated the first cycle of

3   treatment plan."

4   Q.  Okay.  And what does the top of this document

5   say?

6          MR. NICOLEAU:  Which document?

7   BY MS. SALADRIGAS:

8   Q.  Sorry.  Document -- Exhibit 13.

9   A.  "Notes, first cycle."

10   Q.  What do you make of that?

11          MR. NICOLEAU:  Form.

12          THE WITNESS:  I don't make that it was

13      patient initiated the first cycle of treatment

14      plan, first cycle.  I don't do anything else.

15   BY MS. SALADRIGAS:

16   Q.  Is it possible that this guide was used to

17   complete this form?

18          MR. NICOLEAU:  Form.

19          MR. DIAZ:  Form.

20          THE WITNESS:  It doesn't look the same

21      handwriting.

22   BY MS. SALADRIGAS:

23   Q.  Is Number 1, on this guide, the same as what's in

24   the "Notes" section, on that therapy form, marked as

25   Exhibit 14?

 1              MR. DIAZ:  Form.

 2              THE WITNESS:  Yes, it's the same phrase.

 3          What means that?  I don't know what have to do.

 4          I don't understand the question.  What do you

 5          want me to say?

 6    BY MS. SALADRIGAS:

 7      Q.  Did you train the massage therapists on what to

 8    put in the "Notes" section, when they were performing

 9    therapy on patients?

10      A.  Not at all.

11      Q.  Did anybody else perform that?

12      A.  I don't have any idea.

13      Q.  Let me ask my question again.

14          Did anyone else train the massage therapists on

15    how to complete the massage therapy notes form?

16      A.  Probably, in the school of massage therapy.  I

17    don't know.

18      Q.  Okay.

19      A.  But not myself.

20      Q.  All right.  Let's take a break from that.  In a

21    second, we're going to refer back to the massage therapy

22    order.

23              MR. NICOLEAU:  What exhibit?

24              MS. SALADRIGAS:  Sorry.  Exhibit -- I keep

25          doing that.  Exhibit 10.

1           THE WITNESS:  10.  10.

2    BY MS. SALADRIGAS:

3      Q.  And let's take a look at the "Modality" section,

4    at the bottom of Exhibit 14, the massage therapy note.

5      A.  Uh-huh.

6      Q.  Look at the portion that says "Thoracic Spine."

7      A.  Uh-huh.

8      Q.  Compare it to what was prescribed in the

9    "Modalities" section, of Exhibit 10.

10          Do you have that?  You need this one, too.

11          THE WITNESS:  Yeah, they --

12          MR. NICOLEAU:  Oh, okay.

13          THE WITNESS:  What they say is here, they

14       make hot and cold packs.  And here it's not

15       ordered, hot and cold packs.

16    BY MS. SALADRIGAS:

17      Q.  Uh-huh.  Was there therapy that was prescribed,

18    on Exhibit 10, the therapy order form, that was not

19    performed?

20      A.  No, it was performed, but it was not ordered.

21    Hot and cold packs --

22      Q.  Okay.  Keep going down the list.  Are there other

23    modalities that were prescribed, on the therapy order

24    form, that was Exhibit 10, that were not performed, on

25    Exhibit 14?

1    A.  This was done.

2    Q.  And I'm talking about the thoracic spine.

3    A.  The thoracic spine?  Let me see.

4        Thoracic spine was done -- no, no, neuromuscular

5   verification, massage therapy, and they didn't do those.

6   Well, I don't know what was the original one, but they

7   didn't do that.

8    Q.  When you say they didn't do it, is that because

9   there is no X in this box, in that column?

10    A.  Yeah, probably.  I assume that, yeah.

11    Q.  Okay.  Why do you assume that?

12    A.  Because if they did it, they are going to mark

13   it.

14    Q.  Okay.  Are the massage therapists allowed to

15   elect which modalities they want to perform?

16    A.  Well, usually not, but depends of the patient.

17   Sometimes, they don't want some things to be done.

18    Q.  Uh-huh.

19    A.  If the patient express that I don't want this

20   because it produce pain, or I don't like it, or because

21   whatever, probably just not doing it.

22    Q.  Uh-huh.

23    A.  The right is always the patient.  And the way --

24   I don't know the reasons why they didn't do it or they

25   do do it, I cannot give you my opinion about that.  I

1    can give you just a supposition that the massage

2    therapist tried to do whatever it says here.  And

3    sometimes they cannot do it, for whatever reason.

4         Usually, a patient doesn't want to, or the

5    patient complain, or lack of time, the patient wants to

6    go out.  I came for half an hour, or not or two hours,

7    whatever.  But these are just suppositions of mine.  I

8    don't know, really, what was the real reasons.  Okay?

9         If the massage therapist has the right to

10   overwrite treatment or to indicate treatment, no, you're

11   true.  This is not a good thing to do.  Only if they

12   have a good excuse for that and excuse should be, in

13   most of the cases, the patient.

14   Q.  Okay.  Is there a difference, in your mind,

15   between not performing something that's been prescribed

16   and performing something that has not been prescribed?

17   A.  Yes, there is a big difference.

18   Q.  What's the difference?

19   A.  The difference is not to do something that is

20   prescribed is something that can be done because of the

21   patient or because of the opportunity, or the timing, or

22   the fact that maybe there is not working the hot, colds.

23   To do something that is not indicated is something that

24   shouldn't be done, because the doctor didn't order that.

25   If it was done, by mistake, is one thing.  And there can

1   be mistakes.  If I did it on purpose, this is a very bad

2   thing.

3      Q.  Okay.  Do you think it's the job of the medical

4   director to make sure that the therapy that's being

5   prescribed is being performed?

6      A.  Yeah, sure.

7      Q.  And do you think it's the job of the medical

8   director to make sure the therapy that was not

9   prescribed is not being performed?

10     A.  Yes.

11         MR. DIAZ:  Form.

12  BY MS. SALADRIGAS:

13     Q.  Did you look for that when you did your review of

14  the bills and records?

15     A.  I tried to, but, you know, maybe I was not

16  perfect on that.

17     Q.  Let's back up a little bit.  We're talking about

18  the first visit for a patient.  The patient comes in and

19  is in the waiting room.  Before they see you, are you

20  familiar with any forms that they would complete?

21     A.  Yeah, probably, there is a form related with his

22  identity, the insurance they have, the right of the --

23  they have to give the rights to the place, to do the

24  treatments.  I don't know, some kind of regular form.

25  I'm not extremely familiar with that, but I know they

1   have to sign a form.

2    Q.  Did you ever review them, the forms?

3    A.  Probably, I saw the form, but I don't remember

4   exactly.

5    Q.  I'm going to mark, as Exhibit 15, a document I'm

6   going to refer to as the fraud affidavit, but it has no

7   title on it.  It's a form from Health and Wellness, for

8   Patient BR.

9            (Thereupon, Plaintiff's Exhibit No. 15 was

10          marked for identification.)

11  BY MS. SALADRIGAS:

12   Q.  Take a look at that document.

13          MR. NICOLEAU:  Thank you.

14          MS. SALADRIGAS:  Uh-huh.

15          MR. NICOLEAU:  Where does it say "BR"?

16          MS. SALADRIGAS:  I know it's for patient BR

17       because I pulled it.  At the bottom --

18          MR. SPECTOR:  If you look at the second

19       page, we redacted everything, except for the

20       letter of their first and last name.

21          MR. NICOLEAU:  No, I'm just asking.

22          MR. SPECTOR:  Yeah, so I'm pointing it out

23       to you.

24          MR. NICOLEAU:  Okay.  I see it now.  That's

25       what I was looking for.

1          MR. SPECTOR:  Yep.

2    BY MS. SALADRIGAS:

3      Q.  Do you recognize that document, Doctor?

4      A.  No.

5      Q.  Ever seen it before?

6      A.  No.

7      Q.  Have you seen a form like this, at any of the

8    other clinics?

9      A.  Not really.

10      Q.  Or at Health and Wellness, have you seen a form

11    like this?

12      A.  No, I didn't see this before in my life.

13      Q.  Okay.  Do you see -- look at Number 9.  It says,

14    "I affirm that I've not acquired any funds from any

15    health care provider to proceed with this case."

16          You see that?

17      A.  Yeah, what it means that?

18      Q.  I was just going to ask you, what does that mean?

19      A.  I don't know.

20      Q.  Have you seen a provision like that, in any of

21    the other forms, at the clinics that you worked at?

22      A.  No.

23      Q.  What about Number 8, "I affirm I have not

24    received any funds from anyone affiliated with Health

25    and Wellness Services, Inc."

1        What does that mean?

2     A.  That the patient was not paid to do the

3   complaint.  I don't know, something like that.

4     Q.  Have you ever seen a provision like that, in any

5   of the other -- in any forms, at any of the other

6   clinics you worked at?

7     A.  No.

8     Q.  Look at Number 12.  "I avow that I will not

9   enroll, in any way -- or in any way associate myself

10  with any other therapy and rehabilitation health care

11  facilities, or health care clinics, throughout the

12  course of treatment, unless otherwise recommended or

13  referred by my physician."

14       What does that mean?

15    A.  It means if they want to --

16          MR. DIAZ:  Form.

17          THE WITNESS:  -- start treatment, they have

18       to follow treatment.  I think that this is

19       completely out of whack.  It's crazy.  You have

20       the right to go to anyplace you want.  This is a

21       free country.

22          MR. NICOLEAU:  Okay.

23  BY MS. SALADRIGAS:

24    Q.  Let's go to 13.

25       "I understand that it is my right to refuse

1  treatment at Health and Wellness Services, at any time.

2  However, I comprehend that I must give proper notice to

3  Health and Wellness Services, Inc., and be given a final

4  medical evaluation from my physician, as part of

5  standard procedures, in order to terminate my treatment

6  plan."

7    A.  What do you want me to say about it?

8    Q.  Have you seen language like that, in a form, at

9  any of the other clinics before?

10    A.  No.

11    Q.  As a treating physician, do you require patients

12  coming in and getting a final medical evaluation, before

13  discontinuing treatment with you?

14    A.  Absolutely not.

15    Q.  Why not?

16    A.  Because the patient can do whatever they want.

17    Q.  So, why would you require them to do this, in

18  this form?

19        MR. NICOLEAU:  Form.

20        MR. DIAZ:  Form.

21        THE WITNESS:  I didn't require anything.

22        This form is not related with me.  I didn't see

23        this form before.  I don't agree with what it

24        says here in the form.  I think that the idea to

25        protect the establishment of a fraud denounce --

1          or fraud investigation.  This document is

2          completely out of a necessary.

3    BY MS. SALADRIGAS:

4      Q.  All right.  Dr. Goldstraj, do you know a health

5    care practitioner named Juan Deoleo?

6      A.  Juan Deoleo?

7      Q.  Uh-huh.

8      A.  What was he doing?

9      Q.  He was a physician's assistant, at Health and

10   Wellness.

11     A.  No, I didn't know him.

12     Q.  Do you recognize that name, at all?

13     A.  No.  Deleo?  Deleo, probably there was name

14   somewhere else or --

15     Q.  Deoleo.

16     A.  Deoleo?

17     Q.  Uh-huh.

18     A.  No, I don't know.

19     Q.  Okay.

20          MR. NICOLEAU:  How do you spell that,

21        please?

22          MS. SALADRIGAS:  D-E-O-L-E-O.

23          THE WITNESS:  You know, the physician

24        assistant have to be credited by the doctor.  I

25        never credited this physician assistant.

1   BY MS. SALADRIGAS:

2   Q.  They have to be what by the doctor?

3   A.  Credited by the doctor.

4   Q.  Credited by the doctor?

5   A.  Yes.

6   Q.  What does that mean?

7   A.  It means that you have to authorize him to do the

8   work.  If you do not have the right to do the work, you

9   cannot do it.

10   Q.  I would submit to you that Juan Deoleo was

11   performing services, at Health and Wellness, while you

12   were the medical director there.

13   A.  I didn't know that.

14   Q.  Okay.  Did you know that Mr. Deoleo was charged

15   with insurance fraud, in Michigan?

16   A.  No, I didn't know it.  Deoleo, I don't know him.

17   I didn't even know anything about him.  And I did not

18   ask him to be a physician assistant.

19   Q.  At Health and Wellness?

20   A.  Nor anyplace.  When you authorize somebody to do

21   a physician assistant, with you, he can't do it

22   anyplace.  They have to be in that place.  They can't do

23   it another place.  You supervise.  You have to be the

24   supervision of the physician assistant.

25   Q.  Uh-huh.

1    A.  I never supervise him.  I never had the

2    supervision of him.

3    Q.  Okay.

4    A.  I don't know him.

5    Q.  You told me the name of one other physician's

6    assistant?

7    A.  Yes, I did.

8    Q.  De --

9    A.  Hilda de la Pedraja.

10   Q.  So --

11   A.  Hilda de la Pedraja.

12   Q.  Right.  Was there anyone else besides

13   Ms. de la Pedraja?

14   A.  Not as far as I remember, no.

15   Q.  What about Orlando Leyva?

16   A.  No, I don't remember any Orlando Leyva.

17   Q.  Okay.  Let's go back to Deoleo.  If you did not

18   supervise Mr. Deoleo, were the services provided by him

19   awfully rendered?

20   A.  He -- if he has other supervisor --

21        MR. DIAZ:  Form.

22        MR. NICOLEAU:  Form.

23        THE WITNESS:  -- maybe.

24   BY MS. SALADRIGAS:

25   Q.  Who could be the other supervisor be?

1    A.  Another doctor, in another facility, or in this

2   facility.  I don't know.  I think that there are several

3   offices that belongs to the same group.  And maybe there

4   was another doctor, in another place, that was

5   supervising this person.  I don't know.

6    Q.  What do you mean there's other offices that

7   belong to the same group?

8    A.  I think there was one in Homestead that belonged

9   to the same group.

10   Q.  Why do you think that?

11   A.  Because I heard mention that.

12   Q.  Who mentioned it?

13   A.  Probably, the employees, or even the -- Mr. --

14   what's his name?

15   Q.  Muse?

16   A.  Muse.  I don't remember exactly who mentioned it,

17   but I know there was another facility was related.  And

18   I don't know in what way was related.  I was working in

19   Homestead.  And I don't know if there's any doctor,

20   probably another medical director, that maybe was in

21   charge of this person.  But I don't know.  It's one

22   supposition that I have, because you asked me if he was

23   legally working there, and I say, well, I don't know.

24   But I cannot say he was illegally working there.

25   Q.  That's fair.

1      Are you familiar with -- do you recognize the

2  name Pain Relief Clinic of Homestead?

3   A.  No.  I know there was a clinic in Homestead.  I

4  didn't know the name.

5   Q.  Okay.

6      Yeah, can we just take a quick break?  I'm

7  waiting on a few more documents.

8          THE VIDEOGRAPHER:  Going off video record,

9      3:18 P.M.

10          (Thereupon, a short break was taken.)

11          THE VIDEOGRAPHER:  We're now back on video

12      record, 3:35 P.M.

13  BY MS. SALADRIGAS:

14   Q.  Dr. Goldstraj, we're going to refer back to the

15  document I'm referring to as a guide, which is

16  Exhibit 13.

17   A.  Uh-huh.  Yes, I see.

18   Q.  And I'm going to mark, as Exhibit 16, a daily

19  therapy note of patient -- the name is not redacted.

20          MR. SPECTOR:  It's fine.

21          MS. SALADRIGAS:  It's -- we have a -- so,

22      just so that you all know --

23          MR. SPECTOR:  Yes.

24          MS. SALADRIGAS:   -- we have a

25      confidentiality order.  It governs all the

1      documents, particularly the patient records.

2            MR. SPECTOR:  Yes.

3            MS. SALADRIGAS:  So, the patient's name is

4      not redacted.  It's, obviously, meant to be

5      confidential.  The exhibits will not be filed,

6      unless under seal or properly redacted,

7      consistent with the order.

8            MR. NICOLEAU:  And we participate in that

9      protective order.

10   BY MS. SALADRIGAS:

11     Q.  Great.  So, I'm going to mark the daily therapy

12   note, dated April 19, 2012, of B████ R██████ as

13   Exhibit 13 -- 16.  I'm sorry.

14           (Thereupon, Plaintiff's Exhibit No. 16 was

15        marked for identification.)

16   BY MS. SALADRIGAS:

17     Q.  Exhibit 16, take a look.  Do you recognize that,

18   Dr. Goldstraj?

19     A.  What do you mean with "recognize"?

20     Q.  Does it look familiar to you, the farm?

21     A.  Yeah, the form is familiar with me.

22     Q.  Is it the massage therapy form --

23     A.  Yes.

24     Q.  -- used at Health and Wellness?

25     A.  Yes.

1    Q.  Okay.  Can you look at the Notes" section?

2    A.  Which one section?

3    Q.  The "Notes" section, right here.

4    A.  Ah the "Notes," yes.

5    Q.  Can you read what it says there?

6    A.  "The patient has swelling and pain one of the

7    paravertebral areas."

8    Q.  Okay.  Let's refer back to Exhibit 13.  Look at

9    Number 3.

10   A.  "The patient complains of" --

11   Q.  Number 3.

12   A.  "The patient has swelling and pain over the

13   paravertebral area."

14   Q.  Does the language in Number 3, on Exhibit 13,

15   match with the language in the "Notes" section on

16   Exhibit 16?

17   A.  Yes, absolutely.

18   Q.  I'm going to mark, as Exhibit 17, the daily

19   therapy note of B███ R███ dated April 26, 2012.

20        (Thereupon, Plaintiff's Exhibit No. 17 was

21     marked for identification.)

22   BY MS. SALADRIGAS:

23   Q.  Do you recognize that document?

24   A.  Yes.

25   Q.  Is it a form from Health and Wellness?

1   A.  Yes.

2   Q.  Go ahead and read the "Note" section.

3   A.  "The patient continues to complain of ache and

4   pain associated with his back pain."  Therapies they do

5   not have.

6   Q.  Go ahead and look at Number 8, on Exhibit 13.

7   What does it say?

8   A.  "The patient continues to complain of aches and

9   pains associated with his sprains."

10   Q.  Are those pretty similar?

11   A.  Yes, pretty similar.

12   Q.  Look at the bottom of Exhibit 17.  Do you

13   recognize the therapist's signature?

14   A.  I see a signature.  I don't recognize that.  And

15   the side it says, "Rydel. "

16   Q.  Do you know that name?

17   A.  I heard about it.

18   Q.  Where did you hear about it?

19   A.  I don't know.  I heard about it.  Probably, it's

20   a massage therapist.

21   Q.  Why do you say probably it's a massage therapist?

22   A.  Because I cannot say for sure.

23   Q.  Did you hear about it at Health and Wellness?

24   Did you hear about that name at Health and Wellness?

25   A.  Yes, at Health and Wellness, yes.

1    Q.  Who mentioned it to you?

2    A.  I heard them mention it call Rydel, Rydel.

3    Q.  Have you ever met Rydel?

4    A.  Probably, but I don't remember him exactly.

5    Q.  Do you know Rydel's last name?

6    A.  No.

7    Q.  You supervised Rydel?

8    A.  I guess I supervised Rydel, but I don't remember

9    him.  I don't remember him.  I tell you, I'm very bad

10   for persons.  But the -- yeah.

11   Q.  Okay.  Let's mark daily therapy note of B█████

12   R█████  dated April 30, 2012 --

13   A.  Uh-huh.

14   Q.  -- as Exhibit 18.

15   A.  Uh-huh.

16        (Thereupon, Plaintiff's Exhibit No. 18 was

17     marked for identification.)

18   BY MS. SALADRIGAS:

19   Q.  Do you recognize that document?

20   A.  Yes, I do.  Massage therapist notes.

21   Q.  Is it a Health and Wellness form?

22   A.  Yes.

23   Q.  Do you recognize the signature, at the bottom?

24   A.  No.

25   Q.  Can you read the "Note" section to me?

HUGO GOLDSTRAJ, M.D. Volume 2                                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                                 242

1    A.  "Patient continues with all treatment - something

2  - by his physician."

3    Q.  Look at Number 9, on Exhibit -- on the first page

4  of Exhibit 13.  What does it say?

5    A.  "Patient continues with the treatment indicated

6  by his physician or her physician."  There's two

7  possibilities.

8    Q.  Does Number 9, on Exhibit 13, are the words there

9  similar to the words that are used in the "Notes"

10 section --

11   A.  Pretty similar, yes.

12   Q.  -- on Exhibit 18?

13   A.  Pretty similar.

14   Q.  Okay.  I'm going to mark, as Exhibit 19, is the

15 daily therapy note of B█████ R█████ dated May 9, 2012.

16         (Thereupon, Plaintiff's Exhibit No. 19 was

17      marked for identification.)

18 BY MS. SALADRIGAS:

19   Q.  Do you recognize this document?

20   A.  Yes, it's a massage therapy note.

21   Q.  Is it a Health and Wellness form?

22   A.  Yes.

23   Q.  Whose signature is at the bottom?

24   A.  It says, "Rydel."

25   Q.  Can you read the "Note" section?

1    A.  "The patient initiated the second - I don't know

2  - treatment plan."

3    Q.  Flip to the second page, of Exhibit 13.  Look at

4  Number 1.

5    A.  Yeah, "The patient initiated the second cycle

6  treatment plan indicated by his or her physician."

7    Q.  Is the language in Exhibit 19, in the "Notes"

8  section, similar to the language in Number 1, on Page 2

9  of Exhibit 13?

10   A.  Yes.  Yes.  Yes, it's pretty similar.

11   Q.  Uh-huh.  Based on what you've seen, is it

12  possible that this document, Exhibit 13, was used at

13  Health and Wellness to complete the therapy forms?

14   A.  I don't understand the question.  Can you

15  rephrase?

16   Q.  Is it possible that Exhibit 13 --

17   A.  Yes.

18   Q.  -- was used to complete the daily therapy

19  notes --

20   A.  Probably.

21   Q.  -- in all of this?

22   A.  Yes, probably.

23   Q.  And you've never seen Exhibit 13 before today?

24   A.  No.

25   Q.  Okay.  Dr. Goldstraj, did you supervise the

1  treatment being performed at Health and Wellness on a

2  day-to-day basis?

3    A.  No.

4    Q.  Did you do anything to confirm that treatment was

5  actually being performed?

6    A.  Well, I saw many times that the treatment was

7  done, but I cannot say that every one of the treatments

8  was done.

9    Q.  Were you aware of any instances of bills being

10  submitted for treatment that was not rendered?

11    A.  No, not really.  I didn't know that.

12    Q.  Do you think it would be the job of the medical

13  director to determine or identify that bills were being

14  submitted for treatment that was not rendered?

15    A.  Yes.

16    Q.  Let's talk about the Muses, a little bit more.

17  You met Beatriz Muse at Health and Wellness?

18    A.  Yes.

19    Q.  Do you recall when you first met her?

20    A.  Her?

21    Q.  "Her," Beatriz?

22    A.  No, I don't remember the first time that I met

23  her, but I met her many times.

24    Q.  Okay.  Are you familiar with the Muses owning any

25  other clinics, besides Health and Wellness?

1    A.  No.

2    Q.  Okay.  But you did mention a clinic down in

3  Homestead, right?

4    A.  Yes.

5    Q.  Okay.  Do you know Noel Santos?

6    A.  No.  No, as far as I remember.  No.  What

7  is the -- what's the --

8    Q.  Do you know Beatriz Muse's husband?

9    A.  Yes.

10    Q.  What's his name?

11    A.  I don't know.

12    Q.  What does Beatriz Muse's husband do?

13    A.  He was studying for a radiology technician or

14  something like that.

15    Q.  Does Beatriz Muse's husband own any clinics?

16    A.  I don't know.  I didn't see him working in Health

17  and Wellness.  I didn't see that he was working there.

18    Q.  Okay.  So, I want to circle back to how you got

19  to the Muses.  You said that you were introduced to

20  Lazaro Muse by his -- either his wife or ex-wife?

21    A.  Ex-wife, I think.

22    Q.  Ex-wife?

23    A.  Yes.  He -- he married again.

24    Q.  Okay.  Does the name Magda Perez sound familiar

25  to you?

1    A.  Yes.

2    Q.  Is that the person that introduced you?

3    A.  I think probably, yes.

4    Q.  Okay.  And Magda Perez worked at RPM?

5    A.  Yeah.

6    Q.  Okay.  All right.  Dr. Goldstraj, do you

7    currently work as a medical director of Health and

8    Wellness?

9    A.  No.

10    Q.  When did you stop working as the medical director

11    of Health and Wellness?

12    A.  There was a moment in which they asked me that

13    they have to resign to the medical directors because I

14    was accused.  And that way, since then, I didn't work

15    any longer, in any of these clinics.

16    Q.  Tell me a little bit about that.

17       Did someone from Health and Wellness approach you

18    and tell you that you had to stop working at Health and

19    Wellness?

20    A.  Well, I didn't try to keep working, but they

21    didn't want me to work there.

22    Q.  Did you tell them about what was happening with

23    the accusation that you just mentioned?

24    A.  Yes, of course.

25    Q.  Okay.  Did you document that?  Did you put it in

1   a letter or something?

2    A.  No, I didn't go any longer to that place.

3    Q.  Okay.

4    A.  Nor any other place in which they are doing

5   people.

6    Q.  Okay.  Who did you tell?

7    A.  I think I have the conversation with the Muses,

8   specifically with Lazaro.

9    Q.  Okay.  Let me see if I have that document.  Just

10   give me a second.  I'm looking for a document, in my big

11   box of documents.

12         Dr. Goldstraj, do you recall receiving a letter

13   from anyone at Health and Wellness relating to your

14   termination?

15    A.  No, that I remember.

16          MR. NICOLEAU:  Are you marking this?

17          MS. SALADRIGAS:  Yeah, I'm going to mark it

18       as Exhibit 20.

19          (Thereupon, Plaintiff's Exhibit No. 20 was

20       marked for identification.)

21   BY MS. SALADRIGAS:

22    Q.  I'm marking a letter, dated June 3, 2013, to

23   Dr. Goldstraj, as Exhibit 20.  Take a moment and review

24   it.

25    A.  You want me to read it?

HUGO GOLDSTRAJ, M.D. Volume 2                                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                              248

1    Q.  You don't need to read it, just review it.

2    A.  Okay.

3    Q.  Do you recognize that document?

4    A.  No.

5    Q.  You ever seen it before?

6    A.  No.

7    Q.  Was the address under your name, 40 -- 42

8    Northwest 27th Avenue, is that your address, in 2013?

9    A.  Northwest 27th Avenue, I didn't live there.  I

10   don't know what is this address.

11   Q.  Did you work there?

12   A.  42 Northwest 27 -- this was -- I have an office

13   there, but many years before.

14   Q.  Is that where your PA was?

15   A.  Yes.

16   Q.  Do you recall ever receiving this letter?

17   A.  No.

18   Q.  Do you know the name Sandor Abraham Fuentes?

19   A.  Yes.

20   Q.  Who was that?

21   A.  It was the person there that I told they looked

22   like a boss.  He was acting like he was the owner or

23   whatever.  He was a young fellow.

24   Q.  Did you have any conversations with him about

25   discontinuing your work, as a medical director, at

1    Health and Wellness?

2      A.  Probably, I did, yes.

3      Q.  Okay.  Do you recall him, specifically?

4      A.  They told me that I'm not going to work any

5    longer there.  And I knew that I was not going to work

6    any longer there, because they didn't want to do it

7    here, but I didn't expect they were going to tell me

8    that, because even I was not able to be a medical

9    director, I was able to do a doctor, because I didn't

10   have all sorts of -- even to do the plea bargain, I

11   didn't went to trial, etcetera, etcetera.  That way, I

12   was keeping my license.

13        And they tell me that they don't want me to work

14   any longer there, and I agreed, because I knew that I

15   was in this problem, and I didn't want to be anymore in

16   anyplace in which I can get in trouble.  And the way I

17   was not very disappointed.  Anyway, I was feeling that

18   they didn't consider my situation.  Suddenly, they

19   didn't have any work, in anyplace.  And they tell me,

20   yeah, well you can maybe stay here for one more month

21   until you get another situation.  Then, they tell me,

22   no, you have to go.  Okay.  I think it was not fair, but

23   I didn't care too much about it.

24     Q.  Why didn't you care too much about it?

25     A.  No, at all.

1    Q.  Why didn't you?

2    A.  Because I knew that my role, as a physician of

3  the PI, was the end of that.  I didn't want to work

4  anymore with insurance or with the accidents, and I was

5  really, you know, feel extremely disappointed with that.

6  And even I was disappointed with me, to -- because I was

7  doing that kind of work.

8    Q.  Why were you disappointed with yourself for doing

9  that kind of work?

10    A.  Because I think I was overqualified for that.

11  Okay?  I was a good heart surgeon.  I was a very good

12  pediatrician.  I was a good pediatric cardiologist.  And

13  I think I could do many other things.  And, probably,

14  was a mistake for me just to take the easy way, in one

15  direction, and to keep in that direction, and even

16  sacrifice me and my family, maybe, to change the

17  direction.

18        And the way I was disappointed for my work, with

19  these kinds of things, not because of anything bad in

20  that, it's not because I think I deserve better.

21    Q.  Okay.  Let me ask you, when you were a medical

22  director, between 2007 to 2013, that was when you were

23  at Health and Wellness, right?

24    A.  Yeah.

25    Q.  On average, how much were you making a month, as

1   a medical director, not just at Health and Wellness,

2   across all?

3      A.  I'm going to tell you.  It's not a problem.  It

4   was like $6,000 a month.

5      Q.  Okay.

6      A.  $72,000 a year, which is a regular salary for

7   this kind of job.

8      Q.  But if I understand your testimony earlier

9   before, you said that you were making $1,500 a week, at

10  Health and Wellness, alone?

11     A.  Yes.

12     Q.  Okay.  So, that would be approximately $6,000 a

13  month, just at Health and Wellness?

14     A.  Yes.

15     Q.  But what about -- you were working as a medical

16  director, at other clinics, at the same time, right?

17     A.  I was making around $20,000 a month.

18     Q.  Okay.  As a medical director?

19     A.  Yes.

20     Q.  Okay.  Can you tell me a little bit about what

21  happened?  You mentioned accusations, and I don't mean

22  to pry into your personal life --

23     A.  Uh-huh.

24     Q.  -- but I need to get a little bit more

25  information about those accusations that you're

1  referring to.

2    A.  Of course.

3    Q.  Can you tell me a little bit about what happened?

4    A.  Want to tell about my trial or my --

5    Q.  Well, what happened?  What were you accused of?

6  Where did that happen?

7    A.  Yes, I was accused not to see two patients that

8  were billed to the insurance.

9    Q.  Okay.

10   A.  Two patients.

11   Q.  What clinic was this?

12   A.  It was a -- I'll tell you.  I --

13   Q.  We're going to have to look for Exhibit 3, again?

14  Do you have that, Michael?

15         MR. NICOLEAU:  Yes.

16         MS. SALADRIGAS:  I can grab it.  I actually

17     have another copy.

18         MR. NICOLEAU:  Here it is.  Here it is.

19         MS. SALADRIGAS:  Oh, thank you.

20         THE WITNESS:  Clark Medical Services.

21  BY MS. SALADRIGAS:

22   Q.  Okay.  So, tell me a little bit more, about what

23  happened?  You said there were two --

24   A.  Yeah, two patients that I didn't see, and they

25  were billed.  And the real thing is that, yes, I didn't

1    see those patients, the patients were billed.  But, I

2    mean, it's real that the signatures in the charts were

3    not mine.

4       Q.  Whose signatures were they?

5       A.  They were my signatures, but they were falsified.

6       Q.  Someone forged your signature?

7       A.  Yeah, they forged my signature.  And they have an

8    expert that have seen that and I have the report.  In

9    that way, I -- I have two ways to deal with that.  One

10   is to go to trial and to face if the jury decides --

11      Q.  Uh-huh.

12      A.  -- jail.  Or the other is to go and do a plea

13   bargain and meet the guiltiness of this.

14         And, unfortunately, I have my first heart attack

15   when I was 57 years old.  And after that, I have

16   10 stents placed, and many other interventions.  And I

17   was thinking, and not only me, more my family than me,

18   that if I go to trial, and for any reason the jury going

19   to decide I was guilty, I'm going to go to jail.  And

20   the jail is not jail, it's going to be like a death

21   sentence for me.

22         Well, I say, well, I'm going to get the plea

23   bargain, and I'm not guilty.  But, also, I can say that

24   I was not completely innocent, because how you just talk

25   with me, I was not a good medical director.  I didn't

1  see that this is coming.  And I should be seeing that

2  this was coming.

3        In that way, I did a plea bargain.  They put me

4  recon -- what is restitution of $5,000.  Imagine.  And I

5  lost my medical license.  That was the most terrible

6  thing that happened in my life.

7  Q.  Was that part of the plea bargain?

8  A.  No, you don't need to go to plea bargain to lose

9  your license.  If you are guilty of something like that,

10  they say there is a moral defect in you, and they are

11  going to take your license.

12  Q.  Uh-huh.

13  A.  It's not -- I didn't agree to hand in my license,

14  but you have to -- if they surrender, they take it from

15  you.  And they take it from me.  And I lost my license

16  and -- well, and then I have to live for the resources

17  of my wife.  Fortunately, my wife is a person that has a

18  good inheritance and that can support me.  I'm not very

19  proud of that.  And I don't feel very good of that, but

20  this is the real thing.

21  Q.  So, are you not working now?

22  A.  No.

23  Q.  Okay.

24  A.  I'm trying to do some things, but they didn't

25  work, either.

HUGO GOLDSTRAJ, M.D. Volume 2                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                    255

1    Q.  What things did you try?

2    A.  Well, first of all, I tried to work with the

3    Treaty Printing, and to do models of the hearts,

4    congenital hearts.  The problem is the insurance doesn't

5    want to pay for these things.

6         I put a lot of effort in that and I produce some

7    models.  And it's very nice because, you know, the

8    surgeons can follow the three things very well.

9         Now, I'm planning other things, but I'm not just

10   to work with the blood chain and IOT, in other things,

11   and do -- to drive a -- the information of tracts and

12   shapes of -- I'm in the first steps of that.  It's not a

13   business yet and I have to commercialize that, but I

14   think it's going to be a big thing.  But I don't know

15   what is going to happen, as that's approaching.  Okay?

16   I just -- I develop the IOT part and the rest of scenes

17   part.  And now I trying to develop the block chain part,

18   and we're going to see what happens with that.

19   Q.  All right.  I don't -- I'm done.  I don't have

20   any further questions.

21        MR. SPECTOR:  Folks on the phone?  Michael?

22        MR. NICOLEAU:  No, I'm not going to --

23        MR. DIAZ:  Yeah, this is -- this is Rick,

24   but I'll -- I'll yield my time to everybody else

25   because I have a long cross.  And depending on

1    what they do, I can start cutting things out, if

2    they cover matters I intended to cover.

3         MR. NICOLEAU:  I'm -- I'm not at this point

4    redirect.

5         MR. SPECTOR:  I'm not sure anybody else is

6    asking any other questions, Rick.

7         MR. DIAZ:  All right.  So, let's go ahead

8    and get started then.

9              CROSS EXAMINATION

10   BY MR. DIAZ:

11    Q.  And can I -- Dr. Goldstraj, can you please --

12   this is Rick Diaz.  I represent many of the individuals

13   or all of the individually named Defendants, by the last

14   name of Muse, in this case, as well as Noel Santos.

15        And then I also represent, in this matter, two of

16   the corporations, one of which is Health and Wellness,

17   and another one is Medical Wellness Services.  Okay?

18    A.  Okay.

19        MR. SPECTOR:  Rick?

20        MR. DIAZ:  Go ahead.

21        MR. SPECTOR:  It's David.  You represent two

22    of the clinics?

23        MR. DIAZ:  No, I'm sorry, Health and

24    Wellness.

25        MR. SPECTOR:  Because I thought you just

1      said medical wellness, as well.

2           MR. DIAZ:  No.

3           MS. SALADRIGAS:  Yeah, Luis Martinez

4      represents Health and Wellness, Rick.

5           MR. DIAZ:  Correct.

6           MR. SPECTOR:  Okay.  So, Rick, I'm sorry.  I

7      don't mean to be a pain.  So, Mr. Martinez is

8      counsel of record for Health and Wellness.  We

9      got confused by your notice, by your appearance.

10          MR. DIAZ:  Right.

11          MR. SPECTOR:  Can you restate that?

12          MR. DIAZ:  I'm sorry.  Individually, going

13      down the list, is Noel Santos, Lazaro Muse,

14      M-U-S-E, Beatriz Muse, M-U-S-E, and Medical

15      Wellness.

16          MR. SPECTOR:  Okay.

17          MR. DIAZ:  Sorry about that.

18  BY MR. DIAZ:

19   Q.  Dr. Goldstraj, I just want to make sure I

20  pronounce your last name appropriately.  I'm on a cell

21  phone, so if I had been there in person, I probably

22  would not have to ask you.

23          Can you please let me know or tell me exactly how

24  you pronounce your last name?

25   A.  You pronounce it very well.

1   Q.  Okay.  So, you and I have never met or spoken

2   about this case, before today; is that correct?

3   A.  Yes, it's correct.

4   Q.  Okay.  And I haven't spoken to you even through

5   your lawyer or any investigator, either; is that

6   correct?

7   A.  It's correct.

8   Q.  Okay.  So, I'm just going to ask you some

9   questions.  Let me kind of give you a little bit of a

10  road map, so you can be thinking about this.

11      The first area I'm going to talk to you about is

12  basically your background, a little bit, just to fill in

13  some holes.  I'm going to try not to be repetitive.

14  A.  Okay.

15  Q.  Then, I'm going to talk about your work, at some

16  of the clinics.

17  A.  Okay.

18  Q.  And then -- that would be the second area.

19      And then I'm going to want to talk to you a

20  little bit about your medical licenses, and where you

21  got them, and when and how you lost it.  That was

22  covered at the very end of your deposition.

23      And, then, I want to talk to you a little bit

24  about the Complaint, and the allegations in this

25  Complaint, many of which are against you.  Okay?

1    A.  Okay.

2    Q.  All right.  So, let me start with the first area,

3  which is your background.

4        I understand that you're an Argentinian national?

5    A.  Yes, I am.

6    Q.  You immigrated to the United States in what year?

7    A.  1985.

8    Q.  And by then, you had already received your

9  medical degree, right?

10   A.  Yes.

11   Q.  Okay.  And that was in what year?

12   A.  1969.

13   Q.  Okay.  And, then, I think I heard you said you

14 had a Board certification in pediatrics; is that

15 correct?

16   A.  Yes.

17   Q.  Was that in Argentina, as well?

18   A.  No.  In Argentina, I was a heart surgeon.

19   Q.  I'm sorry?

20   A.  In Argentina, I was a pediatric heart surgeon.

21   Q.  Okay.

22   A.  I was --

23   Q.  Does that require what we would call -- go ahead.

24   A.  I was the vice chairman of the pediatric hospital

25 in Buenos Aires.  Hospital de NiÒos, in Buenos Aires.

1          MR. DIAZ:  I'll help the court reporter with

2       that spelling later on, if necessary.

3          THE WITNESS:  Okay.

4  BY MR. DIAZ:

5     Q.  So, did you have to have a separate testing and

6  training and certification for the pediatrics work that

7  you did?

8     A.  Yes, of course.  You have to do -- to do the

9  residence, pediatric residency.  And after that, you

10  have to cross the boards of pediatrics.

11     Q.  Okay.  Did you -- when you came to the United

12  States, how long was it from the time you entered, in

13  1985, until you received your Florida medical license?

14     A.  It was two years, I think.  No Florida medical

15  license, the Texas medical license.  The Florida medical

16  license was later on.

17     Q.  Okay.  And did you receive any state board

18  certifications in Florida or in any other state in this

19  country?

20     A.  I don't know.  I don't understand your question.

21  There are no board certifications in Florida.  The board

22  certifications are national board certifications.

23     Q.  Okay.  So, have you received any national Board

24  certifications, in any specified field or specialty of

25  medicine?

HUGO GOLDSTRAJ, M.D. Volume 2                                   August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                                   261

1       A.  Of course, in pediatrics.  I am a Board Certified

2   pediatrician.

3       Q.  All right.  Have you ever held a medical license

4   in any state, beside the State of Florida?

5       A.  Yes, Texas.

6       Q.  I heard you talk about that earlier.  Besides

7   Florida and Texas, any others?

8       A.  In the world or in the United States?

9       Q.  In the USA?

10      A.  No, not any others in the USA.

11      Q.  Now, I also understand that you had some military

12  experience.

13          Were you actually in the military, as an M.D., as

14  a medical doctor?

15      A.  Yes.

16      Q.  And that would have been for the Argentinian

17  armed forces, in one branch or another?

18      A.  Yes, I was a voluntary.  I was not a career, but

19  I was a voluntary medical doctor, assisting people in

20  the war, yeah.

21      Q.  All right.  And, so, I also understand that

22  during the course of your medical career, besides your

23  -- your -- we'll call it your educational training,

24  meaning your medical degree and, of course, your

25  experience in the two wars that you worked in --

1   A.  Uh-huh.

2   Q.  -- that you've also kept up to date with certain

3   areas in the medical world, and we'll talk about those

4   in a minute, specifically, by reading different kinds of

5   publications and literature?

6   A.  Yes.

7   Q.  I think I heard you say that you were, to use my

8   word, an avid, A-V-I-D, meaning a very active reader?

9   A.  Yes, I'm a very active reader, even today.

10   Q.  Okay.  Would you read medical journals, such as

11   the New England Journal of Medicine?

12   A.  Yes, absolutely.  I'm subscribed to that.

13   Q.  Okay.  You consider that to be one of the premier

14   medical journals, in this country?

15   A.  Yes, it's very good.

16   Q.  And would you also -- bless you, to whoever that

17   was.  Did you also subscribe to other medical journals,

18   besides the New England?

19   A.  Well, I received, for many years, Cardiovascular

20   Surgery -- American Cardiovascular Surgery.  And I --

21   and the others that I didn't subscribe, I was reading in

22   the hospital or library, or another library.

23   Q.  Okay.  Were you also members of any medical

24   organizations, in the United States, including, but not

25   limited to, the American Medical Association?

1    A.  I'm AMA.  I'm Florida Medical Association.  I was

2  the Dental Included Medical Association, in Houston.

3    Q.  Have you been required, over the years of your

4  practice, in Florida, to take what's called CLE, or

5  continuing legal education credits, and have you kept

6  those current, until your license was revoked?

7    A.  Yes, absolutely.

8    Q.  Now, I heard you talk about some writings or

9  publications.  About how many different publications do

10  you credit to yourself, as either an author or

11  co-author?

12    A.  Probably -- publications or research?  Because

13  some of the research was not public or was research done

14  for laboratories or other --

15    Q.  Let's split them.

16    A.  Huh?

17    Q.  Let's --

18        MR. NICOLEAU:  He -- he said, let's split

19      it.

20  BY MR. DIAZ:

21    Q.  Let's split it.

22      So, research -- right.  So, research papers,

23  approximately, how many?

24    A.  Around five or six; not too many.

25    Q.  Did any of those have to do with either accident

1   injuries, or injuries that you associate or can

2   associate with automobile collisions?

3     A.  No.

4     Q.  All right.  So, let's turn now to the

5   publications.  Were those peer reviewed publications,

6   either authored or co-authored?

7     A.  Yes, I'm a co-author and author, both.

8     Q.  Were any of those peer reviewed?  Do you know

9   what that means, to be peer reviewed?

10    A.  Yes, of course, they were peer reviewed and

11  published.  And one has prizes.  I have the European

12  Cardiology Association first prize.

13    Q.  Besides that prize, have you, in your medical

14  practice, either here or abroad, received any awards or

15  recognitions for the quality of medical treatment that

16  you have provided or any papers that you have written?

17          MS. SALADRIGAS:  Form.

18          THE WITNESS:  The most important was always

19       my patients.  They said that I was -- I was a

20       good doctor.  I have the --

21  BY MR. DIAZ:

22    Q.  All right.

23    A.  I have the recognition of them.

24    Q.  And -- and we're going to come back to that at --

25  at the appropriate time in my -- in my inquiry here,

1    I -- I assure you.

2    A.  Uh-huh.

3    Q.  But you also -- I think I heard you say you have

4    an MBA in business administration?

5    A.  Yes.

6    Q.  Or did I mishear you?

7    A.  No.  Yes, I'm MBA.  I did my MBA, in the FIU.

8    Q.  Okay.  And, then, when you came to the United

9    States, we don't need to go through -- I don't want to

10   go through your entire employment history, but at some

11   point in time, you opened your own medical practice, I

12   think in pediatrics, and then after that you started

13   working as a medical director; is that correct?

14   A.  It's correct.

15   Q.  And you talked about being an expert, in some

16   questions earlier today, right after lunch, and I want

17   to understand -- what I'm curious about is to know

18   whether you have ever been an expert witness, where

19   you've testified either in a deposition or at a maybe a

20   Worker's Compensation hearing, or in a trial, for a

21   private entity or for the government.  And I think you

22   may have.

23   A.  No, I didn't.  But I want to clarify, I never

24   said I was an expert.

25   Q.  Okay.  All right.  Have you ever -- besides the

1   deposition and I know the one deposition you gave in a

2   lawsuit that had to do with PIP benefits, and this

3   deposition, have you ever given any other depositions?

4      A.  They are not related with the PIP clinics, no.

5   Always my depositions were related with the PIP clinics.

6   I didn't have any other depositions.

7      Q.  All right.  And, then, as between Health and

8   Wellness, Medical Wellness, and Pain Relief Clinic, did

9   you work for all three of those clinics?

10     A.  No.

11     Q.  Not at the same time, necessarily, but at some

12  point in time?

13     A.  No, I work only for Health and Wellness.

14     Q.  Okay.  So, you never worked at Medical Wellness

15  and you never worked at Pain, correct?

16     A.  No.

17     Q.  Okay.  You became a medical director, at Health

18  and Wellness, at some point in time, right?

19     A.  Yes.

20     Q.  Okay.  Now, I think you said that in order to be

21  that medical director, you had to get either interviewed

22  or vetted, that's V-E-T-T-E-D, vetted, by AHCA?

23     A.  Yes.

24     Q.  When you began to work as a medical director, for

25  Health and Wellness, were you already a medical director

HUGO GOLDSTRAJ, M.D. Volume 2                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                    267

1   at one or more other medical clinics?

2     A.  Yes.

3     Q.  When you worked -- or when you came on as medical

4   director, at Health and Wellness, did -- would that have

5   been within the 10, at the time, permitted number of

6   medical clinics where you could serve as a medical

7   director?  Were you within that compliance regulation?

8     A.  Yes.

9     Q.  Okay.  And, then, I think you said that the

10  person who -- that segued you into Health and Wellness

11  was Lazaro Muse?

12    A.  Yes.

13    Q.  And you don't remember how it was that he

14  contacted you or you contacted him; am I right?

15    A.  Yes, I remember.  I contact him because they was

16  recommended by the ex-wife.

17    Q.  Okay.  And do you remember her name?

18    A.  Not at this point.  It was mentioned today, but I

19  don't remember.  Yeah.

20    Q.  In that, give or take, 30-minute interview, that

21  you had with AHCA, did AHCA tell you, one way or the

22  other, what specific things they wanted to make sure you

23  did, as a medical director, whether at Medical Wellness

24  or any other medical clinic you worked at, as a medical

25  director?

HUGO GOLDSTRAJ, M.D. Volume 2                                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                              268

1          MS. SALADRIGAS:  Form.

2          THE WITNESS:  Yes, they tell me some rules

3      that they have to have the medical director.

4  BY MR. DIAZ:

5    Q.  And we're going to talk a little bit more about

6  the specifics of the operations at Health and Wellness,

7  but while you were there --

8    A.  Uh-huh.

9    Q.  -- do you believe that, from your angle, from the

10  medical director standpoint, that you met all of those

11  AHCA requirements, everything that you understood that

12  you had to do to meet their standards and criteria?

13          MS. SALADRIGAS:  Form.

14          THE WITNESS:  Well, I really don't know.

15      You know, it's a very bad thing to judge your own

16      work, but I mentioned already that I was not an

17      example for a medical director, because the

18      duties of an oversight and the duties of a

19      control, etcetera, etcetera, was never was my

20      strength.

21  BY MR. DIAZ:

22    Q.  When you first sat down with Mr. Muse, and if you

23  ever spoke to Beatriz, did you tell them what you just

24  told us?  Did you tell them that, in your opinion, you

25  were not suited to perform as a medical director?

1        MR. NICOLEAU:  Form.

2        THE WITNESS:  No, I never say that I cannot

3    pursue to be a medical director, even now.  I

4    said I was not the ideal medical director, and I

5    maybe was far to be the ideal, but I also was not

6    a bad medical director.  And never did I mention

7    this to my employers.  That's some kind of crazy,

8    no?

9  BY MR. DIAZ:

10   Q.  I want to try to see if I can put this in some

11  kind of clear or more pointed perspective.  Okay?  And

12  I'm going to give you a scale, and ask you to scale what

13  you perceive you mean by what you say, when you say, I

14  don't think I was a very good, to use your words,

15  medical director.

16        If A is an outstanding medical director, and F is

17  an absolute failure, and C is in the middle, meaning you

18  meet the minimum standards, you're not stellar, and

19  you're not a failure as a medical director, would you

20  say you were an A medical director, a C, or an F?

21        MS. SALADRIGAS:  Objection to form.

22        THE WITNESS:  C.

23  BY MR. DIAZ:

24   Q.  Or somewhere in between?

25   A.  Yeah, C.  I was approved, but no brilliant.

1    Q.  Okay.  But just to be clear, you didn't express

2    any concerns that you had, to Mr. Muse or Beatriz Muse,

3    about how confident and comfortable you felt in acting

4    as a medical director; am I correct?

5    A.  Yeah, you're correct.

6    Q.  I am or I am not?

7    A.  Yes, you are.

8    Q.  Okay.  Thank you.

9        Now, you were asked some questions about who, in

10   your perception, owned Health and Wellness.  I want to

11   ask you a little bit about that.

12       Did you ever have any conversations with Lazaro

13   or Beatriz, or anybody else, where they told you who was

14   the owner of Health and Wellness?

15   A.  No, not really.  They never told me who was the

16   owner of Health and Wellness.

17   Q.  All right.

18   A.  But they did --

19   Q.  Did you ever see any stock -- go ahead.

20   A.  Uh-huh.  No, they leave this to my perception,

21   and I didn't ask even.  Probably, I make a mistake.

22   Q.  Okay.  And that was my next question, they didn't

23   tell you, and you didn't ask; am I right?

24   A.  Yes.

25   Q.  Okay.  And I'm going to ask you a little bit

1  about your perceptions, in a moment, but I want to clear

2  some ground first.

3       Number one, you never saw any stock certificates,

4  any letters, any correspondence, or any documentation

5  that said who was, one way or the other, the owner of

6  Health and Wellness, when you were the medical director

7  there; am I right?

8    A.  Yes, you're right.

9    Q.  Okay.  And I think I heard you say that your

10  interaction with Lazaro was primarily when you

11  negotiated with him your salary and your schedule, for

12  Health and Wellness, right?

13    A.  Yes, right.

14    Q.  And, then, if I heard you correctly, you said

15  that the person whose presence you viewed more when you

16  were at Health and Wellness was Beatriz, over Lazaro; am

17  I correct?

18    A.  Yes, you're correct.

19    Q.  Okay.  And while you may have a perception as to

20  who was its owner, the truth of the matter is you don't

21  know, one way or the other, who was the owner of Medical

22  Wellness; am I correct?

23       MS. SALADRIGAS:  Form.

24       THE WITNESS:  You're correct, I didn't know.

25  BY MR. DIAZ:

1    Q.  Okay.  Okay.  And -- and I -- I don't want you

2    speculating that because, you know, Lazaro negotiated

3    with you, your contract, you thought he was the owner,

4    or speculating on the other side that because Beatriz

5    was writing your checks, and she was there more obvious

6    to you, that she was the owner, either.  So, I just want

7    to make sure that we're not speculating here.

8         So, just to hammer this down, you don't know, one

9    way or the other, who was the true owner of Health and

10   Wellness, when you worked there, as a medical director;

11   am I correct?

12          MS. SALADRIGAS:  Form.

13          THE WITNESS:  Yes, this is correct, because

14       I didn't review any documents related to the

15       corporation or nothing like that.

16   BY MR. DIAZ:

17    Q.  And -- and there was no reason for you to do

18   that?

19    A.  Is what what?

20    Q.  Am I right?

21    A.  No, I don't know what your question is.

22    Q.  There was no reason for you to do that?

23    A.  I don't understand your question.

24          MR. NICOLEAU:  He said:  And there was no

25       need for you to do that?

1            MS. SALADRIGAS:  Form.

2            THE WITNESS:  I don't think there was a need

3        to do that.

4    BY MR. DIAZ:

5      Q.  Okay.  You were asked whether or not you ever

6    suggested -- either suggested, or you, yourself, ever

7    put together policies and procedures, for Health and

8    Wellness, and I think you said no.

9            My question, there's a follow-up to that is:  Did

10   AHCA tell you or anybody else tell you that you needed

11   to do that, at Health and Wellness?

12           MS. SALADRIGAS:  Form.

13           THE WITNESS:  No.

14   BY MR. DIAZ:

15     Q.  Okay.  And even though there were no, to your

16   awareness, written policies and procedures, at Health

17   and Wellness, based on the way they operated, did it

18   appear to you, at the time, that they were operating

19   within acceptable standards for AHCA, in terms of the

20   way they were operating their business and treating

21   their patients?

22           MS. SALADRIGAS:  Form.

23           THE WITNESS:  Yes, probably.  I didn't think

24       there was anything wrong, but you know.

25   BY MR. DIAZ:

1   Q.  Okay.  Well -- and that's my point, if you -- if

2   you had -- without any written policies or procedures,

3   but if you had witnessed something that, as a medical

4   director, and I think you said these were your patients,

5   and you treated them.  If you had seen something wrong

6   or medically unnecessary, or medically unsound, you

7   would have intervened, as the medical director, and said

8   something; am I correct?

9          MS. SALADRIGAS:  Form.

10          THE WITNESS:  Yes.

11   BY MR. DIAZ:

12   Q.  And you never saw a reason or need to do that; am

13   I right?

14   A.  Yes, but, also, I can say that I don't think that

15   the clinic have a very high standard of care.

16   Q.  Well, and we're going to talk about that, in a

17   minute.  See, there's a difference between being

18   careless or negligent and committing fraud.  And that's

19   really where I want to get to.  And we're going to get

20   to that, in a little bit.  Okay?

21   A.  Okay.

22   Q.  So, when you first started working at Health and

23   Wellness, in terms of the overall operations, I'm not

24   talking now looking back, I'm talking at the time when

25   you walked in their doors, and you saw their operations,

1   and you signed the contract, and you agreed to treat

2   those patients, and you agreed to charge $1,500 a week,

3   was the space and the equipment they had, from your

4   perspective, adequate?

5     A.  Yes.

6            MR. SPECTOR:  Form.

7            MS. SALADRIGAS:  Form.

8   BY MR. DIAZ:

9     Q.  Were the certifications, at least that you were

10  able to see on the walls, did they appear to you to be

11  adequate?  Meaning that their staff was properly trained

12  and certified, with licenses; did it appear to you to be

13  that way?

14           MS. SALADRIGAS:  Form.

15           THE WITNESS:  Yes.

16  BY MR. DIAZ:

17    Q.  And before you got your first paycheck, did you

18  ever express to Lazaro Muse, or Beatriz Muse, or anybody

19  at Health and Wellness, that you felt that they were not

20  at least up to minimum standards?  I'm going to call it

21  a C, using my prior reference, an A, a C, and an F.

22        Did you ever tell anybody they were substandard,

23  subpar, and either they needed to correct it or you

24  weren't going to be a part of it?  Did you ever say that

25  to anybody, at Health and Wellness?

HUGO GOLDSTRAJ, M.D. Volume 2                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                    276

1    A.  I don't understand your question.  It's not very

2  clear for me.  It's confusing.

3    Q.  Sure.  Before you began operating at Health and

4  Wellness, did you tell anybody there that you were

5  dissatisfied with the space, the equipment, the

6  staffing, or their capability to treat your patients;

7  did you ever express that to anybody?

8    A.  No.

9    Q.  Okay.  As the medical director, if you saw

10  something like that, do you think it was your

11  responsibility to tell them that, so your patients

12  wouldn't receive inadequate treatment?

13    A.  Yes.

14    Q.  And do you believe that any of your patients, at

15  Health and Wellness, ever received inadequate medical

16  treatment?

17          MS. SALADRIGAS:  Form.

18          THE WITNESS:  Not my knowledge.

19  BY MR. DIAZ:

20    Q.  Okay.

21    A.  I didn't have any --

22    Q.  Were any complaints ever made -- I'm sorry.

23        Were any complaints -- did any complaints ever

24  come to your ear, from a patient at Health and Wellness,

25  about the quality of the service that they were

1   receiving, in terms of the evaluations and treatments?

2   Did you ever hear of any complaints?

3     A.  No.

4     Q.  Okay.  And in terms of your schedule, which I

5   think was Tuesdays and Thursdays, from around 12 to 4,

6   sometimes 5, I know you said there was some variation

7   you may come in an extra hour or day a week?

8     A.  Yeah.

9     Q.  Were you satisfied, as the medical director, when

10  you were at Health and Wellness, that the time that you

11  were spending there was sufficient to cover the needs of

12  the patients?

13        MS. SALADRIGAS:  Form.

14        THE WITNESS:  "The needs of the patients,"

15     what do you mean --

16        MS. PARKER:  Form.

17        THE WITNESS:  -- to see the patients and

18     order the treatments or what?  What do you ask

19     about?

20  BY MR. DIAZ:

21    Q.  Okay.  This is a very general question.  What I'm

22  trying to find out is this:  You were not in Health and

23  Wellness, Monday through Friday, 9 to 5, or while they

24  were open for operations the entire time; am I correct?

25    A.  You are correct.

HUGO GOLDSTRAJ, M.D. Volume 2                        August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                    278

1     Q.  Okay.  What I'm trying to find out is, based on

2     the schedule that you held there, did you feel that you

3     were not putting enough time, at Health and Wellness, so

4     that the patients, so in your mind, the patients were

5     being adequately evaluated and treated?

6             MS. SALADRIGAS:  Form.

7             MS. PARKER:  Form.

8             THE WITNESS:  Okay.  I was --

9             MS. PARKER:  As the medical director or

10        medical doctor?

11    BY MR. DIAZ:

12    Q.  As a medical doctor.

13    A.  No, as a medical doctor, I was doing my job okay.

14    Q.  Okay.  Because you were just not only just the

15    medical doctor, you were also the medical director,

16    correct?

17    A.  Correct.

18    Q.  Did you ever tell Lazaro Muse, or Beatriz Muse,

19    or anybody else, that you felt either as a medical

20    director, or a medical doctor, that you needed to spend

21    more time at Health and Wellness because patient care

22    was being compromised?

23            MS. SALADRIGAS:  Form.

24            THE WITNESS:  No, I don't think that the

25        patient care was compromised, and I didn't say

HUGO GOLDSTRAJ, M.D. Volume 2                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                          279

 1        that.

 2   BY MR. DIAZ:

 3     Q.  Did you see anybody, at Health and Wellness, do

 4   anything under your watch, either as a medical doctor or

 5   a medical director, that you felt was compromising

 6   patient care?

 7           MS. SALADRIGAS:  Form.

 8           THE WITNESS:  No.  As far as I remember, no,

 9       I didn't see anything like that.

10   BY MR. DIAZ:

11     Q.  Okay.  And I think you said you did periodic

12   reviews of patients' files, or patient charts, in your

13   capacity as a doctor, at Health and Wellness?

14     A.  As a capacity of doctor or medical director, what

15   do you say?

16     Q.  Well, either one.  Did you ever look at patients'

17   charts and patient files?

18     A.  I'm not going to review my own charts.  It

19   doesn't have any sense.  But I --

20     Q.  Right.  Let's go back.  Go ahead.  Let me go down

21   a different road here.

22     A.  Okay.

23     Q.  As a medical doctor, when a new patient came into

24   Health and Wellness, did you have to meet that patient

25   face-to-face?

1   A.  Sure.

2   Q.  Okay.  And after that initial face-to-face, would

3   you do an evaluation?

4   A.  How I can do an evaluation if I don't know the

5   patient?  I have to see the patient face-to-face, to do

6   an evaluation.

7   Q.  All right.  And, then, if you -- did you then

8   exercise your independent medical judgment, in order to

9   decide whether or not a plan of treatment was

10  appropriate?

11  A.  Yes, of course.

12  Q.  And would that then be followed up and followed

13  through with the other employees, at Health and

14  Wellness?

15      MS. SALADRIGAS:  Form.

16      THE WITNESS:  Yes.  I was marking or

17      reading, whatever you want to say, the medical

18      treatment.  And they was followed by the rest of

19      the people there, at least I suppose that.

20  BY MR. DIAZ:

21  Q.  For that same patient, was there any practice in

22  place where you would want to see that patient, either

23  every month or periodically, or after you did the

24  evaluation, were there times when you would never see

25  the patient again?

1          MS. SALADRIGAS:  Form.

2          THE WITNESS:  No, we see the patient in two

3      follow-ups and a final examination.  We see the

4      patients on four occasions.

5  BY MR. DIAZ:

6    Q.  When you say "we," does that include yourself, as

7  a medical doctor?

8    A.  Well, myself, I don't know.  I say "we."  I don't

9  know why "we."  I see the patients in two follow-ups and

10  a final examination.  In a regular --

11    Q.  And how do you -- go ahead.

12    A.  In a regular basis, but they -- sometimes they

13  need more follow-up and sometimes the patient didn't

14  come back.  You know, these are things that happens in

15  the practice.  Sometimes the patient didn't like how he

16  was treated and didn't come back.

17    Q.  Understood.  Can you just help us, since a

18  distinction has been made about your work at Health and

19  Wellness, as a medical doctor, versus the medical

20  director, in your own words, can you explain to me what

21  the line is usually between the two?  And you can do it

22  differently by telling me what your responsibilities

23  were as a medical director, versus what they were as an

24  M.D.?

25    A.  As an M.D., your duties are the duties of an

1    M.D., to see a patient, to evaluate a patient, to make a

2    diagnosis, as possible, to order treatment, at your

3    criteria, and to follow up what happened with the

4    patient later on, with the treatment.

5          As a medical director, you have to control the

6    basic administrative things of the place.  And for this,

7    I always say that I was not very good in administration.

8    Here I'm an MBA.  At this time, I was not an MBA.  But I

9    didn't like, too much, that work.  And even though I did

10   some controls of the people that was working there, I

11   saw the certifications on the walls, or whatever, and I

12   saw some of the charts, and I was seeing that the

13   treatments were rendered and like that, but I was not

14   obsessive compulsive, that kind of control.

15    Q.  Okay.  There was some discussion about, I think

16   you said, that at the time that these different services

17   were rendered, at Health and Wellness, that there were

18   other more expensive modalities that were available in

19   the market, but were not present at Health and Wellness.

20          Do you find -- at the time, did you find that was

21   problematic or was it just a situation where these other

22   machines were not necessary, or within budget, in terms

23   of the services that the patients needed?

24          MS. SALADRIGAS:  Form.

25          THE WITNESS:  It's my interpretation of what

1    I say.  What I said, it was available something,

2        something that was too much sophisticated for

3        this kind of treatments.  I didn't say there was

4        any other place that were doing that.  I was

5        doing that in some period of time, in which I was

6        trying to help a paralytic patients, and patients

7        with lost of strength in the muscles.  And I was

8        doing this job very careful.

9            And other times, I was specializing in

10        electric treatments of patients, using

11        electricity for treatment of patients.  And I

12        didn't say this was available, in any other

13        place.  I was saying that this is the possibility

14        to do better treatments, than the usual treatment

15        that they make in that clinic, or other clinics.

16        Okay?

17   BY MR. DIAZ:

18     Q.  Based on -- if I hear you correctly, what you're

19   saying is that the equipment available at Health and

20   Wellness was sufficient, for the most part, for the

21   needs of the patients, but if there was a variation, you

22   would then refer that patient, or those patients, to a

23   specialist, or to another facility, for a different type

24   of treatment that Health and Wellness was not capable of

25   treating?

1          MS. SALADRIGAS:  Form.

2          THE WITNESS:  Yeah, sure, if I going to find

3      that a patient needs a more sophisticated

4      treatment or a more sophisticated diagnostic

5      system, I will recommend this to go to other

6      places.

7   BY MR. DIAZ:

8      Q.  It sounds to me like -- and I'm not trying to put

9   words in your mouth.  You tell me if I'm wrong and

10  correct me.  But it sounds like most of the patients,

11  which means more than half, maybe not a hundred percent,

12  but somewhere in between, most of the patients that came

13  to Health and Wellness were from some form of motor

14  vehicle accident, correct?

15     A.  Yes, absolutely.

16     Q.  And, equally, most of those patients had what

17  sometimes could commonly be called -- Doctor, you may

18  not use this term, but soft tissue injuries?

19     A.  Yes, I use this term.  Most of them were soft

20  tissue injuries, yeah.

21     Q.  Now, I want to make sure that we're clear, on the

22  record, what we mean by "soft tissue."

23          Soft tissue doesn't mean it's not a painful

24  injury, correct?

25     A.  No, soft tissue means what is considered is a

1    muscle, or skin, or fat pad, or ligament.  This means

2    no, absolutely, soft tissue injury is painful.

3      Q.  Okay.  And, so, because most of these patients

4    came from motor vehicle accidents, were you surprised to

5    see that the nature of the complaint and the degree of

6    pain, complained about, was substantially similar,

7    although not obviously identical, in every case?

8         Were you surprised to see that they were

9    complaining primarily about head, neck, shoulder, and

10   upper back injuries?

11         MS. SALADRIGAS:  Form.

12         THE WITNESS:  These were the most common

13          complaints, yes.

14   BY MR. DIAZ:

15     Q.  All right.  So, I just want to understand, with

16   the large percentage of patients that were being treated

17   at Health and Wellness, was there something that set off

18   alarms and bells, and red flags, in your mind, that all

19   of these people were basically complaining of the same

20   general type of injuries?

21         MS. SALADRIGAS:  Form.

22         THE WITNESS:  No, not really.  Because I

23          explain that most of the injuries that happen in

24          MVAs are related with these complaints.  I don't

25          think that these were fabricated.  I cannot say

1        that it was not, but I was not surprised of that.

2              I just explained why I was explained what

3        happened there.  Whiplash is a more common

4        accident -- motor vehicle accident, as a rear

5        accident.  All those things, I already talk

6        about.  In --

7    BY MR. DIAZ:

8      Q.  And that's -- go ahead.

9      A.  In that way, I'm not very surprised that many,

10   many patients have the very same complaints.

11     Q.  And would that explain why, generally, with some

12   variation, most of the modalities and treatment -- and,

13   again, there's some variation, maybe in terms of

14   intensity and duration, but does that explain why,

15   generally, more than 50 percent of patients would

16   receive the same type of treatment because more than

17   50 percent of the patients suffered the same, generally,

18   type of injury?

19              MS. SALADRIGAS:  Form.

20              THE WITNESS:  Yes, it's related one thing

21        with the other.

22   BY MR. DIAZ:

23     Q.  All right.  Did anybody at Health and Wellness,

24   anybody, try to influence your independent medical

25   judgment, as you were performing as a medical doctor?

1    A.  No, not at all.

2    Q.  Did anybody at Health and Wellness, including the

3   Muses, try to influence or corrupt you in what you were

4   doing or advising, at Health and Wellness, as a medical

5   director?

6        MS. SALADRIGAS:  Form.

7        THE WITNESS:  Well, I don't understand the

8        question.  If I going to be corrupted, as a

9        medical director, and I was request to do that?

10       This is the question?  Excuse me.

11       MR. NICOLEAU:  Counsel, could you rephrase?

12   BY MR. DIAZ:

13   Q.  The -- the question is whether or not -- yeah.

14   The question is whether or not Lazaro Muse, or Beatriz

15   Muse, or anybody else, at Health and Wellness, asked to

16   you do something, as a medical director, that you

17   thought was unethical, illegal, or immoral?

18       MS. SALADRIGAS:  Form.

19       THE WITNESS:  No, no, I'm never going to

20       accept something like that.  And they knew

21       perfectly that I'm not going to accept something

22       like that.

23   BY MR. DIAZ:

24   Q.  Okay.  And we're going to get to that, in a

25   minute, because that's what State Farm is essentially

HUGO GOLDSTRAJ, M.D. Volume 2                              August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                           288

1   claiming happened in this case, and we're going to go

2   through that.  Okay?

3      A.  Okay.

4      Q.  But, first, let me ask you this:  Your salary --

5   was your salary based upon how many patients you saw a

6   week?

7      A.  No.

8      Q.  Was your salary based upon the profitability of

9   Health and Wellness?

10     A.  No.

11     Q.  So, is it fair to say that your salary was not

12  tied into, in any way, shape, or form, either patients

13  or profits, at Health and Wellness?

14          MS. SALADRIGAS:  Form.

15          THE WITNESS:  No.

16  BY MR. DIAZ:

17     Q.  Okay.  Now, the days that you were at Health and

18  Wellness, I think Tuesdays and Thursdays, and maybe the

19  occasional extra day or extra hour, were you able to

20  visualize and see, at times, the actual hands-on massage

21  therapy, and the other therapy treatments, that were

22  being given to patients, at Health and Wellness?

23     A.  Yes, I saw.

24     Q.  All right.  And from what you were able to see,

25  did it appear to you that these were procedures and

1   treatments that were being properly and adequately being

2   rendered to the patients, at the time, as you observed

3   them?

4     A.  Yes.

5     Q.  Okay.  And from your eyes and your ears, and your

6   vision, and your perception, on the days that you were,

7   you know, boots on the ground, inside Health and

8   Wellness, were its operations and treatment of its

9   patients consistent with AHCA, federal, and state rules,

10  as far as you know, and consistent with the medical

11  orders that you had prescribed?

12          MS. SALADRIGAS:  Form.

13          THE WITNESS:  Probably, most likely, yes.  I

14      cannot certify that.  As far as I know, I didn't

15      have any complaints about it, but I was not

16      policing all these activities.

17  BY MR. DIAZ:

18    Q.  Right.  And, certainly, there might have been --

19  you don't know what occurred when you weren't there to

20  see it, but what you did see when, were you there, are

21  you satisfied -- at the time, were you satisfied that

22  the therapies and the treatments were being done

23  properly, for these patients?

24          MS. SALADRIGAS:  Form.

25          THE WITNESS:  Well, I tell you, I would like

1      instead to massage therapies to be physical

2      therapies, there.  And I would like to probably

3      to be -- the reports to be a little more -- more

4      extensive.  But the -- essentially, I think there

5      are things you can change and things that you

6      cannot change.

7    BY MR. DIAZ:

8      Q.  Did you -- at any time before you were no longer

9    working at Health and Wellness, did you ever, in writing

10   or in person, tell anybody, including Lazaro and Beatriz

11   Muse, that you objected to their record keeping

12   protocol?

13     A.  No, I never did that.

14     Q.  Did you ever tell them that?

15     A.  No, I never did that.

16     Q.  Okay.  And I hear you saying it now, and that's

17   fine.  What I want to know is whether you told it to

18   them back then.

19          And, so, similarly, you never told Lazaro or

20   Beatriz Muse, or anybody at Health and Wellness, at the

21   time, that you felt that they were deficient in the way

22   that they were handing their patients; am I correct?

23     A.  No, I never say that.  I never talked to them

24   about that.

25     Q.  I'm sorry?

1    A.  No, I never told them.

2    Q.  And you never said -- right.  And you never told

3  them, hey, guys, you need to bring in licensed physical

4  therapists, they're better than licensed medical

5  therapists -- licensed massage therapists.  You never

6  told anybody that when you were working at Health and

7  Wellness, correct.

8    A.  Yes, I say that I would prefer physical therapy

9  to be over the work of the massage therapist, and I

10  prefer that.  I say this sometimes, I think a couple of

11  times, two or three times.  But --

12    Q.  When you were working --

13    A.  -- I lost the hopes about that.

14         MS. SALADRIGAS:  What was your question?

15  BY MR. DIAZ:

16    Q.  Who did you speak to about that?

17    A.  I don't understand the question.  What --

18    Q.  Who did you speak -- okay.  Here's the question:

19  Who, at Health and Wellness, while you worked there, did

20  you tell, in words or substance, that you objected to

21  LNPs and you thought they needed to use LPTs?

22    A.  Well, I didn't mean that.  I didn't object LNPs.

23  I was thinking that a physical therapist is going to be

24  a better option and he can oversight what they are

25  doing.  And these are going to be easier for me, to be

1   sure that everything is going to be done better.  But I

2   was not insisting that.  That was not the saying this

3   every day or every month.  I think I said this a couple

4   of times.  And, well, they decide not to do it.  It's

5   okay.  Well, I think they have a massage therapy school,

6   and they -- I think they graduated there, and they were

7   assured that they were okay.  And I -- I'm almost sure

8   that there was a physical therapist there and I really

9   never understand why they didn't bring this to the

10   place, to help, because they have a good relation,

11   probably.  I didn't know, but I supposed so.

12      Q.  Let me just be clear, because I've heard you say

13   a couple of times, in your answer, I think this, and I

14   think that.  And I want to deal with facts and accurate

15   memory, and not speculation.  So, let me see if we can

16   try to split this a little bit.

17         Do you have a specific recollection, one way or

18   the other, who you spoke to, at Health and Wellness,

19   where you said they needed to use LPTs, at Health and

20   Wellness?

21      A.  I cannot tell you with exactly to with whom we

22   went --

23      Q.  Do have you a specific recollection --

24         MR. NICOLEAU:  Wait.

25         Okay.  Now, answer.

1            THE WITNESS:  You know, I remember that I

2        did that.  To whom?  You know, there's not many

3        people that I can do -- say so.  Probably, I say

4        this to Beatriz Muse, because she was organizing

5        the school of massage therapists.  And I was

6        thinking that maybe she can do that because she

7        has the relation with physical therapists.

8            But I don't remember when and what time.

9        And I'm not sure it was with her or with the

10        brother, or was with other person.  I don't know.

11        You want to -- you want facts?

12   BY MR. DIAZ:

13    Q.  Is it --

14    A.  Facts?

15    Q.  No.  It --

16    A.  What are facts?

17    Q.  I'm sorry.  Go ahead.

18        Did you ever put anything in writing to anybody

19   at Health and Wellness where you suggested using at

20   least one LPT, if not more?

21    A.  No, I don't like to write too much.

22    Q.  Okay.  All right.  And when you said it was

23   probably Beatriz Muse, you have some doubt in your mind

24   that it was somebody else?  Is it your best guess it was

25   her?

1          MS. SALADRIGAS:  Form.

2          THE WITNESS:  My best guess is her, but I'm

3      not sure.  I cannot swear that.

4  BY MR. DIAZ:

5    Q.  And what did she say, in response?

6    A.  Probably, she says that they're going to try to

7  do it, they are going to see about it, etcetera,

8  etcetera.  They didn't deny the possibility of that was

9  a positive thing, yeah.

10   Q.  Okay.  You prefaced your answer with "probably",

11  some people might say you're guessing or speculating.

12  And I want to try to take that out of the equation.

13          Can you tell me that you have a specific

14  recollection, not of her probably saying that, but

15  exactly what she said to you, as close as you can

16  remember?

17   A.  No.

18          MS. SALADRIGAS:  Form.

19  BY MR. DIAZ:

20   Q.  I might have missed the answer.

21          MR. NICOLEAU:  He said "No."

22  BY MR. DIAZ:

23   Q.  Okay.

24   A.  I say no.

25   Q.  All right.  Let me ask you some questions now

1    about your medical license.  I know a little bit about

2    it.

3          It was revoked, I think, in 2014?

4     A.  Uh-huh.  Yes.

5     Q.  Now, at that time -- I think it was May.  At that

6    time, were you working, as a medical director, at any

7    clinics?

8     A.  No.

9     Q.  Had you already separated or disassociated from

10   all the medical director positions you held, at any one

11   or more clinics?

12    A.  Yes.

13    Q.  Okay.  And, actually, I might have misspoken.  I

14   think your court case was May of 2014.  I think the

15   revocation of the license was the following year, I

16   think in April of 2015.

17          Does that jog your memory?

18    A.  It was three months later.

19    Q.  Okay.  All right.  And in that case, you worked

20   out a deal with the state prosecutor?

21    A.  Is it a question or information?

22          MR. NICOLEAU:  It's a question.

23   BY MR. DIAZ:

24    Q.  Did you have a deal, a plea agreement with the

25   state attorney?

1    A.  Yes.

2    Q.  Without telling me anything about conversations

3  you had with your lawyer, did you have legal

4  representation, at the time?

5    A.  Yes.

6    Q.  And who was that lawyer?

7    A.  Ira Lowe.

8    Q.  I'm sorry?

9        (Reporter clarification.)

10    A.  Ira Lowe, which he's a very famous lawyer.

11    Q.  I know Ira.  Okay.

12    A.  You know Ira?  Okay.  Great.

13    Q.  And if I understand you correctly, you actually

14  pled guilty in that case.  Were you adjudicated guilty

15  or did they withhold adjudication?

16    A.  They withhold adjudication.

17    Q.  Okay.  So, I'm trying to get my head around your

18  decision to plead guilty.  I want to see if I got it

19  right.

20        It sounds to me like you felt that you did not

21  commit any fraud of your own will, you did not knowingly

22  and intentionally commit fraud, but you felt that under

23  your watch and your responsibility somebody else did.

24        Have I said too much or is that basically why you

25  pled guilty?

1              MS. SALADRIGAS:  Form.

2              THE WITNESS:  Yes, I think somebody else was

3          fraudulent.  And I have the possibility to be

4          aware of that, and maybe I missed it.  And for

5          this, I feel guilty, not because I tried to do it

6          on purpose.  If not, maybe I did it for omission.

7   BY MR. DIAZ:

8      Q.  Right.  And I think you've said it very well, and

9   I just want to be clear.  You feel that your lack of

10  oversight is what allowed a fraud to be perpetrated, and

11  that made you responsible; am I correct?

12             MS. SALADRIGAS:  Form.

13             THE WITNESS:  Well, some way to see it,

14         yeah.

15  BY MR. DIAZ:

16     Q.  Okay.  But I want to be real quick.  Last

17  question on this matter, and I know it's a sensitive

18  subject for you, but I've got to make it very clear.

19     A.  It's okay.  Go ahead.

20     Q.  You, yourself, never intentionally never

21  defrauded the insurance company, for which you pled

22  guilty.  You didn't knowingly, voluntarily, and

23  intentionally commit fraud, or conspire to commit fraud

24  against anybody; am I correct?

25             MS. SALADRIGAS:  Form.

1          THE WITNESS:  Well, you can see the benefits

2      of this fraud.  The reposition was $5,000.  I'm

3      going to be interested to make fraud, for $5,000?

4      It's ridiculous.  I'm never going to do fraud for

5      any amount of money, but I didn't do for this

6      coins.  Okay?  It doesn't have any sense.  Okay?

7      Why I going to do -- to have it -- I didn't have

8      any benefit.  I have a regular salary, in a place

9      that I didn't have any premise to do nothing.  To

10      do fraud is not going to produce any good for me.

11      What I going to produce fraud?  But it's okay.

12  BY MR. DIAZ:

13   Q.  You've answered my question.

14   A.  I didn't do the oversight that was necessary.

15  And, this, I was guilty of that.  And, in some way, this

16  was part of the remorse that I have.  And for this,

17  probably, was part of the guilty plea that I did.

18      And, sometimes, I repented on that, because

19  probably I should go to trial, and to keep my license,

20  and my life.

21   Q.  Well, we're going to -- I'm going to talk about

22  that, in a moment, but you've answered my question with

23  your explanation, but also with your rhetorical

24  questions back to me.

25      Were there other people charg ed with you, in

1   that case, either in that case, itself, or in a

2   separate, what we call, related case?

3     A.  Yes.

4     Q.  Okay.  So, let me see if I got this correctly.

5        You knew, from Ira, that if you pled guilty, that

6   you could avoid jail time and you'd get only probation.

7   That deal was in place and that was a guarantee; am I

8   right?

9            MS. SALADRIGAS:  Form.

10           THE WITNESS:  Yes.

11  BY MR. DIAZ:

12    Q.  And you knew that as good a lawyer as Ira was, if

13  you went to trial, you don't know what the jury might

14  do, they could convict you.

15       And, there, you knew that you could be

16  adjudicated as a felon, and also you could go to prison

17  for many, many years; am I right?

18    A.  Not many, many years, but at least one to two

19  years, yeah.

20    Q.  The guidelines were well over a year in state

21  prison, at least a year, correct?

22    A.  At least a year, yes.

23    Q.  All right.  And I guess you had a family and a

24  home, at the time?

25    A.  Yes, I still have.

1    Q.  Good.  And congratulations for that.

2        So, I assume that one of the reasons why you felt

3    the best thing for to you do was to plead guilty was

4    because you wanted to guarantee that you would not be

5    separated from your family, and they wouldn't suffer for

6    one or more years you'd be in prison, if you took the

7    gamble, went to trial, and lost; am I correct?

8    A.  No, not totally correct.  I was scared of other

9    things.

10   Q.  I'm sorry?

11   A.  I was scared of -- aware of other problems.  I

12   have health problems.  I knew that going to jail is

13   going to be almost the end of my life.  Okay.

14   Q.  So, that would be all the more reason to plead

15   guilty to the charges they put in front of you, correct?

16   A.  Yes, at least I was pushed to do that by my

17   doctor, my family, and even Ira, that he wants to go to

18   trial, but they say I cannot risk even one percent of

19   the possibilities to be condemned as to guilty.

20   Q.  Understood.  Now, that was an independent

21   resolution to the criminal case, from what the State

22   would, might, and ultimately did do, on your license,

23   correct?

24   A.  Yes.

25   Q.  In other words, the prosecutor or the district

1    attorney could not help you or control what the State

2    would do, with your license, after that; is that right?

3      A.  No, we knew perfectly well what was going to

4    happen with my license, if I'm going to plead guilty.

5      Q.  You pretty much knew that by taking the guilty

6    plea your license was gone?

7      A.  Yeah, sure, we knew that.

8      Q.  And it sounds like you met all your probation

9    conditions, meaning that you reported on time, and you

10   paid your restitution, and you met all your court

11   imposed obligations; am I right?

12     A.  Yes, that's right.

13     Q.  Okay.  Now, the last area I want to talk to you

14   about, and then I'll be finished, is I want to talk to

15   you about some of the allegations in this Complaint.

16   And I want you to comment on them, as to whether you

17   agree or disagree, and why.  Okay?

18     A.  Okay.

19     Q.  I'm going to take maybe a half a dozen or so.

20     A.  Okay.

21     Q.  Do you have any knowledge or information that

22   Lazaro or Beatriz Muse, together with you, together with

23   you, schemed to defraud State Farm?

24     A.  No, not at all.

25     Q.  And do you have any knowledge, one way or the

1   other, whether it's true when State Farm claims that

2   patients at this clinic, meaning Health and Wellness,

3   where you worked, were not medically necessary; true or

4   not true?  As far as you know?

5     A.  It was true that it was not medically necessary

6   or it was untrue that it was not medically necessary?

7   Can you rephrase your question?  It's a little confused

8   for me, what you ask.

9         MR. NICOLEAU:  Counselor?

10        MR. SPECTOR:  We may have lost him.

11        THE VIDEOGRAPHER:  He was on a cell phone.

12        MR. SPECTOR:  Let's just hang, maybe he'll

13     call back in.

14        THE VIDEOGRAPHER:  Going off video record,

15     4:53 P.M.

16        THE WITNESS:  Can I go to the restroom?

17        MR. SPECTOR:  Of course.

18        (Thereupon, a short break was taken.)

19        THE VIDEOGRAPHER:  We're now back on video

20     record, 4:57 P.M.

21   BY MR. DIAZ:

22     Q.  Thank you, Doctor.  I might have missed your

23   answer to your last question.

24        I was just trying to find out whether you ever

25   issued any orders for medical treatment, at Health and

1    Wellness, that in your sound judgment, as a doctor, you

2    thought were not medically necessary?

3      A.  No.

4      Q.  Okay.  Do you have any knowledge, one way or the

5    other, whether medical services were never rendered,

6    that were medically necessary?

7      A.  No, I don't have a personal knowledge of that.  I

8    cannot assure that it was every time it was rendered

9    because I tell you that I didn't control, personally,

10   that, but I didn't have any idea that it was not

11   rendered, either.  I think I cannot determine --

12     Q.  The Plaintiff also -- go ahead.

13     A.  -- yes or no.

14     Q.  The Plaintiff also claims that the treatment

15   plans were pre-determined, meaning it was -- we call it

16   canned, C-A-N-N-E-D, meaning it was prepared in advance,

17   before the initial evaluations, and that is what was

18   given to the patients.

19       Do you agree that the treatment plans were all

20   pre-determined?

21         MS. SALADRIGAS:  Form.

22         THE WITNESS:  No.

23   BY MR. DIAZ:

24     Q.  From the beginning?

25     A.  No, they were similar, the treatment plans,

1  because the lesions were similar, but were not

2  pre-determined.  I don't think so.  I mark it.

3       I never give the treatment before I see the

4  patient, no.  I see the patient and I give them the

5  treatment.

6    Q.  Gotcha.  State Farm also claims that there was a

7  failure to adequately examine the insureds.  That would

8  fall on you as a doctor.  Did you fail to adequately

9  examine the insured, on initial evaluation?

10          MS. SALADRIGAS:  Form.

11          THE WITNESS:  You want me to judge myself?

12  BY MR. DIAZ:

13    Q.  No.  I want you to say whether or not --

14    A.  If I was a good doctor or not a good doctor, or I

15  was doing my examination bad or good?  I'm not the

16  person that can answer that.  It should be another

17  physician, who says it's an oversight that, and says

18  that maybe my evaluation was not correct, or was not

19  enough, or whatever.  Always, you can do your work

20  better.  But I tried to do the best I can, in the time

21  that I have, and the number of patients that I have to

22  see.  You know, this happen with doctors, very often,

23  that when you have to see many, many patients, you don't

24  put the same attention that we have to see when you have

25  less amount of patients.

1       Unfortunately, the health care today pushes you

2   to see a lot of patients to survive.  And that's what

3   happened, in this case.  I have, sometimes, very few

4   patients, I put more attention in few patients.  And,

5   sometimes, they were waiting in the waiting room was

6   full of patients, and I have to rush through the

7   patients, and sometimes the evaluation was not so good

8   as others.  Okay.  I agree with that.  But I put the

9   effort that I can put in every one of them.

10      Q.  All right.  Okay.  Did you spend some time in

11   your position, either as a medical director or as a

12   medical doctor, looking at the records of the clinic?  I

13   think you already said as a doctor, you had to because

14   you had to look at the patient records?

15      A.  Sure.  Well, the records were -- most of the

16   patients were seen by me, and some others probably for

17   one of the physician's assistant.  I looked the ones

18   that was done by the physician assistant, Hilda de la

19   Pedraja, and they were well -- well done.

20          And about what they was putting in the records, I

21   think it was good enough for what the patient was in

22   complain.  If the patient was more complex, than a

23   regular patient, with soft tissue injuries, I would

24   place it.  But, usually, they were not very complex

25   patients.  They were just soft tissue injuries and they

1   took the x-ray and said it was no fractures.  And

2   sometimes you have to do deeper examination and send the

3   patient to MRI, or to consultation with orthopedic

4   doctor, but most of the patients were whiplash injuries

5   and soft tissue injuries.

6      Q.  And for those patients where it was -- I'm going

7   to call them the outliers, O-U-T-L-I-E-R-S, that means

8   the unusual -- some people call them the very unusual

9   patients, for those patients that were the outlier

10  patients, where the injuries were more severe than the

11  larger group, subjectively and objectively, did the

12  medical records for that patient generally reflect that

13  differentiation?

14          MS. SALADRIGAS:  Form.

15          THE WITNESS:  Yes.  Yes.

16  BY MR. DIAZ:

17     Q.  Okay.

18     A.  Sure.

19     Q.  And based upon your position, as the medical and

20  treating doctor, at Health and Wellness, for the years

21  you were there, were the plans of treatment that you

22  prescribed, in terms of the cycles, the modalities, and

23  the intensity of those therapies, did they all match --

24  to the best of your judgment, did they match what you

25  thought the patient reasonably and medically needed?

1              MS. SALADRIGAS:  Form.

2              THE WITNESS:  Yes.

3              MR. NICOLEAU:  He said "Yes."

4    BY MR. DIAZ:

5     Q.  Okay.  All right.  And, then, this is my last

6    question or two.

7         I just want to make sure -- you did not conspire

8    with Lazaro Muse, Beatriz Muse, Noel Santos, if you even

9    know who he is, or Health and Wellness to -- and

10   "conspire" means you agreed -- you agreed with them, you

11   joined them -- to defraud State Farm; is that correct?

12    A.  No, not at all.

13    Q.  And even at the time that were you there, at

14   Health and Wellness, you didn't see anything in terms of

15   the operations that were going on, at the time, that you

16   felt were fraudulent or deceptive to State Farm; is that

17   correct?

18             MS. SALADRIGAS:  Form.

19             THE WITNESS:  No, even I didn't know which

20        patients were from State Farm.

21   BY MR. DIAZ:

22    Q.  And you didn't care?

23    A.  I didn't know review patient was State Farm or

24   Geico, whatever.  I didn't know.

25    Q.  Okay.  That's all I have.  Thank you, very much,

1   Doctor.

2          MR. NICOLEAU:  Karen?  I guess Ms. Parker

3   left us.

4          THE WITNESS:  We lost her?

5          MR. NICOLEAU:  Okay.  I have nothing.  We're

6   done.

7          MS. SALADRIGAS:  You're good?

8          MR. SPECTOR:  Yeah, let me go over one

9   thing.

10         THE WITNESS:  There is somebody there, huh?

11         MR. NICOLEAU:  No, that's the same

12   counselor.

13         THE WITNESS:  Oh, okay.

14         MS. SALADRIGAS:  We're done.

15         MR. NICOLEAU:  We're done.

16         THE VIDEOGRAPHER:  One second.  Read or

17   waive?

18         MR. DIAZ:  Thank you, again, Doctor.  Have a

19   good day, everybody.

20         MS. SALADRIGAS:  Thank you, Rick.

21         THE VIDEOGRAPHER:  This concludes today's

22   deposition.  The time is 5:05 P.M.

23         MR. SPECTOR:  Thank you.

24         Thank you.

25         MS. SALADRIGAS:  Thanks.

HUGO GOLDSTRAJ, M.D. Volume 2                          August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                        309

1   COURT REPORTER:  Anybody ordering?

2   MR. SPECTOR:  We're ordering.

3   COURT REPORTER:  You want to waive or read?

4   MR. NICOLEAU:  We'll read.

5   COURT REPORTER:  Copy?

6   MR. NICOLEAU:  Please.

7       (Thereupon, the above deposition was

8   concluded at 5:05 P.M.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATE OF OATH

2

STATE OF FLORIDA     )
3    COUNTY OF MIAMI-DADE)

4            I, the undersigned authority, certify that
personally appeared HUGO GOLDSTRAJ, before me and was
5    duly sworn.
             WITNESS my hand and official seal this 26th
6    day of August, 2019.

7

8
                      LAURA LENTOSKI
9

10
          REPORTER'S DEPOSITION CERTIFICATE WITH
11              ACKNOWLEDGEMENT

12

13           I, LAURA LENTOSKI, do hereby certify that I
was authorized to and did stenographically report the
foregoing deposition; and that the transcript is a true
14    record of the testimony given by the witness.

15           I further certify that I am not a relative,
employee, attorney or counsel for any of the parties,
16    nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
17    financially interested in the action.

18           Dated this 26th day of August, 2019.

19

20

21               LAURA LENTOSKI

22

23

24

25

1                    ERRATA-SIGNATURE PAGE

2        STATE FARM  V  HEALTH & WELLNESS SERVICES, ET AL
                 CASE NO:  1:18-CV-23125-RNS
3             DEPOSITION TAKEN:  August 13, 2019

4  PAGE _____ LINE _____
   NOW READS: _____
5  SHOULD READ: _____
   REASON FOR CHANGE: _____.
6
   PAGE _____ LINE _____
7  NOW READS: _____
   SHOULD READ: _____
8  REASON FOR CHANGE: _____.

9  PAGE _____ LINE _____
   NOW READS: _____
10 SHOULD READ: _____
   REASON FOR CHANGE: _____.
11
   PAGE _____ LINE _____
12 NOW READS: _____
   SHOULD READ: _____
13 REASON FOR CHANGE: _____.

14 PAGE _____ LINE _____
   NOW READS: _____
15 SHOULD READ: _____
   REASON FOR CHANGE: _____.
16
   PAGE _____ LINE _____
17 NOW READS: _____
   SHOULD READ: _____
18 REASON FOR CHANGE: _____.

19 PAGE _____ LINE _____
   NOW READS: _____
20 SHOULD READ: _____
   REASON FOR CHANGE: _____.
21

22      Under penalties of perjury, I declare that I have
   read the foregoing transcript, and together with any
23 changes made above, the facts stated herein are true.

24
   _____        _____
25  DATE                  HUGO GOLDSTRAJ

**Exhibits**

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT12
160:24
161:2
175:2
194:8
198:11
200:19
219:18

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT13
217:8,9
222:22
223:8
237:16
238:13
239:8,14
240:6
242:4,8
243:3,9,
12,16,23

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT14
218:21
219:1
223:25
225:4,25

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT15
229:5,9

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT16
237:18
238:14,17
239:16

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT17
239:18,20
240:12

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT18
241:14,16
242:12

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT19
242:14,16
243:7

4308354 Hug
o.
Goldstraj -
Volume 2.
EXHIBIT20
247:18,
19,23

**$**

$1,500
251:9
275:2

$20,000
251:17

$400
148:18

$5,000
254:4
298:2,3

$500
148:18

$6,000
251:4,12

$72,000
251:6

**1**

1
181:18
182:1
183:2,11
184:5
222:22
223:1,23
243:4,8

10
165:13
171:12
181:18
182:1,3,
7,8
183:2,11,
13,16
184:5
186:25
191:16,
17,18
192:2,9
194:9
197:8
203:6
213:3
224:25
225:1,9,
18,24
253:16
267:5

11
184:5
217:7
218:2

12
160:24
161:2
175:2
194:8
198:11
200:19
219:18
231:8
277:5

12:44
129:2

13
217:8,9
222:22
223:8
231:24
237:16
238:13
239:8,14
240:6
242:4,8
243:3,9,
12,16,23

14
218:21,24
219:1
223:25
225:4,25

15
165:13
191:16,
17,18
192:2,9
194:20
229:5,9

16
194:8,10
213:16
237:18

238:13,
14,17
239:16

16th
218:25

17
239:18,20
240:12

18
195:14,15
213:16
241:14,16
242:12

19
238:12
242:14,16
243:7

1969
259:12

1980
151:4

1985
151:4
259:7
260:13

1988
151:7

1990
134:3
151:7

1991
134:3

1998
151:7

**2**

2
181:19
243:8



**20**
  136:12
  171:14
  247:18,
  19,23

**2000**
  134:17
  136:11

**2001**
  136:11

**2002**
  149:15

**2004**
  149:20
  156:13
  157:12
  158:8

**2006**
  157:17

**2007**
  158:8
  250:22

**2008**
  157:17

**2012**
  194:8,10
  218:25
  238:12
  239:19
  241:12
  242:15

**2013**
  247:22
  248:8
  250:22

**2014**
  295:3,14

**2015**
  295:16

**24**
  169:4

**26**
  239:19

**27**
  248:12

**27th**
  248:8,9

**2:28**
  208:19

**2:40**
  208:22

───────────

**3**

**3**
  133:9
  146:2,5,
  15 148:1
  149:24
  153:5
  198:11
  200:18
  239:9,11,
  14 247:22
  252:13

**30**
  137:21
  191:22
  241:12

**30-minute**
  267:20

**33**
  137:22,
  23,24
  138:6,14

**3900**
  154:15,
  18,21

**3:18**
  237:9

**3:35**
  237:12

───────────

**4**

**4**
  181:20
  183:13,
  15,16,17
  184:1
  277:5

**40**
  213:23,24
  248:7

**42**
  248:7,12

**441**
  156:4

**45**
  191:21,22

**48**
  169:4
  177:3

**4:53**
  302:15

**4:57**
  302:20

───────────

**5**

**5**
  184:1
  277:6,23

**50**
  286:15,17

**50's**
  214:5

**57**
  253:15

**5:05**
  308:22
  309:8

───────────

**6**

**6**
  181:20
  184:1

**66**
  138:4

───────────

**7**

**70**
  163:10
  171:15
  214:3

**79th**
  154:15,
  18,21

───────────

**8**

**8**
  181:20
  230:23
  240:6

**80**
  163:9

───────────

**9**

**9**
  230:13
  242:3,8,
  15 277:23

**90**
  163:3,9
  167:18,24

───────────

**A**

**A-H**

**152:8**

**A-V-I-D**
  262:8

**abduction**
  205:16

**Abraham**
  248:18

**abroad**
  264:14

**absolute**
  269:17

**absolutely**
  148:24
  211:6
  232:14
  239:17
  262:12
  263:7
  284:15
  285:2

**abuse**
  150:23

**abused**
  150:19

**accept**
  287:20,21

**acceptable**
  273:19

**accident**
  162:21
  163:4,12,
  14 164:1,
  2,10,18,
  19 165:2
  166:1,7
  167:19,22
  168:4
  169:1,3,
  7,19,24
  170:6,9
  171:4,13
  172:10



174:19,
20,21,22
175:10,
12,17,18
177:3,9,
10,13,24,
25 178:2
179:2,11,
15,17
180:17
263:25
284:14
286:4,5

accidents
163:17,
18,19,20,
22,23
164:8,15,
16,17
169:20
176:19
178:24
250:4
285:4

accurate
186:22
292:14

accusation
246:23

accusations
251:21,25

accused
246:14
252:5,7

accustom
171:21

ache
240:3

aches
240:8

acquire
134:24
137:8

acquired
135:7
230:14

acquisition
137:16

acting
248:22
270:3

active
262:8,9

activities
172:22,23
196:16
206:16
207:1,5,
12,15,18
208:4,8,
12,13
289:16

activity
207:1

actual
288:20

acute
195:5,8,
10
196:12,
16,20
197:1
212:19
213:9
214:17

addicted
178:22

address
154:15,
19,23
248:7,8,
10

addressing
203:11

adduction
205:16

adequate
275:4,11

adequately
278:5
289:1
304:7,8

adjudicated
296:14
299:16

adjudicatio
n
296:15,16

administere
d
211:18

administeri
ng
147:8

administrat
ion
265:4
282:7

administrat
ive
282:6

Admitting
149:20

adults
142:19

advance
149:12
303:16

advising
287:4

affect
166:22
167:6

affected

222:25

affidavit
229:6

affiliated
230:24

affirm
230:14,23

afraid
141:15

age
169:21
171:11
214:2,7

ages
162:16

aggressive
216:12

agree
131:10
133:1
161:22
183:2
186:19,21
203:23
205:22
232:23
254:13
301:17
303:19
305:8

agreed
249:14
275:1,2
307:10

agreement
295:24

AHCA
146:14
266:22
267:21
268:11
273:10,19

289:9

ahead
149:10
219:17
222:22
240:2,6
256:7,20
259:23
270:19
279:20
281:11
286:8
293:17
297:19
303:12

aimed
162:6

Aires
259:25

alarms
285:18

alcohol
178:22

allegations
258:24
301:15

allergies
178:24

allowed
226:14
297:10

alteration
180:1

AMA
263:1

ambulance
177:12

Amended
217:8
218:2

American



262:20,25

188:23

**amount**
136:17
298:5
304:25

**anatomy**
166:3,4

**Andover**
135:23
136:21,
22,25
137:1,2,
12

**anesthesia**
187:25
188:3
216:10

**angina**
149:19

**angle**
268:9

**angry**
143:8

**anymore**
137:13
140:10
249:15
250:4

**anyplace**
207:16
231:20
234:20,22
249:16,19

**appearance**
257:9

**appears**
177:3
209:3

**application**
188:18

**applied**

**apply**
141:10,
12,19
142:16,17
188:24,25

**appointment**
202:23

**appointment
s**
173:4

**approach**
246:17

**approaching**
255:15

**appropriate
ly**
257:20

**approved**
269:25

**approximate
ly**
251:12
263:23

**April**
194:8,10
218:25
238:12
239:19
241:12
295:16

**area**
131:4
173:21,23
174:9
204:12
239:13
258:11,18
259:2
301:13

**areas**
203:12

204:9,11
222:25
239:7
262:3

**Argentina**
143:13,18
150:2
259:17,
18,20

**Argentinian**
259:4
261:16

**Argentinian
s**
144:15

**arm**
177:14

**armed**
261:17

**arms**
168:18

**Arterioscle
rotic**
149:17

**Artery**
149:14,17

**article**
165:10,23

**articles**
165:24,25

**articulatio
ns**
180:2

**Assessment**
149:11
220:12

**assistant**
233:9,24,
25
234:18,
21,24

235:6
305:17,18

**assisting**
261:19

**associate**
130:1
138:2
139:7
231:9
264:1,2

**Association**
262:25
263:1,2
264:12

**assume**
220:5
226:10,11
300:2

**Assuming**
220:4

**assure**
265:1
303:8

**assured**
292:7

**athletic**
214:4

**atrophy**
190:14

**attack**
253:14

**attention**
191:24
304:24
305:4

**attorney**
295:25
301:1

**author**
263:10
264:7

**authored**
264:6

**authorize**
234:7,20

**auto**
162:21
171:4

**automatical
ly**
170:7
215:10

**automobile**
163:4
167:19
176:19
264:2

**avenue**
142:12
154:15,21
248:8,9

**average**
250:25

**avid**
262:8

**avoid**
299:6

**avow**
231:8

**awards**
264:14

**aware**
156:21
157:13,
14,16,21
158:9,13,
25  244:9
297:4
300:11

**awareness**
273:16



**B**

**back**
129:1,4
131:21
142:25
146:22
147:7
156:11
160:21
161:21
162:14
164:9
165:3
168:8,17
184:15
186:25
189:19
193:20,24
198:11
203:5
208:21
221:4
224:21
228:17
235:17
237:11,14
239:8
240:4
245:18
264:24
274:24
279:20
281:14,16
285:10
290:18
298:24
302:13,19

**background**
258:12
259:3

**bad**
140:2
142:23

169:19,24
171:25
175:21,24
185:20
202:24
213:6
228:1
241:9
250:19
268:15
269:6
304:15

**badly**
140:7

**barely**
129:14

**bargain**
249:10
253:13,23
254:3,7,8

**based**
178:16
181:22,23
187:10,13
190:25
202:15
204:10
209:6
243:11
273:17
278:1
283:18
288:5,8
306:19

**basic**
282:6

**basically**
258:12
285:19
296:24

**basis**
244:2
281:12

**bath**
195:19,21
196:6

**Beatriz**
244:17,21
245:8,12,
15 257:14
268:23
270:2,13
271:16
272:4
275:18
278:18
287:14
290:10,20
293:4,23
301:22
307:8

**bed**
212:2

**began**
266:24
276:3

**beginning**
134:9
157:13
172:12,14
194:18,22
203:22
220:22,23
303:24

**beings**
201:22

**bells**
285:18

**belong**
236:7

**belonged**
236:8

**belongs**
130:21
143:15
236:3

**benefit**
215:14
298:8

**benefits**
266:2
298:1

**big**
129:25
139:13
171:23
192:3
197:20
199:14
227:17
247:10
255:14

**billed**
252:8,25
253:1

**bills**
228:14
244:9,13

**bit**
129:5
133:14
145:12
164:23
166:16
172:15
190:11,15
209:1
228:17
244:16
246:16
251:20,24
252:3,22
258:9,12,
20,23
268:5
270:11,25
274:20
292:16
295:1

**Blake**

238:12
239:19
241:11
242:15

**blank**
220:3

**bleed**
170:9

**bleeding**
170:1
200:11,12

**bless**
262:16

**block**
149:17
255:17

**blood**
255:10

**blurred**
178:12

**board**
259:14
260:17,
21,22,23
261:1

**boards**
260:10

**body**
203:12
214:13

**bones**
175:23
199:9

**book**
136:7
165:11,
16,20

**books**
165:12,
13,18,19
166:3,11



boots
   289:7

boss
   248:22

bottom
   225:4
   229:17
   240:12
   241:23
   242:23

bought
   130:1,8,
   13

Bowl
   132:9,12

box
   226:9
   247:11

BR
   161:3,12
   187:1,2
   208:25
   218:25
   229:8,15,
   16

brace
   186:6

brain
   170:3,9

brake
   168:22
   186:8,11

branch
   151:6
   261:17

break
   208:16,
   20,24
   224:20
   237:6,10
   302:18

brilliant
   269:25

bring
   138:1
   174:14,
   16,17
   291:3
   292:9

broken
   175:23

brother
   293:10

budget
   282:22

Buenos
   259:25

burn
   216:8

business
   136:1,3
   138:8
   139:2
   151:17,
   19,20
   153:12,21
   158:20,23
   255:13
   265:4
   273:20

businesses
   151:13
   153:7

button
   188:14

buy
   129:24
   130:12
   131:20
   133:1
   136:16
   145:20
   153:15

                    C

C-A-N-N-E-D
   303:16

C-R-R-R-R-
R-R
   185:24

cage
   164:23
   186:3,4

call
   176:10
   202:19,
   22,25
   241:2
   259:23
   261:23
   275:20
   299:2
   302:13
   303:15
   306:7,8

called
   133:16
   166:25
   167:1,2
   263:4
   284:17

calls
   169:13

canned
   303:16

capability
   276:6

capable
   283:24

capacity
   279:13,14

cardiologis
t
   143:18

250:12

cardiology
   143:20,23
   149:20
   264:12

Cardiovascu
lar
   262:19,20

care
   141:11,13
   144:1
   181:14
   182:12,
   15,20,21
   183:3,4,7
   184:22
   186:17,
   19,23
   230:15
   231:10,11
   233:5
   249:23,24
   274:15
   278:21,25
   279:6
   305:1
   307:22

career
   261:18,22

careful
   283:8

careless
   274:18

case
   140:6
   150:24
   230:15
   256:14
   258:2
   285:7
   288:1
   295:14,19
   296:14
   299:1,2

300:21
   305:3

cases
   140:5
   179:8
   205:15
   216:15,16
   227:13

Cash
   153:10,17

cauteries
   190:17

cell
   257:20
   302:11

Center
   152:6,17
   154:1,11
   155:2,4,
   11,16

certificate
s
   271:3

certificati
on
   259:14
   260:6

certificati
ons
   260:18,
   21,22,24
   275:9
   282:11

certified
   261:1
   275:12

certify
   289:14

cervical
   162:23
   163:4,15
   164:13,



21,24
165:2
166:22,24
167:4,20
168:3,12
169:10
172:9
181:3
184:15
185:2,12,
13 186:2
187:17
191:17
193:2
198:12
204:21
211:17
212:7,9

chain
255:10,17

chairman
259:24

change
142:25
190:22
191:11
216:3
250:16
290:5,6

changed
133:20,21

charg
298:25

charge
236:21
275:2

charged
234:14

charges
300:15

chart
174:15,
16,17

207:25
208:6,8

charts
253:2
279:12,
17,18
282:12

check
183:18,20

checks
272:5

chemistry
153:14

child
150:23

children
150:19

choose
142:23

Christi
150:25

chronic
200:5
216:5

circle
143:15
156:11
245:18

claiming
288:1

claims
302:1
303:14
304:6

clarificati
on
179:21
188:2
296:9

clarify

166:16
171:1
196:8
265:23

clarity
217:16

Clark
252:20

classify
195:18

CLE
263:4

clean
217:19

clear
180:23
193:3
196:12
200:22
206:25
217:17
269:11
270:1
271:1
276:2
284:21
292:12
297:9,18

clinic
140:4
141:2,4
143:20,
21,25
145:3,5,
8,14,24
146:25
147:8
148:6,13,
19 177:7
180:13
216:16
219:13
237:2,3
245:2

252:11
266:8
267:24
274:15
283:15
302:2
305:12

clinical
215:21

clinics
146:15
148:1,23
156:14,
16,21
157:25
159:10,13
230:8,21
231:6,11
232:9
244:25
245:15
246:15
251:16
256:22
258:16
266:4,5,9
267:1,6
283:15
295:7,11

close
179:2
294:15

closed
138:11

co-author
263:11
264:7

co-authored
264:6

coffee
178:22

coins
298:6

cold
195:12
225:14,
15,21

colds
227:22

collisions
264:2

column
216:14
226:9

comfortable
270:3

comment
301:16

commerciali
ze
255:13

commit
296:21,22
297:23

committing
274:18

common
150:7
163:12,13
164:1,10
166:1,4,
5,20
167:14
176:18
178:10
203:15
285:12
286:3

commonly
284:17

communicati
on
197:9

companies



151:14
156:8

**company**
137:7,8
154:9
297:21

**compare**
219:17
225:8

**compared**
220:21

**Compensatio
n**
265:20

**complain**
159:2
168:7,14
170:14
227:5
240:3,8
305:22

**complained**
285:6

**complaining**
285:9,19

**complains**
222:24
239:10

**complaint**
178:10
217:8
218:2
222:8
231:3
258:24,25
285:5
301:15

**complaints**
162:20
178:7,9,
11
179:13,18

182:25
183:7
276:22,23
277:2
285:13,24
286:10
289:15

**complete**
175:1
177:23
202:9
221:16,20
222:1,5
223:17
224:15
228:20
243:13,18

**completed**
187:11
201:1
221:4,6,
10

**completely**
188:7
231:19
233:2
253:24

**completing**
177:15

**completion**
218:16

**complex**
305:22,24

**compliance**
267:7

**complicated**
205:5
206:15
216:17

**complimenta
ry**
195:19

**comprehend**
232:2

**comprehensi
ve**
179:5,7

**compressed**
214:23

**compression**
168:11
214:24
215:21

**compromise**
214:21

**compromised**
278:22,25

**compromisin
g**
279:5

**compulsive**
282:14

**concerned**
197:13

**concerns**
270:2

**concluded**
309:8

**concludes**
308:21

**concreted**
142:9

**condemned**
300:19

**condition**
161:24
162:7
220:16

**conditions**
301:9

**Conference**
149:14

**confident**
270:3

**confidentia
l**
238:5

**confidentia
lity**
237:25

**confirm**
244:4

**confused**
257:9
302:7

**confusing**
276:2

**congenital**
255:4

**congratulat
ions**
300:1

**congress**
143:24

**conscious**
177:14

**consciousne
ss**
178:4

**consequence
s**
169:25

**considered**
284:25

**consign**
178:3

**consistent**
238:7
289:9,10

**conspire**
297:23
307:7,10

**consult**
180:10
219:8

**consultatio
n**
306:3

**contact**
131:7
135:3,4
267:15

**contacted**
267:14

**continue**
142:11

**continued**
148:22

**continues**
240:3,8
242:1,5

**continuing**
263:5

**contract**
190:11
272:3
275:1

**contraction**
185:17

**contraction
s**
189:7,8

**contracture**
189:2
195:1,2

**contracture
s**
175:22
190:15

**contrast**
195:19,21
196:6



control
    268:19
    282:5,14
    301:1
    303:9

controls
    282:10

conversatio
n
    247:7

conversatio
ns
    248:24
    270:12
    296:2

convict
    299:14

convinced
    202:5

copy
    146:13,17
    187:4
    252:17
    309:5

corner
    220:13

Coronary
    149:11,
    14,17

Corp
    152:15

corporation
    137:2
    138:1,9
    272:15

corporation
s
    151:16,
    17,18,25
    256:16

Corpus

150:25

correct
    162:8
    184:16
    257:5
    258:2,3,
    6,7
    259:15
    265:13,14
    266:15
    270:4,5
    271:17,
    18,22,24
    272:11,13
    274:8
    275:23
    277:24,25
    278:16,17
    284:10,
    14,24
    290:22
    291:7
    297:11,24
    299:21
    300:7,8,
    15,23
    304:18
    307:11,17

correctly
    166:19
    193:4
    201:6
    271:14
    283:18
    296:13
    299:4

corresponde
nce
    271:4

corrupt
    287:3

corrupted
    287:8

counsel

257:8
287:11

counselor
    302:9
    308:12

country
    231:21
    260:19
    262:14

Countyline
    156:4

couple
    132:25
    222:19
    291:10
    292:3,13

court
    260:1
    295:14
    301:10
    309:1,3,5

cover
    137:20
    256:2
    277:11

covered
    258:22

crash
    169:11

crazy
    231:19
    269:7

create
    180:8
    186:16
    219:6

creating
    180:10

creation
    219:8

credit

263:10

credited
    233:24,25
    234:3,4

credits
    263:5

criminal
    300:21

criteria
    268:12
    282:3

cross
    255:25
    256:9
    260:10

CT
    143:21
    149:12
    170:3,6,
    12

curious
    265:17

current
    155:22
    188:21
    190:1,8
    197:23
    263:6

currents
    188:15,
    16,17
    189:15,
    16,17,25
    190:9

curvature
    185:13,15

curve
    190:20

curved
    185:16

cut

200:15

cutting
    256:1

CV
    149:3

cycle
    222:20,
    21,23
    223:2,9,
    13,14
    243:5

cycles
    170:21
    306:22

_____

        D

D-E-O-L-E-O
    233:22

daily
    218:16,24
    219:20
    237:18
    238:11
    239:18
    241:11
    242:15
    243:18

damage
    169:21

date
    175:9
    194:7
    219:21
    220:8
    262:2

dated
    238:12
    239:19
    241:12
    242:15
    247:22



David
  256:21

day
  173:14,
  16,18
  191:10
  197:15
  219:24
  277:7
  288:19
  292:3
  308:19

day-to-day
  244:2

days
  172:13
  194:20
  288:17
  289:6

de
  235:8,9,
  11,13
  259:25
  305:18

deal
  253:9
  292:14
  295:20,24
  299:7

death
  253:20

deceptive
  307:16

decide
  131:19
  135:1
  148:19
  216:21
  253:19
  280:9
  292:4

decided
  129:24

139:7

decides
  253:10

decision
  134:18
  148:4
  296:18

decrease
  215:4

deep
  200:16
  210:12

deeper
  306:2

deeply
  210:13

defect
  254:10

Defendants
  256:13

deficient
  290:21

defraud
  301:23
  307:11

defrauded
  297:21

degree
  259:9
  261:24
  285:5

Deleo
  233:13

demonstrate
d
  149:18

denounce
  232:25

Dental
  263:2

deny
  294:8

Deoleo
  233:5,6,
  15,16
  234:10,
  14,16
  235:17,18

depending
  169:7
  255:25

depends
  169:21
  171:9,10,
  16 172:23
  183:22
  196:17
  205:12
  211:10
  226:16

depo
  217:8

deposition
  217:13,15
  258:22
  265:19
  266:1,3
  308:22
  309:7

depositions
  266:3,5,6

describe
  181:13
  183:6
  195:4
  198:21
  201:21
  202:2
  207:25

describes
  177:24

describing
  182:11

190:20
215:13

deserve
  250:20

destroy
  138:23
  139:14

destroyed
  138:9

detailed
  186:22,24

detect
  158:15
  160:8,16

detected
  170:2

determine
  244:13
  303:11

develop
  169:4
  190:10
  255:16,17

device
  191:12
  212:11

diagnosed
  198:12
  199:19

diagnosis
  186:15
  200:18,19
  201:1
  202:10,13
  282:2

diagnostic
  284:4

Diaz
  158:3,17
  159:15,
  21,23

160:11,18
204:3
223:19
224:1
228:11
231:16
232:20
235:21
255:23
256:7,10,
12,20,23
257:2,5,
10,12,17,
18 260:1,
4 263:20
264:21
268:4,21
269:9,23
271:25
272:16
273:4,14,
25 274:11
275:8,16
276:19
277:20
278:11
279:2,10
280:20
281:5
283:17
284:7
285:14
286:7,22
287:12,23
288:16
289:17
290:7
291:15
293:12
294:4,19,
22 295:23
297:7,15
298:12
299:11
302:21
303:23
304:12



306:16
307:4,21
308:18

**difference**
187:16,
18,19
192:3,18
210:11
227:14,
17,18,19
274:17

**differentiate**
184:1

**differentiation**
306:13

**differently**
281:22

**difficult**
135:2
142:22
209:22

**difficulties**
145:15

**direction**
250:15,17

**directly**
192:8

**director**
140:5
147:25
148:6,20,
23
156:11,15
157:12,18
160:4,8,
16 162:12
222:11,13
228:4,8
234:12
236:20

244:13
246:7,10
248:25
249:9
250:22
251:1,16,
18 253:25
265:13
266:17,
21,24,25
267:4,7,
23,25
268:3,10,
17,25
269:3,4,
6,15,16,
19,20
270:4
271:6
272:10
274:4,7
276:9
277:9
278:9,15,
20 279:5,
14
281:20,23
282:5
287:5,9,
16 295:6,
10 305:11

**director's**
158:15

**directors**
246:13

**disagree**
301:17

**disappointed**
249:17
250:5,6,
8,18

**disassociated**

295:9

**discontinuing**
232:13
248:25

**discover**
201:17,
18,21

**discussion**
158:22
282:15

**disease**
149:14
179:24
180:3

**diseases**
180:3

**dislocation**
185:8

**dislocations**
175:23

**disperse**
164:22

**displace**
164:25

**displacement**
163:15
164:20
167:2

**dissatisfied**
276:5

**distension**
200:13

**distinction**
281:18

**district**
300:25

**dizzy**
178:8

**doctor**
129:4,15
130:3
140:22
142:13
145:1
149:25
161:4
174:3
176:11
178:17
190:7
197:10,19
202:4
206:6
222:8
227:24
230:3
233:24
234:2,3,4
236:1,4,
19 249:9
261:14,19
264:20
278:10,
12,13,15,
20 279:4,
13,14,23
281:7,19
284:17
286:25
300:17
302:22
303:1
304:8,14
305:12,13
306:4,20
308:1,18

**doctor's**
187:13

**doctors**
201:22
304:22

**document**
149:6
161:4,7,9
205:22
218:12,16
219:1,2,3
223:4,6,8
229:5,12
230:3
233:1
237:15
239:23
241:19
242:19
243:12
246:25
247:9,10
248:3

**documentation**
271:4

**documents**
155:9
237:7
238:1
247:11
272:14

**dollars**
140:7
144:3

**doors**
274:25

**Doral**
154:1,11
155:2,5,
12,17

**doubt**
293:23

**dozen**
301:19

**drive**
255:11



drugs
  178:22

duration
  286:14

duties
  268:18
  281:25

duty
  158:25

_____

    E
_____

ear
  276:24

earlier
  148:2
  212:18
  251:8
  261:6
  265:16

early
  205:9

ears
  289:5

easier
  211:22
  291:25

easily
  164:25

easy
  142:15,23
  193:15
  250:14

ed
  298:25

educate
  207:4,6,7

education
  206:14
  263:5

educational
  261:23

effect
  211:4

effort
  255:6
  305:9

Ehlers
  179:22

Ehlers-
danlos
  179:20,
  22,24

elbow
  168:16

elect
  226:15

electric
  193:19
  283:10

electrical
  187:20

electricity
  283:11

electromyog
raphy
  188:24
  189:1

emergency
  170:4,5
  175:25
  176:1,2,
  5,14,16,
  20  177:2,
  11,13
  178:6

employees
  236:13
  280:13

employers
  269:7

employment
  139:19
  265:10

empty
  137:7

EMS
  187:18,19
  188:5,13
  189:4,13
  190:17,25
  191:21
  192:6
  195:12
  204:1

end
  187:12
  250:3
  258:22
  300:13

England
  262:11,18

enhance
  187:21

enroll
  231:9

entered
  260:12

entire
  167:21
  265:10
  277:24

entity
  265:21

equal
  222:24

equally
  284:16

equation
  294:12

equipment
  275:3

276:5
  283:19

essentially
  287:25
  290:4

establishme
nt
  232:25

etcetera
  137:16,17
  140:1
  174:21,22
  176:12
  179:19
  249:11
  268:19
  294:7,8

European
  149:13,20
  264:11

evaluate
  183:24
  282:1

evaluated
  278:5

evaluation
  161:3,11,
  13
  177:16,21
  181:25
  182:21,
  22,24
  194:8
  201:20
  217:6
  219:18,21
  232:4,12
  280:3,4,
  6,24
  304:9,18
  305:7

evaluations
  277:1

303:17

eventual
  179:11

evidently
  137:17

evolution
  197:23
  205:13

ex-wife
  245:20,
  21,22
  267:16

exam
  186:13,
  16,21
  194:13
  220:10

examination
  159:4
  168:10
  170:16
  174:11
  187:12,14
  256:9
  281:3,10
  304:15
  306:2

examine
  304:7,9

excuse
  167:20
  186:20
  190:23
  218:24
  222:3
  227:12
  287:10

exercise
  280:8

exercises
  172:20
  194:7,13,



16,22
195:3
197:3
204:20
205:1,3,
8,21,23
206:2,9,
17 208:1,
2,3,6
213:7
214:6

exhibit
146:2,5,
15 148:1
153:5
160:24
161:2
175:2
186:25
194:8,9
198:11
200:19
203:6
213:1,3
217:7,8,
9,12,13,
14,15
218:2,21,
24 219:1,
18 222:22
223:8,25
224:23,
24,25
225:4,9,
18,24,25
229:5,9
237:16,18
238:13,
14,17
239:8,14,
16,18,20
240:6,12
241:14,16
242:3,4,
8,12,14,
16 243:3,

7,9,12,
16,23
247:18,
19,23
252:13

exhibits
238:5

expect
163:2
167:18
169:6,9
175:9
184:11
203:16
210:19
249:7

expensive
282:18

experience
162:21
167:14
168:6
176:18
187:10
261:12,25

expert
150:11,
16,18,23
253:8
265:15,
18,24

explain
193:14
281:20
285:23
286:11,14

explained
286:2

explanation
298:23

explicit
189:4

express
183:8
226:19
270:1
275:18
276:7

expressing
183:11

expression
182:19
183:23,24

expressions
144:21

extend
205:8

extension
205:6,7,
11,15
206:4,7

extensive
290:4

extent
200:25

extra
277:7
288:19

extremely
228:25
250:5

eyes
289:5

_____

F

_____

F-
130:18

fabricated
285:25

face
253:10

face-to-
face
279:25
280:2,5

facia
200:12

facial
144:21

facilities
141:10,12
231:11

facility
236:1,2,
17 283:23

fact
164:2
227:22

factors
171:16

facts
292:14
293:11,
14,16

fail
143:6
201:22
304:8

failure
269:17,19
304:7

fair
135:22
236:25
249:22
288:11

fall
304:8

falsified
253:5

familiar
152:4

157:11
228:20,25
237:1
238:20,21
244:24
245:24

family
177:5
179:4,6,
7,11,12
180:5
250:16
253:17
299:23
300:5,17

famous
131:3
133:3,5
296:10

farm
238:20
287:25
301:23
302:1
304:6
307:11,
16,20,23

fast
133:14

fat
285:1

father
153:13

federal
289:9

feel
176:25
250:5
254:19
278:2
297:5,9

feeling
184:12



249:17

**feet**
  206:22

**fellow**
  248:23

**fellowship**
  151:3

**felon**
  299:16

**felt**
  270:3
  275:19
  278:19
  279:5
  290:21
  296:20,22
  300:2
  307:16

**field**
  142:14
  260:24

**filed**
  238:5

**files**
  279:12,17

**fill**
  174:17
  258:12

**final**
  232:3,12
  281:3,10

**financing**
  137:20

**find**
  149:6
  165:25
  170:14
  201:23,24
  202:19,20
  207:16
  277:22

278:1
282:20
284:2
302:24

**findings**
  187:13

**finds**
  202:18

**fine**
  136:18
  237:20
  290:17

**Finer**
  130:23

**Finerman**
  130:16,
  19,20,21,
  24 131:2,
  3,16,22
  132:25
  133:3
  134:22

**fingers**
  172:24

**finish**
  197:5

**finished**
  138:9
  301:14

**firm**
  137:1

**FIU**
  265:7

**fixation**
  216:13

**flags**
  285:18

**flex**
  205:8

**flexion**

205:6,7,
12,15
206:4,7,8

**flip**
  146:12
  185:21
  243:3

**Florida**
  143:5
  144:25
  260:13,
  14,15,18,
  21 261:4,
  7 263:1,4

**focusing**
  200:18

**Folks**
  255:21

**follow**
  231:18
  255:8
  282:3

**follow-up**
  197:17
  198:1
  202:16,
  17,23
  203:4
  273:9
  281:13

**follow-ups**
  281:3,9

**fond**
  210:4,6

**foot**
  168:22,24
  186:8

**force**
  168:22

**forced**
  139:9

**forces**
  261:17

**forged**
  253:6,7

**form**
  132:2
  151:13
  158:3,17
  159:15,
  16,21,23
  160:11,
  12,13,18,
  19 161:6,
  7,11,13
  162:2,10,
  25 163:6,
  7 175:2,
  4,7,10
  176:21
  180:8,10,
  11,12
  181:17
  182:17
  187:11
  193:13
  197:11
  198:22
  200:7
  203:5,23
  204:2,3,
  7,10,25
  209:6
  215:16
  219:6,9,
  11,13,17
  221:6,16,
  17,20
  222:1,5,
  6,15
  223:11,
  17,18,19,
  24 224:1,
  15
  225:18,24
  228:11,
  21,24

229:1,3,7
230:7,10
231:16
232:8,18,
19,20,22,
23,24
235:21,22
238:21,22
239:25
241:21
242:21
264:17
268:1,13
269:1,21
271:23
272:12
273:1,12,
22 274:9
275:6,7,
14 276:17
277:13,16
278:6,7,
23 279:7
280:15
281:1
282:24
284:1,13
285:11,21
286:19
287:6,18
288:12,14
289:12,24
294:1,18
297:1,12,
25 299:9
303:21
304:10
306:14
307:1,18

**forms**
  222:10
  228:20
  229:2
  230:21
  231:5
  243:13



Fortunately
  254:17

forward
  133:14

found
  153:17
  202:21

fracture
  185:7
  202:20
  216:4

fractures
  177:14
  213:21
  306:1

frame
  151:12

France
  149:15

fraud
  156:15,21
  157:22
  158:11,15
  159:12
  160:8,16
  229:6
  232:25
  233:1
  234:15
  274:18
  296:21,22
  297:10,23
  298:2,3,
  4,10,11

fraudulent
  297:3
  307:16

free
  231:21

frequent
  163:10
  167:24

Friday
  277:23

friend
  140:3,14

friends
  143:16
  150:7,8

front
  163:17
  164:4,9
  165:3
  300:15

Fuentes
  248:18

full
  149:8
  305:6

funding
  136:3,4

funds
  134:25
  230:14,24

——————————
          G
——————————

G-A-R-B-E-R
  144:10

gain
  190:11

gait
  173:1,2

Galveston
  151:6

gamble
  300:7

garbage
  153:19

Garber
  140:21,24
  141:1

143:10,12
144:8,25
145:5,13,
21,22
146:25
147:25
148:5,16,
25
149:13,16
150:2
156:14

Garber's
  140:23
  147:8,14

gave
  266:1

Geico
  307:24

general
  142:20
  170:17
  178:20
  277:21
  285:20

generalized
  207:2

generally
  162:22
  180:4
  215:15
  286:11,
  15,17
  306:12

genetic
  179:14,16

genetics
  179:13

give
  129:12
  140:13,
  15,18
  145:16
  171:21,24

176:10
192:9
210:25
226:25
227:1
228:23
232:2
247:10
258:9
267:20
269:12
304:3,4

giving
  195:21
  210:7,8

gold
  153:10,
  14,15,16,
  17,25

Goldstraj
  149:13,16
  155:20
  177:22
  198:20
  199:21
  208:24
  217:23
  233:4
  237:14
  238:18
  243:25
  246:6
  247:12,23
  256:11
  257:19

good
  136:17
  137:6
  138:8
  139:13
  140:14
  143:18,22
  149:25
  201:21
  214:4

222:13
227:11,12
250:11,12
253:25
254:18,19
262:15
264:20
269:14
282:7
292:10
298:10
299:12
300:1
304:14,15
305:7,21
308:7,19

Gotcha
  304:6

government
  265:21

governs
  237:25

grab
  252:16

graduate
  181:19

graduated
  292:6

gram
  153:24

great
  144:4
  153:20
  169:25
  238:11
  296:12

ground
  271:2
  289:7

group
  236:3,7,9
  306:11



grow
139:14

—————————
          H
—————————

guarantee
299:7
300:4

guaranteed
142:8

guess
199:8
220:25
241:8
293:24
294:2
299:23
308:2

guessing
294:11

guide
223:16,23
237:15

guidelines
299:20

guiltiness
253:13

guilty
164:3,9
253:19,23
254:9
296:14,
18,25
297:5,22
298:15,17
299:5
300:3,15,
19 301:4,
5

guys
133:22
146:13
291:3

H-O-S-E
152:8

habit
178:21

half
227:6
284:11
301:19

Hallandale
133:9

hammer
272:8

hand
254:13

handing
290:22

hands
206:22

hands-on
288:20

handwriting
175:7
180:14,
21,23
209:4
218:9
222:16,17
223:21

hang
302:12

hanging
208:1,7,8

happen
136:10
174:14,21
177:25
178:13
185:11

197:22
252:6
255:15
285:23
301:4
304:22

happened
137:14,18
174:18,
21,22
175:24
180:17
185:4,10
186:14
251:21
252:3,5,
23 254:6
282:3
286:3
288:1
305:3

happening
156:16,21
158:1
246:22

hard
199:9,12,
13

harness
212:12

he'll
302:12

head
170:1,6
285:9
296:17

headaches
170:14

heal
200:3,7

heals
200:14

health
147:19
157:18
160:2,4,
8,15,22
161:12,23
162:5,6,
13,15
170:18,21
171:3
173:3,10
175:1
176:15
188:10
190:18
207:19
208:7,8
211:8,18
212:4,14
216:23
218:13,17
219:14
221:15
229:7
230:10,
15,24
231:10,11
232:1,3
233:4,9
234:11,19
238:24
239:25
240:23,
24,25
241:21
242:21
243:13
244:1,17,
25 245:16
246:7,11,
17,18
247:13
249:1
250:23
251:1,10,
13
256:16,23

257:4,8
266:7,13,
17,25
267:4,10
268:6
270:10,
14,16
271:6,12,
16 272:9
273:7,11,
16 274:22
275:19,25
276:3,15,
24
277:10,22
278:3,21
279:3,13,
24 280:13
281:18
282:17,19
283:19,24
284:13
285:17
286:23
287:2,4,
15 288:9,
13,17,22
289:7
290:9,20
291:6,19
292:18,19
293:19
300:12
302:2,25
305:1
306:20
307:9,14

hear
129:14
240:18,
23,24
277:2
283:18
290:16

heard
155:7



156:15,
20,24
236:11
240:17,19
241:2
259:13
261:6
262:7
263:8
265:3
271:9,14
292:12

hearing
178:12
265:20

heart
250:11
253:14
259:18,20

hearts
255:3,4

heat
195:22
210:7,8,
13

held
137:24
158:22
261:3
278:2
295:10

herniation
214:22

hey
151:22
291:3

HG
154:6

high
274:15

Hilda
235:9,11

305:18

hip
209:4,5,
7,13,15,
18,21,25
210:1,12

hipostasia
187:25
188:3

hips
212:13

hire
141:17,22

histories
162:18

history
162:19
177:16,21
179:4,6,
8,11,12
180:14
265:10

hit
186:5

holds
164:23

holes
258:13

Hollywood
133:11

home
177:5
299:24

Homestead
236:8,19
237:2,3
245:3

hopes
291:13

Hoseah

152:6,8

hospital
141:23
151:6
176:8
178:5
259:24,25
262:22

hospitals
142:7

hot
195:21,23
196:2,3,4
210:15,19
225:14,
15,21
227:22

hot/cold
195:20

hour
169:11
170:10
227:6
277:7
288:19

hours
169:4
177:3
220:24
227:6

house
132:3,4,
7,9,12
139:20
154:18,25
166:11

Houston
263:2

Hugo
149:13,16
155:20

human

201:22

hundred
140:7
144:3
284:11

hundreds
141:25

hurt
184:4

hurting
178:7,8
185:6

hurts
185:12

husband
245:8,12,
15

Hydromassag
e
195:16

_____

I
_____

Ibuprofen
172:2

idea
134:21,22
135:3
139:3
153:13,15
191:11
194:17
206:18,20
208:14
224:12
232:24
303:10

ideal
269:4,5

identical
219:16

285:7

identificat
ion
160:25
217:10
218:22
229:10
238:15
239:21
241:17
242:17
247:20

identify
161:9
244:13

identity
228:22

illegal
287:17

illegally
236:24

illness
177:16,21
180:15

Imagine
254:4

immigrated
259:6

immoral
287:17

impact
168:19
186:10

implicated
167:12

implied
163:18

implies
192:21

important



178:3,25
199:14
209:24
264:18

**imposed**
301:11

**improve**
161:24
162:6
217:3

**improving**
216:6

**inadequate**
276:12,15

**include**
172:8
281:6

**included**
175:10
263:2

**including**
170:9
262:24
287:2
290:10

**income**
139:22,25

**increase**
210:13

**independent**
280:8
286:24
300:20

**indicating**
168:20
193:24

**individually**
256:13
257:12

**individuals**

256:12

**industry**
157:22
158:11

**inflammation**
215:5

**influence**
179:14
286:24
287:3

**information**
251:25
255:11
295:21
301:21

**inheritance**
254:18

**initial**
161:2,11,
12
177:15,20
186:13,
16,21
194:7,12
202:17
212:24
213:8
219:18,21
220:8
280:2
303:17
304:9

**initials**
154:3,5,7
161:3

**initiated**
222:19,
21,23
223:2,13
243:1,5

**injections**
216:11

**injured**
203:19

**injuries**
171:11
178:3
179:25
198:21,24
199:19,
21,23
201:7,13,
15 202:3,
5,6 204:9
215:17
264:1
284:18,20
285:10,
20,23
305:23,25
306:4,5,
10

**injury**
165:14
166:4
170:9
178:1,14
179:3
199:11
200:1,10
202:2,24
203:24,25
215:13,
15,18,20
284:24
285:2
286:18

**innocent**
164:4,10
253:24

**inquiry**
264:25

**inside**
137:8
289:7

**insisting**

292:2

**instances**
244:9

**instruct**
222:3,4

**instructed**
190:6

**insurance**
145:6
156:17
228:22
234:15
250:4
252:8
255:4
297:21

**insured**
156:22
304:9

**insureds**
304:7

**intended**
256:2

**intensity**
188:17
286:14
306:23

**intention**
138:23
194:20

**intentionally**
296:22
297:20,23

**interaction**
271:10

**interested**
298:3

**interesting**
169:3

**internal**
142:20

**internet**
153:16,20
163:24
165:13
166:13
207:9,11,
16

**interpretation**
282:25

**interrogation**
182:4

**interrupt**
173:24

**intervened**
274:7

**interventions**
253:16

**interview**
267:20

**interviewed**
266:21

**intraspinal**
216:9

**introduced**
150:8
245:19
246:2

**intrusive**
140:20

**invented**
199:15

**investigating**
157:25



investigati
on
    158:5
    159:6
    233:1

investigato
r
    158:24
    258:5

investment
    137:24

investments
    135:8

Investors
    138:17,18

invited
    132:4,6,
    8,11

involved
    129:6
    163:3
    172:25
    176:19

involving
    135:20

IOT
    255:10,16

Ira
    296:7,10,
    11,12
    299:5,12
    300:17

issued
    302:25

issues
    157:8,11


—————————
        J
—————————

jail
    253:12,

19,20
299:6
300:12

job
    140:3
    228:3,7
    244:12
    251:7
    278:13
    283:8

jog
    295:17

joined
    307:11

joints
    172:25
    180:2
    192:24
    193:2
    194:3
    203:13,
    15,16
    205:4

Jose
    154:13

journal
    165:23
    262:11

journals
    262:10,
    14,17

Juan
    233:5,6
    234:10

judge
    268:15
    304:11

judgment
    280:8
    286:25
    303:1
    306:24

June
    247:22

junior
    141:14

jurors
    217:5

jury
    253:10,18
    299:13


—————————
        K
—————————

Karen
    161:10
    308:2

keeping
    249:12
    290:11

key
    193:19

kidding
    213:25

Kids
    152:17

kind
    147:7
    151:20
    178:23
    179:10
    190:1
    193:4
    194:1
    195:10
    197:24
    202:3
    205:3,10,
    21 212:11
    214:6,16,
    22 215:20
    216:7
    219:3
    221:21

228:24
250:7,9
251:7
258:9
269:7,11
282:14
283:3

kinds
    163:17
    172:23
    216:12
    250:19
    262:4

knee
    168:16,23
    186:3,7
    203:25
    204:1,13
    205:5,6,
    8,12

knees
    203:9
    209:3

knew
    141:20
    145:15
    154:3
    157:5
    249:5,14
    250:2
    287:20
    299:5,12,
    15 300:12
    301:3,5,7

knowingly
    296:21
    297:22

knowledge
    155:2
    218:11,15
    221:21,24
    276:18
    301:21,25
    303:4,7

—————————
        L
—————————

la
    235:9,11,
    13 305:18

laboratorie
s
    263:14

laboratory
    153:17

lack
    227:5
    297:9

Lakes
    133:10

language
    232:8
    239:14,15
    243:7,8

large
    129:25
    285:16

larger
    306:11

lateral
    206:4,8

laugh
    184:7

law
    164:6

lawfully
    235:19

lawsuit
    217:14
    218:3
    266:2

lawyer
    164:6,7
    258:5



Case 1:18-cv-23125-RNS   Document 159-2   Entered on FLSD Docket 10/30/2019   Page 207 of
229
HUGO GOLDSTRAJ, M.D. Volume 2                                    August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                   Index: lawyers..Luis

296:3,6,
10 299:12

lawyers
136:4,6
141:18

laxative
179:24

Lazaro
245:20
247:8
257:13
267:11
270:12
271:10,16
272:2
275:18
278:18
287:14
290:10,19
301:22
307:8

lazy
174:3

leading
155:13
165:10,
15,18

learned
157:21

leave
139:16
143:1
195:1
270:20

left
186:3
206:8
308:3

leg
209:10

legal
263:5

296:3

legally
236:23

lesion
167:4
185:20

lesions
166:6
196:17
199:4,13
201:21
217:4
304:1

letter
229:20
247:1,12,
22 248:16

letters
271:4

level
169:6
184:23

levels
184:11,18

Leyva
235:15,16

library
262:22

license
155:24
249:12
254:5,9,
11,13,15
260:13,
15,16
261:3
263:6
295:1,15
298:19
300:22
301:2,4,6

licensed
144:25
190:4,24
291:3,4,5

licenses
258:20
275:12

life
230:12
251:22
254:6
298:20
300:13

lift
186:11

ligament
285:1

ligaments
179:19,25
180:1
199:10
200:2,3,
13

light
189:10
190:2

limited
262:25

list
225:22
257:13

listed
146:14
187:8
204:20,21

literally
158:20

literature
146:1
165:6,8,
25 166:2,
5,9

167:25
168:5
262:5

litigation
150:12,17

live
248:9
254:16

LLC
152:3
153:10

LNPS
291:21,22

loans
140:1

localizatio
ns
199:3

long
132:18
140:10
145:21
153:21
190:25
191:2,24
192:5
193:12
255:25
260:12

longer
246:15
247:2
249:5,6,
14 290:8

looked
248:21
305:17

lose
254:8

loss
177:14
178:4,12

lost
138:5
139:10
254:5,15
258:21
283:7
291:13
300:7
302:10
308:4

lot
139:14
145:10
165:8,12,
18,19
166:3
168:11
169:11,20
173:22
184:4,9
187:19
189:6,7
191:25
193:9
199:24
255:6
305:2

lots
166:9

low
190:2

Lowe
296:7,10

Lower
209:10

LPT
293:20

LPTS
291:21
292:19

Luis
257:3



lumbar
  162:23
  163:5,16
  164:13,
  21,24
  166:23,24
  167:3
  168:3,12
  169:10
  172:9
  187:17
  191:19
  193:2
  198:18
  204:22
  212:10,
  13,15
  216:14

lunch
  265:16

lying
  211:16,
  21,22,24
  212:12

———————

M

M-U-S-E
  257:14

M.D.
  149:16
  155:20
  261:13
  281:24,25
  282:1

machine
  188:13
  211:13
  212:14

machines
  188:8,9,
  11 211:23
  212:1
  282:22

made
  142:25
  143:3
  179:25
  190:16
  200:19
  276:22
  281:18
  297:11

Magda
  245:24
  246:4

mail
  153:19

main
  159:3

major
  172:4,25
  217:3

majority
  168:2

make
  135:19
  145:4
  158:1
  159:5
  174:4
  184:7
  192:16
  217:6,18
  223:10,12
  225:14
  228:4,8
  257:19
  267:22
  270:21
  272:7
  282:1
  283:15
  284:21
  297:18
  298:3
  307:7

makes
  186:9

making
  148:16
  159:4
  250:25
  251:9,17

mall
  193:15,23

man
  131:11
  154:13

managed
  137:19

Management
  149:14

manual
  192:17,
  19,20,21,
  22,25
  193:4,6
  196:10

map
  258:10

Mario
  140:24

mark
  194:18
  196:14
  217:7
  218:19
  221:1
  226:12
  229:5
  237:18
  238:11
  239:18
  241:11
  242:14
  247:17
  304:2

marked

160:25
203:6
204:7
217:10,
14,15
218:22
223:24
229:10
238:15
239:21
241:17
242:17
247:20

market
  135:7
  136:1
  137:18
  138:20
  141:21
  210:5
  282:19

marking
  146:14
  161:2
  247:16,22
  280:16

married
  245:23

Martinez
  154:13
  257:3,7

massage
  186:25
  189:18,
  20,24
  190:4,19,
  24 192:5,
  17,19,20,
  21 193:1,
  5,10,11,
  19,20,21
  195:13,16
  204:24,25
  205:20

206:11
208:11,25
209:12
219:5
221:10,
11,12,15,
17,19,22,
25 222:4
224:7,14,
15,16,21
225:4
226:5,14
227:1,9
238:22
240:20,21
241:20
242:20
288:20
290:1
291:5,9
292:5
293:5

massage-
type
  193:9

match
  239:15
  306:23,24

matter
  164:1
  256:15
  271:20
  297:17

matters
  256:2

MBA
  265:4,7
  282:8

meaning
  261:24
  262:8
  269:17
  275:11
  301:9



302:2
303:15,16

means
200:10
203:2
206:20,21
219:24
224:3
230:17
231:15
234:7
264:9
284:11,25
285:1
306:7
307:10

meant
238:4

mechanical
192:20
193:21
196:11
211:7,8,
10 213:8,
13

mechanism
178:1,3

medical
140:5
146:1
147:25
148:6,20,
23 152:6,
19,21
156:11,14
157:12,18
158:15
160:4,8,
16
162:12,
18,19
165:6,8
166:2,5
167:25

182:4
222:11,13
228:3,7
232:4,12
234:12
236:20
244:12
246:7,10,
13 248:25
249:8
250:21
251:1,15,
18 252:20
253:25
254:5
256:17
257:1,14
258:20
259:9
260:13,
14,15
261:3,14,
19,22,24
262:3,10,
14,17,23,
25 263:1,
2 264:13,
15
265:11,13
266:8,14,
17,21,24,
25 267:1,
3,6,23,24
268:3,10,
17,25
269:3,4,
6,15,16,
19,20
270:4
271:6,21
272:10
274:3,7
276:9,15
277:9
278:9,10,
12,13,15,
19,20

279:4,5,
14,23
280:8,17
281:7,19,
23 282:5
286:24,25
287:4,9,
16 289:10
291:4
295:1,6,
10 302:25
303:5
305:11,12
306:12,19

medically
274:6
302:3,5,6
303:2,6
306:25

medication
147:12
172:2,4,5
178:23

medicine
142:20
152:3
260:25
262:11

medicines
171:25

meet
129:23,25
130:7
131:2,22,
25
132:16,23
150:6
253:13
268:12
269:18
279:24

members
262:23

memory
292:15
295:17

mention
236:11
241:2
245:2
269:6

mentioned
148:9,25
154:24
212:18
236:12,16
241:1
246:23
251:21
267:18
268:16

merger
135:15,
16,20
136:9,15
137:14

messy
185:23

met
131:4,12
132:6,11,
24 150:4
241:3
244:17,
19,22,23
258:1

met all
268:10
301:8,10

MG
154:1,6,
11 155:2,
4,11,16

Miami
133:10

Michael
152:9
252:14
255:21

Michigan
234:15

middle
269:17

Miguel
140:25
141:1
149:13

miles
169:11
170:10

military
261:11,13

mind
134:23
146:21
202:4
227:14
278:4
285:18
293:23

mine
129:8
137:23
140:14
153:11
175:6
227:7
253:3

minimal
182:11
183:5,10,
13,17,18,
22

minimum
269:18
275:20

minute



262:4
274:17
287:25

**minutes**
191:16,
17,18,21,
22 192:1,
2,9

**mishear**
265:6

**missed**
294:20
297:4
302:22

**misspoken**
295:13

**mistake**
142:25
143:4
194:14
227:25
250:14
270:21

**mistakes**
228:1

**mixed**
145:8,9

**mobilizatio**
**n**
192:22,24
193:1

**mobilize**
194:2,25

**modalities**
147:18
187:8
193:9
204:12
209:8
225:9,23
226:15
282:18

286:12
306:22

**modality**
195:10
204:11
225:3

**models**
255:3,7

**moderate**
182:6,11
183:6,10,
14,17,18,
21

**modify**
203:3

**moment**
135:1
217:22
246:12
247:23
271:1
298:22

**Monday**
277:23

**money**
136:17
138:22,24
139:25
142:5
145:19
148:15,21
298:5

**month**
132:20,
21,23
249:20
250:25
251:4,13,
17 280:23
292:3

**monthly**
148:17

**months**
131:6
138:8,11
295:18

**moral**
254:10

**morphine**
171:22

**mortgage**
139:21

**motor**
170:5
284:13
285:4
286:4

**mouth**
148:8
284:9

**move**
143:5
160:2
168:9
190:13
216:20

**movement**
168:11
172:24
205:7

**movements**
206:21

**MRI**
306:3

**MRIS**
170:3

**multi-p**
149:18

**multiple**
133:6
169:2
184:18,19

**muscle**

190:10,
11,17
200:3,11,
12 285:1

**muscles**
172:14,25
185:17
187:22
188:5,23
189:2,8
190:14
194:2,3
200:2
283:7

**musculature**
169:22

**musculoskel**
**etal**
187:20,21

**Muse**
236:15,16
244:17
245:20
256:14
257:13,14
267:11
268:22
270:2
275:18
278:18
287:14,15
290:11,20
293:4,23
301:22
307:8

**Muse's**
245:8,12,
15

**Muses**
244:16,24
245:19
247:7
287:3

**mute**
151:23

**mutual**
150:8

**MVAS**
285:24

_____

**N**

**N-E-R-M-A-N**
130:19

**named**
154:13
233:5
256:13

**names**
135:6

**national**
259:4
260:22,23

**nature**
285:5

**nausea**
178:9

**necessarily**
216:1
266:11

**neck**
168:8
178:14
211:11
214:13
285:9

**needed**
148:6,21
273:10
275:23
278:20
282:23
291:21
292:19



306:25

**negative**
181:11

**negligent**
274:18

**negotiated**
271:11
272:2

**negotiations**
132:18

**nerve**
214:21,22
215:4,5

**nerves**
187:24
188:1,3
214:24
215:22
216:8

**neurological**
170:15

**neuromuscular**
172:17
226:4

**news**
197:19

**newspapers**
156:23
157:6,8,
10

**nice**
131:10
149:14
210:21,23
214:11
255:7

**NICOLEAU**
140:18

144:20
146:2,17,
22 150:13
153:3,5
154:8,19
155:13
158:4
160:13
161:16
163:6
166:14
167:7
169:13
170:19,23
171:8
176:21
177:18
180:20,24
182:13,18
193:13
196:2
198:22
213:1
215:16
217:20,24
223:6,11,
18 224:23
225:12
229:13,
15,21,24
231:22
232:19
233:20
235:22
238:8
247:16
252:15,18
255:22
256:3
263:18
269:1
272:24
287:11
292:24
294:21
295:22
302:9

307:3
308:2,5,
11,15
309:4,6

**Niños**
259:25

**Noel**
245:5
256:14
257:13
307:8

**Non-invasive**
149:11

**normal**
198:8
200:8

**Northeast**
154:18

**Northwest**
154:15,21
248:8,9,
12

**nose**
158:20

**note**
218:25
219:20
222:14,18
225:4
237:19
238:12
239:19
240:2
241:11,25
242:15,
20,25

**notes**
151:9
218:17
219:5
221:12,18
223:9,24

224:8,15
239:1,3,
4,15
241:20
242:9
243:7,19

**notice**
232:2
257:9

**Novo**
129:21,
22,23
130:3,23,
25 131:1,
9,10,13,
17,19
132:23
133:15
134:8,23
137:23
138:15
139:6
153:8,9

**Nucare**
152:3

**number**
156:14
181:11
222:22
223:1,23
230:13,23
231:8
239:9,11,
14 240:6
242:3,8
243:4,8
267:5
271:3
304:21

————————

O

————————

O-U-T-L-I-E-R-S

306:7

**object**
159:15
182:16
291:22

**objected**
290:11
291:20

**objection**
132:2
155:13
158:3,4
167:7
169:13
170:19,23
171:8
182:13
197:11
269:21

**objections**
182:17

**objective**
181:24,25

**objectively**
306:11

**obligations**
301:11

**observe**
182:10

**observed**
289:2

**obsessive**
282:14

**obvious**
272:5

**occasional**
288:19

**occasions**
281:4

**occurred**



289:19

offer
140:4
142:4,9

offered
131:6,23
142:8
145:13

offers
132:17

office
129:24,25
130:2,8,
13,21,22
131:20
132:25
133:9
147:14
156:3,5
170:3
248:12

offices
133:6,7
170:4
236:3,6

older
213:20
214:7

omission
297:6

on/off
188:14

open
151:13
277:24

opened
151:18
153:9
265:11

operate
153:21,23

operated
273:17

operating
273:18,20
276:3

operational
155:25
156:1

operations
268:6
274:23,25
277:24
289:8
307:15

opinion
165:7,9
226:25
268:24

opportunity
145:13,16
148:10,11
227:21

option
291:24

order
187:1
194:9
203:5
204:25
208:25
212:24
215:10
224:22
225:18,23
227:24
232:5
237:25
238:7,9
266:20
277:18
280:8
282:2

ordered

159:5
200:20,
23,25
201:2
207:23
212:21,22
225:15,20

ordering
147:9,10
202:10
309:1,2

orders
194:19
289:11
302:25

organizatio
ns
262:24

organizing
293:4

original
149:21
226:6

Orlando
235:15,16

orthopedic
216:21
217:5
306:3

osteoporosi
s
213:21

osteoporoti
c
214:6

OT
172:24
206:21

outlier
306:9

outliers

306:7

outstanding
269:16

over-the-
counter
172:2,5

overqualifi
ed
250:10

oversight
268:18
291:24
297:10
298:14
304:17

overwrite
227:10

owned
138:14,15
156:9
270:10

owner
129:9
141:4,5
159:17,20
248:22
270:14,16
271:5,20,
21 272:3,
6,9

owners
134:7,10

owning
129:6
244:24

_____

P

_____

P.M.
129:2
208:19,22
237:9,12

302:15,20
308:22
309:8

PA
155:20
156:2
248:14

pack
195:12

packs
195:20
210:15,19
225:14,
15,21

pad
285:1

paid
231:2
301:10

pain
162:22
163:5
164:13
167:3,15,
20 168:2,
7,8,11,
14,16,23
169:1,2,
3,5,6,10,
19
171:11,
19,20,24
172:9
175:22
177:3,4,6
178:10
181:10,
13,18,19,
23,25
182:1,11,
22,25
183:2,7,
9,11,16
184:3,9,



12,22
185:2,9,
15,17
186:3
188:4
189:6
195:2
199:2
200:5
205:12
214:17,18
216:5,19,
20 221:3
222:24
226:20
237:2
239:6,12
240:4
257:7
266:8,15
285:6

**painful**
284:23
285:2

**pains**
240:9

**papers**
143:24
149:1
263:22
264:16

**paraffin**
209:12,
14,18,22,
25 210:1,
3,4,6,10,
12,13,19

**paralytic**
283:6

**paravertebr
al**
239:7,13

**Parker**
159:16

160:12,19
161:8,14
162:2,10,
25 163:7
197:11
204:2
277:16
278:7,9
308:2

**parking**
169:11

**part**
138:3,4,5
152:23
182:3
232:4
254:7
255:16,17
275:24
283:20
298:16,17

**participate**
238:8

**partner**
129:8,19
131:9,15
138:2

**partners**
131:19

**parts**
169:2

**passive**
193:1

**patient**
140:8
159:2,18
161:2,3,
12 166:6
167:11
168:1
169:2,9,
22,23
170:8,12

171:3,6,
10 172:8,
11 174:18
176:2,11
177:8
178:7,16,
23 179:6
182:9
183:22,
24,25
184:8,12
185:25
186:1,14,
17 187:1,
2 189:5,
22 190:10
194:12
195:9
196:15,
21,22
197:1,7,
14,19,23
198:12
199:17
201:14
202:1,22
203:24
204:8
208:12,25
209:11
211:14
212:11
214:3,17
215:3,24
216:5
218:25
220:1,2,
3,4,5,6,
7,14,16
221:3
222:19,
20,23,24
223:2,13
226:16,
19,23
227:4,5,
13,21

228:18
229:8,16
231:2
232:16
237:19
238:1
239:6,10,
12 240:3,
8 242:1,5
243:1,5
276:24
278:21,25
279:6,12,
17,23,24
280:5,21,
22,25
281:2,13,
15 282:1,
4 283:22
284:3
304:4
305:14,
21,22,23
306:3,12,
25 307:23

**patient's**
161:24
162:7
169:6
174:23
181:13
182:24
183:6,23
197:10
209:12,15
238:3

**patients**
141:2,25
144:1,3
145:6,10,
14,18
147:4,6
149:19
156:16,
17,22
157:4

159:1
162:13,
15,22
163:2,3
164:12,
14,16
167:15,19
168:2,6,
14,17
171:19
172:4
173:3,7,
15,16,17,
22,23,25
174:2,6
176:13,
15,19
190:12
211:17
213:12,
15,16,18,
20 214:3,
5,7,9,19
215:12,
14,18,19
216:17,
18,23
217:2
218:12
224:9
232:11
252:7,10,
24 253:1
264:19
273:21
274:4
275:2
276:6,11,
14
277:12,
14,17
278:4
281:4,9
282:23
283:6,10,
11,21,22
284:10,



Case 1:18-cv-23125-RNS   Document 159-2   Entered on FLSD Docket 10/30/2019   Page 214 of
229
HUGO GOLDSTRAJ, M.D. Volume 2                                          August 13, 2019
STATE FARM vs HEALTH AND WELLNESS SERVICES                    Index: patients'..physical

12,16
285:3,16
286:10,
15,17
288:5,12,
22 289:2,
9,23
290:22
302:2
303:18
304:21,
23,25
305:2,4,
6,7,16,25
306:4,6,
9,10
307:20

**patients'**
279:12,16

**pay**
140:5
144:3
255:5

**paycheck**
275:17

**paying**
140:6,7

**pectoris**
149:19

**pediatric**
141:11,12
142:12,14
151:5
250:12
259:20,24
260:9

**pediatrician**
130:4,5
131:3
133:4,5
141:7,14,
24
142:18,

19,21
150:18,22
250:12
261:2

**pediatricia
ns**
141:15,
17,20,21

**pediatrics**
129:5,7
133:15,16
139:16,24
142:24
151:12
152:9
153:8
156:6
259:14
260:6,10
261:1
265:12

**Pedraja**
235:9,11,
13 305:19

**peer**
264:5,8,
9,10

**pending**
161:16

**people**
135:3,5,
6,25
136:2
137:18,24
138:7,14,
19 141:18
148:4
153:18
158:24
247:5
261:19
280:19
282:10
285:19

293:3
294:11
298:25
306:8

**perceive**
269:13

**percent**
137:21,
22,23,24
138:4,6,
14 163:3,
9,10
167:18,24
284:11
286:15,17
300:18

**percentage**
285:16

**perception**
270:10,20
271:19
289:6

**perceptions**
271:1

**Perez**
245:24
246:4

**perfect**
228:16

**perfectly**
287:21
301:3

**perform**
189:22
190:18,25
205:1
208:12
209:12
211:22
212:15
220:25
221:25
222:3

224:11
226:15
268:25

**performed**
161:23
162:4
211:8
212:19
225:19,
20,24
228:5,9
244:1,5

**performing**
213:22
224:8
227:15,16
234:11
286:25

**period**
139:17
193:12
283:5

**periodic**
279:11

**periodically**
280:23

**permitted**
267:5

**perpetrated**
297:10

**persists**
177:6

**person**
207:22,24
221:7,13
236:5,21
246:2
248:21
254:17
257:21
267:10
271:15

290:10
293:10
304:16

**personal**
181:23
251:22
303:7

**personally**
210:2
215:8
303:9

**persons**
241:10

**perspective**
269:11
275:4

**PERTIERRA**
129:14
132:2

**phase**
195:5,8,
10
196:12,
16,20
197:1
212:19
213:9

**phone**
151:22
161:8
202:19
255:21
257:21
302:11

**phrase**
224:2

**physical**
147:9,10,
12,13,16
159:4
168:10
170:16
172:1,5



187:12,14
190:17,23
200:6,17
216:16
290:1
291:3,8,
23 292:8
293:7

**physician**
162:13
187:11
231:13
232:4,11
233:23,25
234:18,
21,24
242:2,6
243:6
250:2
304:17
305:18

**physician's**
233:9
235:5
305:17

**PI**
250:3

**pictures**
134:11

**piece**
156:12

**pills**
171:22

**PIP**
140:4,10
141:2
144:1
145:5,6
156:17,22
157:22
158:11
159:12
266:2,4,5

**place**
136:18
141:16
142:3
143:7
144:16
148:12
154:3
155:6,19
185:3,19
188:18
193:23
202:21
209:21
210:8
228:23
234:22,23
236:4
247:2,4
280:22
282:6
283:4,13
292:10
298:8
299:7
305:24

**placement**
136:16,17
137:21

**places**
131:4
142:17
143:1
157:2
189:1
284:6

**Plaintiff**
303:12,14

**Plaintiff's**
160:24
217:9
218:21
229:9
238:14
239:20

241:16
242:16
247:19

**plan**
170:17
186:17,
19,22
222:20,
21,24
223:3,14
232:6
243:2,6
280:9

**planning**
255:9

**plans**
303:15,
19,25
306:21

**plastic**
200:15,16

**plea**
249:10
253:12,22
254:3,7,8
295:24
298:17
301:6

**plead**
296:18
300:3,14
301:4

**pled**
296:14,25
297:21
299:5

**point**
188:25
256:3
265:11
266:12,18
267:18
274:1

**pointed**
269:11

**pointing**
229:22

**policies**
273:7,16
274:2

**policing**
289:16

**portion**
225:6

**position**
131:5,6
142:22
164:12
168:1
169:23
305:11
306:19

**positions**
295:10

**positive**
215:6
294:9

**possibiliti
es**
242:7
300:19

**possibility**
283:13
294:8
297:3

**practice**
131:8,23
132:4,17,
19 133:9
142:6
144:14,
15,16
153:9
155:22,
23,24,25

202:9
210:22,24
221:14
263:4
264:14
265:11
280:21
281:15

**practices**
134:24

**practicing**
144:11

**practitione
r**
142:20
233:5

**pre-
determined**
303:15,20
304:2

**prefaced**
294:10

**prefer**
140:13
291:8,10

**premier**
262:13

**premise**
298:9

**prepared**
303:16

**prescribe**
172:10,18
196:15
204:11
207:20
210:1,3
214:19
215:7

**prescribed**
147:19
185:25



186:1
194:13
196:22
207:19
208:13
209:8
210:20
225:8,17,
23
227:15,
16,20
228:5,9
289:11
306:22

prescribing
147:18

presence
271:15

present
130:1,12
131:16
162:22
163:4
167:15
169:9
177:16,21
180:15
282:19

presented
130:15
131:13
204:8

press
186:10

pretty
240:10,11
242:11,13
243:10
301:5

previous
178:24
179:1

price

149:8

primarily
156:16,
17,22
271:10
285:9

Printing
255:3

prior
139:17
275:21

prison
299:16,21
300:6

private
136:3,4,
16,17
156:5
265:21

prize
149:21
264:12,13

prizes
264:11

probation
299:6
301:8

problem
137:20
138:6,22
161:15
168:21
171:23
249:15
251:3
255:4

problematic
282:21

problems
142:24
156:2
164:17

168:15,16
197:20,21
300:11,12

procedures
232:5
273:7,16
274:2
288:25

proceed
230:15

produce
143:23
169:20
170:1
178:14
186:11
187:21,25
190:17
195:3
200:1,4,9
209:14
210:12
215:20
226:20
255:6
298:10,11

produces
164:20

profitabili
ty
288:8

profits
288:13

progress
197:14,16

progressing
197:10,15

project
139:13
140:2

prolonged
190:8

pronounce
257:20,
24,25

proper
232:2

properly
238:6
275:11
289:1,23

prosecutor
295:20
300:25

protect
232:25

protective
238:9

protocol
290:12

proud
254:19

provided
235:18
264:16

provider
230:15

provision
230:20
231:4

prudent
194:21

pry
251:22

public
134:12,
16,19
135:2
137:3,9
263:13

publication
s

150:11
262:5
263:9,12
264:5

publish
143:24

published
149:1
264:11

pulled
229:17

purchase
132:18
133:12,15

purchased
133:23

purify
153:15,16

purpose
186:13
228:1
297:6

purposes
217:16

pursue
269:3

push
186:11

pushed
138:12
139:8
300:16

pushes
305:1

put
137:8
139:25
142:5
143:21
146:7
151:22



158:19
174:22
177:25
184:9
190:1
191:15,24
193:19
209:18,
22,23,25
211:12
212:1,2
216:9
224:8
246:25
254:3
255:6
269:10
273:7
284:8
293:18
300:15
304:24
305:4,8,9

**putting**
217:16
278:3
305:20

**Q**

**quality**
264:15
276:25

**question**
156:19
161:16
166:16
167:9
170:25
171:1
177:18,22
180:6
184:10,14
192:7
197:5

205:17
224:4,13
243:14
260:20
270:22
272:21,23
273:9
276:1
277:21
287:8,10,
13,14
291:14,
17,18
295:21,22
297:17
298:13,22
302:7,23
307:6

**questions**
144:19
178:21
193:18
255:20
256:6
258:9
265:16
270:9
294:25
298:24

**quick**
146:13
237:6
297:16

**quickly**
139:17

**R**

**R&h**
152:19,
21,25

**radiologist**
202:18,25

**radiology**
245:13

**Rainbow**
129:5,6
133:15,16
139:16,24
142:24
151:12
153:8
156:6,7

**rambling**
180:18

**Ramos**
238:12
239:19
241:12
242:15

**range**
221:23

**re-
education**
172:17

**read**
165:19,20
166:3,9
180:14,
20,22
222:16,22
239:5
240:2
241:25
242:25
247:25
248:1
262:10
308:16
309:3,4

**reader**
262:8,9

**reading**
157:7
262:4,21
280:17

**reads**
180:19

**real**
146:12
157:4
184:7,8
185:9,11
227:8
252:25
253:2
254:20
297:16

**rear**
163:18,
20,23
164:1,2,
9,16
286:4

**rear-end**
164:15
186:9

**rear-ender**
163:13,14

**reason**
141:13
163:11,12
227:3
253:18
272:17,22
274:12
300:14

**reasons**
202:6
226:24
227:8
300:2

**recall**
244:19
247:12
248:16
249:3

**receive**
171:6

197:1,8
203:17
204:10
213:13,19
260:17
276:12
286:16

**received**
211:17
230:24
259:8
260:13,23
262:19
264:14
276:15

**receiving**
195:9
202:10
247:12
248:16
277:1

**recognition**
264:23

**recognitions**
264:15

**recognize**
154:23
161:4
218:5,9
219:2
230:3
233:12
237:1
238:17,19
239:23
240:13,14
241:19,23
242:19
248:3

**recollection**
292:17,23
294:14



recommend
    219:11
    284:5

recommendat
ion
    192:10

recommended
    148:8,9
    231:12
    267:16

recon
    254:4

Reconstruct
ion
    149:12

record
    129:2
    158:22
    208:18,22
    237:8,12
    257:8
    284:22
    290:11
    302:14,20

records
    176:8,9,
    10,11
    228:14
    238:1
    305:12,
    14,15,20
    306:12

rectificati
on
    185:12
    203:1

rectified
    185:16

red
    285:18

redacted
    220:4

229:19
237:19
238:4,6

redirect
    256:4

reduce
    188:4

refer
    198:11
    206:23
    216:17,20
    224:21
    229:6
    237:14
    239:8
    283:22

reference
    275:21

referred
    170:12
    215:24
    216:24
    231:13

referring
    204:7
    237:15
    252:1

reflect
    306:12

refuse
    231:25

region
    184:15,18

regions
    167:16,21

regular
    170:3
    175:7
    180:12
    228:24
    251:6
    281:10,12

298:8
305:23

regulation
    267:7

Rehab
    154:1,11
    155:2,4,
    11,16

rehabilitat
ion
    231:10

related
    168:25
    169:8
    171:22
    178:1,13
    179:10,
    17,18
    180:4
    186:8
    187:24
    194:4
    222:7
    228:21
    232:22
    236:17,18
    266:4,5
    272:14
    285:24
    286:20
    299:2

relating
    247:13

relation
    169:19
    292:10
    293:7

relax
    172:13
    189:8
    194:2,3

release
    176:8,9

214:23
215:4

Relief
    237:2
    266:8

relieve
    171:20

rely
    177:17,22

remember
    129:11,
    13,16,18
    132:24
    134:1,6
    135:5
    136:11
    145:25
    147:17,
    21,22
    148:3,13,
    14
    151:15,21
    152:1,12
    154:14
    155:3,6,
    18  156:10
    165:17,24
    180:6
    191:1,7
    208:10
    211:20
    212:5,6,
    16,17
    218:8
    229:3
    235:14,16
    236:16
    241:4,8,9
    244:22
    245:6
    247:15
    267:13,
    15,17,19
    279:8
    293:1,8

294:16

remorse
    298:16

rendered
    235:19
    244:10,14
    282:13,17
    289:2
    303:5,8,
    11

repeat
    154:8
    177:18
    217:24

repentant
    139:10

repented
    298:18

repetitive
    258:13

rephrase
    243:15
    287:11
    302:7

report
    176:14
    253:8

reported
    301:9

reporter
    135:17
    179:21
    188:2
    260:1
    296:9
    309:1,3,5

reports
    176:4
    290:3

reposition
    298:2



**represent**
  256:12,
  15,21

**representat
ion**
  296:4

**represented**
  138:19

**represents**
  257:4

**request**
  287:9

**require**
  232:11,
  17,21
  259:23

**required**
  263:3

**requirement
s**
  268:11

**research**
  149:8,21
  263:12,
  13,22

**residence**
  260:9

**residency**
  151:5
  260:9

**resign**
  246:13

**resistance**
  186:11

**resolution**
  300:21

**resolve**
  199:22,23
  216:18

**resources**

**139:14**
  143:21
  145:16,17
  254:16

**respect**
  205:14

**responding**
  197:22

**response**
  294:5

**responsibil
ities**
  281:22

**responsibil
ity**
  158:15
  276:11
  296:23

**responsible**
  297:11

**rest**
  255:16
  280:18

**restate**
  257:11

**restitution**
  254:4
  301:10

**restroom**
  302:16

**result**
  179:14

**results**
  198:9
  199:11
  202:2,11,
  15

**reverse**
  135:13,
  14,15,20
  136:8,15

**137:14**

**review**
  168:5
  217:22
  222:10
  228:13
  229:2
  247:23
  248:1
  272:14
  279:18
  307:23

**reviewed**
  167:25
  264:5,8,
  9,10

**reviews**
  279:12

**Revision**
  149:16

**revocation**
  295:15

**revoked**
  263:6
  295:3

**rhetorical**
  298:23

**rib**
  164:23
  186:3,4

**Rick**
  255:23
  256:6,12,
  19  257:4,
  6  308:20

**ridiculous**
  298:4

**right-hand**
  220:13

**right-sided**
  168:20

**rights**
  228:23

**rise**
  136:17

**risk**
  300:18

**road**
  258:10
  279:21

**Robert**
  129:17,
  21,22
  151:22
  153:8,9

**Roberto**
  129:17

**Rocks**
  195:25

**role**
  160:7,15
  250:2

**room**
  170:4,5
  174:7,11
  175:25
  176:1,2,
  5,14,16,
  20  177:2,
  11,13
  178:6
  179:5
  228:19
  305:5

**roots**
  215:22

**rotation**
  206:8

**Roughly**
  134:2
  157:16

**round**

**188:21**
  190:3,20

**RPM**
  153:2
  246:4

**rule**
  142:12
  163:16,19
  164:2,4,5
  202:4

**rules**
  191:14
  192:16
  268:2
  289:9

**running**
  139:1

**rupture**
  200:2,3,
  11,13

**rush**
  305:6

**Russia**
  190:16

**Rydel**
  240:15
  241:2,3,
  7,8
  242:24

**Rydel's**
  241:5

———————

      **S**

———————

**sacrifice**
  250:16

**Saladrigas**
  129:3,20
  132:5
  135:24
  136:24



137:10
140:16,19
144:12,
18,24
146:3,6,
8,11,19,
24 150:15
152:2
153:6
154:10,20
155:15
158:6
159:7,19
160:1,14,
20 161:1,
10,15,17,
19 162:3,
11 163:1,
21 166:15
167:10
169:16
170:20
171:2
172:7
176:23
177:19
180:25
182:23
187:6
193:16
196:5,19
198:2,25
204:6
206:10
208:17,23
213:3,5
215:23
217:11,21
218:1,23
223:7,15,
22 224:6,
24 225:2,
16 228:12
229:11,
14,16
230:2
231:23

233:3,22
234:1
235:24
237:13,
21,24
238:3,10,
16 239:22
241:18
242:18
247:17,21
252:16,
19,21
257:3
264:17
268:1,13
269:21
271:23
272:12
273:1,12,
22 274:9
275:7,14
276:17
277:13
278:6,23
279:7
280:15
281:1
282:24
284:1
285:11,21
286:19
287:6,18
288:14
289:12,24
291:14
294:1,18
297:1,12,
25 299:9
303:21
304:10
306:14
307:1,18
308:7,14,
20,25

**salary**
142:5,8

251:6
271:11
288:4,5,
8,11
298:8

**Sandor**
248:18

**Santos**
245:5
256:14
257:13
307:8

**sat**
268:22

**satisfied**
277:9
289:21

**save**
172:3

**scale**
183:2,11,
25 269:12

**scaling**
184:2

**scan**
143:22
149:12
170:6,13

**scans**
170:3

**scar**
200:15

**scared**
173:25
174:2
300:8,11

**scars**
199:24,25
200:1,4,
7,9

**scenes**

255:16

**schedule**
271:11
277:4
278:2

**scheduled**
173:4

**schemed**
301:23

**school**
224:16
292:5
293:5

**scratch**
139:18

**seal**
238:6

**search**
207:9,11

**section**
177:15,23
179:4
181:5,6,7
187:17
202:10
203:8,11
204:20,21
209:2,9
220:12
222:15,18
223:24
224:8
225:3,9
239:1,2,
3,15
240:2
241:25
242:10,25
243:8

**segued**
267:10

**select**

208:12

**sell**
131:8,23
132:17

**send**
153:18
176:6
306:2

**senior**
141:13,
15,17

**sense**
279:19
298:6

**sensitive**
297:17

**sentence**
253:21

**separate**
260:5
299:2

**separated**
295:9
300:5

**serve**
150:17
267:6

**service**
276:25

**services**
152:19,21
230:25
232:1,3
234:11
235:18
252:20
256:17
282:16,23
303:5

**serving**
147:25



set
    285:17

severe
    167:15,20
    168:2
    169:7,9
    170:9
    171:19
    172:9
    177:8,10,
    13
    181:10,
    13,21
    182:7,8,
    12 183:6,
    11
    215:15,18
    306:10

shake
    164:19

shakes
    137:5

shaking
    164:19
    170:1

shape
    288:12

shapes
    255:12

shares
    138:7

shell
    135:7,8,
    10,11,20,
    23 136:9,
    20 137:4,
    6,9,15

short
    208:20
    237:10
    302:18

shoulder

168:16,21
186:6
203:24
204:1,12
205:14,16
209:7
210:3
285:9

shoulders
    203:8
    209:2

show
    149:5,10

sic
    165:1

side
    163:17
    168:21
    212:1,2
    214:25
    240:15
    272:4

sides
    186:5

sign
    176:9,12
    178:6
    229:1

signature
    185:22,23
    221:8,9
    240:13,14
    241:23
    242:23
    253:6,7

signatures
    253:2,4,5

signed
    275:1

significanc
e
    175:19,20

signs
    170:15

similar
    208:7
    211:25
    219:15,16
    240:10,11
    242:9,11,
    13 243:8,
    10 285:6
    303:25
    304:1

similarly
    290:19

simple
    199:15

single
    165:20,23

sitting
    174:9

situation
    175:18
    207:7
    211:25
    249:18,21
    282:21

situations
    175:16

skin
    199:25
    200:14
    285:1

slice
    149:18

slight
    189:5,7

small
    169:20,24
    206:21

smoking
    178:21

so-weird
    180:3

Society
    149:20

soft
    190:9
    198:20,
    21,23
    199:8,12,
    19,21,23
    200:1,10
    202:2
    217:4
    284:18,
    19,22,23,
    25 285:2
    305:23,25
    306:5

Solaris
    152:15

sophisticat
ed
    283:2
    284:3,4

sorts
    249:10

sought
    134:23

sound
    152:3
    245:24
    303:1

sounds
    284:8,10
    296:20
    301:8

space
    275:3
    276:5

Spain
    144:10,
    11,14,15,

17 149:9,
20

Spanish
    187:25
    188:3
    192:22

spasm
    181:10

speak
    155:16
    206:5
    291:16,18

speaking
    182:17

special
    143:21

specialist
    215:25
    216:8
    283:23

specialists
    216:24

specializin
g
    283:9

specialty
    260:24

specific
    169:1
    175:5
    184:11,23
    185:3,18
    189:9
    191:15
    192:16
    205:23
    207:8,16,
    17 267:22
    292:17,23
    294:13

specificall
y



194:1
202:1
222:6
247:8
249:3
262:4

specifics
268:6

SPECTOR
130:19
135:9,11,
14,16,18,
22 136:22
137:5
140:15
144:6,9,
18,22
146:18
151:22
159:22
182:16
187:5
195:23,25
196:4,8
206:5
208:16
229:18,22
230:1
237:20,23
238:2
255:21
256:5,19,
21,25
257:6,11,
16 275:6
302:10,
12,17
308:8,23
309:2

speculating
272:2,4,7
294:11

speculation
169:14
292:15

speedo-
computic
149:18

spell
130:17
144:6
233:20

spelling
260:2

spend
278:20
305:10

spending
277:11

spinal
143:21
203:1

spine
162:23
163:5,15,
16
164:13,
18,21,22,
24,25
165:3
166:23,24
167:3,4,
5,6,12,
16,20,22
168:2,12,
13 172:9
181:3
184:12,
15,24
185:2,12,
13,18
186:2
187:17
193:2
198:12,
16,18
204:22
206:3
211:12

212:10,13
214:25
216:13,14
225:6
226:2,3,4

Spiral
149:12

split
263:15,
18,21
292:16

spoke
155:14
268:23
292:18

spoken
155:11
258:1,4

sprain
186:2
198:13
199:3,18
201:8

sprain/
strain
198:14,
16,18

sprains
240:9

stack
146:8

staff
147:13
275:11

staffing
276:6

standard
181:14
182:12,
15,20,21
183:3,4,7
184:22

191:1,2,
6,9 232:5
274:15

standards
268:12
269:18
273:19
275:20

standing
211:14,
15,16,19,
20,21,22,
23

standpoint
268:10

start
136:19
139:11
140:3
141:18
142:10
143:7
148:4,7,
12 156:13
174:18
221:2
231:17
256:1
259:2

started
157:12
256:8
265:12
274:22

state
260:17,18
261:4
287:25
289:9
295:20,25
299:20
300:21
301:1,23
302:1

304:6
307:11,
16,20,23

stated
205:23,24
206:1

States
140:22
150:4
259:6
260:12
261:8
262:24
265:9

statistics
163:8

stay
249:20

steering
186:7

stellar
269:18

stents
149:12
253:16

steps
255:12

sticker
217:12,17

stickers
218:20

sticking
217:12

stiff
195:1

stimulate
188:22
190:14

stimulation
187:20



188:5
191:16

stock
135:6,25
137:18
138:20
270:19
271:3

stop
213:22
246:10,18

straight
185:16
188:21
190:3,9

strain
186:2
198:12
199:3,18
201:8

stratificat
ion
203:1

Street
133:9
154:18

strength
187:21
190:12
268:20
283:7

stretch
211:12,13
214:13

strike
158:7,13
162:5

struck
164:3

studies
163:24
167:23

study
166:3

studying
245:13

stupid
138:7

subacute
195:8

subject
297:18

subjective
181:24
182:9,25
183:7,25
184:2

subjectivel
y
306:11

submit
234:10

submitted
244:10,14

subpar
275:23

subscribe
262:17,21

subscribed
262:12

substance
291:20

substandard
275:22

substantial
ly
285:6

substitute
210:10,15

Suddenly
249:18

sued
202:8

suffer
300:5

suffered
286:17

suffers
164:18

sufficient
277:11
283:20

sufficientl
y
186:20,22

suggest
216:7

suggested
273:6
293:19

suggests
141:1

suited
268:25

super
132:9,12
211:2

superpose
211:1,3

supervise
234:23
235:1,18
243:25

supervised
241:7,8

supervising
236:5

supervision
234:24
235:2

supervisor
235:20,25

support
254:18

supports
164:12
165:6,9
168:1

suppose
280:19

supposed
292:11

supposition
227:1
236:22

suppositions
227:7

surface
210:14

surgeon
216:21
217:6
250:11
259:18,20

surgeons
255:8

surgery
200:15,16
216:4,13
262:20

surprised
285:4,8
286:1,9

surrender
254:14

survive
305:2

suspicion
215:21

suspicious
159:25
185:3,20

swear
294:3

swelling
239:6,12

symptoms
170:15
175:21

system
284:5

_____

T

_____

taking
301:5

talk
129:4
133:1
134:18
136:4,6
139:6,9,
17 141:6
143:10
151:11
179:4
187:7
192:17
194:6
204:19
211:7
244:16
253:24
258:11,
15,19,23
261:6
262:3
263:8
268:5
274:16
286:5
298:21
301:13,14



**talked**
135:25
156:9
212:23
265:15
290:23

**talking**
148:2
150:10
166:17
173:6
181:17
189:13
216:15
226:2
228:17
274:24

**tambien**
192:21,23

**teach**
153:14

**technician**
245:13

**telling**
164:14
166:8
178:7
281:22
296:2

**tend**
199:22

**tendency**
190:13
200:7
213:20
214:5,8

**tender**
185:19

**tenderness**
181:10

**TENZ**
187:18,24

188:4
196:14,15

**term**
207:2
284:18,19

**terminate**
232:5

**termination**
247:14

**terms**
273:19
274:23
277:1,4
282:22
286:13
306:22
307:14

**terrible**
254:5

**testified**
201:7
265:19

**testimony**
139:18
166:19
201:6
251:8

**testing**
260:5

**Texas**
143:1
150:25
151:2,3,6
260:15
261:5,7

**therapeutic**
172:20,22
194:6,13,
16,22
196:16
197:3
204:19,25

205:8,21,
23 206:2,
16,17,20
207:1,2,
5,12,15,
18,25
208:2,6,
8,13
213:7

**therapies**
193:25
195:17
205:3
240:4
289:22
290:1,2
306:23

**therapist**
147:13,16
159:20
189:18,
20,24
190:5,24
204:24
205:20
206:11
208:11
209:12
221:10,15
227:2,9
240:20,21
241:20
291:9,23
292:8

**therapist's**
240:13

**therapists**
190:19
192:5
221:19
222:1,5
224:7,14
226:14
291:4,5
293:5,7

**therapy**
147:9,10,
12 162:7
172:1,5
186:1
187:1
190:22
192:18,
19,21,25
193:5,6
194:9
196:10
197:2,9,
21,24
200:6,17
203:5
204:25
205:3
208:25
209:24
212:19,24
216:16
217:3
218:16,25
219:5,20,
25 221:8,
9,12,17,
22 223:24
224:9,15,
16,21
225:4,17,
18,23
226:5
228:4,8
231:10
237:19
238:11,22
239:19
241:11
242:15,20
243:13,18
288:21
291:8
292:5

**thing**
148:8

159:3
171:15
175:17
179:12,14
180:5
181:23
182:9
185:10
188:24
191:3,12
194:5,21
200:14,17
203:15
209:24
210:7
211:12
215:6
227:11,25
228:2
252:25
254:6,20
255:14
268:15
286:20
294:9
300:3
308:9

**things**
137:19
139:21
145:20
157:5,10
166:1
168:25
169:23
175:24
178:12,15
179:16,18
186:9
188:7,22
191:11
194:1,4,
25 196:18
197:4
201:17,23
202:21



203:4
206:15
210:25
213:21
226:17
250:13,19
254:24
255:1,5,
8,9,10
256:1
267:22
281:14
282:6
286:5
290:5
300:9

thinking
154:24
213:6
253:17
258:10
291:23
293:6

thoracic
162:23
163:5,15
164:13,22
166:23
167:5,6,
12 168:3,
13 169:10
172:9
187:17
191:18
198:16
204:21
225:6
226:2,3,4

thought
131:12
256:25
272:3
287:17
291:21
303:2

306:25

thousands
141:25

Thursdays
173:8
277:5
288:18

tied
288:12

tilted
171:13

time
131:11
132:6,8,
11 133:18
139:17
140:11
143:25
150:20
151:12,13
156:15
158:13,14
168:18
171:17
178:13
190:21
191:3,13,
25 193:12
195:11
197:13
199:24
210:20
215:7
227:5
232:1
244:22
251:16
255:24
260:12
264:25
265:11
266:11,
12,18
267:5

273:18
274:24
277:10,24
278:3,21
282:8,16,
20 283:5
289:2,21
290:8,21
293:8
295:5,6
296:4
299:6,24
301:9
303:8
304:20
305:10
307:13,15
308:22

times
131:22,24
132:1,17,
25 136:12
157:9
170:1,2
171:7
190:21
196:22
197:8
201:20
206:1
244:6,23
280:24
283:9
288:20
291:11
292:4,13

timing
227:21

tinnitus
178:11

tissue
198:21,23
199:9,12,
13,19,21,
23 200:1,

8,10
202:2
210:13
217:4
284:18,
20,22,23,
25 285:2
305:23,25
306:5

tissues
179:19

title
229:7

titled
203:8

today
243:23
258:2
262:9
265:16
267:18
305:1

today's
308:21

told
139:4
143:22
177:24
178:11,17
180:7
186:6
188:23
196:10
222:12
235:5
248:21
249:4
268:24
270:13,15
290:17,19
291:1,2,6

tomography
149:19

tons
166:8

top
217:13,17
220:13
221:11
223:4

totally
300:8

touch
168:13

toxic
178:21

track
212:13
218:19

traction
172:11,
14,16
196:11
198:9
211:7,8,
10,17
212:7,8,
9,15,18,
25 213:4,
8,13,17,
19,22
214:8,9,
19,23
215:2,8,
10,14

tracts
255:11

trading
136:19
137:7

train
192:5,8
222:4
224:7,14

trained



205:20
221:19
275:11

training
  173:1,2
  190:18
  192:10
  221:22,25
  260:6
  261:23

transition
  147:6

transitione
d
  147:3,24

treat
  141:2
  145:13
  157:3
  171:19,24
  174:6
  196:21
  275:1
  276:6

treated
  156:18
  175:21
  176:16
  274:5
  278:5
  281:16
  285:16

treater
  148:1

treating
  145:6
  147:4,6
  156:22
  162:13,21
  173:7,14,
  16 187:10
  232:11
  273:20
  283:25

306:20

treatment
  147:7
  159:5
  160:21
  161:22
  162:4
  170:17,21
  171:6
  172:15
  189:22
  192:3
  194:23
  195:10
  200:9
  203:3,17
  212:3
  213:9
  216:18,19
  218:12
  220:22,23
  221:2
  222:20,
  21,24
  223:3,13
  227:10
  231:12,
  17,18
  232:1,5,
  13 242:1,
  5 243:2,6
  244:1,4,
  6,10,14
  264:15
  276:12,16
  280:9,18
  282:2,4
  283:11,
  14,24
  284:4
  286:12,16
  289:8
  302:25
  303:14,
  19,25
  304:3,5

306:21

treatments
  216:6,7,
  9,12
  222:20
  228:24
  244:7
  277:1,18
  282:13
  283:3,10,
  14 288:21
  289:1,22

Treaty
  255:3

trial
  150:19,22
  249:11
  252:4
  253:10,18
  265:20
  298:19
  299:13
  300:7,18

trouble
  249:16

true
  143:8
  177:8
  184:7,8
  227:11
  272:9
  302:1,3,
  4,5

trust
  159:2

truth
  158:19
  212:5,17
  271:20

Tuesday
  173:11

Tuesdays
  173:8

277:5
288:18

turn
  160:21
  178:19
  181:1
  188:14
  264:4

type
  136:1
  164:17
  171:11
  283:23
  285:20
  286:16,18

types
  188:16
  189:16,17
  212:8
  213:18
  215:12

——————

U

——————

uh-huh
  139:23
  147:5
  157:23
  158:10
  160:23
  166:18
  173:12
  175:3
  181:5
  182:2
  184:20
  185:14
  187:3,9
  196:24
  199:17
  201:19
  204:23
  215:1
  217:22

218:4
219:19
220:9
225:5,7,
17
226:18,22
229:14
233:7,17
234:25
237:17
241:13,15
243:11
251:23
253:11
254:12
262:1
265:2
268:8
270:20
295:4

ultimately
  300:22

ultrasound
  189:9,11
  195:13,15
  203:25
  204:5
  210:10,
  11,12

uncomfortab
le
  214:15,16
  215:3

uncommon
  186:4

understand
  145:4
  150:21
  156:19
  164:11
  166:19
  167:8
  170:24
  171:1



174:4
180:18
184:14
201:6
204:4
205:17
214:12
221:14
224:4
231:25
243:14
251:8
259:4
260:20
261:11,21
265:17
272:23
276:1
285:15
287:7
291:17
292:9
296:13

**understandi
ng**
160:7

**understood**
193:4
268:11
281:17
300:20

**unethical**
287:17

**United**
140:22
150:4
171:23
259:6
260:11
261:8
262:24
265:8

**unnecessary**
274:6

**unsound**
274:6

**unstable**
149:19

**untrue**
302:6

**unusual**
176:5
179:13
197:22
306:8

**update**
202:13

**upper**
285:10

**USA**
261:9,10

**usual**
216:25
283:14

———————

**V**

**V-E-T-T-E-D**
266:22

**vague**
167:7
170:19,23
171:8
182:13

**valued**
138:10

**variation**
277:6
283:21
286:12,13

**vary**
169:7

**varying**
162:16

**vehicle**
170:5
284:14
285:4
286:4

**verificatio
n**
226:5

**version**
146:14

**versus**
281:19,23

**vertebra**
164:20
167:2
202:20

**vertebrae**
164:24
184:19,23
185:7,8

**vetted**
266:22

**vice**
259:24

**video**
129:1
208:18,21
237:8,11
302:14,19

**view**
199:15

**viewed**
271:15

**vision**
178:12
289:6

**visit**
174:24
197:17
201:18
202:17

219:25
228:18

**visits**
197:8

**visualize**
288:20

**voltage**
190:2

**voluntarily**
297:22

**voluntary**
261:18,19

———————

**W**

**wait**
172:13,15
175:21
189:11
203:4
292:24

**waiting**
173:21,22
174:7,9
228:19
237:7
305:5

**waive**
308:17
309:3

**walk**
174:5

**Walk-in**
152:17

**walked**
274:25

**walks**
195:23

**wall**
205:3

212:2

**walls**
275:10
282:11

**wanted**
134:25
135:18
267:22
300:4

**war**
261:20

**wars**
261:25

**watch**
279:4
296:23

**waves**
188:20,21
190:3

**wax**
195:21,24
196:1,2,
3,4

**ways**
210:8
253:9

**week**
145:18
148:18
171:7
175:13
194:17
196:23
197:8
251:9
275:2
277:7
288:6

**weeks**
171:7
175:14,
18,21,24



194:20
195:4
196:23
197:8,15

**weight**
205:10,11

**well-known**
141:24

**wellness**
147:19
157:19
160:2,5,
9,15,22
161:12,23
162:5,6,
13,16
170:18,22
171:3
173:3,11
175:1
176:15
188:10
190:19
207:19
208:7,9
211:9,18
212:4,14
216:23
218:13,17
219:14
221:15
229:7
230:10,25
232:1,3
233:10
234:11,19
238:24
239:25
240:23,
24,25
241:21
242:21
243:13
244:1,17,
25 245:17

246:8,11,
17,19
247:13
249:1
250:23
251:1,10,
13
256:16,
17,24
257:1,4,
8,15
266:8,13,
14,18,25
267:4,10,
23 268:6
270:10,
14,16
271:6,12,
16,22
272:10
273:8,11,
17 274:23
275:19,25
276:4,15,
24
277:10,23
278:3,21
279:3,13,
24 280:14
281:19
282:17,19
283:20,24
284:13
285:17
286:23
287:2,4,
15 288:9,
13,18,22
289:8
290:9,20
291:7,19
292:18,20
293:19
302:2
303:1
306:20
307:9,14

**whack**
231:19

**wheel**
186:7

**wheels**
168:18

**whiplash**
165:4,5,
14 166:1,
4,17,20,
22,25
167:4,11
185:11
286:3
306:4

**wife**
143:8
245:20
254:17

**wipelash**
165:1

**withhold**
296:15,16

**witnessed**
274:3

**woo**
193:20

**word**
181:12
209:4
220:12
262:8

**words**
182:19
242:8,9
269:14
281:20
284:9
291:20
300:25

**work**
130:21

131:7
136:14
140:4
141:10
142:2,7,
13,21,22
143:23
153:11,18
215:2
234:8
246:7,14,
21
248:11,25
249:4,5,
13,19
250:3,7,
9,18
254:25
255:2,10
258:15
260:6
266:9,13,
24 268:16
281:18
282:9
291:9
304:19

**worked**
136:18
146:25
151:16
152:22,
24,25
159:10,13
230:21
231:6
246:4
261:25
266:14,15
267:3,24
272:10
291:19
295:19
302:3

**Worker's**
265:20

**working**
130:23,25
131:1
140:10
145:21
147:3,24
148:5,16
156:13
157:25
227:22
236:18,
23,24
245:16,17
246:10,
18,20
251:15
254:21
265:13
274:22
282:10
290:9
291:6,12
295:6

**works**
153:14

**world**
261:8
262:3

**worry**
144:20

**worse**
179:2,25
186:9
220:18,
19,21,22
221:2

**write**
179:23
192:13
204:15,18
293:21

**write-off**
138:22,24



**writing**
  272:5
  290:9
  293:18

**writings**
  263:8

**written**
  191:14
  264:16
  273:16
  274:2

**wrong**
  185:4
  202:7
  273:24
  274:5
  284:9

---

**X**

---

**x-ray**
  199:6,15
  200:20,
  23,25
  201:1
  202:10,15
  306:1

---

**Y**

---

**year**
  134:14
  145:23
  147:1
  251:6
  259:6,11
  295:15
  299:20,
  21,22

**years**
  136:12
  171:12,
  14,15

195:14,15
213:16
248:13
253:15
260:14
262:19
263:3
299:17,
18,19
300:6
306:20

**yesterday**
  175:13

**yield**
  255:24

**York**
  135:3
  136:1

**young**
  141:18
  248:23

