### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

Case No. 1:18-CV-23125-RNS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and STATE FARM
FIRE AND CASUALTY COMPANY,

Plaintiffs,

        v.

HEALTH AND WELLNESS SERVICES, INC.,
BEATRIZ MUSE, LAZARO MUSE, HUGO
GOLDSTRAJ, MANUEL FRANCO, MEDICAL
WELLNESS SERVICES, INC., NOEL SANTOS,
ANGEL CARRASCO, JORGE RAFAEL COLL,
PAIN RELIEF CLINIC OF HOMESTEAD, CORP.,
JESUS LORITES, AND JOSE GOMEZ-CORTES,

Defendants.

_____/

## <u>AMENDED COMPLAINT</u>

      Plaintiffs, State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and

State Farm Fire and Casualty Company ("State Farm Fire"), sue Health & Wellness Services, Inc.

("Health & Wellness"), Beatriz Muse ("Ms. Muse"), Lazaro Muse ("Mr. Muse"), Hugo Goldstraj,

M.D. ("Dr. Goldstraj"), Manuel Franco, M.D. ("Dr. Franco"), Medical Wellness Services, Inc.

("Medical Wellness"), Noel Santos ("Mr. Santos"), Angel Carrasco, M.D. ("Dr. Carrasco"), Jorge

Coll, M.D. ("Dr. Coll"), Pain Relief Clinic of Homestead, Corp. ("Pain Relief"), Jesus Lorites,

M.D. ("Dr. Lorites"), and Jose Gomez-Cortes, M.D. ("Dr. Gomez-Cortes"), hereinafter referred

to as Defendants and allege:

### I.   <u>NATURE OF THE ACTION</u>

      1.     Ms. Muse, Mr. Muse, and Mr. Santos (collectively "the Muse Family") orchestrated

a scheme to defraud State Farm Mutual and State Farm Fire through the unlawful operation of



three health care clinics: Health & Wellness, Medical Wellness, and Pain Relief (collectively "the Muse Clinics").

2.  Defendants used individuals who were allegedly involved in automobile accidents and purportedly eligible for Florida No-Fault and related Medical Payments Coverage Insurance benefits from State Farm Fire and State Farm Mutual (the "Insureds") to unlawfully obtain insurance payments from State Farm Mutual and State Farm Fire, which total in excess of $4.7 million dollars.

3.  The Muse Clinics submitted false, materially misleading, and/or fraudulent bills and supporting records to Plaintiffs for services which were not medically necessary, and in some instances were never actually rendered. Most of the time, when treatment was rendered at the Muse Clinics, it was provided pursuant to a pre-determined treatment plan ("Predetermined Treatment Plan"). The Predetermined Treatment Plan at each of the Muse Clinics involved very similar components: (a) failing to adequately examine Insureds to determine the true nature and extent of their injuries; (b) diagnosing nearly every Insured with non-specific pain/sprain/strains of the cervical, thoracic, and lumbar regions of the spine regardless of their true condition; (c) treating nearly all Insureds with excessive therapy modalities regardless of the unique circumstances and needs of each patient; (d) subjecting nearly every Insured to an x-ray without incorporating the results of the x-ray into the treatment plan; (e) conducting re-evaluations of Insureds to further the Predetermined Treatment Plan rather than as part of individualized care; and (f) submitting documents to State Farm Mutual and State Farm Fire falsely representing that the examinations, diagnoses, and treatments purportedly rendered to the Insureds were medically necessary and compensable when, in fact, the examinations and treatments were either not rendered, were not medically necessary, were unlawfully rendered under Florida's No-Fault

2

Statute, Section 627.736, Florida Statutes and were otherwise noncompensable under Section 400.9905 of the Health Care Clinic Act ("HCCA") because the medical directors failed to perform their statutory duties.

4.      As a result of the Predetermined Treatment Plan at the Muse Clinics: (a) Insureds were not properly examined, diagnosed, or treated for conditions which they may have had; (b) Insureds were subjected to medically unnecessary and sometimes excessive medical treatments; and (c) Insureds' limited No-Fault Benefits were substantially depleted or exhausted and therefore not available for appropriate treatment that the Insureds may have needed.

5.      The unlawful treatment provided at the Muse Clinics was made possible by Drs. Goldstraj, Franco, Carrasco, Coll, Lorites and Gomez-Cortes (the "Muse Clinic Medical Directors"), who appeared on paper as Muse Clinic medical directors, but who knowingly did not perform their statutory duties of oversight.

6.      The "on paper" medical directors at the Muse Clinics failed to properly oversee the medical treatment and records of the clinic as required by Florida law, which includes, but is not limited to, conducting systematic reviews of Clinics' billings. Such properly performed systematic reviews would have revealed the Predetermined Treatment Plan and the other unlawful conduct set forth below, in which the Muse Clinics engaged.

7.      Similarly, the medical directors failed to verify that the licensed health care professionals who performed therapies received by Muse Clinic patients maintained the proper licensure for the treatment they rendered. As a result, the health care professionals performed therapy modalities which were outside the scope of their license for nearly every Muse Clinic patient.

3

8.      Nevertheless, the Muse Clinic Medical Directors signed the vast majority of bills that the Muse Clinics submitted to Plaintiffs thereby creating the appearance that they either supervised or performed the treatment rendered and falsely certified that the treatment performed was medically indicated and necessary for the health of the patient.

9.      Accordingly, the services allegedly provided to the Insureds at each of the three Muse Clinics are noncompensable because they were the product of an unlawful Predetermined Treatment Plan and/or were performed at a clinic operating in violation of the HCCA whose medical directors ignored their statutory duties.  Defendants' unlawful conduct set forth in this Amended Complaint occurred as early as 2007 and has continued to the present.  Based on Defendants' material misrepresentations and other affirmative acts to conceal their fraud and unlawful conduct, Plaintiffs did not discover and could not have reasonably discovered that their damages were attributable to Defendants' fraud and unlawful conduct until shortly before Plaintiffs filed this Amended Complaint.

## II.    PARTIES

### A.    Plaintiffs

10.      Plaintiff State Farm Mutual is an Illinois domestic property and casualty insurer incorporated under the laws of Illinois, with its principal place of business in Bloomington, Illinois.  State Farm Mutual is licensed to engage in business in the State of Florida as a foreign corporation and is doing business in Miami-Dade County, Florida.  State Farm Mutual issues automobile insurance policies in Florida and made substantial insurance payments to, or for the benefit of, the Muse Clinics.

11.      Plaintiff State Farm Fire is an Illinois corporation with its principal place of business in Bloomington, Illinois.  State Farm Fire is licensed to engage in business in the State of Florida as a foreign corporation and is doing business in Miami-Dade County, Florida.  State Farm

4

Fire issues automobile insurance policies in Florida and made substantial insurance payments to, or for the benefit of, the Muse Clinics.

**B.    Defendants**

12.    Defendant Health & Wellness is an active Florida corporation with its principal place of business at 2140 W. Flagler Street, Suite 202-203, Miami Florida 33135.[1]  According to the Florida Department of State, Division of Corporations, Health & Wellness was incorporated on June 26, 2007 by Beatriz Muse.  Through a series of purported stock transfers, ownership purportedly passed from Beatriz Muse to Marcelo Velazquez (a phlebotomist at Health & Wellness), then to Sandor Abrahan Fuentes (a patient transport driver), and finally to the purported current owner Andrelvis Perez (the "maintenance man" of Health & Wellness).  None of those stock transfers appear legitimate.  Instead, Ms. Muse and Mr. Muse are the actual owners of Health & Wellness and have been from its inception to the present.

13.    Defendant Beatriz Muse is a citizen of Florida and is believed to reside in Miami-Dade County, Florida.  Ms. Muse still performs the billing at Health & Wellness through her billing company, Confidence Billing & Collection Services, Inc. ("Confidence Billing").  Ms. Muse is a LMT; she received her training at Professional Hands Institute, a massage therapy school partially owned by Noel Ruiz, the lead defendant in *State Farm Mutual Automobile Insurance Co. v. First Care Solutions, Inc.*, against whom State Farm Mutual and State Farm Fire obtained a final judgment for over $640,000.00 on their claims arising from an insurance fraud scheme.  *See State Farm Mut. Auto. Ins. Co. v. First Care Solution, Inc. et al.*, Case No. 15-cv-21215, ECF No. 187 (S.D. Fla. February 14, 2017).  Ms. Muse is also the director of a massage therapy school, Healing

---

[1] Initially, when Health & Wellness was formed it was located at 2128 W. Flagler Street, Suite 205, Miami Florida 33135, in a building owned in part by Lazaro Muse.

5

Hands Institute ("Healing Hands"). Healing Hands purportedly trains students in topics such as massage therapy and phlebotomy and places them at health care clinics, including the Muse Clinics.

14.     Defendant Lazaro Muse is a citizen of Florida and is believed to reside in Miami-Dade County, Florida.. He is a lay person and holds no medical license. Mr. Muse is Beatriz Muse's brother and is believed to be one of the true owners of Health & Wellness, Medical Wellness, and Pain Relief. Mr. Muse formerly co-owned, with Noel Ruiz, the building that housed both First Care Solution, Inc. and Health & Wellness, located at 2128 W. Flagler Street in Miami, Florida.

15.     Defendant Dr. Hugo Goldstraj, M.D. ("Dr. Goldstraj") is a citizen of Florida and is believed to reside in Miami-Dade County, Florida. Dr. Goldstraj was a licensed physician who claimed to be the medical director at Health & Wellness from on or about July 3, 2007 to June 19, 2013. Dr. Goldstraj was arrested in 2013 for insurance fraud associated with his role as a medical director at another clinic in Miami-Dade; Dr. Goldstraj pled guilty to insurance fraud in May 19, 2014. The Department of Health revoked his license to practice medicine on April 21, 2015.

16.     Defendant Dr. Manuel Franco, M.D. is a citizen of Florida and is believed to reside in Miami-Dade County, Florida. Dr. Franco is a licensed physician who claims to be the medical director at Health & Wellness from June 19, 2013 to the present.

17.     Defendant Medical Wellness Services, Inc. is an active Florida corporation with its principal place of business at 3850 SW 87th Ave, Suite 207, Miami, Florida 33165.[2] According

---

[2] Medical Wellness, its owner Noel Santos, its medical director Jorge Coll, and several other employees were sued for fraud by Government Employees Insurance Company ("GEICO") arising out of the alleged medical director's failure to perform his statutory duties. *See GEICO v. Medical Wellness Serv. Inc., et al.*, Case No.: 17-cv-21360, ECF No. 1 (S.D. Fla. April 11, 2017). That litigation ended in settlement.

to the Florida Department of State, Division of Corporation, Medical Wellness was incorporated on June 22, 2009 by Noel Santos. Pursuant to Department of Corporation records, Mr. Santos is the President and Registered Agent of Medical Wellness.  Beatriz Muse handles the billing for Medical Wellness through her billing company, Confidence Billing.

18.     Defendant Noel Santos is a citizen of Florida and is believed to reside in Miami-Dade County, Florida. Mr. Santos is married to Ms. Muse and claims to be the owner of Medical Wellness. Mr. Santos is also a LMT.  He received his training at Professional Hands Institute, a massage therapy school owned by Noel Ruiz, a business partner of Lazaro Muse.  Professional Hands Institute has trained various other therapists that work at the Muse Clinics.

19.     Defendant Angel Carrasco, M.D. is a citizen of Florida and is believed to reside in Miami-Dade County, Florida.  Dr. Carrasco is a licensed physician who claimed to be the medical director at Medical Wellness from August 14, 2009 to September 2, 2013.

20.     Defendant Jorge Rafael Coll, M.D. is a citizen of Florida and is believed to reside in Miami-Dade County, Florida. Dr. Coll is a licensed physician who has claimed to be the medical director at Medical Wellness from September 2, 2013 to the present.

21.     Defendant Pain Relief Clinic of Homestead Corp. is an active Florida corporation with its principal place of business at 26051 South Dixie Highway, Naranja, Florida 33032. Florida Department of Corporation records reflect that Pain Relief was incorporated on May 11, 2010 by Ulises Salgado Acevedo. The initial registered agent for Pain Relief is Better Life Home Health, Inc., a Florida company owned by Lazaro Muse.  Jose Artiles purportedly became a part owner of Pain Relief on August 24, 2012, and purported to take over complete ownership on April 1, 2013 when Ulises Salgado Acevedo resigned.  On July 8, 2013, Jose Artiles purportedly transferred ownership to Daniel Collazo Lopez, who claims to be the current owner.  Despite

7

purported transfers of ownership, the Muse Family still owns and/or controls the operations of Pain Relief; and Beatriz Muse handles the billing for Pain Relief through her billing company, Confidence Billing.

22.    Defendant Jesus Lorites, M.D. is a citizen of Florida and is believed to reside in Miami-Dade County, Florida. Dr. Lorites is a licensed physician who claimed to be the medical director at Pain Relief from June 15, 2010 to April 1, 2013.

23.    Defendant Jose Gomez-Cortes, M.D. is a citizen of Florida and is believed to reside in Miami-Dade County, Florida. Dr. Lorites is a licensed physician who claims to be the medical director at Pain Relief from April 1, 2013 to the present.

## III.    JURISDICTION AND VENUE

24.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, based upon the diverse citizenship of the parties and the amount in controversy, which exceeds $75,000.00, exclusive of interest and costs.

25.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to State Farm Mutual and State Farm Fire's claims occurred in this judicial district, Defendants reside and/or do business in this judicial district, and the conduct of the Defendants has resulted in actionable conduct in this judicial district.

## IV.    ALLEGATIONS COMMON TO ALL COUNTS

### A.    Automobile Insurance in Florida

26.    Under Florida law, each automobile owner or leasee is required to maintain, and each insurer is required to issue, a minimum amount of insurance coverage that is payable without regard to who is at fault in causing an accident ("No-Fault Benefits"). *See* Fla. Stat. §§ 627.730 *et seq.* Auto insurers like State Farm Mutual and State Farm Fire are required to provide No-Fault Benefits of at least $2,500.00, and up to $10,000.00 if the patient is determined to have an

8

emergency medical condition,[3] for losses resulting from injuries arising out of the ownership, maintenance, or use of a motor vehicle.

27.     For purposes of No-Fault Benefits, insurers are required to pay 80% of all reasonable expenses for medically necessary medical, surgical, x-ray, dental, and rehabilitative services related to injuries caused by the accident.

28.     Pursuant to Section 627.732(2)(a)-(c), Florida Statutes, "medically necessary" refers to "a medical service or supply that a prudent physician would provide for the purposes of preventing, diagnosing, or treating an illness, injury, disease, or symptom in a manner that is: (a) [i]n accordance with generally accepted standards of medical practice; (b) [c]linically appropriate in terms of type, frequency, extent, site, and duration; and (c) [n]ot primarily for the convenience of the patient, the physician, or other health care provider."

29.     State Farm Mutual and State Farm Fire are required to pay or deny claims for No-Fault Benefits within 30 days, and may be ordered to pay interest and attorney's fees if they fail to pay the amount determined to be owed within that time period.

30.     Neither an insurer nor an insured is required to pay a claim or charge: (a) for services or treatment that were not lawful at the time rendered; or (b) to any person who knowingly submits a false or misleading statement relating to the claim. Fla. Stat. §§ 627.736(5)(b)(1)(b) and (c). Pursuant to Section 627.732(11), Florida Statutes, "lawful or lawfully" means "in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment."

31.     Medical Payments Coverage ("MPC") is an optional coverage that provides reimbursement benefits in addition to the No Fault Benefits.

---

[3]     Effective January 1, 2013, patients must present with an emergency medical condition, appropriately reflected in the medical records, in order to qualify for $10,000.00 in No-Fault Benefits. Prior to that time, every patient was entitled to up to $10,000.00 in No-Fault Benefits without an emergency medical condition determination.

9

32.     MPC covers the co-payment required for No-Fault Benefits and also allows an insured to elect to extend medical coverage above the $2,500.00 - $10,000.00 mandated by Florida law.

33.     Similar to the law governing No-Fault Benefits, pursuant to State Farm Mutual and State Farm Fire's applicable policies, MPC coverage is only available for treatment which is medically necessary and lawfully rendered.

**B.     Florida's Health Care Clinic Act ("HCCA")**

34.     The HCCA requires each clinic location to obtain a license from the Agency for Health Care Administration ("AHCA"). Fla. Stat. § 400.991. In explaining the purpose of the HCCA, the Florida Legislature stated that "the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers." Fla. Stat. § 400.990(2). Accordingly, the express purpose of the HCCA "is to provide for the licensure, establishment and enforcement of basic standards for health care clinics and to provide administrative oversight by [AHCA]." *Id.*

35.     In furtherance of the goal of clinic oversight, the HCCA requires that clinics which are owned by non-licensed (non-medical) individuals designate a "medical director." The Florida Legislature codified Section, 400.9935, Florida Statutes ("Medical Director Statute") which requires a medical director to assume several statutory obligations to ensure the safety of patients. Fla. Stat. § 400.9935.

36.     The identity of the medical director must be designated in the verified application for clinic licensure required by AHCA. AHCA relies upon this designation in granting a clinic licensure at the request of a non-licensed (non-medical) clinic owner.

37.     Medical directors must agree in writing with the provider to undertake the statutory obligations and legal responsibilities of medical directors identified in the HCCA. Fla. Stat. § 400.9905(1).

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 11 of
110
Case 1:18-cv-23125-RNS   Document 6   Entered on FLSD Docket 08/03/2018   Page 11 of 59

38.     In furtherance of the goal of patient safety, the medical director must ensure that all health care practitioners at the clinic have active, appropriate certification or licensure for the level of care being provided.  Fla. Stat. § 400.9935(1)(d).

39.     In order for the medical director to be in compliance with the HCCA, he or she must verify the proper certification of the individuals rendering services under his or her attention.

40.     Similarly, a medical director must conduct "systematic reviews" of the clinic's billing in an effort to ensure they do not contain fraudulent or unlawful charges, and is required to "take immediate corrective action" should unlawful or fraudulent billing be detected.  Fla. Stat. § 400.9935(1)(g).

41.     Florida law also requires a clinic medical director to serve as records owner and ensure compliance with recordkeeping requirements.  This requires that medical records be maintained in a legible manner, and with sufficient detail to demonstrate why the course of treatment was undertaken. Fla. Admin. Code r. 64B8-9.003(2).  Additionally, the medical record must contain enough information to: identify the patient; support the diagnosis; and justify the treatment and document the course and results of treatment accurately.  Fla. Admin. Code r. 64B8-9.003(3).

42.     Further, "[a] licensed health care clinic may not operate or be maintained without the day-to-day supervision of a single medical or clinic director as defined in Section 400.9905(5), F.S.  The health care clinic responsibilities under Sections 400.9935(1)(a)-(i), F.S., cannot be met without an active, appointed medical or clinic director."  Fla. Admin. Code r. 59A-33.008(1) (2006) (emphasis added).

43.     If a clinic's medical director fails to satisfy his or her statutory duties, that clinic operates in violation of the HCCA, rendering the clinic improperly licensed.  Treatment provided at an improperly licensed clinic is unlawful and therefore, noncompensable. Fla. Stat. § 400.9935(3).

44.     As set forth in detail below, the Muse Clinic Medical Directors failed to satisfy these duties.

11

**C.**     **Florida's Insurance Fraud Statute, Fla. Stat. § 817.234**

45.        Florida's Insurance Fraud Statute broadly prohibits false or·fraudulent insurance claims.

46.        Specifically, Florida's Insurance Fraud Statute states that a person commits insurance fraud if that person "with the intent to injury, defraud, or deceive any insurer: (1) [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." *See* Fla. Stat. § 817.234(1)(a)(1).

47.        The term "statement" is defined to include, but is not limited to, "any notice, statement, proof of loss, bill of lading, invoice, account, estimate of·property damages, bill for services, diagnosis, prescription, hospital or doctor records, x-ray, test result, or other evidence of loss, injury, or expense." Fla. Stat. § 817.234(6).

48.        A violation of Florida's Insurance Fraud Statute constitutes a per se violation of the Florida Unfair and Deceptive Trade Practices Statute, as set forth in more detail below.

**D.**     **An Overview of Legitimate Treatment of Patients with Strains and Sprains**

49.        The Muse Clinics purport to examine, diagnose, and treat Insureds who have been in automobile accidents and complain of neck and/or back pain, among other ailments.

50.        For patients who have been in auto accidents and have legitimate complaints of neck and/or back pain, or other ailments, a provider must record a detailed patient history and perform a complete examination to arrive at a legitimate diagnosis.

51.        Based upon a legitimate diagnosis, a licensed professional must engage in medical decision-making to design an appropriate plan of care that is tailored to the unique circumstances of the patient.  During the course of treatment, the plan of care should be modified based upon the unique circumstances of each patient and their response (or lack thereof) to treatment.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

52.     Appropriate plans of care for patients with strains and sprains may, at times, involve no treatment at all because many of these kinds of injuries heal without any intervention, or a variety of interventions, including medications to reduce inflammation and relieve pain, passive modalities, and active modalities.

53.     In appropriate plans of care, passive modalities should generally be used only to the extent necessary to reduce pain and facilitate active modalities, while active modalities should generally be introduced as soon as practicable to promote the actual healing of strains and sprains.

54.     The decision of which, if any, types of treatment are appropriate for each patient, as well as the level, frequency, and duration of the various treatments, should vary depending on the unique circumstances of each patient, including: (a) the patient's age, social, family, and medical history; (b) the patient's physical condition, limitations, and abilities; (c) the location, nature, and severity of the patient's injury and symptoms; and (d) the patient's response to treatment.

55.     The plan of care should be periodically reassessed and modified based upon the progress of the patient, or lack thereof.  To the extent that diagnostic tests such as x-rays and MRIs are medically necessary and are performed, the plan of care should also integrate their results.

56.     The above-described process of examination, diagnosis, and treatment must be appropriately documented for the benefit of: (a) the licensed professionals involved in the patient's care;  (b) other licensed professionals who may treat the patient contemporaneously or subsequently; (c) the patient, whose care and condition necessarily depends on the documentation of this information; and (d) payors such as State Farm Mutual and State Farm Fire, so that they can pay for reasonable and necessary treatment.

57.     As described below, Insureds at the Muse Clinics are not legitimately examined, diagnosed, or treated for their unique conditions and needs.  Instead, Insureds are subjected to the Predetermined Treatment Plan at the Muse Clinics, under which they receive virtually the same laundry list of services on nearly every visit, which exploits their No-Fault Benefits, rather than addresses their unique conditions and needs.  Furthermore, the pervasive patterns in the

13

documentation of the examinations, diagnoses, and other services that the Muse Clinics have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire demonstrate services that were performed, to the extent they were actually performed at all, pursuant to the Predetermined Treatment Plan, rather than because they were medically necessary to address the unique conditions and needs of each Insured.

## V.    UNLAWFUL CONDUCT

### A.    The Framework For The Muse Family Unlawful Scheme

58.    In furtherance of their scheme, the Muse Family installed individuals to pose as owners of the Muse Clinics, who purported to manage the day-to-day operations of each clinic, but who, in reality, answered to the actual owners: the Muse Family.

59.    Many of the purported "owners" of the Muse Clinics know little to nothing about the businesses they purportedly own.

60.    For example, Daniel Collazo Lopez, the purported owner of Pain Relief, who lacked any medical experience before purportedly purchasing the health care clinic, admitted he was not familiar with the equipment used to render therapy at the Clinic, could not identify any of the employees who worked at the clinic in 2013 (a time during which he was the purported owner), and could not describe the services provided by Pain Relief any more specifically than: "the treatment ordered to the patient by the doctor." *See* Excerpts of D. Collazo Dep. 16:23-17:15, 20:18-21:4, 24:13-25:6, January 13, 2017, attached as **Exhibit 1**.

61.    Similarly, Sandor Abrahan Fuentes, a purported prior owner of Health & Wellness, who previously owned a medical transport company and who had no prior medical-related experience, testified that he did not know whether the pricing for treatment at Health & Wellness was consistent across insurers; could not read the documents related to a specific Health & Wellness claim because he does not read English; did not recognize the name of the doctor performing x-ray reads for patients at Health & Wellness; and did not know the details of Health & Wellness' contract with Atlantic Therapy (the company performing the x-ray reads). *See*

14

Excerpts of S. Abrahan Dep. 35:22-38:8; 52:3-54:6; 55:1-56:11, April 5, 2016 attached as **Exhibit 2**.

62.     The Muse Family also appears to draw from the patient populations at the Muse Clinics to find purported owners and other staff members to participate in the Muse Family's unlawful scheme. For example, Ulises Salgado Acevedo was a patient at Health & Wellness before becoming President of Pain Relief. And Marcelo Velazquez, a purported owner of Health & Wellness for a brief period in 2010, was a patient at Health & Wellness in 2008.

63.     At Medical Wellness, Noel Santos claimed to be the owner at all times, but testimony from former employees suggests that Ms. Muse and Mr. Muse were also owners of that Clinic.

64.     In addition to the ownership structure, the Muse Family also selected medical directors who often were medical directors at an unusually high number of clinics, and who were complicit in the Muse Family's scheme by consciously ignoring the rigorous supervision requirements imposed on medical directors by Florida law. By selecting the Muse Clinic Medical Directors, the Muse Family endeavored to create the appearance of compliance with Florida's medical director laws when in reality those individuals knowingly failed to discharge their supervisory requirements.

65.     Despite creating the appearance of separately operating health care clinics, the Muse Family covertly maintains its control over the three Muse Clinics. The Muse Clinics use Ms. Muse's billing company to perform the billing at each Muse Clinic. This allows the Muse Family to monitor and to control the billings submitted to State Farm Mutual and State Farm Fire.

66.     The Muse Family also staffs the Muse Clinics with individuals who were trained at either, Healing Hands, Ms. Muse's massage therapy school, or Professional Hands, the massage therapy school owned in part by Noel Ruiz, who is the former business partner of Mr. Muse. At least twelve (12) staff members at the Muse Clinics were trained at either Healing Hands or Professional Hands.

15

67. Some of these employees are even shared amongst the Muse Clinics. For example, Annalie Campa, LMT, was initially employed at Pain Relief and then left to work at Health & Wellness. Vladmir Ojeda Perez, CRT, also performs services at both Pain Relief and Health & Wellness concurrently. Similarly, Bernardino Enriquez is an x-ray technician working at all three Clinics. And both Dr. Gomez-Cortes and Physician Assistant Leiva treated patients at all three Clinics.

68. Another example of the Muse Family's control over each of the Muse Clinics is demonstrated by the similarities amongst their medical records. The templated medical forms used to document the therapy plans, prescribing the treatment to be performed, and the daily notes, reflecting the treatment purportedly performed at each visit, are in many instances identical.

69. Further, the manner in which these forms and the medical billing records are completed is basically the same across all Muse Clinics.

70. Moreover, some Pain Relief daily notes reflect the signature of Noel Santos, who claims he owns and is only employed at Medical Wellness. Many of the daily therapy notes from Health & Wellness and from Medical Wellness are on the exact same form with the only distinguishing attribute being a different logo at the top.

71. Similarly, numerous Pain Relief CMS 1500 forms bear the Medical Wellness TIN. *See* **Exhibits 3 and 4**. The same cross-references are also present in the Assignment of Benefits ("AOB") forms, such that an AOB from one Muse Clinic sometimes directs payment to another Muse Clinic. *See* **Exhibit 5**. An additional example of the Muse Clinic interchanging their forms is shown in Pain Relief's Patient Consent Forms and Consent to Interpreter Forms. *See* **Exhibit 6**. In some instances, the letter head for those forms bear Pain Relief's name, but the body of the form refers to "Health & Wellness" as the clinic where treatment is provided. *See id.*

**B.** **Details of the Unlawful Scheme**

72. The Muse Family uses the foregoing framework to perpetrate essentially and materially the same Predetermined Treatment Plan across all three Muse Clinics.

16

73. Each Clinic only treats automobile accident patients. Each Clinic employs a treating physician and several massage therapists. The massage therapists purport to perform treatment pursuant to the prescription from the treating physician.

74. Each Clinic also has a designated location where x-rays are performed and uses an on call x-ray technician to perform x-rays.

75. Each Clinic employs a medical director who, under governing Florida law, is, among other things, responsible for conducting systematic billing reviews to ensure billings are not fraudulent or unlawful; ensuring treating practitioners have active licenses and are properly certified for care being provided; reviewing the clinics' referral contracts; serving as the records owner of all medical records for the clinic; and ensuring that the records are legible and support the treatment prescribed.

76. Despite the statutory obligations imposed on the Muse Clinic Medical Directors, each Muse Family Clinic employs the Predetermined Treatment Plan, which maximizes their billings and the PIP benefits they receive.

77. The Predetermined Treatment Plan follows a pattern whereby the overwhelming majority of Insureds are diagnosed with injuries to the entire back – the cervical, thoracic, and lumbar regions. Almost every Insured is referred for an x-ray that is generally performed on the date of the initial evaluation. None of the treating physicians at the Muse Clinics waits for the results of the x-rays they prescribe before commencing treatment. Instead, on the same date as the initial examination, nearly every Insured is prescribed excessive physical therapy, including extensive active and passive modalities far beyond what is reasonable or medically necessary for most, if not all, Insureds. Moreover, treatment is prescribed for the Insured's entire back, five times per week, for nearly every Insured.

78. The overwhelming majority of Insureds receive treatment in three cycles. The first cycle is generally two weeks, the second cycle is at least three weeks, and the third cycle is generally at least three weeks. The frequency at which the Insured receives treatment in a given week varies depending on what cycle of treatment the Insured is in. In the first cycle, treatment is

17

rendered five times per week. During the second cycle, treatment is rendered at least three times per week. In the last cycle, the treatment is rendered at least three times per week.

79.     The testimony from medical staff across the Muse Clinics confirms the existence of a Predetermined Treatment Plan. Some medical staff have testified to the use of a "guide" when treating patients while others have admitted to a certain "protocol" for treating accident victims, as more fully explained below.

80.     The therapy modalities comprising the Predetermined Treatment Plan consist of largely "passive" modalities including, but not limited to, hot/cold packs, massage, and ultrasound. However, the Predetermined Treatment Plan also includes neuromuscular reeducation, therapeutic exercises and/or therapeutic activities, and potentially gait training, which are often classified as more "active" modalities.

81.     LMTs largely lack the requisite training to supervise or administer "active" modalities.

82.     Nevertheless, Insureds at the Muse Clinics receive, at a minimum, neuromuscular reeducation and gait training from LMTs without the supervision of the treating physician who prescribed the therapy.

83.     Further, there are instances at each Muse Clinic where it appears that bills are being submitted for treatment that has not been rendered. Some Insureds have attested to being out of the country or otherwise having not received treatment on at least some of the dates of service for which bills were submitted to State Farm Mutual and State Farm Fire for payment.

84.     To the extent that treatment is actually rendered, at the completion of the treatment, nearly every Insured has a less than 10% final impairment. *See* **Exhibit 7**.

85.     In total, these similarities across the Muse Clinics reflect a Predetermined Treatment Plan which exploits No-Fault Benefits and disregards treating Insureds based on their actual medical needs, which enriches the Muse Defendants.

18

86.     Had a legitimate medical director been in place and properly performed his or her supervisory obligations to conduct systematic reviews of the bills at the Muse Clinics, he or she would have been able to identify the hallmarks of the Predetermined Treatment Plan.

87.     Here, rather than performing their statutory obligations, the Muse Clinic Medical Directors were complicit in the scheme, knowingly failing to discharge their duties. Instead, the Muse Clinic Medical Directors further misled State Farm Mutual and State Farm Fire by signing CMS 1500 forms. By doing so the Muse Clinic Medical Directors falsely represented that: the treatment reflected on the respective CMS 1500s was medically indicated and necessary, and was personally furnished by them or incident to their services and under their immediate supervision, and the signing medical director was the one who rendered the treatment. Those CMS 1500 forms, containing those false statements were then transmitted to State Farm Mutual and State Farm Fire for payment, further misleading State Farm Fire and State Farm Mutual to believe that treatment at the Muse Clinics was medically necessary and lawfully rendered.

88.     The Muse Family has employed the above-described unlawful scheme for many years and appears to continue to expand its business model. Specifically, they recently appear to have replicated their scheme at a new health care clinic in Miami-Dade county: Caring with Love Center, Inc. ("Caring with Love").

89.     Records from Caring with Love reflect references to the Muse Clinics. For example, one Assignment of Benefits for a patient who treated at Caring with Love states that payments should be "made payable to and mailed to Medical Wellness Services, Inc." *See* **Exhibit 8**.

90.     Caring with Love was incorporated on March 16, 2016. Like other Muse Clinics, the connection to the Muse Family is not apparent from the Department of Corporation records.

91.     However, upon closer examination, the receptionist, Kayla Malagon identified Defendant Mr. Muse as the one who was performing hiring and Manager Jorge Abreu identified "a husband wife team," believed to be Ms. Muse and Mr. Santos, as assisting in the operation of the clinic.

19

92.     Certain employees of Caring with Love were trained and placed at the clinic by Healing Hands, the massage therapy school owned by Ms. Muse.

93.     Ms. Muse, through her billing company Confidence Billing, performs the billing at Caring with Love.

**C.     Unlawful Conduct at Health & Wellness**

94.     Since Health & Wellness' inception, the Muse Family has installed two medical directors over time —Drs. Goldstraj and Franco ("Health & Wellness Medical Directors").

95.     Dr. Goldstraj served as purported medical director from the clinic's inception until June 19, 2013; Dr. Franco supposedly assumed this role on June 19, 2013 and continues to be identified as medical director of Health & Wellness to the present.

96.     Drs. Goldstraj and Franco did not comply with mandatory Florida law in providing oversight at the Clinic during each of their tenures. Instead, both Health & Wellness Medical Directors implemented the Predetermined Treatment Plan and failed to provide proper oversight, which further misled State Farm Fire and State Farm Mutual.

97.     As a result of the foregoing, State Farm Mutual and State Farm Fire paid over $2 million to the Clinic.

**i.     Predetermined Treatment Plan at Health & Wellness**

98.     Between 2007 and 2016, Health & Wellness treated approximately 298 Insureds covered by insurance policies issued either by State Farm Mutual or State Farm Fire. *See* Health & Wellness Predetermined Treatment Plan Summary Chart, a copy of which is attached as **Exhibit 9**.

99.     The Health & Wellness Insureds range in age from 18 years old to 81 years old. These Insureds received treatment to address injuries purportedly sustained from automobile accidents which include rear end accidents; side swipes, cars backing into cars, side impact collisions, and front impact collisions.

100.     Insureds at Health & Wellness purportedly received an initial examination on their first visit to the clinic. Treating physicians completed initial evaluation reports ("Health &

20

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 21 of
110
Case 1:18-cv-23125-RNS   Document 6   Entered on FLSD Docket 08/03/2018   Page 21 of 59

Wellness Initial Evaluations") which purportedly documented the Insureds' subjective complaints, objective evaluations, diagnoses, and relevant patient history. No medical professional prepared an individually tailored treatment plan for an Insured, to specify treatment, set goals and track progress.

101.    Regardless of the age of the Insureds or the type of accident, treating physicians at Health & Wellness identified over 95% of Insureds as reporting subjective pain complaints in all three regions of the spine – the cervical, thoracic, and lumbar regions – on the Health & Wellness Initial Evaluations.

102.    Of those Insureds, roughly 95% also purportedly complained of pain in an extremity.

103.    Treating physicians at Health & Wellness also routinely ordered x-rays as part of their pre-determined treatment—with roughly 95% of Insureds receiving x-rays as part of their treatment.[4] No x-rays results are documented by the treating physician on the day they were taken, which is often the same day treatment begins. Moreover, the results are not fully documented by the treating physician in any subsequent reports. In fact, for roughly 98% of Insureds at Health & Wellness, the medical records failed to reflect any treatment decisions based on the x-ray findings.

104.    Following the initial examination at Health & Wellness, treating physicians at the Clinic purportedly complete a prescription for treatment ("Health & Wellness Therapy Order") which is a combination of passive and active modalities performed by LMTs, who lack the requisite certification to perform at least some of those therapies.

105.    Of the Insureds who received Health & Wellness Therapy Orders, roughly 85% received a prescription for modalities to be performed on the cervical, thoracic, and lumbar spine.

106.    Pursuant to the Health & Wellness Therapy Order, Insureds received treatment in three cycles:

---

[4]  This figure includes four instances where x-rays were ordered but not billed. If those are left out, the percentage increases to 96%.

21

       a.  for over 85% of Insureds the initial treatment frequency prescribed was five times per week for two weeks;

       b.  for nearly 85% of Insureds the second cycle resulted in treatment prescribed four times per week for three weeks; and

       c.  for over 85% of Insureds the third cycle resulted in treatment prescribed three times per week for at least three weeks.

107.    When purported treatment is performed on a subject Insured, it is documented in a daily therapy note ("Health & Wellness Daily Note"). For the first set of treatment records submitted to State Farm Mutual and State Farm Fire, which includes up to ten visits to Health & Wellness, the Health & Wellness Daily Notes for nearly 100% of Insureds have a box checked indicating a subjective complaint of "pain and tenderness" in the cervical, thoracic, and lumbar regions of the spine.

108.    For nearly 90% of Health & Wellness Insureds, the Health & Wellness Therapy Order indicated that the patient received treatment to the cervical, thoracic and lumbar regions of the spine.

109.    Although the Health & Wellness Daily Notes indicate that treatment is supposedly administered pursuant to the Health & Wellness Therapy Order, it is not. When a Health & Wellness Therapy Order exists, in reality, nearly 100% of Insureds receive treatment modalities inconsistent with those prescribed on the Health & Wellness Therapy Order.

110.    Here, rather than abide by their statutory obligations, Drs. Goldstraj and Franco were complicit in the implementation of the Predetermined Treatment Plan and knowingly failed to satisfy their statutory obligations. Drs. Goldstraj and Franco further misled State Farm Mutual and State Farm Fire by signing CMS 1500 forms that were submitted to State Farm Fire and State Farm Mutual. By doing so Drs. Goldstraj and Franco represented that: the treatment reflected on the respective CMS 1500s was performed at Health & Wellness, was medically indicated and necessary, and was personally furnished by them or incident to their services and under their immediate supervision, and the signing medical director was the one who rendered the treatment.

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 23 of
110
Case 1:18-cv-23125-RNS   Document 6   Entered on FLSD Docket 08/03/2018   Page 23 of 59

Those CMS 1500 forms were then transmitted to State Farm Mutual and State Farm Fire for payment, furthering the misconception that treatment at Health & Wellness was medically necessary and lawfully rendered and caused Plaintiffs to make payments for unlawfully rendered treatment.

### ii.   Use of a Pre-Set "Guide" at Health & Wellness to Document Patient Condition and Progress

111.   To further demonstrate the lack of individualized care, a massage therapist at Health & Wellness confirmed he uses a "guide" ("Guide") of stock phrases that he would copy into Health & Wellness Daily Notes to give the appearance of documenting the Insured's medical condition and progress.

112.   Specifically, Health & Wellness LMT Raydel Ruiz[5] testified that he, and possibly other therapists, employed by the Clinic used a Guide that was developed from the Internet, which provides sample phrases that he would copy in the box for narrative description on the Health & Wellness Daily Notes. *See* R. Ruiz Dep. at 62:10-69:10, November 21, 2016, attached as **Exhibit 10**.

113.   The paragraphs on the Guide are numbered; each numbered paragraph corresponds to the dates of service; and the text in the Guide is written in English. According to LMT Raydel Ruiz, he copies the narrative in the Guide's numbered paragraphs that corresponds to the patient's visit number, into the narrative section of the Health & Wellness Daily Note. A copy of the Guide is attached as **Exhibit 11**. For example, if it is a patient's first date of service, LMT Ruiz would find the number "1" on the Guide and hand write the corresponding phrase, next to that number, into the narrative box on the Health & Wellness Daily Note for the first date of service.

---

[5]   Notably, LMT Ruiz was trained at Professional Hands Institute, the massage therapy school of which Noel Ruiz was a prior part owner. Noel Ruiz is currently subject to an outstanding judgment in excess of $640,000.00 held by State Farm Mutual and State Farm Fire as a result of his orchestration of a similar insurance fraud scheme aimed at bilking No-Fault benefits at a separate medical clinic in Miami-Dade, Florida.

23

114.    Notably, LMT Raydel Ruiz cannot read English, and as a result, was unable to clearly identify what each phrase on the Guide meant. *See* **Exhibit 10** at 69:14-72:25.

**iii.    The Submission of Blank, Signed Forms**

115.    In addition, there are several examples of blank Health & Wellness forms that have been submitted with bills.

116.    For example, Health & Wellness has submitted Health & Wellness Therapy Orders to State Farm Fire and State Farm Mutual that are blank except for the Insured's name, the date, and a physician signature. *See* Health & Wellness Therapy Orders attached as **Exhibit 12**.

117.    These Health & Wellness Therapy Orders do not reflect any indication of what modalities should be performed or to which regions of the body they should be performed, yet the physician signed them. *Id.*

118.    Similarly, Health & Wellness has submitted Daily Notes to State Farm Fire and State Farm Mutual, which are signed by the therapist and initialed by the Insured, but which are also blank with respect to any of the medical observations, progress, therapy provided, or any other substantive indication. *See* Blank Daily Notes for J.E. attached as Composite **Exhibit 13**; *see also* Blank Daily Notes for Y.S. attached as Composite **Exhibit 14**.

119.    Specifically, for Insured J.E., the Daily Notes contain no indication as to the subjective condition of the Insured, the objective verification of that condition, or the assessment of the Insured's progress.

120.    Nevertheless, the therapy form is signed by a therapist and initialed by the Insured. This would not occur if the daily therapy notes were completed pursuant to a proper standard. A patient should only ever sign after the treatment is completed and as a result the daily therapy note should already be complete when requesting a patient signature.

121.    State Farm Fire has also received blank, signed final examination reports. *See* "Blank Final Examination for A.P. attached as **Exhibit 15**. Like the Daily Notes, the Final Examinations contain only identifying Insured information and the corresponding Insured's purported signature.

24

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 25 of
110
Case 1:18-cv-23125-RNS   Document 6   Entered on FLSD Docket 08/03/2018   Page 25 of 59

### iv.   Medical director Dr. Goldstraj Admits to Failing to Properly Perform His Statutory Duties

122.   To further demonstrate that the medical directors failed to satisfy their duties, Health & Wellness Medical Director Dr. Goldstraj admitted in deposition that he failed to comply with Florida's medical director requirements while he was medical director at the Clinic stating: "Probably I didn't carry my duties [as medical director] very well." *See* Excerpts of H. Goldstraj Dep. 79:10-81:17, March 9, 2017, attached as **Exhibit 16**. Dr. Goldstraj further testified regarding his role at Health & Wellness:

   a.   He reviewed the billing once a month, but he "was not extremely careful with it." *Id.* at 35:20-38:6.

   b.   He usually did not compare the therapy notes to the prescription when reviewing the billing nor did he review the billing or patient files related to x-rays. Further, he did not maintain a log book regarding files he reviewed. *Id.* at 38:7-42:15.

   c.   His review of the billings was not "systematic" and only took him about five (5) minutes per file. *Id.* at 42:19-43:13.

   d.   Dr. Goldstraj was not really familiar with CPT codes and he does not know what a "unit" of therapy is. He does not know when it is proper to bill one unit versus two units. *Id.* at 73:20-75:15.

   e.   He does not know CPT codes and did not know that the number of units billed correlated to length of time rather than areas of the body. He doesn't think the billing person knew that either. He stated that one reason why he did not pay much attention to that was because he knew that the insurance company would not pay the entire bill anyway. *Id.* at 82:22-84:25.

   f.   When asked if his role was to "rubber stamp to check off that requirement", he stated: "[w]ell, I didn't take extremely seriously all the duties of a medical director, but yes, probably, yes, was just to give the clinic the proper, the proper tool to work legally." *Id.* at 90:6-92:21.

   g.   Dr. Goldstraj concluded his testimony by stating: "And I tell you the truth, these clinics, I talk about this, and the other clinics probably are not completely just. And I never believe that they were completely just, but I was looking *at least it was not grossly breaking the law.*" *Id.* at 92:22-93:3 (emphasis added).

123.   Notably, Dr. Goldstraj was also arrested on charges of insurance fraud, related to his involvement at another clinic for conduct occurring between January 13, 2012 and March 7,

2012—a time period in which Dr. Goldstraj was also purportedly serving as the medical director for Health & Wellness. The Arrest Affidavit was written by a Department of Insurance Fraud ("DIF") agent who obtained his information from a "Witness."[6] *See* Arrest Aff. at p. 1, attached as **Exhibit 17**.

124. The Arrest Affidavit alleges, among other things, that Dr. Goldstraj was the medical director and treating physician at the other clinic in late 2011. *Id.* The Affidavit stated that the Witness was involved in a staged auto accident, then presented to that clinic for treatment. *Id.* The Witness signed several blank treatment forms for treatment that she did not receive at the clinic. *Id.*

125. The medical bills submitted for the purported treatment of this Witness included charges related to four examinations by Dr. Goldstraj, which the Witness stated never occurred. *See id.* Dr. Goldstraj signed the forms submitted for billing related to the treatment that was not provided. *Id.* at p. 2:

126. Dr. Goldstraj pled guilty to making false and fraudulent insurance claims in the criminal action filed against him. *See* May 19, 2014 Plea, attached as **Exhibit 18**. As a result, the Department of Health revoked Dr. Goldstraj's license to practice medicine on April 21, 2015 following an Administrative Complaint filed by the Board of Medicine. *See* April 21, 2015 Order, attached as **Exhibit 19**.

   v. **The Health & Wellness Medical Directors Purportedly Acted as medical directors for Multiple Clinics**

127. Each of the Health & Wellness Medical Directors also separately purportedly served as medical director or provided treatment at many other facilities.

128. Dr. Goldstraj, who was the initial medical director, served from July 3, 2007 through June 19, 2013. During that time, Dr. Goldstraj served as medical director for at least eight additional clinics, pursuant to Agency for Health Care Administration ("AHCA") records. *See*

---

[6] The Witness is unnamed in the Arrest Affidavit and will be referred to as "Witness:"

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

AHCA List of Supervised Clinics for Hugo Goldstraj attached hereto as **Exhibit 20**. Much like Dr. Goldstraj, Dr. Franco was also employed as medical director at numerous health care clinics.

129. Dr. Franco assumed his role as Health & Wellness' purported medical director on June 19, 2013 and continues in the role through today.

130. During the time period when he was medical director at Health & Wellness, Dr. Franco served as medical director at sixteen other health care clinics intermittently, pursuant to Agency for Health Care Administration ("AHCA") records. *See* AHCA List of Supervised Clinics for Manuel Franco attached hereto as **Exhibit 21**.

131. Dr. Franco is currently serving as medical director at a total of four health care clinics, including Health & Wellness according to records publicly available.

132. In addition to his role as medical director at numerous locations, Department of Health records demonstrate that Dr. Franco also runs his own medical practice.

### D. Unlawful Conduct at Medical Wellness

133. Medical Wellness was incorporated in 2009 by Beatriz Muse's husband, Santos.

134. Like Health & Wellness, the Muse Family effectuated its fraud scheme at Medical Wellness through the use of the Predetermined Treatment Plan. To ensure the success of the Predetermined Treatment Plan, the Muse Family installed medical directors to create the appearance of compliance with Florida's HCCA. In reality, the medical directors, Drs. Carrasco and Coll ("Medical Wellness Medical Directors"), failed to discharge their statutory duties and instead were complicit in the unlawful and medically unnecessary treatment provided at Medical Wellness.

135. Drs. Carrasco and Coll's failure to perform their mandatory duties under Florida law and their implementation of an unlawful Predetermined Treatment Plan at Medical Wellness resulted in State Farm Mutual and State Farm Fire's payment of over $1.5 million in unlawful bills.

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 28 of
110
Case 1:18-cv-23125-RNS   Document 6   Entered on FLSD Docket 08/03/2018   Page 28 of 59

### i.   Predetermined Treatment Plan at Medical Wellness

136.   Between 2009 and 2016, Medical Wellness treated approximately 228 Insureds covered by insurance policies issued either by State Farm Mutual or State Farm Fire. *See* Medical Wellness Predetermined Treatment Plan Summary Chart, a copy of which is attached as **Exhibit 22.**

137.   The Medical Wellness Insureds range in age from 13 years old through 84 years old, with a wide variety of medical histories. These Insureds received treatment to address injuries purportedly sustained from automobile accidents which include rear end accidents, side swipes, cars backing into cars, side impact collision and front impact collision, at varying rates of speed. As a result, the purported accidents caused a variety of damage to the involved cars – anything from a minor dent to substantial damage – and associated injuries of varying degree.

138.   Insureds at Medical Wellness purportedly received an initial examination. Treating physicians purportedly completed initial evaluation reports ("Medical Wellness Initial Evaluations") where treating physicians purport to document the supposed subjective complaints of the Insured, the objective evaluation, the diagnosis, and relevant history. The primary method of documentation is through check boxes.

139.   Regardless of Insured age, past medical history, or severity of the subject accident, over 95% of the Insureds treating at Medical Wellness purportedly reported subjective pain complaints in all three regions of the spine, the cervical, thoracic, and lumbar regions.

140.   Of those Insureds, nearly 100% also supposedly reported subjective pain complaints in an extremity.

141.   Treating physicians at Medical Wellness also routinely ordered x-rays as part of their pre-determined treatment— with over 95% of Insureds at Medical Wellness receiving x-rays as part of their treatment. No x-ray results are documented by the treating physician on the day they were taken, which is often the same day treatment begins. Moreover, the results are not fully documented by the treating physician in any subsequent reports. In fact, nearly 100% of the Medical Wellness Insureds' medical records failed to reflect any medical decision-making based

28

on the x-ray findings. Instead, after weeks of therapy, the medical records from the first follow-up visit contain the first note that x-rays were taken, to the extent any reference is made at all, though completely lacking any substance regarding the x-ray results.

142. Following the initial examination at Medical Wellness (just like at Health & Wellness), treating physicians at the Clinic purportedly complete a prescription for treatment ("Medical Wellness Therapy Order") which is a combination of passive and active modalities to be performed by LMTs, who lack the requisite certification to perform certain of those therapies.

143. The Medical Wellness Therapy Orders reflect that treating physicians at Medical Wellness prescribed treatment to the cervical, thoracic, and lumbar spine for over 95 % of Insureds.

144. The Medical Wellness Therapy Orders also show an excessive amount of treatment prescribed to Insureds at Medical Wellness. Pursuant to Medical Wellness' Predetermined Therapy Plan, Insureds were prescribed treatment in three cycles, as follows:

> a. for roughly 93% of Insureds the initial treatment frequency prescribed was five times per week for two weeks;
>
> b. for roughly 90% of Insureds the second cycle resulted in treatment prescribed four times per week for at least three weeks; and
>
> c. for roughly 92% of Insureds the third cycle resulted in treatment prescribed at least three times per week for at least two weeks.

145. The Medical Wellness Therapy Orders for 100% of Insureds fail to specify the amount of time or number of units for each modality in the prescribed treatment.

146. Further, no medical professional prepares an individually tailored treatment plan for an Insured, to specify treatment, set goals and track progress.

147. When purported treatment is performed on a subject Insured, it is thinly documented in a daily therapy note ("Medical Wellness Daily Note"). For the first set of treatment records submitted to State Farm Mutual and State Farm Fire, which includes up to ten visits to Medical Wellness, the Medical Wellness Daily Notes for nearly 100% of Insureds indicate complaints of "pain and tenderness" in the cervical, thoracic, and lumbar regions of the spine.

29

148. Moreover, nearly 100% of Insureds allegedly reported "severe" pain that at a minimum was "frequent" at each visit, as reflected on the Medical Wellness Daily Notes, during the first set of treatment records.

149. While the Medical Wellness Therapy Orders are often confusing or unclear, the Medical Wellness Daily Notes for over 95% of Insureds contain a handwritten statement indicating that treatment was performed pursuant to the Medical Wellness Therapy Order. Contrary to this handwritten language in the Daily Notes, however, nearly 100% of Insureds do not receive the treatment modalities as prescribed in the applicable Therapy Order.

150. Instead, pursuant to Medical Wellness' Predetermined Treatment Plan, most Insureds at the Clinic receive months of therapy, after which they are generally discharged with a final examination and report. Of the 228 Insureds who began the treatment protocol at Medical Wellness, 181 received a purported final examination, performed by a physician where the physicians supposedly document their findings of the Insured's condition (the "Medical Wellness Final Examination"). Medical Wellness Final Examinations reflect that roughly 97% of Insureds at Medical Wellness who complete the three cycles of treatment receive a final impairment rating of 10% or less.

151. Here, rather than abide by their statutory obligations, Drs. Carrasco and Coll were complicit in the implementation of the Predetermined Treatment Plan and knowingly failed to discharge their statutory obligations. Drs. Carrasco and Coll further misled State Farm Mutual and State Farm Fire by signing CMS 1500 forms. By doing so Drs. Carrasco and Coll falsely represented that: the treatment reflected on the respective CMS 1500s was medically indicated and necessary, and was personally furnished by them or incident to their services and under their immediate supervision; and the signing medical director was the one who rendered the treatment. Those CMS 1500 forms were then transmitted to State Farm Mutual and State Farm Fire for payment, further misleading State Farm Fire and State Farm Mutual to believe that treatment at Medical Wellness was medically necessary and lawfully rendered. In reliance on those

30

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 31 of
110
Case 1:18-cv-23125-RNS   Document 6   Entered on FLSD Docket 08/03/2018   Page 31 of 59

misrepresentations by Medical Wellness, its medical directors and owner, Plaintiffs made payments for unlawfully rendered treatment.

### ii.    Medical Wellness Bills for Services Not Rendered

152.    Medical Wellness has also submitted bills for services when in some instances, the services were not rendered.

153.    At least two Insureds provided affidavit testimony regarding Medical Wellness' bills that relate to dates of service when the respective Insureds did not receive treatment at the Clinic.

154.    For example, State Farm Mutual insured B.V. was a patient at Medical Wellness in 2015. *See* B. V. Aff., attached as **Exhibit 23**, at ¶ 4. B.V. stated that at her EUO she reviewed the daily therapy notes from her treatment at Medical Wellness. *Id.* at ¶ 6. She went on to state that "[a]lthough some of the therapy notes were signed by me after I received the treatment, some were signed by me when I did not, in fact, receive treatment. Specifically, on several occasions the therapist would provide me the therapy notes for treatment that I did not receive, which I then signed." *Id.* at 8. B.V. concluded her affidavit by stating that she did not attend every day of therapy as documented by the therapy notes and billed for by Medical Wellness Services." *Id.* at ¶ 9.

155.    Similarly, Medical Wellness patient and State Farm Mutual insured L.O. stated that Medical Wellness billed State Farm Mutual for treatment that was not rendered to him. L.O. testified in his affidavit that he only treated at Medical Wellness briefly after his accident. While treating at Medical Wellness he would sign all the forms as directed without reading them. *See* L. O. EUO, 74:23-81:2, October 30, 2015, attached as **Exhibit 24**. At times he was provided with multiple therapy sheets to sign. *Id.* at 84:18-85:4. Although L.O. did not recall ever receiving electrical stimulation, his billing records from Medical Wellness reflect that he received such therapy at every single visit. *Id.* at 73:2-74:22. And, although he traveled to Cuba for sixteen days shortly after his accident and never returned to treat at Medical Wellness, Medical Wellness

31

nevertheless continued to bill State Farm Mutual for treatment that was never rendered. *See* L. O. Aff. attached as **Exhibit 25**, at ¶ 6.

156.    In addition, State Farm Mutual has received blank, signed Medical Wellness Therapy Order forms. *See* Exemplar Blank Therapy Forms attached as Composite **Exhibit 26**. These forms should reflect the prescription for therapy to be performed on the subject Insured. Instead, they are substantively blank, except for the name of the Insured and the signature of the treating physician. A physician prescribing therapy should only ever sign a therapy order form after the portion prescribing the therapy has been completed.

### iii.    The Medical Wellness Medical Directors Failed to Provide Day-to-Day Supervision

157.    Each of the Medical Wellness Medical Directors also separately purportedly served as medical director or provided treatment at several other facilities.

158.    Dr. Carrasco was the Medical Wellness Medical Director from August 12, 2009 through September 2, 2013. During that time, he also served as medical director at seven other health care clinics, intermittently. *See* AHCA List of Supervised Clinics for Dr. Carrasco attached as **Exhibit 27**.

159.    Separately, Dr. Carrasco indicated that he also served as medical director at Life Medical Center Corp., 10550 NW 77th Ct., #312, Hialeah, Florida 33016 in Medical Wellness' 2009 Application for Health Care Clinic Licensure. *See* Medical Wellness 2009 Application for Health Care Clinic Licensure, attached hereto as **Exhibit 28**. This health care clinic does not appear on AHCA's List of Supervised Clinics.

160.    In addition to serving as a serial medical director for numerous different clinics, Dr. Carrasco also testified that he maintained his own, separate, full-time practice, Neurology and Pain Medicine. *See* A. Carrasco Dep. 16:17-19:6, April 6, 2016, attached as **Exhibit 29**.

161.    Additionally, Dr. Carrasco was also performing consulting work with Humana at Continued Care. *See* A. Carrasco Dep. 9:25-10:15, December 21, 2016, attached as **Exhibit 30**.

32

Case 1:18-cv-23125-RNS  Document 159-3  Entered on FLSD Docket 10/30/2019  Page 33 of
110
Case 1:18-cv-23125-RNS  Document 6  Entered on FLSD Docket 08/03/2018  Page 33 of 59

162.    In his own words, Dr. Carrasco admitted that due to his various commitments he could not provide day-to-day supervision of Medical Wellness. *Id.* at 52:1-53:3. He testified that not only did he not provide day-to-day supervision, but did not believe it was necessary. *Id.* Instead, he was present a couple of times per week and was otherwise available via phone for consultation regarding patient care. *Id.*

163.    When combining the amount of time he necessarily had to spend at other medical offices and other health care clinics where Dr. Carrasco provided services or supervision, along with the weight of his own testimony, Dr. Carrasco failed to provide the type of day-to-day supervision of Medical Wellness required by Florida law.

164.    Similarly, Dr. Coll failed to provide the day-to-day supervision of Medical Wellness required by Florida law. Dr. Coll was the medical director at Medical Wellness from September 2, 2013 to October 10, 2017, when the clinic went out of business.

165.    During his time as medical director, Dr. Coll served as medical director at seven other health care clinics, intermittently. *See* AHCA List of Supervised Clinics for Dr. Coll attached as **Exhibit 31**.

166.    In addition to the seven clinics he reported to AHCA, Dr. Coll separately identified himself as medical director at Bella's Spa during the time he was the Medical Wellness Medical Director. *See* Medical Wellness 2013 AHCA Licensing Application attached hereto as **Exhibit 32**.

167.    Further, Department of Health records reflect that Dr. Coll also identified Gentiva Hospice located at 6161 Blue Lagoon Dr., Suite 170, Miami, Florida 33126 as his primary practice.

168.    Dr. Coll was a named defendant in a separate federal lawsuit brought by Government Employees Insurance Company against Medical Wellness, where similar allegations regarding his failure to satisfy his medical director duties were raised. *See GEICO v. Medical Wellness Services, Inc.*, Case No.: 17-cv-21360, ECF No. 1 (S.D. Fla. April 11, 2017). As referenced above, the suit was ultimately settled outside of court.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

169.    As the foregoing allegations demonstrate, Medical Wellness was engaged in an unlawful scheme to defraud insurers like State Farm Mutual and State Farm Fire through the use of a Predetermined Treatment Plan. A key component to the success of the Muse Family's unlawful scheme was the Medical Wellness Medical Directors' participation, material misrepresentations, and concomitant disregard for their duties under the applicable law. Accordingly, Medical Wellness, the Muse Family, and Drs. Carrasco's and Coll's conduct violates, among other laws, the HCCA and the bills submitted to State Farm Fire and State Farm Mutual are unlawful and therefore noncompensable.

### E.    Unlawful Conduct at Pain Relief

170.    Pain Relief is yet another health care clinic unlawfully operated as part of the Muse Family's scheme. Pain Relief opened in 2010, and has since been purportedly owned by three separate paper owners, all with links to the Muse Family.

171.    The Muse Family also installed successive medical directors, Drs. Lorites and Gomez-Cortes ("Pain Relief Medical Directors") who, much like the medical directors at the other Muse Family clinics, were complicit in the unlawful and medically unnecessary treatment performed at Pain Relief and ignored their statutory obligations as medical directors.

172.    As is true at both Health & Wellness and Medical Wellness, medical directors at Pain Relief, implemented a Predetermined Treatment Plan and knowingly failed to provide the oversight mandated by the applicable Florida statutes and regulations.

173.    As a result of the foregoing, State Farm Mutual and State Farm Fire paid over $500,000.00 to Pain Relief.

### i.    Predetermined Treatment Plan at Pain Relief

174.    Between 2010 and 2016, Pain Relief treated 76 Insureds covered by State Farm Mutual or State Farm Fire No-Fault policies of insurance. *See* Pain Relief Predetermined Treatment Plan Summary Chart, a copy of which is attached as **Exhibit 33**.

175.    The Pain Relief Insureds range in age from 13 years old through 77 years old. These Insureds received treatment to address injuries purportedly sustained from automobile

34

Case 1:18-cv-23125-RNS  Document 159-3  Entered on FLSD Docket 10/30/2019  Page 35 of
110
Case 1:18-cv-23125-RNS  Document 6  Entered on FLSD Docket 08/03/2018  Page 35 of 59

accidents which include rear end accidents, side swipes, cars backing into cars, side impact collision and front impact collision.

176.    Insureds at Pain Relief purportedly received an initial examination.  Treating physicians completed initial evaluation reports ("Pain Relief Initial Evaluations") which purportedly document the subjective complaints of the Insured, the objective evaluation, the diagnosis, and relevant patient history.  No medical professional prepares an individually tailored treatment plan for an Insured, to specify treatment, set goals and track progress.

177.    Regardless of age or type of accident, the Pain Relief Initial Evaluations demonstrate that nearly 100% of Insureds purportedly reported subjective pain complaints in the cervical, thoracic, and lumbar regions of the spine.

178.    Of those Insureds, nearly roughly 95% also purportedly reported subjective pain complaints in an extremity.

179.    Pain Relief Initial Evaluations reflecting patients' subjective complaints do not include results of range of motion testing performed on the cervical, thoracic and lumbar regions of the spine for nearly 100% of the Insureds.

180.    Treating physicians at Pain Relief ordered x-rays on the first date of service for more than 95% of Insureds.  The results of said x-rays are not documented by the treating physician as impacting the first cycle of treatment provided to the patient.  For roughly 95% of Insureds, x-ray results are not noted in the records before the first follow-up evaluation (if at all), which for 80% of Insureds does not occur until at least the tenth visit. Even then, the x-ray results are not fully documented by the treating physician in any subsequent reports.  In fact, for over 95% of Insureds at Pain Relief, the medical records failed to reflect any treatment decisions based on the x-ray findings.

181.    Following the initial examination at Pain Relief, treating physicians at the Clinic purportedly complete a prescription for treatment ("Pain Relief Therapy Order") which is a combination of passive and active modalities to be performed by LMTs, who lack the requisite certification to perform at least some of these therapies.

182.    The Pain Relief Therapy Orders reflect that treating physicians at Pain Relief prescribed treatment to the cervical, thoracic, and lumbar spine for nearly 100% of Insureds during treatment.

183.    For nearly 100% of Insureds, the Pain Relief Therapy Orders fail to specify the time or units for each modality in the prescribed treatment.

184.    The Pain Relief Therapy Orders also show an excessive amount of treatment prescribed to Insureds at Pain Relief. To the extent treatment was performed, the treatment cycles prescribed by the two successive treating physicians at Pain Relief had the exact same frequency and duration, but for the first cycle, which varied slightly, as set forth below:

**First Cycle**

   a.    Dr. Emma de la Rosa prescribed over 95% of Insureds with treatment to be performed at least four times per week for two weeks during the first cycle.

   b.    Dr. Gomez-Cortes prescribed nearly 90% of Insureds with treatment to be performed at least four times per week for four weeks during the first cycle.

**Second Cycle**

   a.    Dr. Emma de la Rosa prescribed roughly 90% of Insureds with treatment to be performed at least three times per week for four weeks during the second cycle.

   b.    Dr. Gomez-Cortes prescribed over 90% of Insureds with treatment to be performed at least three times per week for four weeks during the second cycle.

**Third Cycle**

   a.    Dr. Emma de la Rosa prescribed over 95% of Insureds with treatment to be performed at least three times per week for three weeks during the third cycle.

36

      b.      Dr. Gomez-Cortes prescribed nearly 85% of Insureds with treatment to be performed at least three times per week for four weeks during the third cycle.

185.    Chiropractor Emma de la Rosa treated more than 50 Insureds. Of those Insureds, all but one evaluation (including the Initial Evaluation and, generally, two subsequent follow-up evaluations) included the following indication regarding the treatment frequency: "The patient will require care for a period of Four-Six-Eight weeks pending further evaluation." *See* **Exhibit 34**, Sample Initial Evaluation from Dr. de la Rosa. Dr. de la Rosa never indicates which of those three options applies to any subject Insured.

186.    When purported treatment is performed on a subject Insured, it is documented in a daily therapy note ("Pain Relief Daily Note"). For the first set of treatment records received by State Farm Mutual and State Farm Fire, which includes up to ten visits to Pain Relief, the Pain Relief Daily Notes for over 95% of Insureds are noted as complaining of "pain and tenderness" in the cervical, thoracic, and lumbar regions of the spine.

187.    Similarly, during the first set of treatment records received by State Farm Mutual and State Farm Fire, the Pain Relief Daily Notes reflect that over 95% of Insureds complain of "severe" and "constant" pain across all three regions of the spine, cervical, thoracic, and lumbar.

188.    Despite the fact that Pain Relief Therapy Orders are often confusing or otherwise unclear, the Pain Relief Daily Notes for nearly 80% of Insureds contain a hand-written indication that treatment is performed pursuant to the Pain Relief Therapy Order.

189.    In reality, none of the Insureds received treatment pursuant to the applicable Pain Relief Therapy Order (*i.e.*, over 97% of Insureds received therapy different than that which was set forth in the Therapy Order).

190.    After extensive treatment at Pain Relief, most Insureds are discharged with a final report. The physician supposedly documents his or her findings as to the Insured's condition in a final examination report ("Pain Relief Final Examination"). Pain Relief Final Examinations reflect

that over 95% of Insureds at Pain Relief who treat all the way through the three cycles receive a final impairment rating of 10% or less.

191.    Here, rather than abide by their statutory obligations, Drs. Lorites and Gomez-Cortes were complicit in the implementation of the Predetermined Treatment Plan and knowingly failed to discharge their duties. Drs. Lorites and Gomez-Cortes further misled State Farm Mutual and State Farm Fire by signing CMS 1500 forms. By doing so Drs. Lorites and Gomez-Cortes falsely represented that: the treatment reflected on the respective CMS 1500s was medically indicated and necessary, and was personally furnished by them or incident to their services and under their immediate supervision, and the signing medical director was the one who rendered the treatment. Those CMS 1500 forms were then transmitted to State Farm Mutual and State Farm Fire for payment, further misleading State Farm Fire and State Farm Mutual to believe that treatment at Pain Relief was medically necessary and lawfully rendered. In reliance on those misrepresentations, Plaintiffs made payments to Pain Relief for unlawfully rendered treatment.

**ii.    Pain Relief Employees Acknowledge Use of A Predetermined Treatment Plan**

192.    Pain Relief clinic employees provided testimony which confirms that the Clinic employs a Predetermined Treatment Plan. For example, when asked why a subject Insured's therapy changed over time, massage therapist Annalie Campa stated: "Because first is the first cycle, then the second cycle, and then the third cycle. And each one is with different treatments, as long as the patient improves." *See* Excerpts of A. Campa Dep. 53:12-54:4, July 13, 2016, attached as **Exhibit 35**. *Id.* Ms. Campa, who is specifically tasked with performing treatment consistent with a physician's prescription, testified that she could not decipher the therapy order forms containing the prescription. *Id.* at 31:9-35:3. Most of these forms are at least partially illegible. In addition, Ms. Campa noted one Insured's condition as "worse" on a patient's daily therapy notes from October through December 2014, yet continued to provide treatment. *Id.* at 65:16-67:25. She claimed that the repeated "worse" annotation as to the Insured's condition was an accident—despite the fact that the notation appeared on every single therapy note for months. *Id.* at 65:16-67:25.

38

Case 1:18-cv-23125-RNS Document 159-3 Entered on FLSD Docket 10/30/2019 Page 39 of
110
Case 1:18-cv-23125-RNS Document 6 Entered on FLSD Docket 08/03/2018 Page 39 of 59

193.    Similarly, front desk employee Diana Hernandez provided testimony demonstrating the existence of a Predetermined Treatment Plan at Pain Relief. Ms. Hernandez described the "normal procedure" for treating patients at Pain Relief as: on the first day, the patient comes to Pain Relief, sees the physician, receives an x-ray and then gets therapy. *See* Excerpts of D. Hernandez Dep., 53:11-54:20, November 13, 2015, attached as **Exhibit 36**.

### iii.    The Pain Relief Medical Directors Failed to Perform Their Statutory Duties and Provide Day-to-Day Supervision

194.    Like the medical directors at the other Muse Clinics, each of the Pain Relief Medical Directors also separately purportedly served as medical director or provided treatment at many other facilities.

195.    Dr. Lorites was a medical director at five health care clinics—including Pain Relief—while he served as medical director at Pain Relief. *See* AHCA Chart of Dr. Lorites medical directorships attached as **Exhibit 37**.

196.    Concurrently, Dr. Lorites provided services at Lorites Medical Group, located at 8300 West Flagler St., Suite 112, Miami, Florida 33144. *See* June 15, 2010 Application for Health Care Clinic Licensure attached as **Exhibit 38**. The location of the practice is approximately an hour from Pain Relief's location in Homestead, Florida.

197.    Additionally, Dr. Lorites worked as a supervising physician at Center for Family Medicine Corp. located at 10210 Nicaragua Drive, Miami, Florida 33189. *Id.*

198.    Like Dr. Lorites, Dr. Gomez-Cortes serves as medical director at numerous health care clinics. In fact, Dr. Gomez-Cortes served as medical director at nine separate health care clinics, for various periods of time, during his tenure as medical director at Pain Relief. *See* AHCA Chart of Dr. Gomez-Cortes medical directorships attached as **Exhibit 39**.

199.    Currently, he is the medical director at three separate clinics in addition to Pain Relief. Like Dr. Lorites, some of these clinics are located approximately an hour away from Pain Relief's location in Homestead, Florida.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

200.    Since 2004, Dr. Gomez-Cortes has served as medical director at over fifty (50) health care clinics in South Florida. *Id.*

## IV.    RECORD KEEPING VIOLATIONS AT EACH CLINIC

201.    The medical directors at each of the Muse Clinics also failed to fulfill their obligations under the Medical Director Statute to serve as records custodian of the medical records at each Clinic.

202.    Under Florida law medical directors, as records custodians, must ensure that medical records be maintained in English, in a legible manner, and with sufficient detail to demonstrate why the course of treatment was undertaken. Additionally, the medical record must contain enough information to: identify the patient; support the diagnosis; and justify the treatment and document the course and results of treatment accurately. Fla. Admin. Code r. 64B8-9.003(3).

203.    At each Muse Clinic, however, the Initial Evaluations purportedly documenting the initial examination of an Insured in reality conflict with other medical records and generally lack sufficient details regarding the Insureds' subjective and objective condition.

204.    For example, the Initial Evaluations often lack results of objective testing performed to confirm an Insured's subjective pain complaints. Likewise, the Initial Evaluations at times prescribe "gait training" without any supporting indication of an abnormal gait. Also, there are instances where the subjective pain complaints reflected in the Initial Evaluation conflict with the subjective pain complaints reflected in the Daily Note pertaining to therapy rendered on the very same day as the Initial Evaluation.

205.    Following the initial evaluation, the treating physician at each Muse Clinic generally prepares a prescription for treatment, *i.e.*, the Therapy Order.[7]

206.    The Therapy Orders used by the Muse Clinics are just as problematic as the Initial Evaluations. For example, the Therapy Orders often fail to specify which modality being prescribed should be performed on which body part. As testimony from Pain Relief LMT Annalie

---

[7]  For Pain Relief, Dr. Emma de la Rosa used a form called an "Assessment Form" that contained the same information.

Campa demonstrates, the manner in which Therapy Orders are completed is so confusing that she was unable to decipher what modalities she was to perform when reviewing one during a deposition. *See* **Exhibit 35** at 31:9-35:2.

207.    Moreover, there are numerous instances where the Therapy Order conflicts with the Initial Evaluation in that the Initial Evaluation includes a therapy "prescription" that prescribes different modalities than what was ultimately included in the Therapy Order.

208.    In addition, the Daily Notes, which should document the Insured's condition and the treatment performed on a specific visit, are replete with inconsistencies and often times are illegible.

209.    For example, the Daily Notes generally have a portion for handwritten notes regarding the patient's condition and progress in the treatment. This portion of the Daily Note is often illegible, and when the hand-written words can be deciphered, they appear to be stock phrases purportedly describing the Insured's condition or progress.

210.    Indeed, a single Daily Note sometimes includes an annotation that the Insured is "responding positively to treatment" but also an indication (usually via check-mark) that the Insured's condition is worse. *See* Exemplar Therapy Notes from J. H. Claim File, attached as **Exhibit 40**.

211.    Similarly, many Daily Notes contain an indication that an Insured's treatment was performed pursuant to the "therapy order" but the same Daily Note will also reflect treatment being performed that is not consistent with the prescribing physician's applicable Therapy Order. *See* Exemplar Therapy Notes from M. H. Claim File, attached as **Exhibit 41**.

212.    These deficiencies are more than just excusable errors or unintentional sloppiness. Instead, these deficiencies reflect systematic disregard for the proper documentation of patient care sufficient to satisfy Florida's recordkeeping requirements. The responsibility to maintain records properly and oversee the documentation of treatment rested with the clinic medical director.

41

213. None of the six medical directors across the three Muse Clinics complied with their obligations as medical records owners, and therefore violated Florida's Medical Director Statute and Health Care Clinic Act.

V. **CLAIMS FOR RELIEF**

**Count I – Common Law Fraud**
**(Against Health & Wellness, Beatriz Muse, Lazaro Muse, Hugo Goldstraj, M.D., and Manuel Franco, M.D.)**

214. State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

215. In the claims set forth in **Exhibits 42 and 43**, Defendants the Health & Wellness, Beatriz and Lazaro Muse, and the Health & Wellness Medical Directors (the "Health & Wellness Defendants") knowingly made false and fraudulent statements of material fact to State Farm Fire and State Farm Mutual by submitting, or causing to be submitted, hundreds of bills and supporting documentation that contained false and fraudulent representations of material fact related to the treatment of Insureds in order to induce payment from State Farm Fire and State Farm Mutual.

216. The false and fraudulent representations of material fact include that: (a) the services were performed, were medically necessary, and were lawfully rendered, as required by the No-Fault Laws, when they are not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they are not; (c) patients were legitimately diagnosed with, among other things, sprains and/or strains of the cervical, thoracic, and/or lumbar regions of the spine, as well as an injury to an extremity, when they are not; (d) patients received treatment that was medically necessary, when in fact it was not because the treatment was performed pursuant to the Predetermined Treatment Plan; (e) x-rays were indicated and ordered for patients because they were medically necessary, when in fact they were performed pursuant to the Predetermined Treatment Plan; and (f) the Health & Wellness Medical Directors complied with their duties under Florida law to (i) conduct systematic reviews of Health & Wellness' bills to ensure they were not fraudulent or unlawful; (ii) take immediate, corrective action upon discovery of an unlawful charge at their respective clinics; (iii) provide day-to-day supervision and oversight

42

of the Clinic; (iv) properly ensure that all employees provided treatment within the scope of their respective certification; and (v) properly ensure that medical records were in substantial compliance with Florida laws, which the Health & Wellness Medical Directors failed to do.

217.    The    Health & Wellness    Defendants    knew    that    the    above-described misrepresentations made to State Farm Fire and State Farm Mutual were false and fraudulent when they were made.

218.    The Health & Wellness Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

219.    State    Farm    Mutual    and    State    Farm    Fire    relied    on    these    Defendants' misrepresentations.

220.    As a result of their reliance, State Farm Mutual and State Farm Fire have incurred damages of over $2 million that they paid to Health & Wellness as set forth on **Exhibits 42** and **43**.[8]

221.    The Health & Wellness Defendants are jointly and severally liable for the misrepresentations made to State Farm Mutual and State Farm Fire because they each played an essential role working in concert to further the unlawful, fraudulent scheme.

222.    The Health & Wellness Defendants actively and purposefully concealed their actions from State Farm Mutual and State Farm Fire by, among other things, filing documents with AHCA purporting to comply with medical director requirements at Health & Wellness; creating the appearance of compliance with the HCCA; and inducing Plaintiffs to believe that Health & Wellness provided medically necessary treatment to insureds such that Defendants bills were compensable under the Florida No-Fault laws.  Due to such concealment, State Farm Fire and

---

[8] **Exhibit 43** only relates to Plaintiffs' payments for patients who were not treated pursuant to the Predetermined Treatment Plan, but who had other miscellaneous treatment. These charges are non-compensable because of Health & Wellness' violations of the HCCA.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

State Farm Mutual could not have reasonably discovered that their damages were attributable to fraud until shortly before it filed this Amended Complaint.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Health & Wellness Defendants, jointly and severally, for compensatory damages, and any other relief the Court deems equitable, just, and proper.

### Count II – Common Law Fraud
### (Against Medical Wellness, Beatriz Muse, Lazaro Muse, Noel Santos, Angel Carrasco, M.D. and Jorge Coll, M.D.)

223.   State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

224.   In the claims set forth in **Exhibits 44 and 45**, Defendants Medical Wellness, the Muse Family, and the Medical Wellness Medical Directors (the "Medical Wellness Defendants") knowingly made false and fraudulent statements of material fact to State Farm Fire and State Farm Mutual by submitting, or causing to be submitted, hundreds of bills and supporting documentation that contained false and fraudulent representations of material fact related to the treatment of Insureds in order to induce payment from State Farm Fire and State Farm Mutual.

225.   The false and fraudulent representations of material fact include that: (a) the services were performed, were medically necessary, and were lawfully rendered, as required by the No-Fault Laws, when they are not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they are not; (c) patients were legitimately diagnosed with, among other things, sprains and/or strains of the cervical, thoracic, and/or lumbar regions of the spine, as well as an injury to an extremity, when they are not; (d) patients received treatment that was medically necessary, when in fact it was not, because the treatment was performed pursuant to the Predetermined Treatment Plan; (e) x-rays were indicated and ordered for patients because they were medically necessary, when in fact they were performed pursuant to the Predetermined Treatment Plan; and (f) the Medical Wellness Medical Directors complied with their duties under Florida law to (i) conduct systematic reviews of Medical Wellness' bills to

44

ensure they were not fraudulent or unlawful; (ii) take immediate, corrective action upon discovery of an unlawful charge at their respective clinics; (iii) provide day-to-day supervision and oversight of the Clinic; (iv) properly ensure that all employees provided treatment within the scope of their respective certification; and (v) properly ensure that medical records were in substantial compliance with Florida laws, which the Medical Wellness Medical Directors failed to do.

226.    The   Medical   Wellness   Defendants   knew   that   the   above-described misrepresentations made to State Farm Fire and State Farm Mutual were false and fraudulent when they were made.

227.    The Medical Wellness Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

228.    State   Farm   Mutual   and   State   Farm   Fire   relied   on   these   Defendants' misrepresentations.

229.    As a result of their reliance, State Farm Mutual and State Farm Fire have incurred damages of over $1.5 million that they paid to Medical Wellness as set forth on **Exhibits 44** and **45**.[9]

230.    The Medical Wellness Defendants are jointly and severally liable for the misrepresentations made to State Farm Mutual and State Farm Fire because they each played an essential role working in concert to further the unlawful, fraudulent scheme.

231.    The Medical Wellness Defendants actively and purposefully concealed their actions from State Farm Mutual and State Farm Fire by, among other things, filing documents with AHCA purporting to comply with medical director requirements at Medical Wellness; creating the appearance of compliance with the HCCA; and inducing Plaintiffs to believe that Medical Wellness provided medically necessary treatment to insureds such that Defendants bills were

---

[9] **Exhibit 45** only relates to Plaintiffs' payments for patients who were not treated pursuant to the Predetermined Treatment Plan, but who had other miscellaneous treatment.  These charges are non-compensable because of Medical Wellness' violations of the HCCA.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

compensable under the Florida No-Fault laws. Due to such concealment, State Farm Fire and State Farm Mutual could not have reasonably discovered that their damages were attributable to fraud until shortly before it filed this Amended Complaint.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Medical Wellness Defendants, jointly and severally, for compensatory damages, and any other relief the Court deems equitable, just, and proper.

## Count III – Common Law Fraud
**(Against Pain Relief, Beatriz Muse, Lazaro Muse; Jesus Lorites, M.D., and Jose Gomez-Cortes, M.D.)**

232. State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

233. In the claims set forth in **Exhibit 46**, Defendants Pain Relief, Beatriz Muse, Lazaro Muse, and the Pain Relief Medical Directors ("Pain Relief Defendants") knowingly made false and fraudulent statements of material fact to State Farm Fire and State Farm Mutual by submitting, or causing to be submitted, hundreds of bills and supporting documentation that contained false and fraudulent representations of material fact related to the treatment of Insureds.

234. The false and fraudulent representations of material fact include that: (a) the services were performed, were medically necessary, and were lawfully rendered, as required by the No-Fault Laws, when they are not; (b) patients were legitimately examined to determine the true nature and extent of their injuries, when they are not; (c) patients were legitimately diagnosed with, among other things, sprains and/or strains of the cervical, thoracic, and/or lumbar regions of the spine, as well as an injury to an extremity, when they are not; (d) patients received treatment that was medically necessary, when in fact it was not because the treatment was performed pursuant to the Predetermined Treatment Plan; (e) x-rays were indicated and ordered for patients because they were medically necessary, when in fact they were performed pursuant to the Predetermined Treatment Plan; and (f) the Pain Relief Medical Directors complied with their duties under Florida law to (i) conduct systematic reviews of Pain Relief's bills to ensure they

46

were not fraudulent or unlawful; (ii) take immediate, corrective action upon discovery of an unlawful charge at their respective clinics; (iii) provide day-to-day supervision and oversight of the Clinic; (iv) properly ensure that all employees provided treatment within the scope of their respective certification; and (iv) properly ensure that medical records were in substantial compliance with Florida laws, which the Pain Relief Medical Directors failed to do.

235.    The Pain Relief Defendants knew that the above-described misrepresentations made to State Farm Fire and State Farm Mutual were false and fraudulent when they were made.

236.    The Pain Relief Defendants made the above-described misrepresentations and engaged in such conduct to induce State Farm Mutual and State Farm Fire into relying on the misrepresentations.

237.    State Farm Mutual and State Farm Fire relied on these Defendants' misrepresentations.

238.    As a result of their reliance, State Farm Mutual and State Farm Fire have incurred damages of over $500,000.00 that they paid to Pain Relief as set forth in **Exhibit 46**.

239.    The Pain Relief Defendants are jointly and severally liable for the misrepresentations made to State Farm Mutual and State Farm Fire because they each played an essential role acting in concert to further the unlawful fraudulent scheme.

240.    The Pain Relief Defendants actively and purposefully concealed their actions from State Farm Mutual and State Farm Fire by, among other things, filing documents with AHCA purporting to comply with medical director requirements at Pain Relief; creating the appearance of compliance with the HCCA; and inducing Plaintiffs to believe that Pain Relief provided medically necessary treatment to insureds such that Defendants bills were compensable under the Florida No-Fault laws.  Due to such concealment, State Farm Fire and State Farm Mutual could not have reasonably discovered that their damages were attributable to fraud until shortly before it filed this Amended Complaint.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

Case 1:18-cv-23125-RNS  Document 159-3  Entered on FLSD Docket 10/30/2019  Page 48 of
110
Case 1:18-cv-23125-RNS  Document 6  Entered on FLSD Docket 08/03/2018  Page 48 of 59

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Pain Relief Defendants, jointly and severally, for compensatory damages, and any other relief the Court deems equitable, just, and proper.

## Count IV – Violation of the Florida Deceptive and Unfair Practices Act
### (Against Health & Wellness, Beatriz Muse, Lazaro Muse, Hugo Goldstraj, M.D., and Manuel Franco, M.D.)

241. State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

242. In each claim described in Exhibits 42 and 43, the Health & Wellness Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 502.201, *et seq.* ("FDUTPA").

243. The Health & Wellness Defendants' unfair and deceptive practices include representing that:

    a.    The services were performed, they were medically necessary, and they were lawfully rendered, as required by the No Fault Laws, when they were not;

    b.    Patients were legitimately examined to determine the true nature and extent of their injuries, when they were not;

    c.    Patients were legitimately diagnosed with, among other things, sprains and/or strains of the cervical, thoracic, and/or lumbar regions of the spine, as well as tenderness, when they were not;

    d.    Patients received treatment that was medically necessary, when in fact the treatment was performed pursuant to the Predetermined Treatment Plan;

    e.    X-rays were indicated and ordered for patients because they were medically necessary, when in fact they were performed pursuant to the Predetermined Treatment Plan and the results were not considered in connection with the treatment of Insureds; and

    f.    The Health & Wellness Medical Directors complied with their duties under Florida law to (i) conduct systematic reviews of the Health & Wellness' bills to ensure they were not fraudulent or unlawful, (ii) take immediate, corrective action upon discovery of an unlawful charge at their respective clinics, (iii) provide day-to-day supervision and oversight of the Clinic;

48

(iv) properly ensure that all employees provided treatment within the scope of their respective certification;  and (v) properly ensure that medical records were in substantial compliance with Florida laws, when in fact they failed to perform all of the foregoing.  In addition, the Health & Wellness Defendants filed forms with AHCA representing that the medical directors were properly satisfying their mandatory obligations set forth in the HCCA.

244.    Florida Statute § 626.9541 defines knowingly presenting or causing to be presented "a false claim for payment to any insurer" as an "unfair or deceptive act." Fla. Stat. § 626.9541(1)(u).

245.    Similarly, Florida Statute § 817.234 states that a person commits insurance fraud if that person "with the intent to injure, defraud, or deceive any insurer: (1) [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." *See* Fla. Stat. § 817.234(1)(a)(1).

246.    The Health & Wellness Defendants knowingly presented or caused to be presented a false claim for payment in violation of Fla. Stat. § 626.9541 and § 817.234, each time they presented or caused to be presented charges for services that were not medically necessary and/or not lawful when they were rendered.  Accordingly, this conduct is *per se* unfair and deceptive under FDUTPA.

247.    In addition, the Health & Wellness Defendants' above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing that the charges were medically necessary and lawful when they were rendered.

248.    Further, the Health & Wellness Defendants' above-described conduct was unfair. The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.

249. The Health & Wellness Defendants are jointly and severally liable for the false claims submitted to State Farm Mutual and State Farm Fire because they each played an essential role acting in concert to further the unlawful scheme.

250. As a result of the Health & Wellness Defendants' deceptive and unfair practices, State Farm Mutual and State Farm Fire suffered actual damages in excess of $2 million.

251. State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 502.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in their favor and award compensatory damages in an amount to be proven at trial, interest thereon, attorney's fees, and costs against the Health & Wellness Defendants, jointly and severally, and grant such other relief as the Court deems just and appropriate.

## Count V – Violation of the Florida Deceptive and Unfair Practices Act
### (Against Medical Wellness, Beatriz Muse, Lazaro Muse, Noel Santos, Angel Carrasco, M.D. and Jorge Coll, M.D.)

252. State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

253. In each claim described in **Exhibits 44 and 45**, the Medical Wellness Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 502.201, *et seq.* ("FDUTPA").

254. The Medical Wellness Defendants' unfair and deceptive practices include representing that:

    a. The services were performed, they were medically necessary, and they were lawfully rendered, as required by the No Fault Laws, when they were not;

    b. Patients were legitimately examined to determine the true nature and extent of their injuries, when they were not;

    c. Patients were legitimately diagnosed with, among other things, sprains and/or strains of the cervical, thoracic, and/or lumbar regions of the spine, as well as tenderness, when they were not;

50

    d.  Patients received treatment that was medically necessary, when in fact the treatment was performed pursuant to the Predetermined Treatment Plan;

    e.  X-rays were indicated and ordered for patients because they were medically necessary, when in fact they were performed pursuant to the Predetermined Treatment Plan and their results were not considered in connection with treatment of the Insuredsl; and

    f.  The Medical Wellness Medical Directors complied with their duties under Florida law to (i) conduct systematic reviews of the Medical Wellness' bills to ensure they were not fraudulent or unlawful, (ii) take immediate, corrective action upon discovery of an unlawful charge at their respective clinics, (iii) provide day-to-day supervision and oversight of the Clinic; (iv) properly ensure that all employees provided treatment within the scope of their respective certification; and (v) properly ensure that medical records were in substantial compliance with Florida laws, when in fact they failed to perform all of the foregoing. In addition, the Medical Wellness Defendants filed forms with AHCA representing that the medical directors were properly satisfying their mandatory obligations set forth in the HCCA.

255.    Florida Statute § 626.9541 defines knowingly presenting or causing to be presented "a false claim for payment to any insurer" as an "unfair or deceptive act." Fla. Stat. § 626.9541(1)(u).

256.    Similarly, Florida Statute § 817.234 states that a person commits insurance fraud if that person "with the intent to injury, defraud, or deceive any insurer: (1) [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." *See* Fla. Stat. § 817.234(1)(a)(1).

257.    The Medical Wellness Defendants knowingly presented or caused to be presented a false claim for payment in violation of Fla. Stat. § 626.9541 and § 817.234, each time they presented or caused to be presented charges for services that were not medically necessary and/or not lawful when they were rendered. Accordingly, this conduct is *per se* unfair and deceptive under FDUTPA.

258. In addition, the Medical Wellness Defendants' above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing that the charges were medically necessary and lawful when they were rendered.

259. Further, the Medical Wellness Defendants' above-described conduct was unfair. The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.

260. The Medical Wellness Defendants are jointly and severally liable for the false claims submitted to State Farm Mutual and State Farm Fire because they each played an essential role acting in concert to further the unlawful scheme.

261. As a result of the Medical Wellness Defendants' deceptive and unfair practices, State Farm Mutual and State Farm Fire suffered actual damages in excess of $1.5 million.

262. State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 502.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in their favor and award compensatory damages in an amount to be proven at trial, interest thereon, attorney's fees, and costs against the Medical Wellness Defendants, jointly and severally, and grant such other relief as the Court deems just and appropriate.

### Count VI – Violation of the Florida Deceptive and Unfair Practices Act
### (Against Pain Relief, Beatriz Muse, Lazaro Muse, Jesus Lorites, M.D. and Jose Gomez-Cortes, M.D.)

263. State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

264. In each claim described in **Exhibit 46**, the Pain Relief Defendants engaged in unfair and deceptive acts and practices in the conduct of trade and commerce, in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 502.201, *et seq.* ("FDUTPA").

52

265. The Pain Relief Defendants' unfair and deceptive practices include representing that:

a. The services were performed, they were medically necessary, and they were lawfully rendered, as required by the No Fault Laws, when they were not;

b. Patients were legitimately examined to determine the true nature and extent of their injuries, when they were not;

c. Patients were legitimately diagnosed with, among other things, sprains and/or strains of the cervical, thoracic, and/or lumbar regions of the spine, as well as tenderness, when they were not;

d. Patients received treatment that was medically necessary, when in fact the treatment was performed pursuant to the Predetermined Treatment Plan;

e. X-rays were indicated and ordered for patients because they were medically necessary, when in fact they were performed pursuant to the Predetermined Treatment Plan and their results were not considered in connection with treatment of the Insureds; and

f. The Pain Relief Medical Directors complied with their duties under Florida law to (i) conduct systematic reviews of the Pain Relief's bills to ensure they were not fraudulent or unlawful, (ii) take immediate, corrective action upon discovery of an unlawful charge at their respective clinics, (iii) provide day-to-day supervision and oversight of the Clinic; (iv) properly ensure that all employees provided treatment within the scope of their respective certification; and (v) properly ensure that medical records were in substantial compliance with Florida laws, when in fact they failed to perform all of the foregoing. In addition, the Pain Relief Defendants filed forms with AHCA representing that the medical directors were properly satisfying their mandatory obligations set forth in the HCCA.

266. Florida Statute § 626.9541 defines knowingly presenting or causing to be presented "a false claim for payment to any insurer" as an "unfair or deceptive act." Fla. Stat. § 626.9541(1)(u).

267. Similarly, Florida Statute § 817.234 states that a person commits insurance fraud if that person "with the intent to injury, defraud, or deceive any insurer: (1) [p]resents or causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy or a health maintenance organization subscriber or provider

contract, knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim." *See* Fla. Stat. § 817.234(1)(a)(1).

268.   The Pain Relief Defendants knowingly presented or caused to be presented a false claim for payment in violation of Fla. Stat. § 626.9541 and § 817.234, each time they presented or caused to be presented charges for services that were not medically necessary and/or not lawful when they were rendered.   Accordingly, this conduct is *per se* unfair and deceptive under FDUTPA.

269.   In addition, the Pain Relief Defendants' above-described conduct was deceptive in that it was likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment by representing that the charges were medically necessary and lawful when they were rendered.

270.   Further, Pain Relief Defendants' above-described conduct was unfair.  The conduct was contrary to Florida public policy and was unconscionable, immoral, unethical, oppressive, and unscrupulous.

271.   The Pain Relief Defendants' are jointly and severally liable for the false claims submitted to State Farm Mutual and State Farm Fire because they each played an essential role acting in concert to further the unlawful scheme.

272.   As a result of the Pain Relief Defendants' deceptive and unfair practices, State Farm Mutual and State Farm Fire suffered actual damages in excess of $500,000.00.

273.   State Farm Mutual and State Farm Fire seek an award of attorney's fees pursuant to Florida Statutes § 502.2105(1).

WHEREFORE, State Farm Mutual and State Farm Fire respectfully request this Court to enter judgment in their favor and award compensatory damages in an amount to be proven at trial, interest thereon, attorney's fees, and costs against the Pain Relief Defendants, jointly and severally, and grant such other relief as the Court deems just and appropriate.

## Count VII – Unjust Enrichment
### (Against Health & Wellness, Beatriz Muse, Lazaro Muse, Hugo Goldstraj, M.D. and Manuel Franco, M.D.)

274. State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

275. In each claim described in **Exhibits 42 and 43**, State Farm Mutual and State Farm Fire conferred a benefit upon Health & Wellness by paying money to Health & Wellness.

276. State Farm Mutual's and State Farm Fire's payments to Health & Wellness were distributed to Beatriz Muse, Lazaro Muse, and the Health & Wellness Medical Directors, who used Health & Wellness as a pass-through entity to profit off of Insureds' No-Fault Benefits.

277. The Health & Wellness Defendants voluntarily accepted and retained the benefit of Plaintiffs' payments.

278. Health & Wellness, Beatriz Muse, Lazaro Muse, and the Health & Wellness Medical Directors are jointly and severally liable for orchestrating the scheme to generate and submit medical bills that were the product of an unlawful and fraudulent scheme to State Farm Mutual and State Farm Fire, which induced State Farm Mutual and State Farm Fire to confer benefits on the Health & Wellness Defendants. Each of the Health & Wellness Defendants played an essential role as the orchestrators of the unlawful and fraudulent scheme described above.

279. Because these Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services that were not medically necessary and/or not lawful when they were rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

280. As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and the Health & Wellness Defendants have been unjustly enriched by more than $2 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Health & Wellness Defendants, jointly and severally, for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

### Count VIII – Unjust Enrichment
**(Against Medical Wellness, Beatriz Muse, Lazaro Muse, Noel Santos, Angel Carrasco, M.D. and Jorge Coll, M.D.)**

281.　State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

282.　In each claim described in **Exhibits 44 and 45**, State Farm Mutual and State Farm Fire conferred a benefit upon Medical Wellness by paying money to Medical Wellness.

283.　State Farm Mutual's and State Farm Fire's payments to Medical Wellness were distributed to the Muse Family, and the Medical Wellness Medical Directors, who used Medical Wellness as a pass-through entity to profit off of Insureds' No-Fault Benefits.

284.　The Medical Wellness Defendants voluntarily accepted and retained the benefit of Plaintiffs' payments.

285.　Because the Medical Wellness Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services that were not medically necessary and/or not lawful when they were rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

286.　Medical Wellness, the Muse Family, and the Medical Wellness Medical Directors are jointly and severally liable for orchestrating the scheme to generate and submit medical bills that were the product of an unlawful and fraudulent scheme to State Farm Mutual and State Farm Fire, which induced State Farm Mutual and State Farm Fire to confer benefits on the Medical Wellness Defendants. Each of the Medical Wellness Defendants played an essential role as the orchestrators of the unlawful and fraudulent scheme described above.

287.　As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and Defendants Medical Wellness, the Muse Family, and the Medical Wellness Medical Directors have been unjustly enriched by more than $1.5 million.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Medical Wellness Defendants, jointly and severally, for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

**Count IX – Unjust Enrichment**
**(Against Pain Relief, Beatriz Muse, Lazaro Muse, Jesus Lorites, M.D. and Jose Gomez-Cortes, M.D.)**

288.    State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

289.    In each claim described in **Exhibit 46**, State Farm Mutual and State Farm Fire conferred a benefit upon Pain Relief by paying money to Pain Relief.

290.    State Farm Mutual's and State Farm Fire's payments to Pain Relief were distributed to Beatriz Muse, Lazaro Muse, and the Pain Relief Medical Directors, who used Pain Relief as a pass-through entity to profit off of Insureds' No-Fault Benefits.

291.    The Pain Relief Defendants voluntarily accepted and retained the benefit of Plaintiffs' payments.

292.    Because the Pain Relief Defendants knowingly submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire charges for services that were not medically necessary and/or not lawful when they were rendered, the circumstances are such that it would be inequitable to allow them to retain the benefit of the monies paid.

293.    Pain Relief, Beatriz Muse, Lazaro Muse, and the Pain Relief Medical Directors are jointly and severally liable for orchestrating the scheme to generate and submit medical bills that were the product of an unlawful and fraudulent scheme to State Farm Mutual and State Farm Fire, which induced State Farm Mutual and State Farm Fire to confer benefits on the Pain Relief Defendants. Each of the Pain Relief Defendants played an essential role as the orchestrators of the unlawful and fraudulent scheme described above.

294.    As a direct and proximate result of the above-described conduct, State Farm Mutual and State Farm Fire have been damaged and the Pain Relief Defendants have been unjustly enriched by more than $500,000.00.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against the Pain Relief Defendants, jointly and severally, for compensatory damages plus interest and costs and for such other relief as the Court deems equitable, just, and proper.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

### Count X – Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 *et seq.* (Against the Muse Clinics)

295.    State Farm Mutual and State Farm Fire incorporate, adopt and re-allege as though fully set forth herein, each and every allegation in Paragraphs 1 through 213 above.

296.    There is an actual case or controversy between State Farm Mutual and State Farm Fire as to all claims and charges that the Muse Clinics have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire for No-Fault Benefits, which remain pending. *See* **Exhibits 47, 48, 49, 50 and 51**. To the extent that any such claims and charges are for services that were not medically necessary and/or not lawfully rendered and are pending through the date of this Amended Complaint and the trial of this case, State Farm Mutual and State Farm Fire contend that no such claims and charges are owed.

297.    Because the Muse Clinics have submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire bills and supporting documentation that were false and contained fraudulent statements, and otherwise engaged in the above-described fraudulent and/or unlawful conduct, the Muse Clinics are not entitled to reimbursement for any claims and charges submitted to State Farm Mutual and State Farm Fire to date and through the trial of this case.

298.    There is a *bona fide*, present, and practical need for a declaration as to all such claims and charges.

WHEREFORE, State Farm Mutual and State Farm Fire seek a judgment declaring that all outstanding unpaid claims and charges that the Muse Clinics submitted, or caused to be submitted, to State Farm Mutual and State Farm Fire for No-Fault and MPC Benefits to date and through the trial of this case are not owed.

### JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury.

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

Dated: August 3, 2018.

By: _/s/ Brad McPherson_

DAVID SPECTOR
Fla. Bar No. 086540
david.spector@akerman.com
BRAD MCPHERSON
Fla. Bar No. 017395
brad.mcpherson@akerman.com
CAITLIN SALADRIGAS
Fla. Bar No. 095728
caitlin.saladrigas@akerman.com
**AKERMAN LLP**
777 South Flagler Drive
Suite 1100, West Tower
West Palm Beach, Florida 33401
Telephone: (561) 653-5000
Facsimile: (561) 659-6313

45985452v1

AKERMAN LLP, 777 SOUTH FLAGLER DRIVE, SUITE 1100, WEST TOWER, WEST PALM BEACH, FL 33401

# CURRICULUM VITAE

Hugo David Goldstraj, M.D

**Licensure and Certification**
**State of Florida: ME58165**
**DEA: FG1803988**

## Education and Training:

*Jun/2002 – Dec/2003*

Masters in Business Administration, Florida International University

*Jul/1988 – Jun/1990*

Pediatric Residency Program, Buffalo Children's Hospital State University of New York at Buffalo, New York.

*Jul/1988 – Jun/1990*

Pediatric Internship and Residency, Driscoll Foundation Children Hospital University of Texas Galveston Branch. ( Corpus Christy Texas)

*Jul/1985 –.Jun/1988*

Fellowship in Cardiovascular Surgery and Cardiovascular Disease, University of Texas at

Huston Texas Heart and Texas Children Hospital.

*Jul/1981 – Dec/1981*

Surgery and Treatment of the Vascular Diseases of the Skin, Laser Surgery, Mount Sinai Hospital Harvard University.

*Jul/1978 – Jul/1979*

Fellowship in Pediatric Cardiovascular Disease, Cardiovascular Surgery, and Intensive Care, Chaim Sheeba Medical Center University of Tel Aviv,

State of Israel Tel Hashomer Hospital.

*Jun/1970 – Jun/1975*

General Surgery Residency and Cardiovascular Surgery, Ramos Mejia Hospital, Durand Hospital State University of Buenos Aires, Argentina.

*Sep/1963 – Dec/1969*

Medical Doctor, Graduated with Honors.

*Mar/1960 – Dec/1963*

Bachelor in Sciences with a major in Psychology, University of Buenos Aires, Argentina.

## Certifications:

- Board; 1, 2, 3 VQE (Visa Qualifaing Examination)

- Federal License Examination Flex

- EFCMG

- American Board of Pediatrics



**Licensures:**

- Medical License of Florida.

- Medical License of Texas.

- Medical License of the State of Israel.

- Medical License of the Argentinean Republic.

- Board Certified of American Board of Pediatrics.

**Hospital Affiliations: past**

- Memorial Pembroke Hospital.

- Pembroke Pines Hospital.

- Aventura Hospital.

**Professional Experience:**

*Mar/2006 – Present:*
Exclusive Health Systems, INC. Principal Investigator.
*Jan/1999 – Present:*
Medical Director of the Medical Centers in South Florida. Private Practice of Pediatrics, Cardiology and General Medicine. Specialist in Cardiovascular and Respiratory Disease. Research in Cardiology, Coronary Disease, Complex Image Early Detection, and Follow-up.
*Aug/1994 – Feb/1999*
Chairman of Pediatrics of Adventure Hospital.
*Jun/1993 – Jun/1998*
Vice Chairman of Pediatrics of the Cedars Medical Center.
*Jun/1995 – Jun/2000*
Chairman of Pediatrics in Pembroke Pines Hospital.
*Dec/1991 – Present*
Private Practice.
*Aug/1978 – Nov/1982*
Vice Chairman of Cardiovascular Surgery, Children Hospital, Buenos Aires, Argentina.
*Jun/1974 – Jun/1977*
Cardiovascular surgeons, attending and director of the residency program at Duran Hospital, Buenos Aires, Argentina.

**Academics Appointments:**

- Instructor of Medicine and Pediatrics to the Physician Assistant Program of Miami Dade College.
- Instructor of Pediatrics of the School of Medicine at the State University of New

York, Buffalo.

- Director of the Cardiovascular Surgery Residency Program at the University of

Buenos Aires School of Medicine at the Buenos Aires Children Hospital.

- Instructor of General Surgery at the University of Buenos Aires School of

Medicine, Duran Hospital and Ramos Mejia Hospital.

## Clinical Research Experience:

- Patent Ducts Arteriosum, 90 cases, approach through the extra-pleural 1982,

South American Cardiology Society Congress.

- Treatments of the Coarctation of the Aorta, the Subclavian Flap as a Patch.

Cardiology Society Convention, Argentina.

- Heart Failure in Children. 1990, presented in Cardiology, University of New York

at Buffalo.

- None-Invasive Assessment of Coronary Stents by Spiral CT-Scan and Advance

Reconstruction. Miguel Garber M.D and Hugo Goldstraj, M.D. European

Conference on Management of the Coronary Artery Disease, Nice, France 2002.

- M Garber M.D. and Hugo D. Godstraj M.D Regression of an Atherosclerotic

Coronary Artery Plaque demonstrated by multi pea slice spiral computer

tomography in patients with stable Angina Pectoris and taking stains. European

Society of Cardiology meeting. Spain 2004, First price to original research.

- A Multicenter, randomized, double-blind Parallel Arm. Study to evaluate the

  effects of XXX and XXX in Postmenopausal Women with Osteoporosis.

- Phase randomized double-Placebo Trial to evaluate safety and efficacy of XXX in

  DM2.

- A randomized, double-Blind Parallel study to evaluate efficacy and safety of

  XXX as XXX. Therapy in Diabetes Mellitus 2.

- A phase II, randomized, double-blind, Placebo controlled multicenter trials to

  evaluate safety and efficacy of XXX for the treatment of antihypertensive in

  patients with Hypertension and Diabetes Mellitus I.

- A phase III randomized double-blind study to evaluate the safety and efficacy of

  XXX in subjects with Hypertension Arterial.

- GI randomized event and safety open-label-endpoint, Parallel group trial of GI

  safety of XXX compared with XXX in Osteoarthritis subjects.

- Double-blind Placebo controlled study to evaluate the safety and efficacy of XXX

  in subjects with Diabetes Mellitus I.

# AGENCY FOR HEALTHCARE ADMINISTRATION
## HUGO GOLDSTRAJ
### List of Supervised Clinic

Date  12/28/2016

| File Nbr | Lic Nbr | Provider Name | St Addr1 | St Addr2 | St City | St State | St Zip | Lic Status | Effective Date | End Date |
|---|---|---|---|---|---|---|---|---|---|---|
| 133 | 3700 | PROGRESS REHABILITATION, INC | 10855 S. W. 72ND STREET | STE 24 | MIAMI | FL | 33173 | FAILED TO RENEW | 4/24/2006 | 8/21/2006 |
| 2187 | 4148 | GREATER MIAMI HEALTH MEDICAL CENTER, INC | 807 SW 25TH AVENUE | # 302B | MIAMI | FL | 33135 | MOVED TO EXEMPT | 3/1/2004 | 11/22/2006 |
| 2817 | 4121 | MILLER REHABILITATION CENTER | 807 S.W 25TH AVENUE | UNIT 302 | MIAMI | FL | 33135 | CLOSED | 8/14/2008 | 8/13/2007 |
| 3145 | 4301 | COMFORT REHABILITATION CENTER | 5805 SW 8 STREET | | MIAMI | FL | 33144 | FAILED TO RENEW | 3/1/2004 | 10/6/2006 |
| 3161 | 4511 | ASCLEPIUS ASSOCIATES, INC | 807 SW 25 AVENUE | SUITE 206 | MIAMI | FL | 33135 | FAILED TO RENEW | 5/7/2004 | 5/11/2006 |
| 3741 | 4516 | EXCEL MEDICAL CORP. | 6741 SW 24 STREET | STE. 41-42 | MIAMI | FL | 33155 | FAILED TO RENEW | 8/15/2005 | 1/18/2008 |
| 3759 | 5281 | BECKER MEDICAL CENTER, INC | 7811 CORAL WAY | SUITE 103 | MIAMI | FL | 33155 | FAILED TO RENEW | 5/5/2004 | 9/20/2006 |
| 4023 | 4638 | EXCLUSIVE HEALTH SYSTEMS INC | 7805 SW 24TH STREET | SUITE 121 | MIAMI | FL | 33155 | LIC SURRENDER | 3/13/2006 | 6/8/2013 |
| 4845 | 5576 | PERSONAL CARE MEDICAL CENTER, INC. | 2050 NE 163 STREET | | NORTH MIAMI BEACH | FL | 33162 | CLOSED | 5/20/2004 | 11/17/2004 |
| 4906 | 4160 | METROPOLITAN MEDICAL GROUP INC | 3001 NW 49 AVENUE | STE 202 | LAUD LAKES | FL | 33313 | FAILED TO RENEW | 10/4/2005 | 10/7/2006 |
| 5525 | 4291 | NATIONAL BALANCE CENTERS | 16378 NORTHEAST 26TH AVENUE | | NORTH MIAMI BEACH | FL | 33160 | CLOSED | 3/23/2005 | 10/6/2006 |
| 5635 | 4731 | HEAVENLY ESTHETIC, INC. | 7805 SW 24TH STREET | SUITE #121 | MIAMI | FL | 33155 | VOL CLOSURE | 3/13/2006 | 3/13/2007 |
| 5891 | 7182 | TAFT CHIROPRACTIC CENTER INC | 5900 SW 24 ST | STE 102 | MIAMI | FL | 33165 | FAILED TO RENEW | 12/15/2008 | 3/23/2014 |
| 6542 | 6415 | TRINITY MEDICAL HEALTH CENTER, INC. | 8370 WEST FLAGLER ST. | #222 | MIAMI | FL | 33143 | FAILED TO RENEW | 7/11/2005 | 10/8/2006 |
| 6595 | 6376 | GABLES MEDICAL CENTER CORP | 717 PONCE DE LEON BLVD. | #218 | CORAL GABLES | FL | 33134 | FAILED TO RENEW | 6/29/2005 | 1/29/2007 |
| 7026 | 6800 | DORAL MEDICAL OFFICE CORP | 4005 NW 114TH AVE | SUITE 22 | MIAMI | FL | 33178 | FAILED TO RENEW | 5/22/2006 | 2/16/2007 |
| 7216 | 6920 | ELIOM MEDICAL CENTER INC | 9600 SW 8TH STREET | SUITE 38 | MIAMI | FL | 33174 | CLOSED | 3/17/2006 | 10/6/2006 |
| 7417 | 7155 | MORRIS PROFESSIONAL SERVICES INC | 7500 NW 25 STREET UNIT 257 | | MIAMI | FL | 33122 | CLOSED | 11/5/2007 | 4/25/2011 |
| 7901 | 7742 | CLARKE MEDICAL SERVICES INC | 10344 W FLAGLER ST | | MIAMI | FL | 33174 | FAILED TO RENEW | 7/1/2007 | 1/20/2011 |
| 7957 | 7691 | RPM MEDICAL CENTER INC | 42 NW 27TH AVE | SUITE 308 | MIAMI | FL | 33125 | FAILED TO RENEW | 4/16/2007 | 10/28/2008 |
| 8117 | 7817 | HEALTH AND WELLNESS SERVICES INC | 2140 WEST FLAGLER STREET | #202-203 | MIAMI | FL | 33135 | LICENSED | 6/14/2007 | 6/13/2016 |
| 9829 | 9127 | Y & J CHIROPRACTIC CENTER INC | 8210 W FLAGLER ST | | MIAMI | FL | 33144 | REVOKED | 3/28/2011 | 5/1/2012 |
| 10386 | 9773 | J C MEDICAL SERVICES INC | 3900 NW 79 AVE #235 | | DORAL | FL | 33166 | LICENSED | 2/6/2013 | 7/2/2014 |

Page 1



EXHIBIT
3
GOLDSTRAJ
8/13/19

## *PAIN RELIEF CLINIC OF HOMESTEAD CORP.*
## *311 NE 8 ST. STE. 101*
## *HOMESTEAD, FL 33030*
## *PH: (786) 339.9270  FAX: (786)339.9295*

### *MEDICAL OR CLINICAL DIRECTOR AGREEMENT*

**Responsibilities of Doctor acting as Medical or Clinical Director.** In general, a A of personnel, the prompt, accurate and proficient performance of treatment, and compliance with state and federal law. A Medical or Clinical Director may perform the duties of a supervisor or technologist in the specialty for which he or she is licensed or may delegate these responsibilities to appropriately licensed personnel.

Medical or Clinical Director agrees by signing this agreement to accept legal responsibility for the following activities on behalf of the clinic as per Chapter 400.9935. The Medical or Clinical Director shall:

(a)  Have signs identifying the medical director or clinic director posted in a conspicuous location within the clinic readily visible to all patients.

(b)  Ensure that all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license.

(c)  Review any patient referral contracts or agreements executed by the clinic.

(d)  Ensure that all healthcare practitioners at the clinic have active appropriate certification or licensure for the level of care being provided.

(e)  Serve as the clinic records owner as defined in s. 456.057.

(f)  Ensure compliance with the recordkeeping, office surgery, and adverse incident reporting requirements of chapter 456, the respective practice acts, and rules adopted under this part.

(g)  Conduct systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful. Upon discovery of an unlawful charge, the medical director or clinic director shall take immediate corrective action.

1

EXHIBIT
U
Guistry
5/9 13/M

**RECEIVED**

JUL 29 2013

Central Systems
Management Unit

## MEDICAL OR CLINICAL DIRECTOR AGREEMENT

If the clinic performs only the technical component of magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography, and provides the professional interpretation of such services, in a fixed facility that is accredited by the Joint Commission on Accreditation of Healthcare Organizations or the American College of Radiology; and if, in the preceding quarter, the percentage of scans performed by that clinic which was billed to all personal injury protection insurance carriers was less than 15 percent, the chief financial officer of the clinic may, in a written acknowledgment provided to the agency, assume the responsibility for the conduct of the systematic reviews of clinic billings to ensure that the billings are not fraudulent or unlawful.

(h)  Not refer a patient to the clinic if the clinic performs magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography. The term "refer a patient" means the referral of one or more patients of the medical or clinical director or a member of the medical or clinical director's group practice to the clinic for magnetic resonance imaging, static radiographs, computed tomography, or positron emission tomography. A medical director who is found to violate this paragraph commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

_____          _____
JOSE J. GOMEZ CORTES, MD.                 DANIEL COLLAZO LOPEZ
MEDICAL DIRECTOR                          PRESIDENT
Date Signed: _____7/8/2013_____

**RECEIVED**

JUL 2 9 2013

Central Systems
Management Unit



Application Page 1

# 8117

## Application for Health Care Clinic Licensure

Under the authority of Part X, Ch. 400, Florida Statutes (F.S.), this application is made to obtain a license to operate a health care clinic. A separate application must be completed for each health care clinic location, including each mobile clinic. After completion, mail to: AHCA-HCCU, 2727 Mahan Drive, MS #53, Tallahassee, Florida, 32308. Faxes will not be accepted for processing.

**Please Print or Type**                     **Refer to the Instructions for completing the Application**

**SECTION 1. APPLICATION TYPE, SERVICES, and FEES: Complete Subsection 1.A., 1.B., and 1.C. Below.**

**1.A.** Application is for **(check one)**:

☒ **INITIAL LICENSING.** Must include financial schedules or surety bond.

☐ **CHANGE OF OWNERSHIP. EFFECTIVE DATE OF CHANGE:** |____/____/____|

For a Change of Ownership, the application must be received by the Agency at least **60 days** prior to change of ownership. Must include financial schedules or surety bond, and a bill of sale or letter signed by the seller and buyer agreeing to the transaction and showing the effective date of change. Attach a copy of the current Health Care Clinic License.

☐ **LICENSE RENEWAL. CURRENT DATE OF EXPIRATION:** |____/____/____|

For a License Renewal, the application must be received by the Agency at least **60 days** prior to expiration date. **ATTACH COPY OF CURRENT HCC LICENSE.**

☐ **ADDRESS CHANGE.** Check box, complete items below, and Sections 2, 3, & 9. No fee required.

**PREVIOUS ADDRESS:** _____

**EFFECTIVE DATE OF CHANGE:** |____/____/____|          **ATTACH COPY OF CURRENT HCC LICENSE.**

☐ **FACILITY NAME CHANGE.** Check box, complete items below, and Sections 2, 3, 5, & 9. No fee required.

**PREVIOUS FACILITY NAME:** _____

**EFFECTIVE DATE OF CHANGE:** |____/____/____|          **ATTACH COPY OF CURRENT HCC LICENSE.**

**1.B.** Application Fee: For Initial Licensing, Change of Ownership, and License Renewal applications only, attach a check in the amount of **$2,000**, payable to **"Agency for Health Care Administration"**.

**1.C.** List services to be provided at the clinic. (Attach additional sheets if necessary)

Rehabilitation _____ _____

_____ _____ _____

_____ _____

EXHIBIT
PENGAD 800-831-6989
GILBERT
8/13/19

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1365
Form available at: http://ahca.myflorida.com/MCHQ/Health_Facility_Regulation/HealthCareClinic/index.shtml



Application Page 2

## SECTION 2. CLINIC IDENTIFICATION AND LOCATION INFORMATION.

Health AND Wellness Services, INC.

Clinic Name (fictitious name or d/b/a if any)

2128 W. Flagler St # 205                    Miami Dade

Street Address                                        County

Miami                          Fl              33135

City                              State            Zip Code

305-649-2591              305-649-2593

Telephone Number        FAX Number                Email Address

the same

Mailing Address (If different from above)

the same

City                              State            Zip Code

## Clinic Type  (Check all that apply):

☒ Receives reimbursement from    ☐ Mobile Clinic.*    ☐ Portable Equipment Provider.*    ☐ None Apply.
Personal Injury Protection Insurance.

*See definitions in the Instructions for Completing the Application Form.*

## SECTION 3.  LICENSEE IDENTIFICATION.                    3-3317

Health and Wellness Services, Inc.          26 0422658

Name of Licensee (corporation, partnership, individual, etc.)      FEIN#

2128 W. Flagler St # 205 .                  Miami Dade

Street Address                                        County

Miami                          Fl              33135

City                              State            Zip Code

305-649-2591          305-649-2593

Telephone Number        FAX Number                Email Address

the same

Mailing Address (If different from above)

the same

City                              State            Zip Code

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1365
Form available at: Form available at: http://ahca.myflorida.com/MCHQ/Health_Facility_Regulation/HealthCareClinic/index.shtml

Application Page 3

## SECTION 4. APPOINTED MEDICAL OR CLINIC DIRECTOR: [Add to Addendum to the Application]

**(Check One):** ☑ MEDICAL DIRECTOR ☐ CLINIC DIRECTOR

Enter the required information for the Medical Director or Clinic Director. [The clinic may not operate without a medical/clinic director. You must report changes of Medical/Clinic Director to the Agency by using the Change of Medical/Clinic Director Form.]

Hugo D. Goldstraj, MD.

Name (As it appears on the Dept. of Health's License)

ME 5816 5

Florida Department of Health License (Attach a copy of the license)

_____ Hallandale FL 33009 .

Residence Address (Street, City, State, Zip Code)    Residence Telephone Number

2128 W. Flagler St # 205 Miami Fl 33135 .

Business Address (Street, City, State, Zip Code)    Business Telephone Number

LIST OF LICENSED HEALTH CARE CLINICS CURRENTLY SUPERVISED BY THE MEDICAL/CLINIC DIRECTOR: (Attach additional sheets if necessary)

| Name of Clinic | Address (Street, City, & Zip) | HCC License No. |
|---|---|---|
| Excel Medical Corp | 6741 Su 24 St. #41-42 Miami Fl 33155 | |
| Exclusive Health System Inc. | 7801 SW 24 St # 122 Miami Fl 33135 | |
| Greater Miami Health Medical Center INC | 807 Sw 25 Ave # 302B Miami Fl 33135 | |

*Signatory hereby agrees, in writing, to accept legal responsibility for the activities on behalf of the clinic, as specified in Section 400.9935, F.S., Clinic Responsibilities.

_____    07/03/07

*Signature of Medical or Clinic Director    Date

## SECTION 5. OWNERSHIP AND CONTROL INFORMATION: [Add to Addendum to the Application]: Complete Subsection 5.1. and 5.2. Below.

16167

5.1. Provide the full name, residence and business address, and telephone number of each person who owns or controls, directly or indirectly, 5% or more interest in the clinic and general partners. (Attach additional sheets as necessary).

Name: Beatriz Muse Esteves   Position/Title: President   Percent Interest 100 %

Residence Address: _____ Miami Fl 33144 .
(Street, City, State, Zip Code)

Residence Telephone Number: _____

Business Address: 2128 W Flagler St. #205 Miami Fl 33135
(Street, City, State, Zip Code)

Business Telephone Number: 786 337 2685

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1365
form available at: form available at: http://ahca.myflorida.com/MCHQ/Health_Facility_Regulation/HealthCareClinic/index.shtml

Application Page 4

Name:_____ Position/Title:_____

Percent Interest [ ] %

Residence Address:_____
(Street, City, State, Zip Code)
Residence Telephone Number:_____

Business Address:_____
(Street, City, State, Zip Code)
Business Telephone Number:_____

Name:_____ Position/Title:_____

Percent Interest [ ] %

Residence Address:_____
(Street, City, State, Zip Code)
Residence Telephone Number:_____

Business Address:_____
(Street, City, State, Zip Code)
Business Telephone Number:_____

Name:_____ Position/Title:_____

Percent Interest [ ] %

Residence Address:_____
(Street, City, State, Zip Code)
Residence Telephone Number:_____

Business Address:_____
(Street, City, State, Zip Code)
Business Telephone Number:_____

## 5.2. FINANCIAL OFFICER: Provide the following for the financial officer. The financial officer or similarly titled individual is the person who is responsible for the financial day-to-day operation of the clinic.

Name: **Beatriz Muso**      Position/Title: **President**

Residence Address: ▓▓▓▓▓▓▓▓ **Miami Fl 33144**
(Street, City, State, Zip Code)
Residence Telephone Number:_____

Business Address: **2128 W. Flagler St. #205 Miami Fl 33135**
(Street, City, State, Zip Code)
Business Telephone Number: **786-237 2685**

---

## SECTION 6. LICENSED PERSONNEL ON CLINIC STAFF: [Add to Addendum to the Application]

Provide information requested on all health care practitioners that have been issued a current license by the Florida Department of Health (DOH), both employed and under contract, including medical staff, nurses, and technicians. Attach extra sheets as necessary. (See Instructions for Completing the Clinic License Application for a definition of health care practitioner.)

Name: **Hugo D. Goldstraj, MD**    Job/Position/Title: **Medical Director**

DOH License Number: **ME 81168**    Status: [ ] Employee [X] Contract

Residence Address: ▓▓▓▓▓▓▓▓ **Hallandale Fl 33009**
(Street, City, State, Zip Code)
Residence Telephone Number:_____

Name: **Teresa Gonzalez**    Job/Position/Title: **Massage Therapist**

DOH License Number: **MA VO1130**    Status: [X] Employee [ ] Contract

Residence Address: ▓▓▓▓▓▓▓▓ **Miami Fl 33165**
(Street, City, State, Zip Code)
Residence Telephone Number:_____

AHCA Form 3110-0013 July 06

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1385
Form available at: form available at: http://ahca.myflorida.com/MCHQ/Health_Facility_Regulation/HealthCareClinic/index.shtml

Application Page 5

Name: _____ Job/Position/Title: _____

DOH License Number: _____ Status: ☐ Employee ☐ Contract

Residence Address: _____
(Street, City, State, Zip Code)

Residence Telephone Number: _____


Name: _____ Job/Position/Title: _____

DOH License Number: _____ Status: ☐ Employee ☐ Contract

Residence Address: _____
(Street, City, State, Zip Code)

Residence Telephone Number: _____


Name: _____ Job/Position/Title: _____

DOH License Number: _____ Status: ☐ Employee ☐ Contract

Residence Address: _____
(Street, City, State, Zip Code)

Residence Telephone Number: _____


Name: _____ Job/Position/Title: _____

DOH License Number: _____ Status: ☐ Employee ☐ Contract

Residence Address: _____
(Street, City, State, Zip Code)

Residence Telephone Number: _____


## SECTION 7. GENERAL INFORMATION CONCERNING THE CLINIC: Complete Subsection 7.1. and 7.2. Below.

**7.1.** Has this clinic or any individual owning or controlling, directly or indirectly, 5 percent or more of an interest in a clinic, the medical or clinic director, or a similarly titled person responsible for day-to-day operation, ever been excluded, permanently suspended, or terminated from the Medicare or Medicaid program?

☐ **YES** ☒ **NO** [If Yes, attach a description and explanation of any exclusion, permanent suspension, or termination.]


**7.2.** Does the clinic provide magnetic resonance imaging services (MRI)? ☐ **YES** ☒ **NO**
[As required in section 400.9935(11)(a), F.S., for a clinic that provides magnetic resonance imaging services, provide evidence of accreditation* by one of three organizations listed below.] **Check accreditation organization below:**

☐ American College of            ☐ Accreditation Association of        ☐ Joint Commission on
    Radiology                     Ambulatory Health Care                   Accreditation of Health Care

N/A

*If the clinic is not accredited, provide "good faith" documentation of your plans and the anticipated date for making application and progress you have made toward receiving accreditation. The MRI must be accredited within 1 year of license issuance unless an extension is granted.

⬤                    ⬤

---

| **SECTION 8.   ADDITIONAL ATTACHMENTS:  Complete Subsection 8.1., 8.2, and 8.3.** |
|---|

**8.1. Proof of Financial Ability:** For an initial application or change of ownership application, submit a <u>Projected Income and Expense Statement</u> and <u>Projected Balance Sheet</u> (see schedules 2 and 3) for the first 12 months of operation, which provide evidence of the applicant's having sufficient assets, credit, and projected revenues to cover liabilities and expenses. These documents must be prepared in accordance with generally accepted accounting principles, may be in a compilation form, and the financial statement must be signed by a <u>certified public accountant</u>(CPA). As an alternative, submit a surety bond payable to the Agency for Health Care Administration of at least $500,000 that guarantees the clinic will act in full conformity with the legal requirements for operating a health care clinic.

**8.2. Background Screening:**

| A license may not be granted to a clinic if a person deemed an applicant has been found guilty of, regardless of adjudication, or has entered a plea of nolo contendere or guilty to, any offense prohibited under the level 2 standards for screening set forth in chapter 435, F.S., or a violation of insurance fraud under s. 817.234, F.S., within the past 5 years. If the applicant has been convicted of an offense prohibited under the level 2 standards or insurance fraud in any jurisdiction, the applicant must show that his or her civil rights have been restored prior to submitting an application. |
|---|

Background screening is required for each person deemed an **"applicant"**, in accordance with the level 2 standards for screening set forth in chapter 435, F.S. For a definition of "applicant" and individuals deemed "applicants", see the instructions for completing the Application for Health Care Clinic Licensure.

Proof of compliance with the level 2 background screening requirements of chapter 435, F.S., which has been submitted within the previous 5 years in compliance with any other health care licensure requirements of this state, is acceptable in fulfillment of this paragraph. If no documentation of previous background screening is available, please submit completed fingerprint cards for all required individuals and submit a $47 processing fee for each card, payable to the Agency for Health Care Administration. A single check covering all processing fees is acceptable.  Please see the "instructions" for directions on how to obtain fingerprint cards.

**8.3. Outstanding Fines:** Per section 408.831, F.S. ("this section"), the Agency may take action against a license or application for any clinic with outstanding obligations assessed against that clinic or against a related entity as described in this section by Final Order of the Agency for Health Care Administration that is not subject to final appeal or a Final Order issued by the Center for Medicare and Medicaid Services that is not subject to further appeal. If the clinic has outstanding obligations under this section, the obligations must first be paid or a repayment plan must be approved by the Agency.

**8.3A.** Are there outstanding obligations as described above?     ☐ Yes   ☒ No

**8.3B. If yes,** please complete the following for each separate outstanding fine or obligation under this section (attach additional sheets if necessary):
   a.  Fine or obligation amount $ ___0___
   b.  Due date of obligation: ___N/A___
   c.  Are there any complaints pending/applicable to this section for which a financial obligation may be rendered against the applicant or related entity?  ☐ Yes   ☒ No

Application Page 7

## SECTION 9. AFFIDAVIT.

I, _Beatriz Muse_ hereby swear or affirm that the information provided in this application, including all attachments, is true and correct, all other federal, state and local laws and rules have been complied with and I will comply with administrative and procedural requirements of the laws governing this program.

Name of Authorized Representative (Print/Type): _Beatriz Muse_

Signature of Authorized Representative: _____

Title of Authorized Representative: _President_

(STATE OF FLORIDA
COUNTY OF _Dade_.)

This document was acknowledged before me on _07 / 03 / 07_ (date) by _Beatriz Muse_, (name of officer or person) of _Health and Wellness Services_ (name of entity acknowledging), a _INC_ (e.g. corporation, partnership, LLP, LLC, Limited Partnership) of _Florida_ (state or place of incorporation or filing), on behalf of the entity. He/she is personally known to me or has produced _____ (type of identification) as identification.

NOTARY PUBLIC
Stamp or Seal with date of expiration

NOTARY PUBLIC-STATE OF FLORIDA
Anet Perez
Commission # DD551454
My Comm. Expires: 05/11/2010

AUG 01 2007

AHCA Form 3110-0013 July 06

AHCA, HCC Unit, 2727 Mahan Dr MS 53, Tallahassee, FL 32308 (850) 488-1365
Form available at: Form available at: http://ahca.myflorida.com/HQIE/Health_Facility_Regulation/HealthCareClinic/index.shtml

STATE OF FLORIDA    AC# 2402177
DEPARTMENT OF HEALTH
DIVISION OF MEDICAL QUALITY ASSURANCE

| DATE | LICENSE NO. | CONTROL NO. |
|------|-------------|-------------|
| 02/02/2007 | ME 50165 | 215247 |

The MEDICAL DOCTOR
named below has met all requirements of
the laws and rules of the state of Florida.
Expiration Date:    JANUARY 31, 2009

HUGO DAVID GOLDSTRAJ

LICENSEE SIGNATURE

AUG 0 1 2007
AUG 0 1 2007

# Roberto Alvarez PA

**601 SW 57 Ave**
**Suite F**
**Miami, Fl 33144**
**Phone: (305) 265-9195**

Health and Wellness Services Inc
2128 W. Flagler St. Suite 205
Miami, FL. 33135

Board of Directors:

We have compiled the accompanying forecasted balance sheet of Health and Wellness Services Inc as of July 31, 2008, and the related statements of income and expense for the twelve month period then ended, in accordance with generally accepted Accounting Principles established by the American Institute of Certified Public Accountants.

A compilation is limited to presenting in the form of a forecast information that is the representation of management and does not include evaluation of the support for the assumptions underlying the forecast. The assumptions disclosed herein are those that management believes are significant to the forecast. We have not examined the forecast and, accordingly, do not express an opinion or any other form of assurance on the accompanying statements or assumptions. Furthermore, there will usually be differences between the forecasted and actual results because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

_Manuel Garcia_ C.P.A.

Manuel Garcia CPA

AUG 01 2007

_Roberto Alvarez_

Roberto Alvarez PA

Jul./10/07

**HEALTH CARE CLINIC**
**HEALTH AND WELLNESS SERVICES INC**
**SCHEDULE 3: PROJECTED BALANCE SHEET**
**FOR THE FIRST YEAR AFTER LICENSURE ENDED: JULY 31, 2008**

**ASSETS**

| | | |
|---|---:|---:|
| Current Assets | | |
| Bank | $ | 22,814 |
| Accounts Receivable | | 7,000 |
| Total Current Assets | | 29,814 |
| Fixed Assets | | |
| Furniture & Equipment | | 20,000 |
| Less: | | |
| Accumulated Depreciation | | (2,000) |
| Total Fixed Assets | | 18,000 |
| Other Assets | | |
| Deposits | | 2,600 |
| Total Other Assets | | 2,600 |
| **TOTAL ASSETS** | $ | 50,414 |

**LIABILITIES & EQUITY**

| | | |
|---|---:|---:|
| Liabilities | | |
| Current Liabilities | | |
| Accounts Payable | $ | 400 |
| Payroll Liabilities | | 860 |
| Total Current Liabilities | | 1,260 |
| Long-Term and Other Liabilities | | |
| Loans from Stockholders | | 30,000 |
| Total Long-Term and Other Liabilities | | 30,000 |
| Total Liabilities | | 31,260 |
| Equity | | |
| Common Stock | | 500 |
| Retained Earnings | | 18,654 |
| Total Equity | | 19,154 |
| **TOTAL LIABILITIES & EQUITY** | $ | 50,414 |

AUG 01 2007

**HEALTH CARE CLINIC**
**HEALTH AND WELLNESS SERVICES INC**
**SCHEDULE 2: PROJECTED INCOME AND EXPENSE STATEMENT**
**FOR THE FIRST YEAR OF OPERATIONS AFTER LICENSURE**
**FOR THE TWELVE MONTH PERIOD ENDED JULY 31, 2008**

**PATIENT SERVICE REVENUE**

| | | |
|---|---|---:|
| PIP Auto Insurance | $ | 168,000 |
| **TOTAL PATIENT SERVICE REVENUE** | | 168,000 |

**EXPENSES**

**ADMINISTRATION & OVERHEAD**

| | |
|---|---:|
| Salaries and Wages | 40,800 |
| Rent | 15,600 |
| Telephone | 4,020 |
| Payroll Taxes | 3,611 |
| Transportation Expense | 3,360 |
| Licenses and Permits | 2,990 |
| Depreciation & Amortization | 2,000 |
| Legal and Accounting | 1,500 |
| Miscellaneous Expense | 1,140 |
| Bank Charges | 900 |
| Repair & Maintenance | 875 |
| Insurance | 800 |
| Interest | 350 |
| **TOTAL ADMINISTRATION & OVERHEAD** | 77,946 |

**PATIENT CARE COSTS**

| | |
|---|---:|
| Contract Services | 67,200 |
| Medical Supplies | 4,200 |
| **TOTAL PATIENTS CARE COSTS** | 71,400 |

| | | |
|---|---|---:|
| **TOTAL OPERATING COST** | | 149,346 |
| **HEALTH CARE CLINIC - INCOME OR (LOSS)** | $ | 18,654 |



# Health Care Licensing Application

**THIS FORM IS RECOMMENDED FOR USE TO COMPLY WITH THE REPORTING REQUIREMENTS PURSUANT TO CHAPTER 408, PART II, FLORIDA STATUTES. PLEASE FILL OUT THE INFORMATION AS APPLICABLE TO THE ENTITY REQUESTING LICENSURE:**

## 1. Provider Information

Provider/Facility Type: Rehabilitation

National Provider ID#: N/A
(If applicable)

Provider/Facility Name: Health and Wellness Services, INC.

EIN: 260422658

Street Address: 2128 W. Flagler St. #205 City: Miami State: Fl Zip: 33135

Licensee Name (If different than above): the same

EIN (If different from above):

Licensee Mailing Address: the same City: State: Zip: Miami Fl [illegible]

## 2. Controlling Interests of Licensee

**AUTHORITY:**

Pursuant to subsections 408.806(1)(a) and (b), Florida Statutes, an application for licensure must include: the name, address and social security number of the applicant and each controlling interest if the applicant or controlling interest is an individual; and the name, address, and federal employer identification number (EIN) of the applicant and each controlling interest if the applicant or controlling interest is not an individual. Disclosure of your social security number is mandatory. The Agency for Health Care Administration shall use such information for purposes of securing the proper identification of persons listed on this application for licensure. However, in an effort to protect all personal information, **do not include social security numbers on this form.** All social security numbers must be entered on the Addendum to the Application.

**Controlling Interests**, as defined in subsection 408.803(7), Florida Statutes, are the applicant or licensee; a person or entity that serves as an officer of, is on the board of directors of, or has a 5-percent or greater ownership interest in the applicant or licensee; or a person or entity that serves as an officer of, is on the board of directors of, or has a 5-percent or greater ownership interest in the management company or other entity, related or unrelated, with which the applicant or licensee contracts to manage the provider.  The term does not include a voluntary board member.

**Voluntary Board Member**, as defined in subsection 408.803(13), Florida Statutes, means a board member of a not-for-profit corporation or organization who serves solely in a voluntary capacity, does not receive any remuneration for his or her services on the board of directors, and has no financial interest in the corporation or organization.  The statement affirming the status of the board member must be submitted to the agency on a form provided by the agency.

---

### A. Individual and/or Entity Ownership of Licensee

Provide the following information for **each person or entity (corporation, partnership, association) with 5% or greater ownership interest** in the licensee/provider.  Attach additional sheets if necessary.

| FULL NAME of INDIVIDUAL or ENTITY | BUSINESS ADDRESS | TELEPHONE NUMBER | EIN | % OWNERSHIP INTEREST |
|---|---|---|---|---|
| Beatriz Muso | 2128 W. Flagler St #205 Miami Fl 33135. | | ▓ | 100 % |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

### B. Board Members and Officers of Licensee

Provide the following information for **each person that serves as an officer or is on the board of directors** (excludes voluntary board members) for the licensee/provider.  Attach additional sheets if necessary.

| TITLE | FULL NAME | TELEPHONE NUMBER | % OWNERSHIP INTEREST |
|---|---|---|---|
| Director/CEO | | | |
| President | Beatriz Muso | | 100 % |
| Vice President | | | |
| Secretary | | | |
| Treasurer | | | |
| Other: | | | |
| | | | |
| | | | |
| | | | |

September 26, 2006

### C. Voluntary Board Members and Officers of Licensee

Provide the following information for **each person that serves as a voluntary board member** for the licensee/provider. Attach additional sheets if necessary. A Voluntary Board Member Affidavit must be attached for each voluntary board member.

| FULL NAME | BUSINESS ADDRESS | TELEPHONE NUMBER | AFFIDAVIT ATTACHED Yes / No |
|---|---|---|---|
| | N A | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## 3. Management Company Controlling Interests

If a company other than the licensee manages the licensee/provider, complete the following information:

### A. Individual and/or Entity Ownership of Management Company

Provide the following information for **each person or entity (corporation, partnership, association) with 5% or greater ownership interest** in the management company. Attach additional sheets if necessary.

| FULL NAME of INDIVIDUAL or ENTITY | BUSINESS ADDRESS | TELEPHONE NUMBER | EIN | % OWNERSHIP INTEREST |
|---|---|---|---|---|
| | N A | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

AHCA Recommended Form
Page 3 of 5

September 26, 2006

## B. Board Members and Officers of Management Company

Provide the following information for **each person that serves as an officer or is on the board of directors** (excludes voluntary board members) for the management company. Attach additional sheets if necessary.

| TITLE | FULL NAME | TELEPHONE NUMBER | % OWNERSHIP INTEREST |
|---|---|---|---|
| Director/CEO | N/A | | |
| President | | | |
| Vice President | | | |
| Secretary | | | |
| Treasurer | | | |
| Other: | | | |
| | | | |
| | | | |
| | | | |

## C. Voluntary Board Members and Officers of Management Company

Provide the following information for **each person that serves as a voluntary board member** for the management company. Attach additional sheets if necessary. A Voluntary Board Member Affidavit must be attached for each voluntary board member.

| FULL NAME | BUSINESS ADDRESS | TELEPHONE NUMBER | AFFIDAVIT ATTACHED Yes/No |
|---|---|---|---|
| | N/A | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

AHCA Recommended Form
Page 4 of 5

September 26, 2006

## 4. Provider Fines and Financial Information

Pursuant to subsection 408.831(1)(a), Florida Statutes, the Agency may take action against the applicant, licensee, or a licensee subject to this part which shares a common controlling interest with the applicant if they have failed to pay all outstanding fines, liens, or overpayments assessed by final order of the agency or final order of the Centers for Medicare and Medicaid Services, not subject to further appeal, unless a repayment plan is approved by the agency.

A. Are there any incidences of outstanding fines, liens or overpayments as described above?

YES ☐   NO ☒

B. If yes, please complete the following for each incidence (attach additional sheets if necessary):

1. Amount: $_____
2. Assessed by: ☐ Agency for Health Care Administration    N/A
   ☐ Centers for Medicare and Medicaid Services
3. Date of related inspection, application, or overpayment period if applicable: ____ N/A
4. Due date of payment: _____ N/A
5. Is there an appeal pending from a Final Order? YES ☐   NO ☒
6. Please attach a copy of the approved repayment plan if applicable.

## 5. Affidavit

I, _Beatriz Muse_, hereby swear or affirm that the statements in this application are true and correct.

_____   President
Signature of Licensee or Authorized Representative   Title

STATE OF FLORIDA
COUNTY OF _Dade_

Sworn to and subscribed before me this day of _07_, _03_ by _2007_.

This individual is personally known to me or produced the following identification: _FDL_

███████████████████

Notary Public

NOTARY SEAL:
NOTARY PUBLIC-STATE OF FLORIDA
Anet Perez
Commission # DD551454
My Comm. Expires: 05/11/2010

September 26, 2006

AHCA Recommended Form
Page 5 of 5



## FLORIDA DEPARTMENT OF STATE
## DIVISION OF CORPORATIONS

| Home | Contact Us | E-Filing Services | Document Searches | Forms | Help |
|------|-----------|-------------------|-------------------|-------|------|

| Previous on List | Next on List | Return To List | |
|------------------|--------------|----------------|---|
| No Events | No Name History | | Entity Name Search |

# Detail by Entity Name

## Florida Profit Corporation

HEALTH AND WELLNESS SERVICES, INC.

## Filing Information

| | |
|---|---|
| Document Number | P07000076073 |
| FEI Number | NONE |
| Date Filed | 06/29/2007 |
| State | FL |
| Status | ACTIVE |

## Principal Address

2128 W. FLAGLER STREET, SUITE 205
MIAMI FL 33135

## Mailing Address

2128 W. FLAGLER STREET, SUITE 205
MIAMI FL 33135

## Registered Agent Name & Address

MUSE, BEATRIZ
121 SW 72 AVENUE
MIAMI FL 33144 US

## Officer/Director Detail

**Name & Address**

Title P

MUSE, BEATRIZ
121 SW 72 AVENUE
MIAMI FL 33144

## Annual Reports

**No Annual Reports Filed**

## Document Images

06/29/2007 -- Domestic Profit

Note: This is not official record. See documents if question or conflict.

Home  Contact us  Document Searches  E-Filing Services  Forms  Help
Copyright and Privacy Policies
Copyright © 2007 State of Florida, Department of State.

Miami Florida, August 13. 2007

Attention: Mr. Lee Stone
      Agency for Health Care Administration

Ref: 1.- MILLER REHABILITATION CENTER, CORP.      $F. le \# 2817$   $PV$
      2.- CLARKE MEDICAL SERVICES, INC.       ——— $F, le \# 7901$   $VR$

Dear Mr. Stone

The above named clinics are not Health Care Clinics currently supervised by me, I don't have contact with this persons and I don't remember when this clinics closed.

If there is anything I can do. please don't hesitate to contact me (954-655.5438)

                        Sincerely,

                        Hugo D. Golstraj, MD.

FROM : INJURY PAINRELEASE CENTE          FAX NO. :3056316665          Aug. 09 2003 02:39PM P2

Monday, July 23, 2007

To Whom It May Concern:

To: Miami Dade County, Florida
      Tax Collection Division

From: Hugo D Goldstraj MD

I actually work in the following center:

1- Excel Medical Corp                          # 3741
   6741 SW 24 ST Suite 41-42
   Miami, Fl 33155

2- Exclusive Health Systems, Inc      # 4023
   7801 SW 24 ST Suite 122
   Miami, Fl 33155

3- Greater Miami Health Medical Center, Inc
   807 SW 25 Ave Suite 302B                   Exempt
   Miami, Fl 33135

4- RPM Medical Center Inc                      # 7957
   42 NW 27 Ave Suite # 308
   Miami, Fl 33125

For further information, please feel free to contact my office at (305) 644-1218

Sincerely,

Hugo D Goldstraj MD
23 July 2007

**HEALTH AND WELLNESS SERVICES, INC.**
**2140 WEST FLAGLER ST.   STE. 202-203**
**MIAMI, FL 33173**
**PH: (305)6492591   FAX: (305)6492593**

## *PREPARATION OF A MEDICAL RECORD/CHART*

In order to ensure that a patient's needs are being met adequately and appropriately, and services are adapted and adjusted within an individual patient situation as needed, a plan is essential.   A plan is starts upon initiation of service with continuing evaluation and service modifications as an integral part of the ongoing provision of the facility services.

Steps to be taken in the preparation of the Medical Record:

1   Prepare a file to be initiated upon arrival of a new patient by assigning a chart number or by patient's name (alphabetical order).
2   Insertion of patient personal data as copies of ID, Social Security card, copy of Identification and insurance coverage.
*3*   Insertion of legal and authorization forms (eg. *Standard consent's approval/authorization's release of patient information and treatment. Privacy Act (HIPPA).*
4   Identification of health needs/problems/diagnostic studies results/process of services/payments.
5   Determination of the nature of the service(s) needed.
6   Submission HCA 1500 forms.   Registry of payments.
7   Determination of the role to be played by various persons, e.g. Physician, Physician Assistant, Chiropractic, CCPA, RN., LPN, Medical Assistant, RPT, Massage Therapist, Phlebotomist, Radiology.

All patient's files shall be kept confidential as per HIPPA compliance, and would be kept for at least 5 years.

Files shall be kept in areas secured at all times by lock doors or cabinets.   Files will be kept in their appropriate area as to their current status.

No records will be release without a signed authorization/consent from the patient and approval from the Medical Director.

EXHIBIT
Ω
8/13/19

SF v Muse/Health & Well Prod 001691

*HEALTH AND WELLNESS SERVICES, INC.*
*2140 WEST FLAGLER ST. STE. 202-203*
*MIAMI, FL 33173*
*PH: (305)6492591  FAX: (305)6492593*

## PROTOCOL FOR ADECUACY OF MEDICAL RECORDS

(1)  Medical Records are maintained for the following purposes:
   (a)  To serve as a basis for planning patient care and for continuity in the evaluation of the patient's condition and treatment.
   (b)  To furnish documentary evidence of the course of the patient's medical evaluation, treatment, and change in condition.
   (c)  To document communication between the practitioner responsible for the patient and any other health care professional who contributes to the patient's care.
   (d)  To assist in protecting the legal interest of the patient, and the practitioner responsible for the patient.

(2)  A licensed physician shall maintain patient medical records in English, in a legible manner and with sufficient detail to clearly demonstrate why the course of treatment was undertaken or why an apparently indicated course
of treatment was not undertaken.

(3)  The medical record shall contain sufficient information to identify the patient, support the diagnosis, justify the treatment and document the course and results of treatment accurately, by including, at a minimum, patient histories, examination results; test results, records of drugs prescribed, dispensed, or administered; reports of consultations and hospitalizations; and copies of records or reports or other documentation obtained from other health care practitioners at the request of the physician and relied upon by the physician in determining the appropriate treatment of the patient.

(4)  All entries made into the medical records shall be accurately dated and timed.  Late entries are permitted, but must be clearly and accurately noted as late entries and dated and timed accurately when they are entered into the record.  However, office records do not need to be timed, just dated.

(5)  In situations involving medical examinations, tests, procedures, or treatments requested by an employer, an insurance company, or another third party, appropriate medical records shall be maintained by the physician and shall be subject to the privacy regulations on the disclosure of the patient health information (Hippa).



EXHIBIT
7

SF v Muse/Health & Well Prod 001688

## HEALTH AND WELLNESS SERVICES, INC.
### 2128 WEST FLAGLER ST. SUITE 205
### MIAMI, FL 33135.
### PH: (305) 649.2591   FAX: (305) 649.2593

Licensure Requirements

### POLICY

All individuals employed by **THE ABOVE FACILITY** that are directly responsible for the out come of care and treatment provided to patient must have a current registration/ license to practice as required by Florida State Law.

A copy of the current professional license shall be maintained in the employee's personnel file. Additionally, the professional license will be posted in **THE FACILITY** as per Florida State Law requirement.

It is the responsibility of each licensed individual to renew and maintain his or her professional license in accordance to Florida State Law. It is the responsibility of the Administrator or designee to verify current licensure.

Failure of a licensed employee to maintain professional license, or any disciplinary action by a Florida State regulatory agency against their professional license may be grounds for disciplinary action, including:

- Written warning
- Placement on probation
- Reduction in responsibilities
- Suspension
- Termination

### PROCEDURE

It is the responsibility of the Administrator and Medical Director to confirm the license status of each licensed employee. The procedure will be to contact Florida Department of Health and inquire on the individual's license to ensure it is **ACTIVE/CLEAR**. This will be performed every six (6) months for proper follow-up. The Medical Director will then be informed of each employee status.

It is the responsibility of the Medical Director of designee that if an additional physician is added to the group, that before the physician is offered a position that his license is verified. If the license shows in DOH as restricted, directly supervised or has a history of disciplinary action the Medical Director will address the findings with the incoming physician and appropriate actions will be taken.



EXHIBIT
8
ᏀᎡᏌᎠᏚᎢᏃᎯᎢ
8/13/19

SF v Muse/Health & Well Prod 001680

# HEALTH AND WELLNESS SERVICES, INC.
## 2128 WEST FLAGLER ST. SUITE 205
## MIAMI, FL 33135.
### PH: (305) 649.2591   FAX: (305) 649.2593

## License Status Definitions

**AUTHORITY VOID** – the licensing board or department voided practitioners license. Practitioner no longer obligated to update their profile data.

**CLEAR ACTIVE**– the licensed practitioner is clear to practice their profession in the state of Florida.

**CLEAR INACTIVE**– the licensed practitioner is not practicing in the state of Florida, but maintains a license.

**CONDITIONAL ACTIVE** – the licensing board or department imposed conditions as part of the initial license or disciplined the practitioner's current license and imposed conditions on the practitioners license as specified in the final order. The licensed practitioner is clear to practice their profession in the state of Florida under conditions specified by the licensing board or department.

**CONDITIONAL INACTIVE** – the licensing board or department disciplined licensed practitioner and imposed conditions on the practitioner's license as specified in the final order. The licensed practitioner is not practicing in the state of Florida, but maintains a license.

**DELINQUENT ACTIVE OR INACTIVE** - a licensed practitioner who held a CLEAR ACTIVE or CLEAR INACTIVE license, but failed to renew the license by the expiration date. The licensed practitioner is restricted from practicing in the state of Florida.

**DISCIPLINARY RELINQUISH** – the licensing board or department disciplined licensed practitioner and the licensee offers to give up their license to practice in the state of Florida to avoid further prosecution in a disciplinary case. Practitioner no longer obligated to update their profile data.

**MILITARY ONLY** – licensed practitioner provided licensing board or department required documentation of their active status in the military, which exempts them from having to comply with Florida's licensure requirements as long as they are a member of the Armed Forces of the United States on active duty. Practitioner is not obligated to update their profile data.

1

SF v Muse/Health & Well Prod 001681

**NULL AND VOID** – licensed practitioner failed to renew their licensure status for two renewal cycles, resulting in their license expiring. Practitioner no longer obligated to update their profile data. If a NULL AND VOID licensee wishes to return to practice, he/she must re-apply and meet the current licensure requirements in order to be considered for another Florida license.

**OBLIGATIONS ACTIVE** - the licensing board or department disciplined licensed practitioner and a penalty, including restrictions and additional requirements, was placed on the licensed practitioner. The licensed practitioner is clear to practice their profession in the state of Florida under the conditions specified by the licensing board or department.

**OBLIGATIONS INACTIVE** - the licensing board or department disciplined licensed practitioner and a penalty, including restrictions and additional requirements, was placed on the licensed practitioner. The licensed practitioner is not practicing in the state of Florida, but maintains a license.

**PROBATION ACTIVE** – the licensing board or department disciplined licensed practitioner and placed their license in a probationary status as specified by final order. The licensed practitioner is clear to practice their profession in the state of Florida under conditions specified by the licensing board or department.

**PROBATION INACTIVE** – the licensing board or department disciplined licensed practitioner and placed their license in a probationary status as specified by final order. The licensed practitioner is not practicing in the state of Florida, but maintains a license.

**REVOKED** – the licensing board or department disciplined licensed practitioner and their license was removed. Practitioner no longer obligated to update their profile data. If a REVOKED licensee wishes to return to practice, he/she must re-apply and meet the current licensure requirements in order to be considered for another Florida license.

**SUSPENDED ACTIVE OR INACTIVE** – the licensing board or department disciplined licensed practitioner, prohibiting practitioner from practicing in Florida for a specified period of time outlined in the final disciplinary order. The licensed practitioner is restricted from practicing in the state of Florida, but maintains a license.

**VOLUNTARILY RELINQUISH** – licensed practitioner elected to give up their license to practice in the state of Florida. Practitioner is no longer obligated to update their profile data.

2

SF v Muse/Health & Well Prod 001682

**HEALTH AND WELLNESS SERVICES, INC.**
**2140 WEST FLAGLER ST. STE. 202-203**
**MIAMI, FL 33173**
**PH: (305)6492591  FAX: (305)6492593**

# PHYSICIAN PLAN OF TREATMENT

A physician's plan of treatment is a plan reduces to writing by the physician.

Physician orders are established and documented for the health care services the Medical Facility provides to those patients who:

1. Are being actively treated for a diagnosed health care problem.

2. Have a health care need or change in physical status requiring medical intervention.

A physician's plan of treatment must be signed by the physician and in the chart

1. All diagnoses relevant to the Plan of Care, the type and frecuency of services needed.
2. Prognosis
3. Medications
4. X-rays
5. Prescriptions
6. Referral orders

A physician's plan of treatment shall be dated and signed by the attending physician. If the patient has been seen by the physician assistant that plan has to be developed by both and signed by both.

Physician orders must be signed and dated by the physician before billing for payment.

This Medical Facility does not accept any signatures with rubber stamped physician signatures.

Any changes in the physician's plan of treatment shall be made in writing and signed by the physician.



1

SF v Muse/Health & Well Prod 001689

Page 2   Plan of Treatment

The physician's plan of treatment shall be reviewed by the attending physician in consultation with the professional personnel, at such interval as the severity of the patient's illness requires, but not to exceed eight weeks.

Physician orders are renewed more frequently when:

1. The physician changes orders or treatment
2. The patient changes source of medical care
3. There is significant change in the patient's condition.

Each review of the physician's plan of treatment shall contain the signature of the attending physician and the date of review.

In addition the physician is immediately notified when:

1. An adverse incident is experienced by the patient

2. Any significant adverse change in the patient's condition

3. Any specific parameter or symptoms requested by the physician.

SF v Muse/Health & Well Prod 001690

**HEALTH AND WELLNESS SERVICES INC.**
2140 WEST FLAGLER ST. Suite 202
MIAMI, FL 33135
**Ph:** 305-649-2591.**Fax:** 305-649-2593

## MASSAGE THERAPY ORDER

**Patient Name:** ██████ . **Date:** 4/16/12

## MODALITIES:

### Cervical, Thoracic and Lumbar Spine:

EMS ( ) slight          Contrast Bath ( )
Hot/Cold Packs ( )       Therapeutic Ex. ( )
Massage ( )              Manual Therapy ( )
Ultrasound ( ) slight    Mech. Traction ( )
Neuromuscular Ex. ( )    TENS ( )
Hydromassage ( )         Therapeutic Activities ( )

### Shoulders and Knees:

Hot/Cold Packs ( )       Therapeutic Exercises ( )          hip
EMS ( ) slight           Ultrasound ( ) slight
Infrared ( ) slight      Contrast Bath ( )
Paraffin ( )             Whirlpool( )

### Wrists, Elbows, Fingers, Ankles:

Hot/Cold Packs ( )       Whirlpool( )
Paraffin ( )
Massage ( )
Therapeutic Ex. ( )
Ultrasound ( )

**Frequency:** 54w/k for 2 weeks.

**Doctor's Signature:** _____



EXHIBIT
10
Goldstray
8/13/19

**HEALTH AND WELLNESS SERVICES, INC.**
**2140 WEST FLAGLER ST.   STE. 202-203**
**MIAMI, FL 33173**
**PH: (305)6492591   FAX: (305)6492593**

## PROCEDURE FOR TREATMENT/THERAPY

TREATMENT VISIT:

1. FRONT DESK gives Patient Chart to PHYSICIAN.

1. PHYSICIAN gives chart to THERAPIST.

2. THERAPIST  evaluates doctor's orders in the patient chart and
     evaluates the patient for therapy treatments.

3. THERAPIST must explain to the patient the services to be performed. Then
     he/she will perform the therapies.

   4. Patient must understand and sign the service received.

5. Appointment for next treatment would be scheduled.

6. Patient's chart is filed into a locked filing cabinet.



SF v Muse/Health & Well Prod 001694

# Health and Wellness Services, Inc.

2140 W Flagler st, suite 202

Miami, Florida 33135

Phone: (305)649-2591 – Fax: (305) 649-2593

## INITIAL EVALUATION

Patient's Name: _____ Age: _17_ Sex: _M_ Date: _4/10/12_

Height: _____ Weight: _____ BP: _____ Pulse: _____ Resp: _____ Temp: _____

Reason for visit: _Evaluation & treatment_

### HISTORY OF PRESENT ILLNESS

Race ___ Injury Cause: ☑ Auto Accident ☐ Other _____ Date of Accident: _____

☑ Driver ☐ Passenger / Seat Location: _____ Patient had/seat belts on: ☑ Yes ☐ No

Describe Accident: _____

Mechanism of Injuries: _____

Loss of Consciousness: ☐ Yes ☑ No     Hospital visit: ☐ Yes ☑ No

Complains: _____

PAST MEDICAL HISTORY

Should: _____

Toxic Habits: Smoking _____ Alcohol _____ Drugs _____ Coffee _____ Medication _____

Allergies: _____     Previous Accidents: _____

### FAMILY HISTORY

Mother Alive or Dead/ _____ Father Alive or Dead/ _____

### PHYSICAL EXAMINATION

General appearance: Normal, _____

Head: Norm cephalic, _____

_____



EXHIBIT
12

LMP: _____

Thorax: Expansion, _*good*_ _____

Lung:   Clear - ☑ Yes  ☐ No   W - ☐ Yes  ☑ No   R - ☐ Yes  ☐ No

Hears:  Rhyme Sound - ☐ Yes  ☐ No   Murmurs - ☐ Yes  ☐ No

Patient's Name: ▨▨▨▨▨▨   Date: 4/16/12

**PHYSICAL EXAMINATION – (CONT)**  (B) *Ribs cages tenderness*

Ribs Cages: ☐ WNL  ☐ Other _____

Abdomen:   Soft - ☑ Yes  ☐ No   Tenderness: ☐ Yes  ☑ No   Masses: ☐ Yes  ☑ No

Upper extremities: ☐ WNL  ☐ Other (B) *Shoulder abduction rotation tenderness*

Lower extremities: ☐ WNL  ☐ Other (B) *knee flexion, extension rotation tenderness (B) hip flexion, abduction*

Hip: ☐ WNL  ☐ Other (B) *hip tenderness*

Neurological Examination – DTR: ☐ Symmetric  ☐ Normal   Romberg - ☑ NEG  ☐ POS

Babinscy - ☑ NEG  ☐ POS   Cranial Pair - ☑ Normal  ☐ Other _____

Gait: _*good*_

**CERVICAL SPINE:**

Pain> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Tenderness> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Spasm> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Sotohal maneuver- ☑ NEG  ☐ POS   Adson maneuver- ☐ NEG  ☐ POS

Trigger point  ☐ stetnocleidomastoideus  ☐ Trapezius  ☐ Subscapularis  ☐ Levator scapulae  ☐ Supraspinatus

**DORSAL SPINE:**

Pain> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Tenderness> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Spasm> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Trigger point _____

**LUMBAR SPINE:**

Pain> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Tenderness> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Spasm> _____   __MINIMAL  __MODERATE  ⟨SEVERE⟩  __NONE

Lasegue maneuver- ☑ NEG  ☐ POS   Braggard maneuver- ☑ NEG  ☐ POS

Trigger point  ☐ stetnocleidomastoideus  ☐ Trapezius  ☐ Subscapularis  ☐ Levator scapulae  ☐ Supraspinatus

**MUSCLE POWER GRADE:**

__Hamstring muscles __Deltoid & Bicep __Extensoradialis __Finger Flexor __Triceps & Finger extensor

__Hip adduction __Knee extensor __Knee flexion __Great toe extensor __Great toe flexor

Patient's Name: ████ █ ████  Date: 4/14/12

Diagnosis:
1. Cervical spine sprain/strain
2. Thoracic spine sprain/strain
3. Lumbar spine sprain/strain
4. Breast cage –
Shoulders sprain/strain
Knee sprain/strain

Procedures: Initial Therapies – 3x wk x 2 wks:
x-rays address & ordered

Treatment:
1. Continue with adol –
2. _____
3. _____

Recommendation:
1. _____
2. Ed: patient was instructed & call 9q/ql
3. _____  q/sec

Return:   1/wk   2/wks.   Other: 3x wk. x 2 wks.

Doctor's signature _____

Patient's Signature: ████ █ ████

Notas

1er ciclo

1. the patient initiated the first cycle treatment plan.

2. the patient complains of equal pain on the affected areas.

3. the patient has swelling and pain over the paravertebral area.

4. the patient stated that sitting, standing and walking causes his/her lower back pain.

5. the patient complains of general back pain.

6. the patient continues to express upper and lower back pain.

7. the patient continues to experience back pain.

8. the patient continues to complain of aches and pains associated with his/her sprains

9. Patient continues with treatment indicated by his/her physician

EXHIBIT
13
Goldstraj
8/13/19

2do eyclo

① The Patient initiated the second cycle treatment plan indicated by his physician.
   her

② The Patient received all treatment plan

③ The Patient continues with all treatment pla

4. The Patient expressed that treatment has helpe reduce his back pains.
   her

5. the patient revealed that sitting with his leg-elevated alleviates his lower back pain
   her
   her

6. the patient states that treatment alleviate his / pains for a couple of hours, but pain reappears.
   her

7. Patient states that on the days that he/she receives treatment she/He sleeps better.

8. The patient stated That rest helps alleviate some of the pains.

9 the Patient is marking progress with treat-ment plan.

10. the Patient is responding well to treatment plan.

11. the patient continues his normal course of

treatment until other wise indicated by his
physician.

12.- the patient has moderate pain over paraver-
tebral muscles.

13.- the range of motion has greatly increased.

14.- Patient is scheduled to follow-up ...
    - today -
    - next week. -

cuenta.  Otras notas para utilizar en
    codo, rodillas hombros tobillos etc.

- this patient stays the continues experimenting
      pain all over his-her neck.
                    She

- He complains to be having problems while
    moving his arm in particular his ®-elbow ..
          her.                            (L)

- We noted today that the range of motion of
    his ®. knee has greatly increased.
    her (L)

Aboz the range of motion of her left shoulder is near.
    completed.                    his

the range of motion of her left shoulder has been
                          his Right    increasing

Case 1:18-cv-23125-RNS   Document 159-3   Entered on FLSD Docket 10/30/2019   Page 101 of
Case 1:18-cv-23125-RNS   Document 6-11   Entered on FLSD Docket 08/03/2018   Page 5 of 6
110

<u>3er cyclo</u>.

1. the patient initiated the third cycle treatment
   <u>plan indicated by his physician</u>
                              her

2. the - Patient received all treatment plan indi-
   cated by his physician.
              her
3. the - Patient continues with treatment plan

4. - the patient stated that the massage thera-
   by has reduced his/her muscles tension
   and associated pains.

5. - the patient states that rest helps alleviate
   some of the pains.

6. - the patient responded well to his new treat-
   ment plan.                    (her)

7. - Patient is positively responding to the
   treatment

8. - Muscles spasms have been decreased
   throught the treatment cycle.

9. - Patient states she fell better yesterday after
   the therapy.    He

10. - the range of motion has greatly increased

11. - She states she feels better after the therap
       He              His

12.- treatment does have given positive results.

13.- Patient is having good progress.

14.) the Patient came to office for examina-
tion final.

**HEALTH AND WELLNESS SERVICES, INC.**
2140 WEST FLAGLER ST. STE 202
MIAMI FL, 33135

## MASSAGE THERAPY NOTES

**PATIENT'S NAME :** ▇ **D.O.S** 04 / 16 / 12



| SUBJECTIVE | OBJECTIVE | ASSESSMENT |
|---|---|---|
| **NECK PAIN** | **CERVICAL** | **PT. CONDITION IS:** |
| ☐ 1+ MILD   ☐ OCCASIONAL (0-25) | ☑ Pn/ Tenderness | ☐ IMPROVING  ☐ UNCHANGED |
| ☐ 2+ MODERATE ☐ INTERMITTENT (25-50) | ☐ Spasm | ☑ WORSE |
| ☑ 3+ SEVERE   ☐ FREQUENT (50-75) | **THORACIC** | **PHASE OF CARE:** |
| ☑ CONSTANT (75-100) | ☑ Pn/ Tenderness | ☑ ACUTE  ☐ REPAIR/REHAB |
| | ☐ Spasm | ☐ EXACERBATION  ☐ CHRONIC |
| **UPPER AND MID BACK PAIN** | **LUMBAR** | **HOME CARE:** |
| ☐ 1+ MILD   ☐ OCCASIONAL (0-25) | ☑ Pn/ Tenderness | ☐ ICE  ☐ HEAT |
| ☐ 2+ MODERATE ☐ INTERMITTENT (25-50) | ☐ Spasm | ☐ OTHER: |
| ☑ 3+ SEVERE   ☐ FREQUENT (50-75) | **PELVIC/HIP** | **PATIENT IS TO BE SEEN:** |
| ☑ CONSTANT (75-100) | ☑ Pn/ Tenderness | 6 (5) 4  3  2  1 X'S/ WK FOR |
| | ☐ Spasm | 2 WKS |
| **LOWER BACK PAIN** | **UPPER EXT.:** ARM  L / R | **LOWER EXT.:** |
| ☐ 1+ MILD   ☐ OCCASIONAL (0-25) | Rate Pain:___ HAND L / R Rate Pain:___ | HIP  L / R Rate Pain:___ |
| ☐ 2+ MODERATE ☐ INTERMITTENT (25-50) | ELBOW L / R Rate Pain:___ | KNEE L / R Rate Pain:___ |
| ☑ 3+ SEVERE   ☐ FREQUENT (50-75) | WRIST L / R Rate Pain:___ | LEG  L / R Rate Pain:___ |
| ☑ CONSTANT (75-100) | SHOULDER L / R Rate Pain:___ OTHER: | ANKLE L / R Rate Pain:___ FOOT L / R Rate Pain:___ |
| **HEADACHE RATE PAIN:** _____ | L / R Rate Pain:___ | TOE  L / R Rate Pain:___ |
| ☐ 1-3 Mild ☐ 4-7 Moderate ☐ 8-10 Severe | ☐ Pn/ Tenderness ☐ Spasm | THIGH L / R Rate Pain:___ |
| | | ☐ Pn/ Tenderness ☐ Spasm |

**NOTES:** The patient indicated the first cycle dressed- mixed place.

| INITIAL | | MODALITIES | Cervical Spine | Thoracic Spine | Lumbar Spine | Pelvis / Hip | Lt. Upper Ext. | Rt. Upper Ext. | Lt. Lower Ext. | Rt. Lower Ext. |
|---|---|---|---|---|---|---|---|---|---|---|
| | a | 97010  HOT / COLD PACKS /PAÑOS CALIENTES Y FRIOS | X | X | X | X | | | | |
| | | 97110  THERAPEUTIC EXERCISES | | | | | | | | |
| | • | 97032  ELEC.MUSCLE STIMULATION/EST ELECRICA | X | | X | | | | | |
| | | 97035  ULTRASOUND/ULTRASONIDO | ✓ | | X | | | | | |
| | | 97012  MECH. CERVICAL TRACTION/TRACCION CERVICAL | | | | | | | | |
| | a | 97018  PARAFFIN BATH /PARAFINA | | | — | | | X | | X |
| | | 97026  INFRARED /BOMBILLA INFRAROJA | | | | | | | | |
| | | 97140  MANUAL THERAPY TECHNIQUES (TRIGGER POINT) | | | | | | | | |
| | | 97039  UNLISTED MODALITY (HYDRO THERAPY) | | | | | | | | |
| | | 97034  CONTRAST BATHS /.CONTRASTE CALOR/FRIO | | | | | | | | |
| | • | 97112  NEUROMUSCULAR REEDUCATION | X | X | X | | | | | |
| | • | 97124  MASSAGE THERAPY/ | X | X | X | X | | | | |
| | | 97___  E MASAJE EN AGUA | | | | | | | | |

URE/AND DATE: ▇ **THERAPIST SIGNATURE:** ▇
tient, Parent, Gua... ative: Firma Del Paciente, Padre, Guardian, o Representante Personal. My signature on this
the fact that the service set forth herein were actually rendered/ Mi firma en Este documento certifica que estos servicios fueron realmente
proveídos.

**EXHIBIT** Goldstra

PBI/GAD 800-631-0988

Health & Wellness Services Inc.
2140 W. Flagler Street, Suite 202
Miami, FL 33135
Phone: (305) 649-2591 Fax: (305) 649-2593

1.  I was involved in an automobile accident on:             April 13, 2012

2.  As a result of said accident, I suffered bodily injury, including pain, suffering and discomfort to my personal being.

3.  Since the accident, I voluntarily sought medical treatment for such injuries

4.  The selections of my medical doctors, hospitals, and/or clinics have been chosen by me, freely, and without duress, urging, or coercion.

5.  I have not been unlawfully assisted or urged by any person, or attorney, to make any fraudulent or false civil damage claims.

6.  The personal injury claim presented is due to bodily injuries suffered by me, as a result of this automobile accident.

7.  No one has conspired with me or on my behalf to induce, assist, or urge, me to make any fraudulent civil action damage claim or to fraudulently violate the Laws of the State of Florida.

8.  I affirm that I have not received any funds from anyone affiliated with Health & Wellness Services Inc.

9.  I affirm that I have not acquired any funds from any healthcare provider to proceed with this case.

10.  I affirm that as of the initiation of my treatment with Health & Wellnes Services Inc. I have not attend nor enrolled in, any health care clinics of facilities who render services for accident victims.

11.  I affirm that I have cooperated to the best of my ability to honestly and properly submit all information concerning my case.

12.  I avow that I will not enroll or in anyway associate myself with any other therapy and rehabilitation health care facilities or health care clinics throughout the course of treatment, unless otherwise recommended or referred by my physician.

13.  I understand that it is my right to refuse treatment at *Health & Wellness Services Inc.* at any given time; however, I comprehend that I must give proper notice to *Health & Wellness Services Inc.* and be given a Final Medical Evaluation from my physician as part of standard procedure, in order to terminate my treatment plan.

14.  I affirm that to the best of my ability, I will follow and maintain the treatment plan that was indicated to me by my physician.

INITIAL

EXHIBIT
15
Goldstei
8/13/19
PENGAD 800-631-6989

**Health & Wellness Services Inc.**
2140 W. Flagler Street, Suite 202
Miami, FL 33135
Phone: (305) 649-2591 Fax: (305) 649-2593

15. I understand that I will be required to give *Health & Wellness Services Inc.*, *Inc* notice of any changes to my address, telephone number, surname and/or any other changes such as my health status.

16. I avow that I must give notice to *Health & Wellness Services Inc.*, *Inc* of any upcoming travel plans that may disrupt the course of treatment.

17. I hereby declare, for the benefit of any and all insurance companies involved or other persons related to this accident, that I have been legitimately injured.

18. I have read and understood the contents of this 'FRAUD STATEMENT' and to the best of my knowledge; it expresses the truth of the facts contained herein.

B██ R.███████

Name of Patient, Parent, Guardian or Personal Representative

Signature of Patient, Parent, Guardian or Personal Representative

## NOTARY CERTIFICATE

State of     **FLORIDA**
County of    **MIAMI DADE**

The foregoing instrument was acknowledge before me this _____ day of _____
2011 by the above affiant (s) who is personally known to me or has produced his diver's license as identification.

Official Seal

_____                    _____
Notary Public - Print Name                    Notary Public Signature

**HEALTH AND WELLNESS SERVICES, INC.**
2140 WEST FLAGLER ST. STE 202
MIAMI FL, 33135

## MASSAGE THERAPY NOTES

PATIENT'S NAME : ████████████

D.O.S 04/19/12

|  | SUBJECTIVE | OBJECTIVE | ASSESSMENT |
|---|---|---|---|

### SUBJECTIVE

**NECK PAIN**
- ☐ 1+ MILD
- ☐ OCCASIONAL (0-25)
- ☐ 2+ MODERATE
- ☐ INTERMITTENT (25-50)
- ☒ 3+ SEVERE
- ☐ FREQUENT (50-75)
- ☒ CONSTANT (75-100)

**UPPER AND MID BACK PAIN**
- ☐ 1+ MILD
- ☐ OCCASIONAL (0-25)
- ☐ 2+ MODERATE
- ☐ INTERMITTENT (25-50)
- ☒ 3+ SEVERE
- ☐ FREQUENT (50-75)
- ☒ CONSTANT (75-100)

**LOWER BACK PAIN**
- ☐ 1+ MILD
- ☐ OCCASIONAL (0-25)
- ☐ 2+ MODERATE
- ☐ INTERMITTENT (25-50)
- ☒ 3+ SEVERE
- ☐ FREQUENT (50-75)
- ☒ CONSTANT (75-100)

**HEADACHE RATE PAIN:** _____
- ☐ 1-3 Mild  ☐ 4-7 Moderate  ☐ 8-10 Severe

### OBJECTIVE

**CERVICAL**
- ☒ Pn/ Tenderness
- ☒ Spasm

**THORACIC**
- ☒ Pn/ Tenderness
- ☒ Spasm

**LUMBAR**
- ☐ Pn/ Tenderness
- ☒ Spasm

**PELVIC/HIP**
- ☐ Pn/ Tenderness
- ☐ Spasm

**UPPER EXT.:**
ARM   L / R
Rate Pain:____
HAND L / R  Rate Pain:____
ELBOW L / R  Rate Pain:____
WRIST L / R  Rate Pain:____
SHOULDER L /Ⓡ Rate Pain:____
OTHER:
___ L / R  Rate Pain:___
- ☐ Pn/ Tenderness
- ☐ Spasm

### ASSESSMENT

**PT. CONDITION IS:**
- ☐ IMPROVING
- ☐ UNCHANGED
- ☐ WORSE

**PHASE OF CARE:**
- ☐ ACUTE
- ☐ REPAIR/REHAB
- ☐ EXACERBATION
- ☐ CHRONIC

**HOME CARE:**
- ☐ ICE
- ☐ HEAT
- ☐ OTHER:

**PATIENT IS TO BE SEEN:**
6 ( 5 ) 4  3  2  1
X'S/ WK FOR
___ WKS

**LOWER EXT.:**
HIP   L /Ⓡ Rate Pain:___
KNEE  L /Ⓡ Rate Pain:___
LEG   L / R  Rate Pain:___
ANKLE L / R  Rate Pain:___
FOOT  L / R  Rate Pain:___
TOE   L / R  Rate Pain:___
THIGH L / R  Rate Pain:___
- ☐ Pn/ Tenderness
- ☐ Spasm

**NOTES:**
The patient has swelling and pain over the lumbo vertebral area.

| INITIAL | | | MODALITIES | Cervical Spine | Thoracic Spine | Lumbar Spine | Pelvis / Hip | Lt Upper Ext. | Rt Upper Ext. | Lt Lower Ext. | Rt Lower Ext. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | ● | 97010 | HOT / COLD PACKS /PAÑOS CALIENTES Y FRIOS | ✓ | ✓ | ✓ | ✓ | | | | |
| | | 97110 | THERAPEUTIC EXERCISES | | | | | | | | |
| | ● | 97032 | ELEC.MUSCLE STIMULATION/EST ELECRICA | ✓ | | ✓ | | | | | |
| | ● | 97035 | ULTRASOUND/ULTRASONIDO | ✓ | | ✓ | | | | | |
| | | 97012 | MECH. CERVICAL TRACTION/TRACCION CERVICAL | | | | | | | | |
| | ● | 97018 | PARAFFIN BATH /PARAFINA | | | | | | ✓ | | ✓ |
| | | 97026 | INFRARED /BOMBILLA INFRAROJA | | | | | | | | |
| | | 97140 | MANUAL THERAPY TECHNIQUES (TRIGGER POINT) | | | | | | | | |
| | | 97039 | UNLISTED MODALITY (HYDRO THERAPY) | | | | | | | | |
| | | 97034 | CONTRAST BATHS / CONTRASTE CALOR/FRIO | | | | | | | | |
| | ● | 97112 | NEUROMUSCULAR REEDUCATION | ✓ | ✓ | ✓ | | | | | |
| | ● | 97124 | MASSAGE THERAPY/ | ✓ | ✓ | ✓ | | | | | |
| | | 97022 | MASAJE EN AGUA | | | | | | | | |

PATIENT/SIGNATURE/AND DATE; ████████████   THERAPIST SIGNATURE: _____

Patient, Parent, Guardian or Personal Representative: Firma Del Paciente, Padre, Guardian, o Representante Personal. My signature on this document certifies the fact that the service set forth herein were actually rendered: Mi firma en Este documento certifica que estos servicios fueron realmente providos.

EXHIBIT 16
Goldstray
8/13/19
PENGAD 800-631-6989

**HEALTH AND WELLNESS SERVICES, INC.**
2140 WEST FLAGLER ST. STE 202
MIAMI FL, 33135

## MASSAGE THERAPY NOTES

PATIENT'S NAME : B█████ R█████          D.O.S 4 / 26 / 12

| | SUBJECTIVE | OBJECTIVE | ASSESSMENT |
|---|---|---|---|

**SUBJECTIVE**

**NECK PAIN**
- ☐ 1+ MILD
- ☐ 2+ MODERATE
- ☑ 3+ SEVERE
- ☐ OCCASIONAL (0-25)
- ☐ INTERMITTENT (25-50)
- ☐ FREQUENT (50-75)
- ☑ CONSTANT (75-100)

**UPPER AND MID BACK PAIN**
- ☐ 1+ MILD
- ☐ 2+ MODERATE
- ☑ 3+ SEVERE
- ☐ OCCASIONAL (0-25)
- ☐ INTERMITTENT (25-50)
- ☐ FREQUENT (50-75)
- ☑ CONSTANT (75-100)

**LOWER BACK PAIN**
- ☐ 1+ MILD
- ☐ 2+ MODERATE
- ☑ 3+ SEVERE
- ☐ OCCASIONAL (0-25)
- ☐ INTERMITTENT (25-50)
- ☐ FREQUENT (50-75)
- ☑ CONSTANT (75-100)

**HEADACHE RATE PAIN:** _____
- ☐ 1-3 Mild ☐ 4-7 Moderate ☐ 8-10 Severe

**NOTES:**
the patient continues
to complain of neck
and pain associated
with his back
pain

**OBJECTIVE**

**CERVICAL**
- ☑ Pn/ Tenderness
- ☐ Spasm

**THORACIC**
- ☑ Pn/ Tenderness
- ☑ Spasm

**LUMBAR**
- ☑ Pn/ Tenderness
- ☐ Spasm

**PELVIC/HIP**
- ☐ Pn/ Tenderness
- ☐ Spasm

**UPPER EXT.:**
ARM L / R
Rate Pain:____
HAND L / R Rate Pain:____
ELBOW L / R Rate Pain:____
WRIST L / R Rate Pain:____
SHOULDER L /(R) Rate Pain:____
OTHER:
L / R Rate Pain:____
- ☐ Pn/ Tenderness
- ☐ Spasm

**ASSESSMENT**

**PT. CONDITION IS:**
- ☐ IMPROVING
- ☐ UNCHANGED
- ☑ WORSE

**PHASE OF CARE:**
- ☑ ACUTE
- ☐ REPAIR/REHAB
- ☐ EXACERBATION
- ☐ CHRONIC

**HOME CARE:**
- ☐ ICE
- ☐ HEAT
- ☐ OTHER:

**PATIENT IS TO BE SEEN:**
6 (5) 4 3 2 1
X'S/ WK FOR
2 WKS

**LOWER EXT.:**
HIP L /(L) Rate Pain:____
KNEE L /(R) Rate Pain:____
LEG L / R Rate Pain:____
ANKLE L / R Rate Pain:____
FOOT L / R Rate Pain:____
TOE L / R Rate Pain:____
THIGH L / R Rate Pain:____
- ☐ Pn/ Tenderness
- ☐ Spasm

---

| INITIAL | MODALITIES | Cervical Spine | Thoracic Spine | Lumbar Spine | Pelvis / Hip | Lt Upper Ext. | Rt Upper Ext. | Lt Lower Ext. | Rt Lower Ext. |
|---|---|---|---|---|---|---|---|---|---|
| | 97010 HOT / COLD PACKS /PAÑOS CALIENTES Y FRIOS | ✓ | ✓ | ✓ | | | | | |
| | 97110 THERAPEUTIC EXERCISES | | | | | | | | |
| | 97032 ELEC.MUSCLE STIMULATION/EST ELECRICA | ✓ | | ✓ | | | | | |
| | 97035 ULTRASOUND/ULTRASONIDO | ✓ | | ✓ | | | | | |
| | 97012 MECH. CERVICAL TRACTION/TRACCION CERVICAL | | | | | | | | |
| | 97018 PARAFFIN BATH /PARAFINA | | | | | | ✓ | | ✓ |
| | 97026 INFRARED /BOMBILLA INFRAROJA | | | | | | | | |
| | 97140 MANUAL THERAPY TECHNIQUES (TRIGGER POINT) | | | | | | | | |
| | 97039 UNLISTED MODALITY (HYDRO THERAPY) | | | | | | | | |
| | 97034 CONTRAST BATHS / CONTRASTE CALOR/FRIO | | | | | | | | |
| | 97112 NEUROMUSCULAR REEDUCATION | ✓ | ✓ | ✓ | | | | | |
| | 97124 MASSAGE THERAPY/ | ✓ | ✓ | ✓ | | | | | |
| | 970__ ____ SAJE EN AGUA | | | | | | | | |

PATIENT/SIGNATURE/AND DATE █████████          THERAPIST SIGNATURE: _Randol_

Signature of Patient, Parent, Guardian or Personal Representative: Firma Del Paciente, Padre, Guardian, o Representante Personal. My signature on this Document attest to the fact that the service set forth herein were actually rendered: Mi firma en Este documento certifica _____ ente provecidos.

EXHIBIT 17
Goldstraj
8/13/17
PENGAD 800-631-6989

**HEALTH AND WELLNESS SERVICES, INC.**
2140 WEST FLAGLER ST. STE 202
MIAMI FL, 33135

## MASSAGE THERAPY NOTES

| PATIENT'S NAME : | ▓▓▓▓ | D.O.S 4/30/12 |
|---|---|---|



| SUBJECTIVE | OBJECTIVE | ASSESSMENT |
|---|---|---|
| **NECK PAIN**<br>☐ 1+ MILD   ☐ OCCASIONAL (0-25)<br>☐ 2+ MODERATE   ☐ INTERMITTENT (25-50)<br>☑ 3+ SEVERE   ☐ FREQUENT (50-75)<br>☑ CONSTANT (75-100) | **CERVICAL**<br>☑ Pn/ Tenderness<br>☑ Spasm | **PT. CONDITION IS:**<br>☐ IMPROVING<br>☐ UNCHANGED<br>☑ WORSE |
| | **THORACIC**<br>☑ Pn/ Tenderness<br>☐ Spasm | **PHASE OF CARE:**<br>☑ ACUTE<br>☐ REPAIR/REHAB<br>☐ EXACERBATION<br>☐ CHRONIC |
| **UPPER AND MID BACK PAIN**<br>☐ 1+ MILD   ☐ OCCASIONAL (0-25)<br>☐ 2+ MODERATE   ☐ INTERMITTENT (25-50)<br>☐ 3+ SEVERE   ☐ FREQUENT (50-75)<br>☑ CONSTANT (75-100) | **LUMBAR**<br>☑ Pn/ Tenderness<br>☑ Spasm | **HOME CARE:**<br>☐ICE<br>☐HEAT<br>☐OTHER: |
| | **PELVIC/HIP**<br>☐ Pn/ Tenderness<br>☐ Spasm | **PATIENT IS TO BE SEEN:**<br>6 5 4 3 2 1<br>X'S/ WK FOR<br>2 ___WKS |
| **LOWER BACK PAIN**<br>☐ 1+ MILD   ☐ OCCASIONAL (0-25)<br>☐ 2+ MODERATE   ☐ INTERMITTENT (25-50)<br>☐ 3+ SEVERE   ☐ FREQUENT (50-75)<br>☑ CONSTANT (75-100)<br><br>**HEADACHE RATE PAIN:** _____<br>☐ 1-3 Mild ☐ 4-7 Moderate ☐ 8-10 Severe | **UPPER EXT.:**<br>ARM   L / R<br>Rate Pain:___<br>HAND  L / R  Rate Pain:___<br>ELBOW L / R  Rate Pain:___<br>WRIST L / R  Rate Pain:___<br>SHOULDER L / (R) Rate Pain:___<br>OTHER:<br>L / R  Rate Pain:___<br>☐ Pn/ Tenderness<br>☐ Spasm | **LOWER EXT.:**<br>HIP   L / (R) Rate Pain:___<br>KNEE  L / (R) Rate Pain:___<br>LEG   L / R  Rate Pain:___<br>ANKLE L / R  Rate Pain:___<br>FOOT  L / R  Rate Pain:___<br>TOE   L / R  Rate Pain:___<br>THIGH L / R  Rate Pain:___<br>☐ Pn/ Tenderness<br>☐ Spasm |

**NOTES:**
Patient continues with
all treatment indicated
by his physician

| INITIAL | MODALITIES | Cervical Spine | Thoracic Spine | Lumbar Spine | Pelvis / Hip | Lt Upper Ext. | Rt. Upper Ext. | Lt. Lower Ext. | Rt. Lower Ext. |
|---|---|---|---|---|---|---|---|---|---|
| | 97010  HOT / COLD PACKS /PAÑOS CALIENTES Y FRIOS | ✓ | ✓ | ✓ | | | | | |
| | 97110  THERAPEUTIC EXERCISES | | | | | | | | |
| | 97032  ELEC. MUSCLE STIMULATION/EST ELECRICA | ✓ | | ✓ | | | | | |
| | 97035  ULTRASOUND/ULTRASONIDO | ✓ | | ✓ | | | | | |
| | 97012  MECH. CERVICAL TRACTION/TRACCION CERVICAL | | | | | | | | |
| | 97018  PARAFFIN BATH /PARAFINA | | | | | | ✓ | | ✓ |
| | 97026  INFRARED /BOMBILLA INFRAROJA | | | | | | | | |
| | 97140  MANUAL THERAPY TECHNIQUES (TRIGGER POINT) | | | | | | | | |
| | 97039  UNLISTED MODALITY (HYDRO THERAPY) | | | | | | | | |
| | 97034  CONTRAST BATHS / CONTRASTE CALOR/FRIO | | | | | | | | |
| | 97112  NEUROMUSCULAR REEDUCATION | ✓ | ✓ | ✓ | | | | | |
| | 97124  MASSAGE/THERAPY/ | ✓ | ✓ | ✓ | | | | | |
| | 97___  ___E MASAJE EN AGUA | | | | | | | | |

PATIENT/SIGNATURE/AND DATE: _____   THERAPIST SIGNATURE: _____

Signature of Patient, Parent, Guardian or Personal Representative: Firma Del Paciente, Padre, Guardian, o Representante Personal. My signature on this ___ to the fact that the service set forth herein were actually rendered: Mi firma en Este documento certifica que estos servicios fueron realmente proveídos.

EXHIBIT
18
GnlcStoy
8/13/19
PENGAD 800-631-6989

**HEALTH AND WELLNESS SERVICES, INC.**
2140 WEST FLAGLER ST, STE 202
MIAMI FL, 33135

## MASSAGE THERAPY NOTES

**PATIENT'S NAME:** ▇ R▇

**D.O.S** 5 / 9 / 1▇

| SUBJECTIVE | OBJECTIVE | ASSESSMENT |
|---|---|---|
| **NECK PAIN**<br>☐ 1+ MILD  ☐ OCCASIONAL (0-25)<br>☒ 2+ MODERATE  ☐ INTERMITTENT (25-50)<br>☐ 3+ SEVERE  ☒ FREQUENT (50-75)<br>☐ CONSTANT (75-100) | **CERVICAL**<br>☒ Pa/ Tenderness<br>☐ Spasm<br>**THORACIC**<br>☒ Pa/ Tenderness<br>☐ Spasm | **PT. CONDITION IS:**<br>☒ IMPROVING<br>☐ UNCHANGED<br>☐ WORSE<br>**PHASE OF CARE:**<br>☐ ACUTE<br>☐ REPAIR/REHAB<br>☐ EXACERBATION<br>☐ CHRONIC |
| **UPPER AND MID BACK PAIN**<br>☐ 1+ MILD  ☐ OCCASIONAL (0-25)<br>☒ 2+ MODERATE  ☐ INTERMITTENT (25-50)<br>☐ 3+ SEVERE  ☐ FREQUENT (50-75)<br>☐ CONSTANT (75-100) | **LUMBAR**<br>☐ Pa/ Tenderness<br>☒ Spasm<br>**PELVIC/HIP**<br>☐ Pa/ Tenderness<br>☐ Spasm | **HOME CARE:**<br>☐ ICE<br>☐ HEAT<br>☐ OTHER:<br>**PATIENT IS TO BE SEEN**<br>6 5 ④ 3 2 1<br>X'S/ WK FOR<br>3 WKS |
| **LOWER BACK PAIN**<br>☐ 1+ MILD  ☐ OCCASIONAL (0-25)<br>☒ 2+ MODERATE  ☐ INTERMITTENT (25-50)<br>☐ 3+ SEVERE  ☐ FREQUENT (50-75)<br>☐ CONSTANT (75-100)<br><br>**HEADACHE RATE PAIN:** ____<br>☐ 1-3 Mild ☐ 4-7 Moderate ☐ 8-10 Severe | **UPPER EXT.:**<br>ARM  L / R<br>Rate Pain:____<br>HAND L / R Rate Pain:____<br>ELBOW L / R Rate Pain:____<br>WRIST L / R Rate Pain:____<br>SHOULDER L /R Rate Pain:____<br>OTHER:<br>____ L / R Rate Pain:____<br>☐ Pa/ Tenderness<br>☐ Spasm | **LOWER EXT.:**<br>HIP  L / R Rate Pain:____<br>KNEE  L /R Rate Pain: -<br>LEG  L / R Rate Pain:____<br>ANKLE  L / R Rate Pain:____<br>FOOT  L / R Rate Pain:____<br>TOE  L / R Rate Pain:____<br>THIGH L / R Rate Pain:____<br>☐ Pa/ Tenderness<br>☐ Spasm |

**NOTES:**
the patient insisted
the record up
treatment plan

**MODALITIES**

| INITIAL | | | Cervical Spine | Thoracic Spine | Lumbar Spine | Pelvis/Hip | Lt. Upper Ext. | Rt. Upper Ext. | Lt. Lower Ext. | Rt. Lower Ext. |
|---|---|---|---|---|---|---|---|---|---|---|
| ○ | 97010 | HOT / COLD PACKS /PAÑOS CALIENTES Y FRIOS | ✓ | ✓ | ✓ | | | | | |
| | 97110 | THERAPEUTIC EXERCISES | ✓ | | ✓ | | | | | |
| | 97032 | ELEC.MUSCLE STIMULATION/EST ELECRICA | ✓ | | ✓ | | | | | |
| | 97035 | ULTRASOUND/ULTRASONIDO | ✓ | | ✓ | | | | | |
| | 97012 | MECH. CERVICAL TRACTION/TRACCION CERVICAL | | | | | | | | |
| | 97018 | PARAFFIN BATH /PARAFINA | | | | | | | | |
| | 97026 | INFRARED /BOMBILLA INFRAROJA | | | | | | ✓ | | ✓ |
| ○ | 97140 | MANUAL THERAPY TECHNIQUES (TRIGGER POINT) | ✓ | ✓ | ✓ | | | | | |
| | 97039 | UNLISTED MODALITY (HYDRO THERAPY) | | | | | | | | |
| | 97034 | CONTRAST BATHS / CONTRASTE CALOR/FRIO | | | | | | | | |
| | 97112 | NEUROMUSCULAR REEDUCATION | | | | | | | | |
| | 97124 | MASSAGE THERAPY/ | | | | | | | | |
| | 97022 | AJE RN AGUA | | | | | | | | |

**PATIENT/SIGNATURE/AND DATE:** ▇  **THERAPIST SIGNATURE:** Ron del

Signature of Patient, Parent, Guardian or Personal Representative: Firma Del Paciente, Padre, Guardian, o Representante Personal. My signature on this fact that the service set forth herein were actually rendered: Mi firma en Este documento certifica que estos servicios fueron realmente proveidos.

PENGUIN 800-631-0939

**EXHIBIT**
19
Goldstraj
8/13/19

**HEALTH AND WELLNESS SERVICES, INC**
**2140 W FLAGLER ST #202-203**
**MIAMI, FL 33135**

06/03/2013

**HUGO DAVID GOLDSTRAJ, MD**

~~Miami, FL 33125~~
**LICENSE #.ME58165**

DEAR **HUGO DAVID GOLDSTRAJ, MD**:

I REGRET TO INFORM YOU THAT YOUR EMPLOYMENT WITH **HEALTH AND WELLNESS SERVICES, INC**, TERMNATED EFFECTIVE AS OF **06/17/2013**.

IF I CAN BE OF ANY ASSISTANCE DURING THIS TRANSITION, PLEASE CALL ME AT YOUR EARLIEST CONVENIENCE.

SINCERELY,

**SANDOR ABRAHAN FUENTES, PRESIDENT**

EXHIBIT
PENGAD 800-631-6989
30
Goldstraj
8/13/19

**RECEIVED**

JUN 2 4 2013

Central Systems
Management Unit