# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:18-CV-23125-RNS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE and CASUALTY COMPANY,

Plaintiffs,

                v.

HEALTH AND WELLNESS SERVICES,
INC., BEATRIZ MUSE, LAZARO MUSE,
HUGO GOLDSTRAJ, MANUEL FRANCO,
MEDICAL WELLNESS SERVICES, INC.,
NOEL SANTOS, ANGEL CARRASCO,
JORGE RAFAEL COLL, PAIN RELIEF
CLINIC OF HOMESTEAD, CORP., JESUS
LORITES, AND JOSE GOMEZ-CORTES,

Defendants.

_____/

## AFFIDAVIT OF JORGE COLL, M.D.

STATE OF FLORIDA             )
                                )
COUNTY OF MIAMI-DADE    )

BEFORE ME, the undersigned authority personally appeared Jorge Coll, M.D., who being by me first duly sworn, deposed and said:

1.      My name is Jorge Coll. I am over the age of eighteen (18) years old, am competent to testify, and have personal knowledge of the facts contained in this Affidavit.

2.      I am a medical doctor, licensed to practice medicine since 1998 in the State of Florida.

3.      I am board eligible in internal medicine. I have never been sanctioned or found to have been involved in any fraud or illegitimate medical practice.

4.      In 2013 I was recommended by an associate, Dr. Orlando Leiva, to meet with Lazaro Muse for a medical director position at a health clinic that he was associated with. Dr. Leyva worked at Medical Wellness Services, Inc. ("Medical Wellness").

5.      Lazaro Muse identified the clinic he was involved with as Medical Wellness Services, Inc. ("Medical Wellness").  I was never advised and was unaware that Lazaro Muse owned any other clinics. At the time I met with Lazaro Muse, I was told that Noel Santos was the owner. When I met with Lazaro Muse I believed that he had some interest or association with Medical Wellness. I don't recall if Lazaro Muse told me what his actual position was at Medical Wellness. I met with Lazaro Muse at Medical Wellness to discuss the medical director position.

6.      Following the meeting at Medical Wellness, I met other clinic employees there including Noel Santos, who I understood to be a licensed massage therapist at the clinic and the owner.

7.      Lazaro Muse hired me during our initial meeting at Medical Wellness as the medical director of Medical Wellness at a pay rate of $1,000.00 every other week.

8.      I served as the medical director at Medical Wellness from the end of 2013 to the beginning of 2017.

9.      While I was the medical director at Medical Wellness, I was also the medical director at D&K Rehab, Sunshine Medical Center, and VLO Medical. I no longer work at any of these clinics.

10.      During my time at Medical Wellness I recall seeing Lazaro Muse at Medical Wellness 4-5 times.

11.      At the time that I was hired, I had not reviewed in detail nor received any education by Medical Wellness regarding the laws and/or regulations which apply to medical directors in the

2

state of Florida such that I did not know the full scope nor all of the intricacies of my responsibilities as Medical Wellness' medical director. I did not receive any training at or from Medical Wellness regarding any of its policies. I also did not receive or review a copy of any of Medical Wellness' policies.

12.     Since the time I was hired until the date I left Medical Wellness, I have not read, reviewed in detail, nor received any education regarding the laws and/or regulations which apply to medical directors in the state of Florida and was therefore not aware of the full scope nor all of the intricacies of my responsibilities as medical director at any time during my tenure at Medical Wellness.

13.     During my tenure as medical director at Medical Wellness:

    a.  My systematic review of the billings was limited to reviewing the medical records, *i.e.*, examination reports, therapy reports and daily therapy notes, and the related medical bills that were briefly reviewed. I did not document any concerns in the records and billings I reviewed at Medical Wellness. Further, I never voiced any such concerns to any person because I thought my concerns were not relevant.

    b.  Medical Wellness never published a schedule of charges of any kind reflecting the costs associated with the medical services offered to patients at Medical Wellness.

    c.  Other than being aware of the physical copies of the Medical Wellness practitioners' licenses, which were posted onsite, I never verified that health care practitioners at Medical Wellness maintained current active and unencumbered Florida licenses. I never contacted the Department of

Health, any applicable licensing board, or the Agency for Health Care Administration to verify the status of those health care practitioners' licenses.

d. I was unfamiliar with all the requirements of Florida Statute § 456.057 which sets forth the parameters of serving as the clinic's medical records custodian, a role that I held as medical director of Medical Wellness. I was not aware that I was a custodian of the medical records at Medical Wellness.

e. I was unaware of the sources of Medical Wellness patients, other than the fact that they were auto accident victims because they brought police reports with them, and was unaware of any patient referral contracts or agreements executed by the clinic.

f. To my knowledge, Medical Wellness never made an attempt to collect any co-payments or deductibles from any patients. To my knowledge, no co-payments or deductibles were ever collected at Medical Wellness. I was unaware of the provision in Florida's Insurance Fraud Statute, Fla. Stat. § 817.234, regarding the required collection of co-payments or deductibles.

14. Even though I did not believe it was my responsibility at Medical Wellness to directly supervise the treating physician, in retrospect and after reviewing additional information, it is my opinion the treatment performed on Medical Wellness patients was not appropriate and in accordance with the standard of care in the following ways:

**Subjective Pain Complaints**

a. In a normal setting, 95% of patients would not present with subjective pain complaints in the cervical, thoracic, and lumbar regions of the spine.

4

#69587343_v1

b. In a normal setting, 100% of patients would not present with subjective pain complaints in an extremity.

c. These patterns would not be credible.

**Initial Evaluation**

d. The Medical Wellness initial examination form does not provide a space for the examining provider to identify the specific muscles which are the source of the patient's pain or the specific levels of the spine where the patient experiences pain. In its current form, this would not meet the standard of care for objectively diagnosing a patient's pain symptoms.

e. Due to the deficiencies in the Medical Wellness initial evaluation forms, a patient at Medical Wellness could not receive a correct or proper diagnosis.

**Therapy Order Form**

f. The therapy order form used at Medical Wellness does not provide sufficient information for an examining practitioner to properly document the treatment prescribed. This form does not meet the standard of care for medical record keeping.

g. Specifically, there are no options for the types of therapeutic exercises for the treating physician to select.

h. There are no options for the types of manual therapy for the treating physician to select.

i. There are no options for the frequency or amplitude of the EMS and TENS therapies.

j. There is no option to elect the type of mechanical traction.

#69587343_v1

k. There is no place for the prescription of time or units for each modality.

l. Due to the deficiencies in the Medical Wellness therapy form, it does not allow for enough detail in the prescription to allow for appropriate treatment options.

X-rays

m. X-rays were not being interpreted by a radiologist prior to therapy beginning for patients treating at Medical Wellness. Where patients received mechanical traction before their x-rays were interpreted, such treatment did not meet the standard of care.

n. X-rays should be used to assist in the decision making process for a patient's proper care, but they were not used in this way at Medical Wellness.

o. When a radiologist recommends additional diagnostic studies, those studies should be taken into consideration and performed unless a documented reason not to exists.

Therapy

p. If a specific therapy modality is performed on more than one region of the body, therapists should document it in the treatment records.

q. Such an indication is a prerequisite to billing a "59 modifier" on a CMS 1500 form.

Final Evaluation & Impairment Ratings

r. The final impairment ratings (other than 0%) provided by physician's assistants at Medical Wellness were never verified by me to ensure that they were consistent with the American Medical Association standards.

#60587343_v1

    s.   I never questioned the way that impairment ratings were assigned.

15.    I resigned from the position of medical director at Medical Wellness in late 2017.

16.    I never reviewed the medical records to determine if any patient in fact had, in my opinion, an emergency medical condition as that term is defined in the Florida Statutes. The emergency medical condition status was determined by the treating and/or examining physician. I was never advised of the process used at Medical Wellness by the treating and/or examining physician for determining if a patient did or did not have an emergency medical condition.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Jorge Coll, M.D.

The foregoing instrument was sworn to and subscribed before me this 22ⁿᵈ day of August, 2019, by **JORGE COLL, M.D.**, who is:

☒    personally known to me; or

☐    produced a driver's license issued by the _____ Department of Highway Safety and Motor Vehicles as identification; or

☐    produced the following identification: _____

NOTARY PUBLIC, STATE OF FLORIDA

Olga Lydia Torres
(Print, Type or Stamp Commissioned Name of Notary Public)



OLGA LYDIA TORRES
MY COMMISSION # GG072740
EXPIRES February 13, 2021

#69587343_v1