UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:18-CV-23125-RNS

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE and CASUALTY COMPANY,

Plaintiffs,

v.

HEALTH AND WELLNESS SERVICES,
INC., BEATRIZ MUSE, LAZARO MUSE,
HUGO GOLDSTRAJ, MANUEL FRANCO,
MEDICAL WELLNESS SERVICES, INC.,
NOEL SANTOS, ANGEL CARRASCO,
JORGE RAFAEL COLL, PAIN RELIEF
CLINIC OF HOMESTEAD, CORP., JESUS
LORITES, AND JOSE GOMEZ-CORTES,

Defendants.
_____/

## AFFIDAVIT OF ANGEL CARRASCO, M.D.

STATE OF FLORIDA        )
                        )
COUNTY OF MIAMI-DADE    )

BEFORE ME, the undersigned authority personally appeared Angel Carrasco, M.D., who being by me first duly sworn, deposed and said:

1. My name is Angel Carrasco. I am over the age of eighteen (18) years old, am competent to testify, and have personal knowledge of the facts contained in this Affidavit.

2. I am a medical doctor, licensed to practice medicine since 1971 in the States of Vermont, Georgia, Massachusetts and particularly in the State of Florida since 2001.

3. I am board certified in neurology. I have never been sanctioned or found to have been involved in any fraud or illegitimate medical practice.

4. In 2009, Lazaro Muse came to my neurology practice, Neurology & Neuro Rehabilitation, unsolicited, and asked me if I wanted to serve as the medical director of a health care clinic he owned.

5. Lazaro Muse identified the clinic he owned as Medical Wellness Services, Inc. ("Medical Wellness"). I was never advised and was unaware that Lazaro Muse owned any other clinics.

6. Following the meeting at my practice, I went to the Medical Wellness clinic location with Lazaro Muse and met other clinic employees there including Noel Santos, who I understood to be a licensed massage therapist at the clinic.

7. Lazaro Muse hired me as the medical director of Medical Wellness at a pay rate of $1,000.00 every other week/bi-weekly. Approximately six months after Lazaro Muse hired me as the medical director, I was told Noel Santos took over as the owner of Medical Wellness.

8. I served as the medical director at Medical Wellness from 2009 until 2013.

9. At the time that I was hired, I had not reviewed in detail nor received any education regarding the laws and/or regulations which apply to medical directors in the state of Florida such that I did not know the scope of my responsibilities as Medical Wellness's medical director.

10. Since the time I was hired until the date I left Medical Wellness, I have not read, reviewed in detail, nor received any education regarding the laws and/or regulations which apply to medical directors in the state of Florida and was therefore not aware of the scope of my responsibilities as medical director at any time during my tenure at Medical Wellness.

11. During my tenure as medical director at Medical Wellness:

a. I never maintained a log of the systematic reviews of billings that I performed.

b. My systematic review of the billings was limited to reviewing the medical records, *i.e.*, examination reports, therapy reports and daily therapy notes, and the related medical bills that were briefly reviewed. I did not document any concerns in the records and billings I reviewed at Medical Wellness. Further, I never voiced any such concerns to any person because I thought my concerns were not relevant.

c. Medical Wellness never published a schedule of charges of any kind reflecting the costs associated with the medical services offered to patients at Medical Wellness.

d. Other than being aware of the physical copies of the Medical Wellness practitioners' licenses, which were posted onsite, I never verified that health care practitioners at Medical Wellness maintained current active and unencumbered Florida licenses. I never contacted the Department of Health, any applicable licensing board, or the Agency for Health Care Administration to verify the status of those health care practitioners' licenses.

e. I was unfamiliar with all the requirements of Florida Statute § 456.057 which sets forth the parameters of serving as the clinic's medical records custodian, a role that I held as medical director of Medical Wellness.

f. I was unaware of the sources of Medical Wellness patients, other than the fact that they were auto accident victims because they brought police reports

      with them, and was unaware of any patient referral contracts or agreements executed by the clinic.

    g. To my knowledge, Medical Wellness never made an attempt to collect any co-payments or deductibles from any patients. To my knowledge, no co-payments or deductibles were ever collected at Medical Wellness. I was unaware of the provision in Florida's Insurance Fraud Statute, Fla. Stat. § 817.234, regarding the required collection of co-payments or deductibles.

12. Now, in retrospect and after reviewing additional information, it is my opinion the treatment performed on Medical Wellness patients was not appropriate and in accordance with the standard of care in the following ways:

### Subjective Pain Complaints

    a. In a normal setting, 95% of patients would not present with subjective pain complaints in the cervical, thoracic, and lumbar regions of the spine.

    b. In a normal setting, 100% of patients would not present with subjective pain complaints in an extremity.

    c. These patterns would not be credible.

    d. It is the job of a health care clinic medical director to detect these patterns.

### Initial Evaluation

    e. The Medical Wellness initial examination form does not allow the examining provider to record the patient's pain on a 1-10 pain scale. Instead, the form tracks a patient's pain as severe, moderate, and mild. The 1-10 pain scale is the standard of care and therefore Medical Wellness's initial examination form is deficient.

f. The Medical Wellness initial examination form also does not provide a space for the examining provider to identify the specific muscles which are the source of the patient's pain or the specific levels of the spine where the patient experiences pain. In its current form, this would not meet the standard of care for objectively diagnosing a patient's pain symptoms.

g. Due to the deficiencies in the Medical Wellness initial evaluation forms, a patient at Medical Wellness could not receive a correct or proper diagnosis.

**Therapy Order Form**

h. The therapy order form used at Medical Wellness does not provide sufficient information for an examining practitioner to properly document the treatment prescribed. This form does not meet the standard of care for medical record keeping.

i. Specifically, there are no options for the types of therapeutic exercises for the treating physician to select.

j. There are no options for the types of manual therapy for the treating physician to select.

k. There are no options for the frequency or amplitude of the EMS and TENS therapies.

l. There is no option to elect the type of mechanical traction.

m. There is no place for the prescription of time or units for each modality.

n. Due to the deficiencies in the Medical Wellness therapy form, it does not allow for enough detail in the prescription to allow for appropriate treatment options.

### X-rays

o. X-rays were not being interpreted prior to therapy beginning for patients treating at Medical Wellness. Where patients received mechanical traction before their x-rays were interpreted, such treatment did not meet the standard of care.

p. X-rays should be used to assist in the decision making process for a patient's proper care, but they were not used in this way at Medical Wellness.

q. When a radiologist recommends additional diagnostic studies, those studies should be taken into consideration and performed unless a documented reason not to exists.

### Therapy

r. If a specific therapy modality is performed on more than one region of the body, therapists should document it in the treatment records.

s. Such an indication is a prerequisite to billing a "59 modifier" on a CMS 1500 form.

t. In my experience at Medical Wellness, I never saw a treatment record reflect that a particular therapy modality had been performed on multiple regions of the body.

### Final Evaluation & Impairment Ratings

u. The final impairment ratings (other than 0%) provided by physician's assistants at Medical Wellness were never verified to ensure that they were consistent with the American Medical Association standards.

v. I never questioned the way that impairment ratings were assigned.

13. I resigned from the position of medical director at Medical Wellness in 2013. At that time, the laws in Florida changed and required a documented emergency medical condition in order for a patient with Personal Injury Protection ("PIP") insurance to obtain the full $10,000.00 in insurance benefits.

14. Medical Wellness began to complete these emergency medical condition forms in 2013. I did not believe that the patients treating at Medical Wellness presented with a legitimate emergency medical condition. I voiced this concern to Noel Santos. Mr. Santos disagreed with me. I chose to resign because I did not believe that Medical Wellness was appropriately documenting patients as having an emergency medical condition.

15. I have not served as a medical director at any other clinic since I was the medical director at Medical Wellness.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
Angel Carrasco, M.D.

The foregoing instrument was sworn to and subscribed before me this __17th__ day of __July__, 2019, by **ANGEL CARRASCO, M.D.**, who is:

☒ personally known to me; or

☐ produced a driver's license issued by the _____ Department of Highway Safety and Motor Vehicles as identification; or

☐ produced the following identification: _____

_____
NOTARY PUBLIC, STATE OF FLORIDA

JENNY E. GRIJALBA
MY COMMISSION # GG 303766
EXPIRES: February 19, 2023
Bonded Thru Notary Public Underwriters

_____
(Print, Type or Stamp Commissioned Name of Notary Public)



7