**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

**CASE NO.  1:18-cv-23125-Scola/Torres**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE FARM
FIRE & CASUALTY COMPANY,

      Plaintiff,

vs.

HEALTH AND WELLNESS SERVICES, INC.,
BEATRIZ MUSE, LAZARO MUSE, HUGO
GOLDSTRAJ, MANUEL FRANCO,
MEDICAL WELLNESS SERVICES, INC.,
NOEL SANTOS, ANGEL CARRASCO, PAIN
RELIEF CLINIC OF HOMESTEAD, CORP.,
JESUS LORITES, and JOSE GOMEZ-CORTES

      Defendants.

_____/

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

**[THIS SECTION IS INTENTIONALLY LEFT BLANK]**

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire")(collectively "the SF Plaintiffs") move for partial summary judgment as to liability and damages on their claims for violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), unjust enrichment and declaratory relief alleged in the Amended Complaint [ECF No. 6] against defendants Health & Wellness Services, Inc. ("H&W"); Medical Wellness Services, Inc. ("MW"); Pain Relief Clinic of Homestead, Corp. ("PR"); Beatriz Muse ("Ms. Muse"); Lazaro Muse ("Mr. Muse"); Noel Santos ("Mr. Santos"); Hugo Goldstraj, M.D. ("Dr. Goldstraj"); Manuel Franco, M.D. ("Dr. Franco"); Angel Carrasco, M.D. ("Dr. Carrasco"); Jesus Lorites, M.D. ("Dr. Lorites"); and Jose Gomez-Cortes, M.D. ("Dr. Gomez-Cortes").   The SF Plaintiffs' Motion for Partial Summary Judgment is based on the following memorandum as well as facts and evidence set forth in the SF Plaintiffs' Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment [ECF No. 183] ("SOF") filed contemporaneously herewith.

## I.   INTRODUCTION AND BACKGROUND

This action arises out of claims for auto insurance benefits submitted by three licensed health care clinics, H&W, MW, and PR (the "Muse Clinics") for purported services unlawfully rendered to obtain insurance payments from the SF Plaintiffs.  Between 2007 and August 1, 2018, (the "Relevant Time Period"), the Muse Clinics submitted bills to the SF Plaintiffs for services unlawfully rendered and non-compensable.  The SF Plaintiffs sued the Muse Clinics, as well as, Mr. Muse, along with Ms. Muse (his sister) and Mr. Santos (his brother-in-law) (collectively the "Muse Family"), and the current and former medical directors of the Muse Clinics, Drs. Goldstraj, Franco, Carrasco, Lorites, and Gomez-Cortes (collectively "the Muse Medical Directors").[1]  [SOF, ¶¶1-12].  The Defendants collectively perpetrated a large scale scheme to obtain No-Fault or Personal Injury Protection ("PIP") insurance benefits by misrepresenting to the SF Plaintiffs that services purportedly provided were lawfully rendered. In reality, these purported services were unlawfully rendered in violation of a myriad of Florida laws which rendered the services

---

[1] The SF Plaintiffs initially brought suit against Dr. Jorge Coll, a medical director at Medical Wellness.  However, the SF Plaintiffs and Dr. Coll reached a settlement, and Dr. Coll was subsequently dismissed from this suit.  *See* [ECF No. 142], Or. Dismissing Jorge Coll Only.  The SF Plaintiffs obtained clerk's defaults against Drs. Carrasco, Franco, and Gomez-Cortes.  *See* [ECF Nos. 73 & 146].  On October 9, 2019, the SF Plaintiffs filed a Notes of Joint Liability relating to Dr. Gomez-Cortes.  *See* [ECF No. 154].

noncompensable under Florida's No-Fault system.  Further, each Muse Clinic had a medical director statutorily charged with preventing this unlawful conduct.  At H&W those medical directors were Dr. Goldstraj, from 2007 – 2013 ("Goldstraj Period") and Dr. Franco, 2013-present ("Franco Period").  [SOF, ¶¶ 4-5].  At MW those medical directors were Dr. Carrasco, from 2009-2013 ("Carrasco Period"), and Dr. Coll, 2013-2017 ("Coll Period").  [SOF, ¶¶ 8-9].  Finally, at PR, the medical directors were Dr. Lorites (2010-2013) ("Lorites Period"), and Dr. Gomez-Cortes, 2013-present ("Gomez-Cortes Period").  [SOF, ¶¶ 11-12].[2]

At all times, the main orchestrator of Defendants' scheme was layperson Mr. Muse.  Over the past two decades, Mr. Muse has been the owner of healthcare clinics that focused on billing insurers like the SF Plaintiffs for No-Fault benefits.  Mr. Muse formed a healthcare clinic with no medical background or experience.  [SOF, ¶¶ 13].  Within two years, he invested in a piece of commercial property he rented to numerous other health care clinics focused on billing No-Fault benefits, one of which hired him to be an "administrator."  [SOF, ¶ 16].  As administrator, Mr. Muse hired his sister, Ms. Muse, and trained her to run a No-Fault clinic.  [SOF, ¶ 17].  With $50,000.00 in seed money from Mr. Muse and a tenancy in his commercial property, Ms. Muse formed H&W.  [SOF, ¶ 18].  From there, the Muse Family enterprise expanded to include MW in 2009, which his brother-in-law Mr. Santos ran with direction and oversight from Mr. Muse and later billing support from his wife, Ms. Muse.  [SOF, ¶¶ 20 and 24]. Mr. Muse expanded the operations further to include PR in 2010, which was formed by an associate of Mr. Muse and used one of Mr. Muse's many companies as registered agent.  [SOF, ¶ 21].  Mr. Muse again provided oversight and guidance at PR.  [SOF, ¶¶ 21, 22, 26 and 48].  Ms. Muse and Mr. Muse together formed a billing company and a massage therapy school which facilitated the scheme at the Muse Clinics.  [SOF, ¶ 30].  At each of the Muse Clinics, the Muse Family hired the medical directors, provided an AHCA consultant who prepared the clinic's licensure applications, and/or supplied a particular accountant to prepare the Muse Clinics' tax returns.  [SOF, ¶¶ 4, 19 and 22].  As a result, the Muse Clinics' operations including the unlawful conduct occurring there were fully controlled—regardless of any purported ownership transfers—by the Muse Family.

---

[2] The SF Plaintiffs will file a Motion for Judicial Notice related to articles of incorporation, agency records, and county property records which set forth the ownership and licensure of and this Court's jurisdiction over these Defendants.

As set forth in detail in the SF Plaintiffs' SOF, [ECF No. 183], the Muse Clinics operated in violation of numerous Florida laws, rules and regulations promulgated specifically to protect the general welfare of their patients. These deficiencies include the most basic and fundamental aspects of rendering health care services such as using appropriately licensed practitioners, maintaining adequate medical records, employing competent and compliant medical directors and collecting patient payment amounts. More specifically:

- Despite representing to the SF Plaintiffs and the State of Florida they employed medical directors who supervised the day-to-day operations of the Muse Clinics and ensured the services billed were not unlawful or fraudulent (amongst other duties), the Muse Medical Directors allowed the Muse Clinics to improperly and unlawfully operate in violation of Fla. Stat. § 400.9935.
- The Muse Clinics failed to engage in a general business practice of collecting co-payments and deductibles which patently violates Florida's Insurance Fraud Statute, Fla. Stat. § 817.234(7)(a).
- The Muse Clinics failed to have adequate medical records including using forms that do not properly document the patient's condition, failed to maintain records for the requisite time-frame, and allowed protected health information to be reviewed without patient consent.
- The Muse Clinics rendered treatment unlawfully without a valid prescription.
- The Muse Clinics employed licensed massage therapists ("LMTs") who were not qualified to perform various modalities, including neuromuscular re-education, therapeutic exercises, and gait training rendered at the Muse Clinics.

It is well settled in Florida that rampant and systemic noncompliance with Florida law constitutes precisely the sort of practices medical directors are charged with identifying and preventing, and serves as a basis for the SF Plaintiffs' claim that all the services performed during the Relevant Time Period were unlawfully rendered and noncompensable. In fact, the Muse Medical Directors, by their own admission, lacked any significant understanding of the legal requirements of a medical director under Florida law, and failed to educate themselves as to what those duties entailed. Indeed, there is no genuine issue of material fact that the Muse Clinics operated in violation of numerous Florida laws, and critically, that the Muse Medical Directors failed to identify and prevent continuous violations of Florida law described herein. Accordingly, none of the services rendered by the Muse Clinics were lawful or compensable, and the SF Plaintiffs are entitled to damages for the insurance benefits paid to the Muse Clinics, which benefited Defendants.

The SF Plaintiffs asserted a claim for unjust enrichment and violations of FDUTPA to recover payments the SF Plaintiffs made to the Muse Clinics for these unlawful and

4

noncompensable services. As a result of Defendants' submission of bills for these unlawful services to the SF Plaintiffs' insureds, the SF Plaintiffs paid the following amounts: $1,580,414.15 to H&W [ECF Nos. 6-42 & 6-43]; $1,022,072.06 to MW [ECF Nos. 6-44 & 6-45]; and $350,566.94 to PR [ECF No. 6-46]. Further, the Muse Clinics billed the SF Plaintiffs an additional $618,732.50 for unlawful services which remain unpaid. *See* [ECF Nos. 6-47 - 6-51]. As a result, the SF Plaintiffs seek a declaratory judgment holding that the SF Plaintiffs do not owe the $618,732.50 in bills received from the Muse Clinics that remain unpaid for the services purportedly rendered during the Relevant Time Period.

## II.    SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' " *Med. Serv. Center* Case No. 14–cv–20625–KMM, 2015 WL 2170396, *4 (S.D. Fla. May 8, 2015) (citing Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue of material fact.'" *Id.* (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of coming forward with proof of the absence of any genuine issue of material fact, the non-moving party must make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Williams Island Synagogue, Inc. v. City of Aventura*, 358 F. Supp. 2d 1207, 1213 (S.D. Fla. 2005) (citing *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2553). "On a plaintiff's motion for summary judgment, the defendant bears the initial burden of showing that the affirmative defense is applicable." *Office of Thrift Supervision v. Paul*, 985 F.Supp. 1464, 1470 (S.D. Fla. 1997) (citing *Blue Cross and Blue Shield v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990) (affirming district court's summary judgment order as to plaintiff)).

## III.   FLORIDA'S NO-FAULT LAW: SERVICES MUST BE LAWFUL TO BE COMPENSABLE
### A.    OVERVIEW OF APPLICABLE LAW

Florida's No-Fault Law requires up to $10,000.00[3] in mandatory coverage for Florida automobile policy holders for PIP coverage and provides victims of motor vehicle accidents benefits for 80% of reasonable, necessary, related and lawful treatment irrespective of fault. Fla. Stat. § 627.730 *et seq*. Florida Statute §627.736 (1)(a) sets forth what benefits ***shall*** be covered under PIP. (Emphasis added). This section states in pertinent part that "...*the medical benefits **shall** provide reimbursement only for such services and care that are **lawfully provided, supervised, ordered or prescribed**...".* Fla. Stat. §627.736 (1)(a) (emphasis added). Florida's No-Fault Law further provides that "[a]n insurer is not required to pay a claim or charges for any service or treatment ***that was not lawful at the time rendered***." Fla. Stat. §627.736 (5)(b)(1)(b) (emphasis added); *Med. Serv. Center*, Case No. 14–cv–20625–KMM, 2015 WL 2170396, *1 (S.D. Fla. May 8, 2015) (Florida law "provides that an insurer is required to provide reimbursement to health care clinics only for medical benefits that are 'lawfully provided.'").

"Lawful" or "lawfully" means in substantial compliance with all relevant applicable criminal, civil, and administrative requirements of state and federal law related to the provision of medical services or treatment.  Fla. Stat. §627.732 (11).  Florida's No-Fault Law also provides that "[n]o statement of medical services may include charges for medical services of a person or entity that performed such services ***without possessing the valid licenses required to perform such services***." Fla. Stat. §627.736(5)(d) (emphasis added).  The Statute provides further that "[a]n insurer is not required to pay a claim or charges for any service or treatment, bill or statement that ***does not substantially meet the applicable requirements of paragraph (d).***"  Fla. Stat. §627.736(5)(b)(1)(d) (emphasis added).

### B.  PRACTITIONERS AT THE MUSE CLINICS PRACTICED OUTSIDE THE SCOPE OF THEIR LICENSE IN VIOLATION OF FLORIDA LAW

There is no issue of material fact that the Muse Clinics violated Florida law by employing healthcare practitioners who performed treatment outside the scope of their respective licenses.  At each Muse Clinic, therapy modalities including gait training, therapeutic exercises and neuromuscular reeducation were rendered exclusively by licensed massage therapists ("LMT"). [SOF, ¶¶ 36 and 37].  LMTs are only able to perform "massage," which is defined as "manipulation

---

[3] Reimbursement for medical care and treatment provided pursuant to Fla. Stat. §627.736(1), can be up to $10,000 if a provider determines the injured person had an emergency medical condition. However, this reimbursement is limited to $2,500 if a provider determines the injured person did not have an emergency medical condition.  *See* Fla. Stat. §§627.736(3),(4).

of the soft tissues of the human body with the hand, foot, arm, or elbow, whether or not such manipulation is aided by hydrotherapy, including colonic irrigation, or thermal therapy; any electrical or mechanical device; or the application to the human body of a chemical or herbal preparation." *See* Fla. Stat. § 480.033(3).   A plain reading of the statute would not include modalities like gait training, therapeutic exercises and neuromuscular reeducation as such modalities are exercises and do not require physical contact from a health care practitioner.

Further, according to the AMA Current Procedural Terminology ("CPT Manual"), Fourth Edition,[4] therapeutic exercises, neuromuscular reeducation, and gait training can only be performed by a "physician or other qualified health care professional."  The CPT Manual defines a "physician or other qualified health care professional" as:

> [A]n individual who is qualified by ***education, training, licensure/regulation*** (when applicable), ***and facility privileging*** (when applicable) who performs a professional service within his or her scope of practice and independently reports that professional service.

The CPT Manual expressly distinguishes a "physician or other qualified health care professional" from "clinical staff." The CPT Manual defines "clinical staff" as:

> [A] person who works under the supervision of a physician or other qualified health care professional, and who is allowed by law, regulation and facility policy to perform or assist in the performance of a specific professional service, but does not individually report that professional service.

To assess whether LMTs are "qualified health professionals" permitted to perform these modalities, they must be qualified by education, training, licensure/regulation and facility privileging.  As noted above, LMTs are only permitted to perform "massage" as defined by Florida law and thus lack the education, training, licensure/regulation, or facility privileging required to perform neuromuscular reeducation, therapeutic exercises, and gait training.

Moreover, the Florida Department of Health has determined modalities like gait training, therapeutic exercises, and neuromuscular reeducation are outside the scope of an LMT's licensure. *See* Ex. A, DOH v. Gustavo Acosta, D.C., Case No. 2006-30571, Admin. Compl. at ¶¶ 59-63 (finding that a chiropractor could not properly delegate "therapeutic exercises" to LMT to perform

---

[4] The Muse Clinics are bound by the American Medical Association's ("AMA") coding requirements.  The No-Fault Law expressly mandates that all claims for PIP benefits comply with the CPT Manual. Fla. Stat. § 627.736(5)(d).

on a patient); Ex. B, DOH v. Alpizar, LMT, Case No. 2015-26667, Admin. Compl. (finding "it is inappropriate for a massage therapist to perform neuromuscular reeducation and therapeutic exercises; these are treatment modalities performed by someone licensed or certified to do so by law, such as a physical therapist or a physical therapist assistant.").  Insurers like the SF Plaintiffs are not required to pay a claim for medical services performed by a person or entity not validly licensed to perform those services.  *See* Fla. Stat. § 627.736(5)(b)(1)(d); *State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015) (granting summary judgment and finding charges unlawful where a basic machine operator performed x-rays outside the scope of his license).  As a result of the foregoing, the Muse Clinics' use of LMTs to perform modalities which are outside the scope of their practice is unlawful.

## C.    MUSE CLINICS FAIL TO ABIDE BY FLORIDA'S RECORD KEEPING LAWS

There are numerous recordkeeping requirements that apply to health care clinics and more specifically to the practice of medicine generally, of which the Muse Medical Directors should be well aware.[5]  For example, medical records must be maintained "in English, in a legible manner and with sufficient detail to clearly demonstrate why the course of treatment was undertaken." *See* Fla. Admin. Code r. 64B8-9.003(2).  A patient's "medical record shall contain sufficient information to identify the patient, support the diagnosis, justify the treatment and document the course and results of treatment accurately, by including, at a minimum, patient histories; examination results; test results; records of drugs prescribed, dispensed, or administered; reports of consultations and hospitalizations; and copies of records or reports or other documentation obtained from other health care practitioners at the request of the physician and relied upon by the physician in determining the appropriate treatment of the patient." *See* Fla. Admin. Code r. 64B8-9.003(3).  A patient's medical records need to be maintained for five years from the last patient contact.  *See* Fla. Admin. Code r. 64B8-10.002(3).

Further, each Muse Clinic was required to have a "records owner" who "…shall develop and implement policies, standards, and procedures to protect the confidentiality and security of the medical record. Employees of records owners shall be trained in these policies, standards, and

---

[5] As each of the Muse Medical Directors are medical doctors, the respective practice act is Chapter 458, titled "Medical Practice."  Regulations contained in chapter 64B pertain to the "Division of Medical Quality Assurance" and are specifically authorized by provisions of Chapter 458.

procedures." Fla. Stat. § 456.057(10).[6]  Moreover, the records owner must ensure medical records are properly maintained to safeguard patients' protected health information.  *See* Fla. Stat. § 456.057(7)(a) Therefore, "[r]ecords owners are responsible for maintaining a record of all disclosures of information contained in the medical record to a third party, including the purpose of the disclosure request." Fla. Stat.  § 456.057(11).

As set forth in detail below, the recordkeeping standards of the Muse Clinics failed to meet even the most minimum standards.  Further, the Muse Medical Directors failed to safeguard patients' records by failing to serve as  the medical records owners.

### 1.    Record Keeping Violations at H&W

H&W disregarded numerous medical record keeping standards.  It is telling that Mr. Muse through his company Advance Total Services, Inc., admitted, that he *as a layperson business consultant* would review the medical records to review the treatment rendered as opposed to the medical directors.  [SOF, ¶ 54].  He further admitted neither he nor his consulting company had a business associate agreement with H&W that would allow him to review those patient records.  [SOF, ¶ 54].[7]  Moreover, both Drs. Franco and Goldstraj – H&W's medical directors—had never seen H&W's policies and procedures and were never consulted by anyone about them.  [SOF, ¶ 55].  Dr. Franco admitted he did not know whether H&W properly maintains patient records for five years.  [SOF, ¶ 52].  Separately, Dr. Goldstraj admitted he was completely unaware of his statutory recordkeeping responsibilities.  [SOF, ¶ 57].

On a substantive level, X-ray results were not documented as being utilized in the patients' treatment, which violates yet another basic requirement under Florida law.  [SOF, ¶ 58].

### 2.    Record Keeping Violations at MW

At MW, both Drs. Coll and Carrasco admitted they were unaware they were responsible for serving as the records custodian at the clinic.  [SOF, ¶ 40].  Drs. Carrasco and Coll further admitted the medical records used at MW were substantively deficient.  For example, examination forms qualitatively describe the patient's pain rather than use a 1-10 pain scale which Dr. Carrasco

---

[6] Florida law expressly requires the clinic medical director to serve as "records owner" by Florida law.  Fla. Stat. § 400.9935(1)(e).

[7] In order for disclosure of a patient's protected health information by a provider to be legally appropriate, the provider must have a business associate agreement or other authorized disclosure agreement with the individual or entity to which the provider is making the disclosure.  *See* 45 CFR 164.502(a); 45 CFR 160.310.

admits does not comport with the standard of care.  [SOF, ¶ 41]. The evaluation forms also fail to allow a provider to identify the specific areas of the patient's pain, which Dr. Coll admits would not meet the standard of care. [SOF, ¶ *Id.*]. X-ray results were not documented as being utilized in the patients' treatment, which violates yet another basic requirement under Florida law.  [SOF, ¶ 45].  Patients' treatment plans at MW did not include the amount of time or units a particular modality should be performed.  [SOF, ¶ 46].  In addition, MW did not properly maintain patient files for the five-year time frame required by Florida law.  [SOF, ¶ 42].  As was the case at H&W, Mr. Muse testified he inspected the patient's records at each clinic as part of his consulting role [SOF, ¶ 43], despite the fact that he was never an employee of MW and therefore should not have ever had access to MW patient records.

### 3.    Record Keeping Violations at PR

As was the case at H&W and MW, Lazaro Muse, a layperson, served as the business consultant at PR where he again inspected patient files to purportedly ensure the treatment was appropriate.  [SOF, ¶ 48].  X-ray results were not documented as being utilized in the patients' treatment, which violates yet another basic requirement under Florida law.  [SOF, ¶ 49].  Patients' treatment plans at PR did not include the amount of time or units a particular modality should be performed.  [SOF, ¶ 50].  SF Plaintiffs are entitled to reimbursement.  [ECF No. 181], ¶¶ 13-14.

### D.    PRESCRIPTIONS FOR TREATMENT ISSUED BY THE MUSE CLINICS WERE INVALID AND UNLAWFUL

At each of the Muse Clinics, patients received unlawful prescriptions for treatment.  Under Florida law, a prescription must justify the course of treatment to be valid and lawful.  Fla. Admin. Code. r. 64B8-9.003(2)-(3).  A physician may face disciplinary action or denial of licensure for failure to "keep legible, as defined by department rule in consultation with the board, medical records that identify the licensed physician or the physician extender and supervising physician by name and professional title who is or are responsible for rendering, ordering, supervising, or billing for each diagnostic or treatment procedure and that justify the course of treatment of the patient, including, but not limited to, patient histories; examination results; test results; records of drugs prescribed, dispensed, or administered; and reports of consultations and hospitalizations."  Fla. Stat. § 458.331(1)(m).  Here, each of the Muse Clinics issued prescriptions for treatment which were not followed.  [SOF, ¶ 38].  Moreover, in some instances patients received treatment that was never prescribed by any health care provider.  [SOF, ¶ 39].  Such deviations from Florida law

renders the Muse Clinics' prescriptions patently unlawful. Such deviations from Florida law rendered the Muse Clinics' prescriptions patently unlawful and as such SF Plaintiffs are entitled to reimbursement. [ECF No. 181], at ¶ 12.

IV. **THE MEDICAL DIRECTORS FAILED TO COMPLY WITH THEIR LEGAL OBLIGATIONS, PROVIDING AN ADDITIONAL BASIS FOR THE NONCOMPENSABILITY OF THE SERVICES**

A. **THE REQUIRED DUTIES OF MEDICAL DIRECTORS UNDER FLORIDA LAW**

Florida enacted the Health Care Clinic Act (the "HCCA") (Fla. Stat. §§ 400.990 – 400.995) in 2003 to improve the regulation of health care clinics, including those providing medical care covered by an insured's No-Fault Benefits. The HCCA was enacted based on the Florida legislature's finding "that the regulation of health care clinics must be strengthened to prevent significant cost and harm to consumers." *See* Fla. Stat. § 400.990. To accomplish this goal, the HCCA "provide[s] for the licensure, establishment, and enforcement of basic standards for health care clinics and [] provide[s] administrative oversight by the Agency for Health Care Administration [("AHCA")]." *See id.* As part of this comprehensive plan for oversight and consumer cost reduction, the HCCA requires licensed health care clinics to appoint a medical director. *See* Fla. Stat. § 400.9935(1). The Medical Director "shall agree in writing to accept legal responsibility" for the activities expressly identified in the HCCA. *Id.*; Fla. Stat. §400.9905(5).

In order to provide for oversight and prevent significant cost and harm to the public, Florida's HCCA charges a Medical Director with the responsibility of day-to-day supervision of the health care clinic. The Medical Director must agree to accept legal responsibility for the following activities: (1) ensuring all practitioners providing health care services or supplies to patients maintain a current active and unencumbered Florida license; (2) reviewing any patient referral contracts or agreements executed by the clinic; (3) *ensuring all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided*; (4) serving as the clinic's records owner as defined in s. 456.057; (5) *ensuring compliance with the recordkeeping, office surgery, and adverse incident reporting requirements of chapter 456, the respective practice acts, and rules adopted under this part and part II of chapter 408*; (6) *conducting systematic reviews of clinic billings to ensure the billings are not fraudulent or unlawful and upon discovery of an unlawful charge, taking immediate corrective*

*action;* and (7) ensuring the clinic publishes a schedule of charges for the medical services offered to patients.  Fla. Admin. Code r. 59A-33.008; Fla. Stat. §§ 400.990 *et seq.* (emphasis added).

In addition to the requirements of a Medical Director outlined in §400.9935, AHCA has adopted rules set forth in the Florida Administrative Code requiring day-to-day supervision by a Medical Director[8].  Section 59A-33.008(1), of Florida's Administrative Code states:

> A licensed health care clinic **may not operate or be maintained without the day-to-day supervision** of a single medical or clinic director as defined in Section 400.9905(5), F.S. The health care clinic responsibilities under Sections 400.9935(1)(a)-(g), F.S., **cannot be met without an active, appointed medical or clinic director**. Failure of an appointed medical or clinic director **to substantially comply** with health care clinic responsibilities under Rule 59A-33.012, F.A.C., and Sections 400.9935(1)(a)-(g), F.S., shall be grounds for the revocation or suspension of the license and assessment of a fine pursuant to Section 400.995(1).

To ensure these statutes and administrative codes are complied with, Fla. Stat. § 400.9935(3), states "[a]ll charges or reimbursement claims made by or on behalf of a clinic that is required to be licensed under this part, but that is not so licensed, *or that is operating in violation of this part*, are unlawful charges, and therefore are non-compensable and unenforceable."  *See* Fla. Stat. § 400.9935(3) (emphasis added).  Moreover, as detailed above, Florida's No Fault statute provides an insurer is not required to pay a claim or charges for any service or treatment that was not lawful at the time rendered.  *See* Fla. Stat. § 627.736(5)(b)(1)(b).

Several courts in Florida have held the failure of a Medical Director to perform "all required duties and responsibilities mandated by Florida law" rendered the services provided by the clinic unlawful and unenforceable. S*tate Farm Mut. Auto. Ins. Co. v. A&J Medical Center, Inc.*, Case No. 14-20066-CIV, 2015 WL 4387946, *2 (S.D. Fla. June 24, 2015) (holding the services were unlawful and unenforceable because the medical directors did not exercise all required duties and responsibilities); *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1331 (11th Cir. 2016) (affirming the clinic had rendered unlawful services because of its medical director's failure to comply with her duties); *State Farm Mut. Auto. Ins. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1163 (S.D. Fla. 2015) (holding the services were unlawful and non-compensable because the medical directors failed to perform their statutory obligations).  In these cases, insurers sued healthcare clinics based on the clinics' Medical Directors' failure to exercise the duties and responsibilities mandated by

---

[8] The HCCA gives rulemaking authority to AHCA and states AHCA "shall" adopt rules necessary to administer the HCCA.  Fla. Stat. §400.9925(1), (2).

Florida law. *Id.* Further, a licensed clinic may be held responsible for its medical director's failure to substantially comply with the medical director duties enumerated in the Health Care Clinic Act. *Allstate Ins. Co. v. Vizcay*, 826 F.3d 1326, 1331 (11th Cir. 2016).

### B.   THE MUSE MEDICAL DIRECTORS' FAILURE TO PREVENT UNLAWFUL OR FRAUDULENT BILLING RESULTED IN THE NUMEROUS VIOLATIONS OF FLORIDA LAW

A medical director's responsibility to ensure their respective health care clinic does not submit unlawful or fraudulent billing is clear. The statute requires a medical director to "conduct systematic reviews of clinic billings to ensure that the billings are not ***fraudulent*** or ***unlawfu***l." Fla. Stat. § 400.9935(1)(g)(emphasis added). This responsibility is so great that "upon discovery of an unlawful charge, the medical director or clinic director shall take ***immediate corrective action***." *Id.* (emphasis added). Regulations interpreting this provision further require specific documentation of the medical director's review reflecting whether a fraudulent or unlawful charge was identified and the action taken. *See* Fla. Admin Code r. 59A-33.012(3)(m). It is undisputed there was no review undertaken by the Muse Medical Directors sufficient to detect the myriad of statutory and regulatory violations detailed herein, including LMTs performing services outside the scope of their license, the litany of recordkeeping violations present at each clinic, and the use of unlawful prescriptions in treating patients at the Muse Clinics. This unlawful conduct dovetails precisely with the Muse Medical Directors' other responsibilities, i.e., to ensure all health care practitioners at the clinic have active appropriate certification or licensure for the level of care being provided, serve as the clinic records owner as defined in Fla. Stat. 456.057; and ensure compliance with the recordkeeping, office surgery, and adverse incident reporting requirements of chapter 456, the respective practice acts, and rules adopted under this part and part II of chapter 408. Fla. Stat. §§ 400.9935(1)(d)-(f). As set forth above, none of these obligations were met by the Muse Medical Directors.

### C.   THE MUSE MEDICAL DIRECTORS FAILED TO ENSURE THE MUSE CLINICS ENGAGED IN A GOOD FAITH EFFORT TO COLLECT CO-PAYMENTS AND DEDUCTIBLES

Importantly, to prevent violations of Florida's Insurance Fraud Statute, the medical directors must ensure co-payments and deductibles are collected by the health care clinic. *See State Farm Mut. Auto. Ins. Co. & State Farm Fire & Cas. Co. v. B&A Diagnostic, Inc.*, 145 F. Supp. 3d 1154, 1166 (S.D. Fla. 2015). In order to protect the public and reduce insurance fraud

13

and abuse, Florida law makes it a crime for a provider to engage in the general business practice of waiving, or failing to make a good-faith effort to collect, copayments and deductibles from PIP patients. *Id*. at §10, p. 32.  Section 817.234(7)(a) states:

> **It shall constitute *a material omission and insurance fraud***, punishable as provided in subsection (11)[9], for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, **or does not for any other reason intend to collect the total amount of such charge**. With respect to a determination as to whether a service provider has engaged in such general business practice, consideration shall be given to evidence of **whether the physician or other provider made a good faith attempt to collect such deductible or copayment**.

*Id*. (emphasis added).  This provision requires providers to charge an amount that truly reflects what it intends to collect with the copayment portion, rather than "up-charge" the amount to compensate for the portion it never intends to collect from its patient.  Courts interpreting this statute have found the purpose of a co-pay or deductible is to incentivize a patient to be conscious of the cost of medical treatment because s/he bears some portion of that cost.  *See e.g., United Auto. Ins. Co. v. Fla. Wellness & Rehab. Ctr.*, No. 08-20348-CIV, 2009 WL 10667729, at *2 n.2 (S.D. Fla. Feb. 11, 2009) (The Florida legislature enacted the copayment requirement "to create a negative incentive for insureds to control their consumption of medical services.  That is, if insureds are required to pay a deductible every time they visit a medical clinic, they will be less likely to make unnecessary visits to the medical clinic."); *see Progressive Select Ins. Co. v. Fla. Hosp. Med. Ctr.*, 260 So. 3d 219, 222 (Fla. 2019) (the deductible "is an amount for which the policyholder agrees to self-insure" and as such the policyholder is free "to contest any bill that" he or she "is required to pay to meet the deductible.").  The failure to collect co-pays and deductibles removes this incentive, which provides an opportunity for the Muse Clinics to administer excessive and unnecessary care.

As is detailed below, the Muse Clinics failed to make any effort to collect co-payments and deductibles which underscores the Medical Directors' failure to prevent unlawful or fraudulent billings.  *B&A* is directly applicable here.  In *B&A*, the same SF Plaintiffs alleged two medical directors failed to comply with their medical director duties because, in part, those medical directors failed to ensure B&A collected co-payments and deductibles.  *Id*. at 1160-61.  The Court

---

[9] Subsection 11 to Fla. Stat. § 817.234 states if the value of the property exceeds $100,000, the offender commits a felony of the first degree. *Id*., which is exceeded in this case.

granted summary judgment finding there was no genuine issue of material fact that the medical director defendants failed to ensure B&A collected co-payments and deductibles which those medical directors were required to do under their obligation to conduct systematic reviews of the bills to prevent unlawful or fraudulent billing. *Id*. at 1164 n. 7 (citing Fla. Stat. §§ 627.736(5)(b)(1)(b), 817.234(7)(a)). Accordingly, the Muse Medical Directors were legally required to ensure the Muse Clinics properly collected co-payments and deductibles as part of their obligation to conduct a systematic review of the bills to prevent unlawful or fraudulent billing.

### 1.   H&W and Its Medical Directors Made No Effort to Collect Co-Payments or Deductibles from the Patient

The current owner of H&W, Andrelvis Perez, testified he is not aware of H&W accepting payments of *any* kind from patients directly. [SOF, ¶ 58]. In fact, Mr. Perez testified it would be impossible for H&W to collect a co-payment or deductible because patients at H&W were not able to pay cash for the services rendered, and H&W does not have a credit card machine. [SOF, ¶ 59]. In addition, both Drs. Goldstraj and Franco testified they never saw any patient pay a co-payment at H&W. [SOF, ¶ 60]. Dr. Franco was unfamiliar with whether H&W had any policies relating to the collection of co-payments or deductibles. [SOF, ¶ 61]. Moreover, Dr. Goldstraj testified he was not aware of H&W having policies and procedures of any kind—let alone policies governing collecting co-payments and deductibles.. [SOF, ¶ 61].

Similarly, Mr. Perez testified H&W never sent any patient a bill nor did H&W ever provide a bill to patients in any form. [SOF, ¶ 62]. Ms. Muse, the original owner of H&W, testified patients were only informed of the cost of treatment if they asked for that information. *Id*. Ms. Muse further stated that "[i]f they didn't ask, I wouldn't tell them anything." *Id*. Additionally, Mr. Muse, w a business consultant on "all aspects of the business," did not know of any effort H&W made to collect co-payments or deductibles. [SOF, ¶ 61].

### 2.   MW and Its Medical Directors Made No Effort to Collect Co-Payments or Deductibles from the Patient

MW also failed to engage in a business practice of attempting to collect co-payments and deductibles. The MW medical directors, Drs. Carrasco and Coll, both admitted they were not aware of any co-payments or deductibles being collected at MW. [SOF, ¶ 63]. Further, the owner Mr. Santos, testified he could not tell the difference between a co-payment and a deductible, and he believed the 20% patients purportedly paid to MW was in fact a deductible rather than a co-

payment.  [SOF, ¶ 67].  MW possesses no documents reflecting the payment of co-payments or deductibles by patients.

MW has no evidence it engages in a good faith business practice to collect co-payments and deductibles.  [SOF, ¶¶ 64-65].  Mr. Santos testified MW never sent a bill to a patient.  [SOF, ¶ 66].  Rather, patients purportedly would be shown the bill for MW' services by the front desk staff and the amount of the co-payment would be computed based on the bill shown to the patient. *Id*.  Also, Mr. Muse who consulted on all aspects of the business, was completely unaware of any co-payments or deductibles being collected at MW.  *Id*.

### 3. PR and Its Medical Directors Made No Effort to Collect Co-Payments or Deductibles from the Patient

Finally, PR also failed to collect co-payments and deductibles.  PR's owner, Daniel Collazo unequivocally testified PR does not collect co-payments.  He also did not know how deductibles operate, whether PR collects deductibles or whether PR has any policies regarding the collection of deductibles.  [SOF, ¶¶ 68 and 70].  PR also has not produced any records or policies regarding the payment of co-pays or deductibles.  [SOF, ¶ 69].  Additionally, Mr. Muse, who testified he was a business consultant on "all aspects of the business," did not know of any effort made by PR to collect co-payments or deductibles.  [SOF, ¶ 71].

### V. THE SF PLAINTIFFS ARE ENTITLED TO SUMMARY JUDGMENT AS TO LIABILITY ON THEIR CLAIMS FOR VIOLATIONS OF FDUTPA, UNJUST ENRICHMENT, AND DECLARATORY RELIEF

As established in the foregoing sections, no genuine issue of fact remains that the Muse Clinics did not operate lawfully on a myriad of levels, and that the Muse Clinics failed to employ legally compliant Medical Directors, who failed to ensure the billings were lawful, failed to ensure practitioners rendered treatment at the appropriate level of care, failed to serve as records owner, and failed to ensure recordkeeping standards were met.  *See* Fla. Stat. § 400.9935 (1)(d)-(g).  As a result, summary judgment is appropriate on the SF Plaintiffs' claims for FDUTPA, unjust enrichment, and declaratory relief.

### A. FDUTPA (COUNTS IV-VI)

To prevail on a claim under the FDUTPA, Plaintiffs must show (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Med. Serv. Ctr.*, 103 F. Supp. 3d at 1354 (citing *Galstaldi v. Sunvest Communities USA, LLC*, 637 F. Supp. 2d 1045, 1056 (S.D. Fla. 2009)).  A deceptive act or practice is "one that is likely to mislead consumers and an unfair practice is one

that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Washington v. LaSalle Bank Nat'l Ass'n,* 817 F. Supp. 2d 1345, 1350 (S.D. Fla. 2011). Importantly, "deception may be accomplished by innuendo" and through omissions "rather than outright false statements." *Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1264 (Fla. 3d DCA 2000).

To determine whether an act is deceptive or unfair, Florida law employs an objective test: whether "the alleged practice was likely to deceive a consumer acting reasonably in the same circumstances," rather than "actual reliance on the representation or omission at issue." *Vazquez v. Gen. Motors, LLC*, 17-22209-CIV, 2018 WL 447644, at *6 (S.D. Fla. Jan. 16, 2018) (internal quotations and citations omitted). Where corporate officers or shareholders directly participate in improper conduct, they can be held individually liable under FDUTPA. *See Nationwide Mut. Co. v. Ft. Myers Total Rehab Ctr., Inc.*, 657 F. Supp. 2d 1279, 1287–88 (M.D. Fla. 2009); *KC Leisure, Inc. v. Haber*, 972 So. 2d 1069, 1074 (Fla. 5th DCA 2008); *see also State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diag. Imaging, Inc.*, No. 611-cv-1373, 2011 WL 6450769, at *4 (M.D. Fla. Dec. 21, 2011). Defendants' conduct was clearly deceptive under FDUTPA. Certainly, submission of unlawful, unenforceable, and noncompensable invoices for payment, to which one is not entitled, is a deceptive practice that violates FDUTPA. *See State Farm Mut. Auto. Ins. Co. v. First Care Sol., Inc.*, 232 F. Supp. 3d 1257, 1268–69 (S.D. Fla. 2017); *State Farm Mut. Auto. Ins. Co. v. Med. Serv. Ctr. of Fla., Inc*., 103 F. Supp. 3d 1343 (S.D. Fla. 2015); *Williams v. Delray Auto Mall, Inc.*, 916 F. Supp. 2d 1294, 1300 (S.D. Fla. 2013); *see also* Fla. Stat. § 817.234(1)(a)(1)-(2); Fla. Stat. § 626.989(1)(a)1 (defining "fraudulent insurance act").

There is no issue of material fact that each of the Muse Clinics submitted invoices for payment to the SF Plaintiffs which were unlawful, unenforceable, and noncompensable. Additionally, the Muse Medical Directors failed to comply with their statutory obligations rendering their bills unlawful and noncompensable. Moreover, the Muse Family was directly in control of the operations at each of the Muse Clinics, either as the owner, the biller, or the consultant. [SOF, ¶¶ 18, 20, 21, 22, 24, 26]. Therefore, the Defendants collectively engaged in a deceptive practice that violated FDUTPA. The SF Plaintiffs issued payment as a result of the deceptive practices. [SOF, ¶¶ 72-74]. Accordingly, the SF Plaintiffs are entitled to joint and

several liability against the Muse Clinics, Muse Family and the Muse Medical Directors as set forth in Section IV(C).

## B.  UNJUST ENRICHMENT (COUNTS VII-IX)

Plaintiffs are entitled to summary judgment on their unjust enrichment claims for relief based on Defendants' unlawful conduct in violation of the HCCA, Florida's scope of practice laws, minimum recordkeeping standards, No-Fault Law, and Insurance Fraud Statute as Defendants accepted and retained benefits they were not legally entitled to receive.  Summary judgment on State Farm Mutual's unjust enrichment claim is appropriate against all Defendants, while State Farm Fire is entitled to summary judgment on its unjust enrichment claim against the Muse Clinics, Ms. Muse, Mr. Santos, Mr. Muse, Dr. Goldstraj, Dr. Franco, Dr. Carrasco, and Dr. Lorites.

The elements for a claim of unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without paying the value thereof to the plaintiff. *Med. Serv. Center*, 2015 WL 2170396, at *9 (citations omitted); *see also State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291, 1301 (S.D. Fla. 2018) (citing *Johnson v. Catamaran Health Sols., LLC*, 687 F. App'x 825, 830 (11th Cir. 2017)). It is well settled that Florida law supports a cause of action for unjust enrichment upon a defendant's acceptance and retention of a benefit "that it is not legally entitled to receive in the first place." *Silver Star*, 739 F.3d at 584.  The Eleventh Circuit in *Silver Star* reasoned: "State Farm claimed in this case that Silver Star was unjustly enriched because it accepted payments from State Farm that it was not entitled to under Florida law. **If an entity accepts and retains benefits that it is not legally entitled to receive in the first place, Florida law provides for a claim of unjust enrichment.**" *Id*. [10] at 584; *Med. Serv. Center*, 2015 WL 2170396, *9 (granting summary judgment in favor of insurer and holding that an insurer can refuse payment for services unlawfully rendered as "it would be inequitable to allow Defendants to retain those benefits, regardless of whether those services were medically necessary"); *see also State Farm Mutual Auto. Ins. Co. vs. Physicians Group of Sarasota, LLC*, 9 F. Supp. 3d 1303, 1312 (M.D. Fla. 2014) (finding that if services were unlawful, then insurer was under no obligation to pay for the services and substantiates a claim for

---

[10] The *Silver Star* Court found that Florida law was clear on this issue and denied Silver Star's motion to certify questions to the Florida Supreme Court.  *Id*. at fn. 4.

unjust enrichment); *State Farm Mut. Auto. Ins. Co. v. Altamonte Springs Diagnostic Imaging, Inc.*, 2011 WL 6450769, at *5(M.D. Fla. 2011).

It is undisputed State Farm conferred a benefit on the Muse Clinics for the services identified in the Amended Complaint, and the Muse Clinics voluntarily accepted and retained this benefit.  It is also undisputed Ms. Muse, Mr. Santos, Mr. Muse, Dr. Goldstraj, Dr. Franco, Dr. Carrasco, and Dr. Lorites received the benefit of the illegal and improper payments to the Muse Clinics in the form of salaries and additional payments.  [SOF, ¶¶ 79, 83 and 87].  "There is significant case law holding that a defendant is not required to individually receive payments in order for a cause of action for unjust enrichment to exist."  *State Farm Mut. Auto. Ins. Co. v. B & A Diagnostic, Inc.,* No. 14–CV–24387–KMM, 2015 WL 2217312, at *7 (S.D. Fla. Apr. 6, 2015) (citing *State Farm Mut. Auto. Ins. Co. v. Physicians Injury Care Ctr., Inc.,* 427 Fed. Appx. 714, 722–23 (11th Cir. 2011)); *see also State Farm Mut. Auto. Ins. Co. v. A & J Med. Ctr., Inc., 20 F. Supp. 3d 1363 (S.D. Fla. 2014)* (the fact that a defendant may have received PIP benefits indirectly and may not have had actual "knowledge of the benefits" is insufficient to compel dismissal).

Likewise, members of the Muse Family were involved at each of the Muse Clinics and received benefits in the form of various payments.  For example, Mr. Muse helped Ms. Muse form H&W by providing her with advice and $50,000.00 in seed money.  [SOF, ¶ 18].  Mr. Muse hired Dr. Goldstraj to serve as the medical director at H&W.  [SOF, ¶¶ 4 and 19].  Mr. Muse then served as the business consultant on all aspects of the business at H&W as well as MW and PR until 2018.  [SOF, ¶¶ 19-21].  Ms. Muse was the original owner of H&W and then served as the biller for both it and MW.  [SOF, ¶ ¶ 18 and 24].  Mr. Santos was the owner of MW the entire time it operated and used money from an account he shared with Ms. Muse to capitalize the clinic.  Mr. Muse also hired Dr. Carrasco to serve as the medical director at MW.  [SOF, ¶ 20].  "[I]t would be most inequitable for [Defendants]" to accept and retain the benefits they received as a direct result of their participation and responsibility in the scheme.  *See Malamud v. Syprett*, 117 So. 3d 434, 438-39 (Fla. 2d DCA 2013) (*citing Huntsman Packaging Corp. v. Kerry Packaging Corp.*, 992 F. Supp. 1439, 1446 (M.D. Fla. 1998); *Aceto Corp. v. TherapeuticsMD, Inc.*, 953 F. Supp. 2d 1269, 1288 (S.D. Fla. 2013).

As set forth above, no genuine issue of material fact remains that the services performed at the Muse Clinics identified on Exhibits 42-51 to the Amended Complaint, were not "lawfully provided" and are therefore non-compensable.  Because Defendants were not legally entitled to

receive the payments identified on Exhibits 42-46 to the Amended Complaint, Defendants should be required to disgorge any payments they received from Plaintiffs.

### C.   DECLARATORY RELIEF (COUNT X)

The SF Plaintiffs are entitled to a declaration they are not required to pay the Muse Clinics' outstanding invoices.  The law in this circuit is well-settled that insurers like the SF Plaintiffs are not obligated to pay bills submitted by a clinic that is operating unlawfully.  *B&A Med. Serv. Center*, 2015 WL 2170396, at *9 (finding it appropriate to enter declaratory judgment confirming State Farm is not obligated to pay any bills during the relevant timeframe clinic was operating unlawfully); *Active Spine Ctrs., LLC v. State Farm Fire and Cas. Co.*, 911 So. 2d 241, 242 (Fla. 3d DCA 2005).  Plaintiffs are entitled to a declaration that it does not owe Defendants' outstanding invoices on pending claims.

### D.   DAMAGES

Because the Defendants were not legally entitled to receive payments identified on Exhibits 42-46 to the Amended Complaint, the SF Plaintiffs are entitled to recovery of those payments.

Further, the SF Plaintiffs are entitled to joint and several liability against each Muse Clinic for each time period associated with a specific Muse Medical Director.  Florida law is clear – where an action is based on an intentional tort, joint and several liability applies.  *See Democratic Rep. of the Congo v. Air Capital Group, LLC*, No. 12-20607-CIV, 2014 WL 11429106, at *4 (S.D. Fla. Mar. 19, 2014) (citing Fla. Stat. § 768.81).  Joint and several liability applies both to claims of FDUTPA and unjust enrichment.  *Id.*; *Allstate Ins. Co. v. Palterovich*, 653 F. Supp. 2d 1306, 1334 (S.D. Fla. 2009) ("[w]here Defendants each filled a defined role in an ongoing fraudulent enterprise that contributed to the damages incurred by Plaintiffs, it is appropriate to impose joint and several liability.")

This action is premised upon intentional torts, i.e., the intentional submission of claims for services which were unlawfully rendered.  Each Defendant played a critical role to effectuating the scheme.  The Muse Family controlled the operation of the Muse Clinics by either serving as the owner, the biller, or the consultant to each one. The Muse Medical Directors existed to create the appearance the Muse Clinics were operating with the appropriate supervision, when in fact, they were not.   The Muse Clinics were the vehicle through which the services resulting in the unlawful bills were purportedly performed. [SOF, ¶¶ 72-74].

Accordingly, the SF Plaintiffs are entitled to joint and several liability against the Defendants as follows:

1. The SF Plaintiffs' Damages Against H&W

- Judgment in favor of SF Fire and against H&W., Ms. Muse, Mr. Muse, and Dr. Goldstraj, jointly and severally, in the amount of $306,958.92. [SOF, ¶ 76].
- Judgment in favor of SF Mutual and against H&W, Ms. Muse, Mr. Muse, and Dr. Goldstraj, jointly and severally, in the amount of $1,070.337.35. *Id.*
- Judgment in favor of SF Fire and against H&W, Ms. Muse, Mr. Muse, and Dr. Franco, jointly and severally, in the amount of $8,943.61. *Id.*
- Judgment in favor of SF Mutual and against H&W, Ms. Muse, Mr. Muse, and Dr. Franco, jointly and severally, in the amount of $194,174.25. *Id.*

2. The SF Plaintiffs' Damages Against MW

- Judgment in favor of SF Fire and against MW, Ms. Muse, Mr. Muse, Mr. Santos, and Dr. Carrasco, jointly and severally, in the amount of $156,317.64. [SOF, ¶ 77].
- Judgment in favor of SF Mutual and against MW, Ms. Muse, Mr. Muse, Mr. Santos, and Dr. Carrasco, jointly and severally, in the amount of $647,730.35. *Id.*
- Judgment in favor of SF Mutual and against MW, Mr. Muse, Mr. Muse, and Mr. Santos, jointly and severally, in the amount of $221,302.66. *Id.*

3. The SF Plaintiffs' Damages Against PR

- Judgment in favor of SF Fire and against PR, Mr. Muse, and Dr. Lorites, jointly and severally, in the amount of $145,326.15. [SOF, ¶ 78].
- Judgment in favor of SF Mutual and against PR, Mr. Muse, and Dr. Lorites, jointly and severally, in the amount of $94,482.69. *Id.*
- Judgment in favor of SF Mutual and against PR, Mr. Muse, and Dr. Gomez-Cortes, jointly and severally, in the amount of $80,758.10. *Id.*

## VI.   CONCLUSION

For the foregoing reasons, summary judgment in favor of Plaintiffs on all claims is warranted and appropriate.

DATED: October 30, 2019                    Respectfully submitted,

                                           */s/ David I. Spector, Esq.*
                                           DAVID SPECTOR (FBN:  086540)
                                           david.spector@hklaw.com
                                           CAITLIN SALADRIGAS (FBN:  095728)
                                           caitlin.saladrigas@hklaw.com
                                           **HOLLAND & KNIGHT LLP**
                                           222 Lakeview Avenue, Suite 1000
                                           West Palm Beach, FL 33401
                                           Telephone:  (561) 833-2000
                                           Facsimile:  (561) 650-8399
                                           *Attorneys for Plaintiffs*

### CERTIFICATE OF SERVICE

I hereby certify that on October 30, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified in the list below via transmission of Notices of Electronic Filing generated by CM/ECF and served on all other parties via U.S. Mail.

                                           */s/ David I. Spector*
                                           David I. Spector, Esq. (FBN: 086540)

**SERVICE LIST**

| | |
|---|---|
| Christian Carrazana, Esq.<br>**CHRISTIAN CARRAZANA, P.A.**<br>P.O. Box 900520<br>Homestead, FL 33030<br>Telephone: (786) 226-8205<br>Email: christian@carrazana-legal.com<br>*Attorney for Defendant Pain Relief Clinic of Homestead, Corp.*<br>**Served via email**<br><br>Karen B. Parker, Esq.<br>**KAREN B. PARKER, P.A**<br>2550 S. Bayshore Drive, Suite 102<br>Coconut Grove, FL 33133<br>Telephone: (305) 343-8339<br>Email: kparker@kbparkerlaw.com<br>    kbparkerlaw@gmail.com<br>    parkerlawasst@gmail.com<br>*Attorneys for Defendant Jesus Lorites*<br>**Served via email**<br><br>Michael Nicoleau<br>**NICOLEAU | LAW**<br>11900 Biscayne Boulevard, Suite 770<br>North Miami, FL  33181-2737<br>Telephone:  (305) 438-7883<br>Email: michael@nicoleaulaw.com<br>    eservice@nicoleaulaw.com<br>*Attorneys for Defendant Hugo Goldstraj*<br>**Served via email** | Richard J. Diaz, Esq.<br>Attorney at Law<br>3127 Ponce De Leon Boulevard<br>Coral Gables, FL 33134<br>Telephone: (305) 444-7181<br>Facsimile:  (305) 444-8178<br>Email: rick@rjdpa.com<br>*Attorneys for Defendants Medical Wellness Services, Inc., Beatriz Muse, Lazaro Muse, and Noel Santos*<br>**Served via email**<br><br>Louis V. Martinez, Esq.<br>**DIAZ, REUS & TARG LLP**<br>3400 Miami Tower<br>100 SE 2nd Street<br>Miami, FL 33131<br>Telephone: (305) 375-9220<br>Facsimile:  (305) 375-8050<br>Email: lmartinez@diazreus.com<br>*Attorneys for Defendant Health & Wellness Services Inc.*<br>**Served via email**<br><br>Jose Gomez-Cortes, MD<br>1840 West 49th Street, Suite 305<br>Hialeah, FL  33012<br><br>  - AND -<br><br>3400 SW 130th Avenue<br>Miami, FL  33175<br>*In Pro Se*<br>**Served via U.S. Mail** |