# Exhibit 1

NICHOLAS D. A. SUITE M.D.
THE ACADEMIC NEUROLOGY NETWORK INC.
11860 W. State Road 84, Suite B-10, Davie,
FL 33325

---

**Summary report of cases concerning the matter of State Farm vs. Medical Wellness Services**

By way of introduction, my name is Nicholas Suite. I am a board-certified neurologist in clinical practice in South Florida for the past 27 years. I was educated at the Johns Hopkins university in Baltimore Maryland where I received both my undergraduate and medical degrees. I was trained at the New York Hospital Weill-Cornell Medical Center, Memorial Sloan Kettering Cancer Center, and the Hospital for Special Surgery in both Internal Medicine and Neurology. Upon completion of that extensive training, I did an additional year of teaching and training at the University of Miami school of medicine. Upon completion of that year, I opened my own clinical practice.

For the past 24 years, my practice has concentrated on clinical Neurology and Neuro-rehabilitation. I see patients who are very similar in terms of their histories and physical examinations to those patients whose records have been studied in preparation for today's report and opinions. My practice focuses on the diagnosis and care of patients who are injured in various traumatic incidents including car accidents, slip and fall accidents, and sports injuries. These are areas of concern which I focus on and include, but are not limited to traumatic brain injury, traumatic spinal injury, and traumatic nerve injury. In addition, the patients that I see also complain of diffuse aches and pains in the neck and back, typically as a consequence of some type of physical injury, such as a car accident.

I have been specifically retained by Mr. Richard Diaz, of the law firm of Richard Diaz to review medical records from the Medical Wellness Services.

The purpose of my involvement as a retained expert is to study and analyze the medical records generated by the Medical Wellness Services on approximately 38 patients whose care and treatment have been called into question by the plaintiff in this matter, State Farm Mutual Insurance company. I have been asked specifically to focus on the reasonableness, relatedness, and medical necessity of the care and treatment given to these patients in the context of the specific motor vehicle injuries that each patient sustained in the course of a road traffic accident.

It is my understanding as a practicing physician in South Florida for the past 27 years, that it is customary for all services that are billed to an insurance company must meet the typical standard which is that they must be considered medically necessary and reasonable. In order to determine whether a service is reasonable and necessary, each patient receiving such services must have

their unique medical condition carefully assessed in light of the medical record documentation as well as the plan of care and any investigations that lead to a determination of outcome and prognosis. This structure provides the basis for such the terminations as to reasonableness, relatedness, and medical necessity. It is incumbent upon the insurer, to base their coverage decisions upon the subjective and objective clinical evidence of the patient's individual need for care. Therefore, the medical records must be considered carefully in the context of such decisions and decision making.

In preparation for this summary report, I have reviewed the following medical records:

1. Deposition of Jesus Lorites MD
2. Clinic analysis summaries
3. Deposition of Hugo Goldstraj MD
4. Plaintiff's expert reports from Mark Rubenstein MD
5. SF Corporate representative, deposition and exhibits

Additionally, forty Medical Wellness Clinic records were received and 10 were randomly selected for detailed study while the rest were reviewed in a more focused and concise manner.

The forty documents comprise thirty-nine patient care records and one index. These are listed below:

A[redacted], M[redacted].pdf*
A[redacted], D[redacted]pdf
A[redacted], J[redacted].pdf*
A[redacted], A[redacted].pdf
B[redacted], D[redacted].pdf*
C[redacted], J[redacted].pdf
C[redacted], L[redacted].pdf
Client Index.xlsx
D[redacted], V[redacted].pdf*
E[redacted] D[redacted].pdf
E[redacted], I[redacted] (File 1).pdf*
E[redacted], I[redacted] (File 2).pdf*
F[redacted], Y[redacted].pdf
F[redacted], L[redacted] Y.pdf*
F[redacted], L[redacted].pdf*
F[redacted], M[redacted].pdf
G[redacted], B[redacted].pdf*
G[redacted], J[redacted].pdf
G[redacted], J[redacted].pdf
G[redacted], M[redacted].pdf
H[redacted], R[redacted].pdf*
H[redacted], J[redacted].pdf
H[redacted], J[redacted].pdf
H[redacted], D[redacted].pdf



The 15 that were selected are both starred and highlighted in yellow.

I have also relied upon my own education, training, and experience in caring for and managing patients very similar to the ones who have been the subject of this matter. I am therefore very familiar with the methodologies utilized in the care and treatment of such patients following this type of accident injury.

In terms of an important aspect of the evaluation and care of patients injured in motor vehicle accidents, the majority of these patients suffer sprains and strains of the neck and back, typically in the setting of pre-existing degenerative spine disease. The degenerative spine disease may be asymptomatic prior to the injury but the accident frequently causes either an exacerbation or aggravation of the underlying degenerative change, producing symptoms consistent with a cervical sprain or lumbar sprain type injury. Review of hospital emergency room records indicate that the majority of these patients who present themselves for emergency assessment will have x-rays and or CT scans as well as a physical examination. This is a realistic expectation on the part of the patient and also a typical scenario on the part of the emergency room provider. It is reflective of the standard of care and not reflective of a preconceived plot on the part of the emergency room provider to simply rubber stamp and enforce some type of covertly planned or orchestrated standard care and evaluation. Rather the approach to the patient constitutes standard procedure for the evaluation of thousands of patients who are injured in a similar fashion. There is no covert guile or dishonesty in play when patients injured (by similar mechanisms) are assessed and treated in a similar fashion, anywhere in the vast expanse of the healthcare system, be it at a hospital or outpatient clinic setting. With this in mind, it is appropriate to review some of the highlighted medical records.

I have been asked to review these records to assess the reasonableness, relatedness, and medical necessity of the care and treatment provided to these patients by the medical wellness clinic.

The records of M[redacted] A[redacted] DOB [redacted]/1955 commence with her initial evaluation at Medical Wellness on September 16, 2014. At that time, she reported that she was injured in a motor vehicle accident That took place on September 9, 2014. She reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulders, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges, and below hospital averages.

The records of J[redacted] A[redacted] DOB [redacted]/1960 commence with his initial evaluation at Medical Wellness on February 18, 2015. At that time, he reported that he was injured in a motor vehicle accident that took place on February 9, 2015. He reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulders, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges and below hospital averages.

The records of D[redacted] B[redacted] DOB [redacted]/1985 commence with his initial evaluation at Medical Wellness on September 22, 2015. At that time, he reported that he was injured in a motor vehicle accident that took place on September 16, 2015. He reported pain in the neck, shoulders, back, hips, and both knees and calves with difficulty walking. He reported pain in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulders, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges and below hospital averages.

The records of V[redacted] D[redacted] DOB [redacted]/1995 commence with her initial evaluation at Medical Wellness on September 12, 2016. At that time, she reported that she was injured in a motor vehicle accident that took place on August 31, 2016. She reported pain in the neck,

shoulders, back, and the left knee. Also, in the paraspinal region there were multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, left knee tendonitis, and iliosacral sprain strain. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of I[REDACTED] E[REDACTED] DOB [REDACTED]/1975 commence with her initial evaluation at Medical Wellness on April 22, 2015. At that time, she reported that she was injured in a motor vehicle accident that took place on April 20, 2015. She reported pain in the neck, shoulders, Back, and in the paraspinal region with multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulders, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of L[REDACTED] F[REDACTED] DOB [REDACTED]/1965 commence with his initial evaluation at Medical Wellness on June 6, 2015. At that time, he reported that he was injured in a motor vehicle accident that took place on May 31, 2015. He reported pain in the neck, shoulders, left arm numbness, back pain, hip pain and pain in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of L[REDACTED] Y. F[REDACTED] DOB [REDACTED]/1994 commence with his initial evaluation at Medical Wellness on June 3, 2015. At that time, he reported that he was injured in a motor vehicle accident that took place on May 31, 2015. He reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy

interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of B█ G█ DOB █/1963 commence with her initial evaluation at Medical Wellness on November 29, 2012. At that time, she reported that she was injured in a motor vehicle accident That took place on November 24, 2012. She reported pain in the neck, shoulders, back, knees and ankles, and in the paraspinal region with multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bilateral shoulder sprain strain, lumbosacral sprain strain, lumbar radiculopathy, right ankle sprain strain, and right leg contusion. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. MRI imaging was ordered. These were recorded in the intake and subsequent reports. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of R█ H█ DOB █/1971 commence with his initial evaluation at Medical Wellness on April 29, 2015. At that time, he reported that he was injured in a motor vehicle accident That took place on April 26, 2015. He reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. MRI imaging was ordered. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of L█ J█ DOB █/1969 commence with his initial evaluation at Medical Wellness on March 22, 2013. At that time, he reported that he was injured in a motor vehicle accident that took place on March 16, 2013. He reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and left hip/iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature

is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of B L DOB /1984 commence with her initial evaluation at Medical Wellness on November 4, 2014. At that time, she reported that she was injured in a motor vehicle accident That took place on October 27, 2014. She reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of E M DOB /1993 commence with his initial evaluation at Medical Wellness on September 12, 2016. At that time, he reported that he was injured in a motor vehicle accident that took place on August 31, 2016. He reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, left knee tendonitis, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of R O DOB /1966 commence with his initial evaluation at Medical Wellness on July 22, 2015. At that time, he reported that he was injured in a motor vehicle accident that took place on July 15, 2015. He reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, cervical radiculopathy, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of M[redacted] P[redacted] DOB [redacted]/1975 commence with her initial evaluation at Medical Wellness on September 16, 2014. At that time, she reported that she was injured in a motor vehicle accident that took place on September 9, 2014. She reported pain in the neck, shoulders, back, and in the paraspinal region with multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of V[redacted] R[redacted] DOB commence with his initial evaluation at Medical Wellness on February 13, 2012. At that time, he reported that he was injured in a motor vehicle accident that took place on February 3, 2012. He reported pain in the neck, shoulders, back, left hip, and in the paraspinal region with multiple trigger points noted on examination. He was also found to have some decreased range of motion in the shoulders. He was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, and iliosacral sprain strain. Based upon these exam findings he was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. A compulsory medical examination was also performed and the report by Dr. Stuart Jacobs was reviewed. It appears that Dr. Jacobs sanctioned the findings of Medical Wellness' providers. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

The records of B[redacted] V[redacted] R[redacted] DOB [redacted]/1959 commence with her initial evaluation at Medical Wellness on December 9, 2015. At that time, she reported that she was injured in a motor vehicle accident that took place on November 30, 2015. She reported pain in the neck, shoulders, back, both knees, and in the paraspinal region with multiple trigger points noted on examination. She was also found to have some decreased range of motion in the shoulders. She was diagnosed as having cervical sprain strain, bicipital tendonitis in the shoulder, lumbosacral sprain strain, bilateral knee tendonitis and iliosacral sprain strain. Based upon these exam findings she was prescribed a combination of physical therapy interventions including passive and active approaches. These were recorded in the intake report. Subsequent physical therapy notes were reviewed and they appeared to indicate that the therapies were delivered on the days indicated on the therapy record sheets. The patient signature is noted at the bottom of each therapy page. Additionally, in the records reviewed, it appears that this patient signed for treatments that were not received, according to her testimony and this will be commented upon later in this report. The billing is also reviewed and it appears that the costs of the therapies as well as the x-rays performed are within community ranges but below hospital averages.

A *verbatim* excerpt from the report of opposing expert, Dr. Marc Rubenstein, on behalf of State Farm is included below in italics in the body of my report in order that I may comment on it both now and at the time of my upcoming deposition:

*1. Medical records are frequently unreliable, generic, and nonspecific. For example, the file of [redacted] [redacted] suggests diagnoses of cervical, thoracic, and lumbar sprain with bilateral shoulder sprains. The file of [redacted] [redacted] is consistent with many of the other patients of Dr. Ocampo. Dr. Ocampo will often claim that the shoulder has "80% AROM" at the initial visit. This is typical for any time the shoulder is implicated in his patients. Diagnoses like many of the other Dr. Ocampo patients include cervical sprain/strain, bicipital tendinitis RL, lumbar sprain/strain, and "ileosacral S/S." Additionally, many files such as the one of [redacted] [redacted] describe "whole spine pain." This reviewer notes that shoulder range of motion should be listed by degrees in unique positions, and every patient may have a different normal* ***range. For example****, abduction and flexion are usually recorded in a number of degrees. Internal and* ***external r****otation would be separately reported by degrees, though internal rotation can occasionally be* ***done by anato****mic landmarks. The files of Medical Wellness never delineate the specific range of motion to this degree, but generically indicated as a percentage rather than an absolute amount. A percentage can only be compared to a previous point in time, not to normal. Furthermore, diagnoses such as bicipital tendinitis do not occur after uncomplicated motor vehicle accidents since bicipital tendinitis is a result of overuse and improper mechanics, not isolated allegedly traumatic events.*

*2. Excessive treatment and implausible diagnoses for patients who did not even report any injury at the accident scene are found. It is not medically credible that a patient would develop later-onset soft tissue complaints that would justify protracted or excessive courses of modality-oriented therapy. If there was no injury at an accident scene, a patient would not subsequently likely develop severe spasm throughout the entire spinal axis. Additionally, it is highly unlikely that the thoracic spine would be injured in a properly restrained patient involved in a minimal-impact motor vehicle accident.*

*3. Templates for the exam and diagnoses are frequently utilized. See the file of [redacted] [redacted]. The physician describes improved pain yet the therapist on the template continues to allege complaints. The therapist is administering traction to this 26-year-old female despite lack of any order by the physician to do so. The therapist also appeared to follow a protocol rather than base treatment on objective findings.*

*file of [redacted] [redacted] shows that the physician claims "whole spine pain" and shoulder pain. The therapist employs traction despite lack of order and lack of objective correlation. Templates are not individualized, not plausible, and not at all encompassing of what would occur after a traumatic accident.*

*4. Diagnoses are markedly similar from patient to patient and simply circled on a template. Bicipital tendinitis bilaterally is found in most patients, which would be highly unlikely if not implausible after a motor vehicle collision.*

*7/28/2019* ***MISC*** *Page 2 of 5*

*5. Templates for modality orders are used rather than individualized prescription, and most of the time nearly every modality is circled rather than individualized treatment. Template-driven protocols or care fail to take into consideration the uniqueness or individuality of the diagnoses of a problem. Therapeutic templates risk billing for services that did not take place or where a*

*therapist nonqualified to do so administers treatment. Templates often rely on medically unnecessary services for the purpose of generating insurance payments. Exam templates and diagnoses (such as bicipital tendinitis diagnosis) is **essentia**lly falsifying a patient's diagnosis to attempt to justify intervention or modalities that may not be medically necessary. In the current age of electronic records, templates are used for billing purposes more so than reliably documenting the objective pathology. The templates used at the time the patients were seen did not appear to be unique and did not appear to have any individualized true objective assessments. They appeared to be rather generic **similar assessme**nts in an attempt to justify modality therapy. For an example of a file containing templates, see M████ R████ in my review of same.*

*6. Essentially no **treatment alternatives** other than modality-oriented therapy were offered to these patients. For example, see the file of E████ L████, a 75-year-old allegedly with "whole spine pain" **where cervical, thoracic, and lumbar traction were a**llegedly provided, modalities that could have significant risk to a patient at that age. Also inconsistencies on the same day of services such as 11/04/2010 where Dr. Carrasco claims full recovery with resolution of pain, and the therapist notes "frequent pain" show the inconsistencies. Additional files showing only modality-oriented therapy include J████ L████ and A████ L████ among many others.*

*7. Nearly every patient of Dr. Ocampo allegedly had "acute persistent painful muscle spasms with multiple trigger pain points limiting normal ADL's/AROM." Also, he would list "5/10 AROM of strength" in the cervical, thoracic, and lumbar spine, which is not an accepted reporting measure. Examples of this include the file of D████ L████ where there was no objective documentation that the patient had injuries, and the physical exam was simply not plausible. The file of I████ L████ is similar. The file of B████ L████ showed a minimal impact parking lot accident in a 30-year-old individual with no injuries at the scene, and yet developed the same alleged spasms and range of motion deficits.*

*8. Nearly every patient of Dr. Ocampo had shoulder range of motion listed initially at the visit of 80% without discrete true measurements made. See above.*

*9. Examples of patients that had allegedly not reached the point of maximum medical improvement and would need treatment for control of exacerbations were documented, yet this was only 1 day after the accident which would be implausible. One cannot forecast exacerbations if the patient had acute symptoms which could and should have been self-limited. For example, see the file of A████ A████.*

*10. Many patients records were incongruous and were simply a veiled attempt to justify therapy. See the file of E████ L████ where the therapist reports ongoing pain on the same day as the physician reports improvement. The file of C████ M████ shows an improbability that the therapist can claim severe neck, upper and midback, and lower back pain on the same day that Dr. Carrasco claims there is no pain and everything had resolved.*

*7/28/2019 **MISC Page 3 of 5***

*11. Cleary many records were invalid, such a multiple patients having 2/5 strength, which would be less than antigravity, yet have normal. gait. This is physiologically impossible. Gait requires greater than antigravity strength of the quadriceps, hamstrings, and tibialis anterior among other muscle groups. Less than antigravity strength, which is defined as 3/5, would be inconsistent with the ability to even stand independently without an assistive device. Clearly the records are falsified as a patient would not be able to ambulate if they truly had 2/5 strength. As mentioned, this is simply physiologically impossible. See the file of A████ A████.*

*12. Most patient's of Dr. Ocampo's are diagnosed with bicipital tendinitis bilaterally, cervical sprain,* ***ilios****acral sprain/strain, enthesopathy of the cervical and lumbar region. These multiple diagnoses are highly unlikely with the frequency recorded and, therefore, implausible. For example, see the file of L█ O█, a 24-year-old who allegedly developed left ankle and right wrist tendinitis as well as bicipital tendinitis, cervical and lumbosacral sprain/strains, and enthesopathy of the cervical and lumbar region. This is almost implausible after a motor vehicle accident or trauma. The file of R█* ***R█ shows diagnoses of cervical sprain/strain,*** *bicipital tendinitis RL, lumbosacral sprain/strain, "****ileosacra****l sprain/strain," and right and left knee tendinitis. This is a 22-year-old patient, and there are* ***inconsiste****ncies between what the therapist documented and the medical doctor. Additionally, there were no injuries to the scene of R█ R█, and the diagnoses are simply not plausible or likely.*

*13. Dr. Carrasco's patient's at this clinic clearly had "cycles" of treatment with implausible documentation by the therapist.*

*14. History and physical exams are often suboptimal and beneath the standard of care in terms of documenting a neurologic or musculoskeletal examination in an attempt to justify treatments.*

*15. Generic diagnoses are offered and often implausible diagnoses were provided as I have noted above. For example, see the file of A█ R█ where there were generic diagnoses not substantiated by the medical record. The file of A█ C█ R█ shows no reliable objective evidence that the patient had dysfunction warranting excessive,* ***extensiv****e, and protracted modality care. There was no basis to support even a diagnosis of cervical, thoracic, or lumbar sprain/strain. There was no documentation in the file of Ms. R█ to confirin the patient was even in the vehicle allegedly involved in the accident.*

*16. There are gross inconsistencies between physician findings and therapist findings on the same days of service rendering multiple records invalid.*

*17. Many examples of grossly over exaggerated and implausible findings are appreciated. For example, there was a 19-year-old patient who had a police officer at the scene with no injuries documented at the time of the accident, yet allegedly 2 days later when they presented to the clinic had severe pain in the cervical, thoracic, and lumbar spine as well as right hand, right wrist, and right shoulder despite no objective correlation ever documented by the physician. No detailed exam or detailed history other than template-driven forms were documented. For example, see the file of R█ S█ where inconsistencies even in the intake information as to where the patient actually was in the vehicle are 7/28/2019 MISC :* ***Page 4 of 5 noted. There were im****plausible diagnoses such as "sprain of humerus," and generic diagnoses with abnormal radiologic findings unrelated to the injury that were never addressed by the treating physician. A sprain of a humerus cannot occur as a humerus is a bone. Sprain would occur of soft tissues and not of a bone. Furthermore, abnormal radiologic tests require discussion with the patient. If the tests ordered are not being reviewed then there is no basis of obtaining same. It is also noted that Mr.* ***S█ h****ad no injuries at the scene rendering the findings highly unlikely. Another file example consistent with the premise is I█ L█. It is highly unlikely that a patient who had had absolutely no injuries or complaints at the scene on 08/06/2014 would have developed "acute, intense spasms" in the neck, shoulders, lower back, and hips"*
*[TIME: 16:18] by 08/13/2014. There were no true objective, reliable diagnostic studies that documented any acute injury. Templates of Dr. Ocampo's physical exam are strikingly similar to almost every other patient through this clinic that the physician saw at the same clinic. It is highly unlikely that the documented findings were reliable, and even more so almost implausible that the patient would have developed the type of pathology alleged such as bilateral bicipital*

*tendinitis. Additionally, the file of D R shows inconsistencies between the therapist and physician notes such as on 03/07/2012. There was a sideswipe collision at minimal speed with no injuries at the scene. It is not plausible that the patient would have developed severe pain,* ***tendemess, and spasm with reduction in motion of the cervical, th****oracic, and lumbar spine as well as wrist and shoulders.*

*18. Mechanical traction was allegedly performed by nonqualified individuals.*

*19. Therapist credentials are not listed, but a licensed physical therapist would be required to perform neuromuscular re-education with balance, posture, and coordination. It does not appear that a licensed physical therapist was at the clinic.*

*20. Legitimate medical practices would not be expected to diagnose more than 90% of motor vehicle accident victims with cervical, thoracic, and lumbar sprain/strain syndromes. Legitimate medical* ***practices wou****ld not be expected to diagnose extremity pain related to motor vehicle accident in absence of any true, reliable, objective evidence.*

*21. Radiographic studies should be ordered and performed when there is clinical suspicion of fracture or other osseous abnormality. A diagnosis of strain or sprain does not justify unnecessary exposure to radiation, Legitimate practitioners and practices would not order radiographs on more than 90% of their patients without proper indications and a plan for utilizing said testing to guide treatment. The excessive use of radiographic studies and billing therein is simply not credible.*

*22. Legitimate medical practices would not subject patients to "cycles" or protocols of therapeutic intervention, as care should be individualized to each patient. Practices where more than 90% of patients receive the same "cycles" of therapeutic modalities that are not individualized to the patient would not be credible.*

*23. I would expect a medical director at each clinic to detect or identify deficiencies during their required systematic reviews or the records and billing therein.*

**COMMENT:**

First of all, based upon my review of 15 exemplars taken from the records of Medical Wellness, it appears that all of these patients that have been reviewed were involved in motor vehicle accidents. Some of the accidents were front impact, some were side impact, and some were rear impact. In all cases, the patients reported complaints that were very similar. This in and of itself ought not to raise suspicion on the part of the responsible carrier. Rather, the documentation generated by the clinic in question, is the vessel through which the clinical information is channeled so that treatment may then begin. It is no secret amongst physicians who evaluate patients in car accidents that the complaints are quite similar from patient to patient. This is evident throughout the records. The evaluations are also quite similar and if the emergency rooms in South Florida were to be audited, the data would also likely reveal that most patients involved in a car accident that present to an Emergency room would be evaluated in a similar fashion and have x-rays and probably CT scans immediately. Furthermore, the diagnosis sheets that they would be given to take-home would also reflect the same diagnosis as those of the Medical Wellness clinic. These are just the plain facts regarding the care and treatment of this population of patients. There are exceptions within this population of Medical Wellness patients and among them there are individuals who required MRI studies of the cervical and lumbar spine. There are also individuals that needed to have different types of treatment for involved body parts. The average accident patient however is reflected in these records and in my opinion,

within a reasonable degree of medical probability, there is no cause for concern as far as the way in which these patients were evaluated and subsequently treated.

That said however, the comments of Dr. Rubinstein are noted and so are his concerns. The medical doctor evaluating these types of patients is in the best position to make diagnoses on these patients. These majority of these patients have not had the benefit of a second opinion or compulsory medical examination but certainly in the case of V[redacted] R[redacted], there was such an examination and the physician (Dr. Stuart Jacobs) found similar findings to the physician at Medical Wellness.

The use of templates is widespread and well accepted at every level of healthcare delivery including hospitals, clinics, and outpatient surgery centers. The criticism of Dr. Rubenstein regarding templates is difficult to validate because of the Federal requirements regarding electronic health records (EHR).

Additionally, there are inexplicable inconsistencies in some charts as noted by Dr. Rubenstein such as the registration of two out of five strength. Ambulation and even minimal use of a limb that possesses two out of five strength is impossible physiologically.

Finally, there is documentation from the record and testimony of B[redacted] V[redacted] R[redacted] in which she admits that she signed paperwork indicating that she received therapy which she did not receive. This is unacceptable and cannot be defended.

To summarize, it is my opinion within a reasonable degree of medical probability that the care and treatment received by the majority of patients at the Medical Wellness Clinic, as noted in the exemplars which I reviewed (except for B[redacted] V[redacted] R[redacted]) were reasonable, related and necessary as they pertained to the respective accidents that prompted such evaluation and treatment.

Nicholas D.A. Suite *(Electronically signed to avoid delay)*

___________________________

Nicholas D. A. Suite M.D.
Board-certified Neurologist